**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| THABID, et al<br>    Petitioners | ) ) ) | |
| v. | ) ) | Civil Action No. 05-2398 |
| GEORGE W. BUSH, et al,<br>    Respondents | ) ) ) | |
| AL YAFIE, et al,<br>    Petitioners | ) ) ) | |
| v. | ) ) | Civil Action No. 05-2399 |
| GEORGE W. BUSH, et al,<br>    Respondents | ) ) ) | |

**PETITIONERS' REPLY IN SUPPORT OF
MOTIONS FOR 30-DAYS NOTICE OF TRANSFER**

Petitioners' request for equitable relief asks simply for 30 days' notice, to their attorneys and to this Court, before Respondents dispatch any of the Petitioners to a country outside the jurisdiction of this Court. Based on Respondents' Opposition brief ("Opp'n"), the countries that Respondents believe are appropriate destinations for transfer actually pose for Petitioners a considerable risk of torture, arbitrary detention, and possibly extra-judicial execution. Petitioners are foreign nationals seeking habeas relief; they are litigants properly before this Court. Petitioners' equitable motion requires only a minimal administrative effort by Respondents which will help protect the Court's jurisdiction, preserve Petitioners' Constitutional rights before this Court, and possibly save Petitioners from grave danger. Balancing Respondents' minimal

administrative obligation against the forfeit of this Court's jurisdiction and Petitioners' Constitutional rights, and the distinct possibility of torture, the equities clearly lean in favor of granting Petitioners' Motion for 30-days Notice.

ADDITIONAL BACKGROUND

Two of the Petitioners are Yemeni. Two Petitioners are Uighurs. Uighurs are a distinct ethnic group who reside in the far western region of China, whose culture and religion are Muslim. They continue to honor their culture and religion despite official and unofficial Chinese government repression that has gone so far as to include extra-judicial execution.[1]

Respondents' Opposition brief states that, if and when Respondents decide to release Petitioners from indefinite custody, Respondents will most likely ship them off to their countries of citizenship, respectively Yemen and China. (Opp'n at 5, Waxman Decl. ¶ 3; Prosper Decl. ¶ 3) The Yemeni Petitioners were not in Yemen when they were abducted. The Uighur Chinese Petitioners were not in China when they were abducted.[2] Yemen and China are both well-known to routinely inflict arbitrary, indefinite detention and torture on persons in custody, for "offenses" such as non-state-approved religious practice or any expression of political dissent. (*See* U.S. Department of State Country Reports, Yemen 2004; China 2004.)

Uighurs are foremost among the groups accused and persecuted by Chinese authorities for having "separatist" – i.e. politically dissident – tendencies. (U.S. State Department, China

---

[1] "The situation for the indigenous peoples of Xinjiang [Uighurs] is unprecedented in its severity, surpassing even the repressive policies facing the Tibetans.. . . . The state has conflated the practice of Islam with separatist activity and completely overreacted in its illegally prohibiting almost all forms of Islamic education and public religious practice. Large numbers of Muslims in Xinjiang have been thrown in jail and sentenced without public trial. And an untold number have been executed for accused political crimes." U.S. Congressional-Executive Commission on China, Testimony of Dr. Jacqueline Armijo, Stanford University, July 24, 2003; (http://www.cecc.gov/pages/hearings/072403/armijo.php).

[2] The Yemeni Petitioners were reportedly abducted in Afghanistan. The Uighur Petitioners were reportedly kidnapped by a tribal warlord in Pakistan and transported to Afghanistan before they were turned over to U.S. forces. (personal communication, December 09, 2005) Some authorities believe this may have had something to do with the enormous cash bounties that U.S. security officials offered to Afghan tribal warlords for each "enemy fighter" they could deliver. (*See Associated Press*, n.8 below)

2004, *and see* Testimony of Dr. Jacqueline Armijo, *supra n. 1*)  This is considered a potential

capital offense in China, and extra-judicial killing is a distinct possibility as administration of the

death penalty in China lacks any semblance of due process.  (*Id.*)   Any Uighurs such as

Petitioners, suspected of "separatist tendencies," who are delivered into the control of Chinese

authorities face a high probability of arbitrary detention, torture, and possibly execution on

political grounds.  (*See* Amnesty International, *Fear of forcible return/torture/execution*;

http://web.amnesty.org/library/Index/ENGAMR510902004.)

The Yemeni Petitioners may fare no better.  According to the U.S. State Department,

minor officials in Yemen arbitrarily detain, incarcerate, and torture citizens. (U.S. State

Department, Yemen 2004)  Corruption is rampant and officials extract bribes for the favor of

humane treatment. *Id.* The Yemeni government itself acknowledges that it is unable to deter the

torture of detainees by its own officials. *Id.* "Overly devout" religious adherents have been

incarcerated indefinitely without charges and without even a semblance of due process. *Id.*

Yemeni law still allows punitive amputation. *Id.*

Both Yemen and China are parties to the UN Convention Against Torture.[3]  Officially,

the "Chinese government attaches great importance to the implementation of the United Nations

Convention Against Torture and has fulfilled its relevant obligations."[4]   Officially, Yemen

submits annual reports on its human rights progress.  Unofficially, both Yemen and China

continue to tolerate and practice the worst sorts of human rights abuses. (U.S. State Department,

Yemen 2004, *supra* ("the [Yemeni] government acknowledged publicly that torture occurred;

---

[3] United Nations, Report of the Secretary-General:  Status of the Convention against Torture and Other
Cruel, Inhuman or Degrading Treatment or Punishment
http://www.un.org/documents/ga/docs/53/plenary/a53-253.htm; visited January 25, 2006
[4] China People's Daily online; "*China Fulfills Obligations Under U.N. Convention Against
Torture*;" http://english.people.com.cn/english/200005/05/eng20000505_40220.html, visited
January 25, 2006.

however, it claimed that torture was not official policy. . . . The law prohibits arbitrary arrest and detention; however, the Government generally did not observe these prohibitions. There were reports that the CID routinely used torture in order to obtain confessions."))

Torture and arbitrary detention are carried out indiscriminately in both these countries, often at the initiative of local officials, regardless of the official government policy or treaties to which the country subscribes. To deliver Petitioners into the custody of Yemeni or Chinese officials, after having at one time announced that simply by virtue of being detained at Guantanamo they were the "worst of the worst,"[5] may pronounce a death sentence on Petitioners despite any high-level official assurances to the contrary.

Respondents' brief acknowledges by implication that large numbers of the Guantanamo detainees never posed any threat to the U.S. but were incarcerated for years at Guantanamo by mistake. (Waxman Decl. at 4).[6] U.S. security forces in Afghanistan paid cash bounties, up to $5000 – five to ten times the local per capita annual income[7] – to the tribal warlords to hand over "enemy fighters."[8] In view of the enormous cash incentives, the warlords' process for distinguishing between innocent strangers and "enemy fighters" apparently was not a rigorous one – ergo the large numbers of detainees the U.S. has already transferred for release who were almost certainly transported to Guantanamo in the mistaken belief they were enemy fighters.[9]

---

[5] Jamestown Foundation, *Who's Who at Guantanamo Bay*, 9/27/2004, quoting Secretary of Defense Donald Rumsfeld, January 28, 2002; http://www.jamestown.org/news_details.php?news_id=69#

[6] Petitioners note that Former Deputy Assistant Secretary Waxman refers to all detainees as "these enemy combatants." It is now known, of course, that many of the detainees at Guantanamo were nothing of the sort. *See* Note 2, *supra*, Notes 7, 8, *infra*.

[7] United Nations Office for Coordination of Humanitarian Affairs, IRIN News; http://www.irinnews.org/report.asp?ReportID=34261&SelectRegion=Central_Asia&SelectCountry=AFG HANISTAN; visited January 26, 2005.

[8] Associated Press: *U.S. Paid Bounty for Capture of Detainees*, May 31, 2005.

[9] Logically, the incentives were stronger for warlords to collect their bounties by delivering non-combatants than they were for delivering actual "enemy fighters." Turning over actual Taliban or al Qaeda fighters to the U.S. forces could result in reprisals against the warlords; turning over itinerant, non-violent foreigners carried no such risk. One of the released innocent detainees, a farmer from

Respondents acknowledge that "transfer for release" does not guarantee that such detainee actually will be released upon his arrival in the destination country. (Waxman Decl. ¶ 5). Respondents disclose that 180 detainees were transferred "for release," but, significantly, do not specify what actually happened to these detainees. (Opp'n at 5, n5).

## ARGUMENT

**I.    THE BALANCING TEST FOR INJUNCTIVE RELIEF IS A FLEXIBLE ONE THAT TAKES INTO ACCOUNT THE NATURE OF THE RELIEF SOUGHT.**

In considering Petitioners' request for preliminary injunctive relief, the Court considers four factors: (1) whether Petitioners would suffer irreparable injury if an injunction were not granted; (2) whether Petitioners have a substantial likelihood of success on the merits; (3) whether an injunction would substantially injure other interested parties; and (4) whether the grant of an injunction would further the public interest. *Al-Joudi v. Bush,* No. 05-CV-301, 2005 U.S. Dist. LEXIS 6265 at *9-10 (D.D.C. April 4, 2005).

Petitioners need not show that they overwhelmingly prevail on every one of these factors; rather, these factors interrelate on a sliding scale and must be balanced against each other. *Serono Lab. v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998). If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are weak. *City Fed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995), *and see generally* 11 C. Wright & A. Miller, Federal Practice and Procedure § 2948 (1973). When the balance of hardships tips decidedly toward the movant, it will ordinarily be enough that the movant "has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation."

---

Afghanistan, reported that nearly all the detainees at Guantanamo came from Afghan bounty hunters. New York Times, June 21, 2004; http://select.nytimes.com/search/restricted/article?res=F30E11FD395D0C728EDDAF0894DC404482

*Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977) (internal citations omitted). An order maintaining the status quo is therefore appropriate "when a serious legal question is presented, when little if any harm will befall other interested persons or the public and when denial of the order would inflict irreparable injury on the movant." *Id.* at 844.

Respondents argue for a much harsher test in this Circuit, but cite to cases bearing little or no relation to the instant matter. In the first case Respondents cite, *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997), the Court overturned an injunction that prohibited the state of Montana from enforcing a law limiting the practice of abortion to licensed physicians – a remedy that the Court found not only extraordinary but unnecessary, in that the law posed no substantial obstacle to women seeking abortion. It is not clear how this ruling informs the present case. Shipping Petitioners into the custody of countries with little or no human rights guarantees, thousands of miles away from the Court's jurisdiction, with no notice to Petitioners' counsel or the Court, would likely pose a very substantial obstacle to the habeas relief Petitioners seek.

In the second case cited by Respondents, *Cobell v. Norton*, 391 F.3d 251 (D.C. Cir. 2004), the preliminary injunction sought "required disconnection of substantially all of the Department of the Interior's computer systems from the Internet," which would certainly qualify as an extraordinary remedy. Yet, even in that case, this Court found that injunctive relief might well be justified but vacated the injunction because of procedural errors in the court below. *Id.* Neither of these cases is particularly helpful here where the injunctive relief at issue is simply 30 days' notice of any impending transfer.

The third case Respondents cite, *Wisconsin Gas Co. v. Federal Energy Regulatory Com.*, 758 F.2d 669 (D.C. Cir. 1985), also is unpersuasive; if anything, the equitable test set forth in

that case argues in favor of the relief Petitioners seek.  In *Wisconsin Gas*, this Court held that because the anticipated injury was only a recoverable economic loss of prepayments that the movants could easily recover if they did occur, this possible injury did not warrant the issuance of a stay to U.S. Federal Energy Regulatory Commission regulations.  *Id*.  In marked contrast, Petitioners here anticipate possible indefinite detention, torture, and potentially loss of life if they are dispatched to the repressive regimes Respondents indicate are their most likely destinations. These are clearly not "easily remedied" economic losses. The equitable analysis described in *Wisconsin Gas*, when applied to the types of injuries these Petitioners face, would argue in favor of granting Petitioners' request for advance notice.

## II.   THE BALANCING FACTORS WEIGH CLEARLY IN FAVOR OF GRANTING PRELIMINARY RELIEF.

### A.   Petitioners demonstrate a clear probability of irreparable injury.

Irreparable harm to the moving party is the basis of injunctive relief in the federal courts. *City Fed Fin. Corp.*, 58 F.3d at 747 (*quoting Sampson v. Murray*, 415 U.S. 61, 88 (1974)). To obtain preliminary injunctive relief, Petitioners must show that the threatened injury is not merely remote and speculative. *Milk Indus. Found. v. Glickman*, 949 F. Supp. 882, 897 (D.D.C. 1996).

In this case, Petitioners face two distinct injuries that would each constitute irreparable harm if Petitioners' motions are not granted; neither of these is remote or speculative.  First, they face the possibility of transfer to a country where they might be indefinitely confined, tortured, or killed.  The second injury Petitioners face is the loss of their due process rights in this Court.

### 1. Indefinite detention, torture, and possible execution qualify as "irreparable harms."

Because it defies credibility for Respondents to try to argue that arbitrary detention, indefinite detention, and torture would not constitute irreparable injuries, Respondents choose a

7

straw-man target to attack instead. Respondents reinterpret Petitioners' Motion for them, claiming that the ultimate relief Petitioners seek is "obviously" only release from U.S. custody (Opp'n at 10) – and then argue that delivery from U.S. custody into some other country's custody realizes this goal. Respondents acknowledge in their brief that, even if it is the United States' intention and understanding that Petitioners are to be released, the receiving country may at its option renege on the agreement and put them in jail or take any "investigatory" action that it may deem appropriate instead. (Opp'n at 12)  Despite this, Respondents' argue that passing Petitioners from United States custody into the custody of some other country would moot Petitioners' habeas claims. (Opp'n at 11-12)  This argument is a non-starter.

The relief Petitioners seek with their habeas actions is not further indefinite incarceration and possible torture in Yemen, or China, or any other country to which Respondents decide to dispatch them. The relief Petitioners seek is, first, due process of law in the speedy and legitimate adjudication of any charges against them, and, second, their liberty. Their liberty, not simply delivery into detention under some repressive foreign regime, is the relief Petitioners seek.

Respondents argue that Petitioners engage in "rife speculation" that the United States will "defy its own policy" to bring about their torture. (Opp'n at 12) This is another straw-man argument. It is not defiance of U.S. policy that Petitioners are concerned about; rather, it is Respondents' announced plans to follow that imprecisely-outlined policy that puts Petitioners at risk.

The official United States policy as described by Respondents is preferentially to send detainees to their country of citizenship – in this case Yemen and China – or at Respondents' option to any other country that can provide "adequate assurances" of safety.  One of the things a

country can do to pass the "adequate assurance" test is to sign on to "certain treaties." (Prosper Decl. ¶ 6)

Both Yemen and China easily pass this test, as both are signatories to the U.N. Convention Against Torture. Yet even the U.S. State Department reports that these countries have deplorable records of human rights abuses, including torture and extra-judicial execution, inflicted on their citizens in detention. Yemen and China both officially prohibit torture. Yemen and China both unofficially practice, condone, and perpetrate torture. Torture may not be official policy in these countries, but torture is nevertheless practiced with shocking frequency. According to Respondents' described policy, it would be perfectly acceptable to send Petitioners to Yemen or to China because both countries would officially offer "adequate assurances." This ignores the very real possibility that Petitioners would be tortured or killed in either country.

Respondents' Opposition indicates that other detainees have already been transferred to countries that the U.S. State Department reports torture prisoners, including Pakistan, Saudi Arabia, and Morocco. (Waxman Decl. ¶ 4, *and see* State Department Country Reports on Human Rights Practices – 2004; http://www.state.gov/g/drl/rls/hrrpt/2004.) The threat of arbitrary detention and torture is therefore neither remote nor speculative; it is a serious potential harm.

## 2. Loss of this Court's jurisdiction and the forfeit of Petitioners' Due Process rights also constitute irreparable harms

Petitioners also face the threat of irreparable harm based on this Court's loss of jurisdiction and the consequent end to the possibility of adjudicating Petitioners habeas claims. This Court has previously found that it was unclear whether transferring similar petitioners would strip the Court of jurisdiction. *See Abdah v. Bush*, No. 04-CV-1254, 2005 U.S. Dist. LEXIS 4942 at *13, (D.D.C. March 29, 2005) (transfer to another country "would effectively extinguish [Petitioners'] habeas claims by fiat"); *but see Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28,

54 (D.D.C. 2004) (holding that an individual detained in Saudi Arabia could survive a motion to dismiss his habeas claim based on the theory of constructive custody).   Respondents, however, make clear their position that transfer of Petitioners from Guantanamo would immediately extinguish the Court's jurisdiction over the controversy. (Opp'n at 10–12) The Court need not reach this question at this point; it need only note that as a practical matter there is at least a significant danger that upon transfer of Petitioners to Yemen or China or any other country, Petitioners could remain in custody indefinitely, out of reach of this Court's ability to effectively adjudicate Petitioners' claims. *See Al-Joudi v. Bush*, 05-CV-301, 2005 U.S. Dist. LEXIS 6265, 12-14 (D.D.C. April 4, 2005), *citing Lee v. Reno*, 15 F. Supp. 2d 26, 32 (D.D.C. 1998).   This Court has found under these circumstances that this, too, "would certainly constitute a threat of irreparable harm," and that an order preserving the status quo is therefore appropriate. *Id*. This Court has found in other cases previously that petitioners in the same situation would sustain injury under this test by being denied the ability to pursue their established claims in U.S. courts. *See Abdah*, 2005 U.S. Dist. LEXIS 4144 at *13-14 ("Were the Petitioners to be transferred to the control of a foreign country, they would effectively lose their rights to pursue their habeas claims in this country. . . . While the Supreme Court has granted Petitioners a right of access to our court system, such a transfer would terminate that right, insofar as it sounds in *habeas corpus*, because U.S. courts would no longer have control over their warden.")[10]

    Protecting the Court's jurisdiction is a valid reason for injunctive relief.

    Contrary to Respondents' assertion that protection of the Court's jurisdiction "would not be an appropriate legal rationale" to require advance notice of transfer, many United States courts have held that protecting the court's jurisdiction is a legitimate reason for injunctive relief.

---

[10] The Court in *Abdah* granted a Temporary Restraining Order, followed by a preliminary injunction, prohibiting the transfer of Yemeni detainees from Guantanamo to any other country. *Id*.

*See, e.g. SEC v. Vision Communs.*, 315 U.S. App. D.C. 384, 74 F.3d 287, 291 (D.C. Cir. 1996) ("The Court has the authority to issue such an injunction pursuant to the All Writs Act, 28 U.S.C. § 1651(a), which "empowers a district court to issue injunctions to protect its jurisdiction."); *see also Abdah*, 2005 U.S. Dist. LEXIS 4144 at *12; *Abu Ali*, 350 F. Supp. 2d at 54 (*quoting Alabama Great S. R. Co. v. Thompson*, 200 U.S. 206, 218, 50 L. Ed. 441, 26 S. Ct. 161 (1906)) ("It is well-established that the federal courts may and should take such action as will defeat attempts to wrongfully deprive parties entitled to sue in the Federal courts for the protection of their rights in those tribunals.").

Furthermore, Respondents argument here is not only implausible but a dangerous one as well. If it were true, as Respondents argue, that moving a litigant from detention within a court's jurisdiction to another place of detention outside that court's jurisdiction would moot a pending habeas petition, then the Government could moot any habeas petition by periodically moving an illegally detained citizen from jurisdiction to jurisdiction, always staying one step ahead of the injunction. Such a construct is not compatible with the United States Constitution or basic common law habeas rights.

Petitioners have demonstrated the clear probability of irreparable harm, both in the form of harm to their persons and in the form of harm to the legal rights they have established in this Court. This factor therefore weighs heavily in favor of granting the injunctive relief they seek.

**B.    Petitioners are Likely to Succeed on the Merits**

Under the balancing of equities that is the rule for equitable relief, and especially given the minimally intrusive relief Petitioners seek – merely 30 days' notice before transfer – Petitioners need not demonstrate an inevitability or "mathematical probability of success." *Washington Metro. Area Transit Comm'n*, 559 F.2d at 844. Rather, "if the questions raised are so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation" it will

ordinarily be adequate justification for the court to provide equitable relief maintaining the status quo. *Id.* (*quoting Hamilton Watch Co.*, 206 F.2d at 740).

Respondents argue that Petitioners cannot legally challenge their <u>transfer</u> from Guantanamo as opposed to their <u>detention</u> at Guantanamo (emphasis in original, Opp'n at 14). Respondents imply there is no existing legal precedent to such a challenge. (Opp'n at 14, "...even if a valid source of legal authority existed for an order prohibiting a <u>transfer</u> . . ." (emphasis in original)) and cite *Abdah*, 2005 WL 711814 at *4, 2005 U.S. Dist. LEXIS 4942 at *14-15 in support.

Respondents' argument here mis-states not only the object of Petitioners' motion but the law in this Circuit as well. In quoting the slip opinion Respondents' claim supports their position, the quote is truncated so as to appear to reverse the Court's actual holding. Respondents' quote in support of their opposition to an injunction, "<u>if</u> there are no circumstances under which Petitioners could obtain a court order preventing a contemplated transfer, a preliminary injunction should not be granted. (emphasis in original)." (Opp'n at 14, *citing Abdah, supra*)

The Court's actual holding in *Abdah* is just the opposite. The Court in *Abdah* held, "Respondents are correct that <u>if</u> there are no circumstances under which Petitioners could obtain a court order preventing a contemplated transfer, a preliminary injunction should not be granted. Respondents are wrong, however, in arguing that there are in fact no such circumstances present, and that consequently there is no legal basis for judicial involvement in transfer or repatriation decisions regarding Petitioners. To the contrary, transfer of Petitioners without notice and leave of court is forbidden by Fed. R.App. P. 23(a). . . . Petitioners thus demonstrate that they have a clear likelihood of success in blocking a transfer made absent notice to, and approval from, the

court." *Abdah, supra*, at *4, 2005 U.S. Dist. LEXIS 4942 at *14-15 (granting preliminary injunction for 30 days' advance notice).

Far from having no authority for injunctive relief inhibiting the transfer of detainees, Courts of the District of Columbia Circuit have found this authority many times over. *See, e.g.,* *Al-Shiry v. Bush*, No. 05-CV-0490, 2005 U.S. Dist. LEXIS 6636 (D.D.C. 2005) ("… it is hereby ORDERED that the respondents, their agents, servants, employees, confederates, and any persons acting in concert or participation with them, or having actual or implicit knowledge of this Order by personal service or otherwise, may not remove petitioner from the Guantanamo Bay Naval Base unless this court and counsel for petitioners receive thirty days' advance notice of such removal.") (emphasis in the original); *Al-Oshan v. Bush*, No. 05-CV-0520 2005 U.S. Dist. LEXIS 6635 at * 3-4 (D.D.C. 2005) (finding that transfer of petitioners from Guantanamo "would abuse the processes now put in place for the purpose of adjudicating matters on their merits. . . . Accordingly, the court cannot allow such a scenario to unfold;" and ordering "that the respondents, their agents, servants, employees, confederates, and any persons acting in concert or participation with them, or having actual or implicit knowledge of this Order by personal service or otherwise, may not remove the petitioners from GTMO unless this court and counsel for petitioners receive thirty days' advance notice of such removal;"); *Kurnaz v. Bush*, Nos. 04-CV-1135 and. 05-CV-0392, 2005 U.S. Dist. LEXIS 6560 (D.D.C. 2005) (granting limited preliminary injunction for 30 days' advance notice where ". . . several examples [of transfers from Guantanamo] offered by petitioners raise sufficiently serious concerns to justify the limited remedy of advance notice."); *Al-Marri v. Bush*, No. 04-CV-2035, 2005 U.S. Dist. LEXIS 6259, at *6 (D.D.C. Apr. 4, 2005) (ordering respondents to provide 30 days' notice of any transfer from Guantanamo). Other decisions in this Circuit may have come out differently, but

Respondents' claim that "No Valid Legal Basis Exists" for a judicial order enjoining transfer of detainees from Guantanamo is simply unsupportable. (*See* Opp'n at 15, emphasis in the original).

This Court has previously held, in response to other petitioners' motions seeking this same injunctive relief, that "[the] exact chances of success in this case are extremely difficult to assess. It is clear, however, that, at a minimum, Petitioners have raised fair ground[s] for litigation." *Al-Joudi*, 2005 U.S. Dist. LEXIS 6265 at *15-18, *citing Washington Metro. Area Transit Comm'n*, 559 F.2d at 844. As this Court found in *Al-Joudi*, the "issues raised in these motions are sensitive and involve complex constitutional questions. Indeed, there are areas of disagreement even among the judges on this Bench about the legal issues raised in these Petitions. Like the issues in *Hamdi v. Rumsfeld*, *Padilla v. Rumsfeld*, and *Rasul*, there is a strong probability that they ultimately will be resolved by the Supreme Court." *Id.* (internal citations omitted) This Court found, as it had previously, "even though the mathematical probability of success is impossible to assess, there can be no doubt that the questions raised here are so 'serious, substantial, difficult, and doubtful,' as to make them a 'fair ground for litigation'." *Id.* at *18 (internal citations omitted). Petitioners therefore have demonstrated that they can carry their burden with regard to this balancing factor.

### C.    The Harm to Respondents, If Any, Would be Minimal

Respondents contend that 30 days notice to Petitioners' counsel about a pending transfer will harm to its ability to conduct negotiations with foreign governments regarding the transfer and subsequent release of Guantanamo detainees, because such negotiations are often conducted in secret and divulging their details could impair their success.

Petitioners ask only for 30 days' notice of any pending transfer. As this Court has previously held, it is unlikely that there would be "any injury whatsoever that the Government would suffer from granting the requested preliminary injunction. Petitioners request only 30

days' notice of transfer -- a narrow and discrete request that would impose no burden on the Government. Beyond 'vague premonitions' that such relief would harm the executive's ability to conduct foreign policy, there is no concrete evidence that such notice actually will intrude upon executive authority." *Abdah*, 2005 U.S. Dist. LEXIS 4942 at *19, 2005 WL 711814 at *4. Granting Petitioners' request for 30 days' notice of transfer "would not require the Court to second-guess foreign policy decisions of the Executive, would not require the Government to divulge information relating to its negotiations with foreign governments, and would not prevent the Government from speaking with one voice." *Id.*, *see also Al-Joudi*, 2005 U.S. Dist. LEXIS 6265 at *18-20 ("[In] weighing the respective hardships imposed upon the parties, the balance clearly tilts in favor of Petitioners. The requested relief does not constitute even a minimal burden on the Government; at most, it would require the Government to file a few pieces of paper. Such a minimal consequence does not outweigh the imminent threats of indefinite detention, potential torture, and the elimination of Petitioners' claims before this Court.")

### D.      The Public Interest is Strongly in Favor of Protecting Constitutional Rights

The fourth balancing factor is that of the public interest in the relief Petitioners' seek. Fortunately, it is well established that the protection and vindication of Constitutional rights for one litigant is an outcome that is fully in the public interest. "The public interest undeniably is served by ensuring that Petitioners' constitutional rights can be adjudicated in an appropriate manner." *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) (holding that it is always in the public interest to protect the violation of a party's constitutional rights) *citing Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 383 (1979)).

Petitioners cannot vindicate the rights that the Supreme Court found were due them if they are being held incommunicado in a prison in Yemen or China. This Court's retaining

jurisdiction over this case is therefore essential to protecting the public interest. *See Al-Joudi, supra* at *20-21.

Respondents argue that the minimally intrusive relief requested would be contrary to the public interest, because it could somehow interfere with foreign policy and violate the separation of powers. This Court has previously held in this context that the Government's argument is "unpersuasive, however, for it simply conflates the public interest with [the Government's] own position. . . ." *Id.* at *20, *citing Abdah,* 2005 U.S. Dist. LEXIS 4942 at *21.

Although Respondents explore the law of extradition at some length, extradition is not at issue here and these cases do not control the instant inquiry. Respondents fail to note the crucial difference between these lines of cases and Petitioners' situation: extradition is a procedure of criminal law that involves a request from a foreign sovereign to the Executive of this country, for custody of an individual seeking protection in our country from formal criminal charges in the second country. Furthermore, extradition is a process that is already well-grounded in existing international law and treaty. Respondents, however, are in uncharted waters, far from existing international and domestic law. Petitioners are habeas litigants who have not been formally charged with any crime, who are already before an American court with established jurisdiction over their cases. Respondents, however, propose to take unilateral action that would deprive this Court of its jurisdiction over the person and the controversy. In this case, the "Rule of Non-Inquiry" is inapposite

Respondents also muster an argument that by their interpretation the Detainee Treatment Act of 2005 (DTA) should strip this Court of jurisdiction over litigation already properly commenced. In the wake of the enactment of the DTA, Respondents notified the Court that they intend to move to dismiss all such related cases. To date, however, Respondents have not filed

such a motion, and instead, are awaiting rulings from the U.S. Supreme Court in the *Hamdan* case and from the D.C. Circuit Court of Appeals in the *Al Odah* and *Boumediene* cases on the issue of the effect of the Act on the courts' subject matter jurisdiction. In the interim, there can be no doubt that the All Writs Act, 28 U.S.C. Section 1651(a), empowers a district court to issue injunctions to protect its jurisdiction. *See, e.g., SEC v. Vision Communications, Inc.*, 74 F.3d 287, 291 (D.C. Cir. 1996); *see also Abdah, supra*, (granting a preliminary injunction restraining the government from transferring Guantanamo detainee despite the existence of a stay ordered by coordinating judge). Plainly, this Court has jurisdiction to ensure that this case is not wrongly transferred out of its jurisdiction in the event that the Court of Appeals rejects the government's argument.

Finally, Respondents further claim that the proposed 30 days notice would somehow interfere with future Court of Appeals jurisdiction. Respondents do not state how, exactly, notice to this Court and Petitioners' attorneys could interfere with theoretical future jurisdiction of the Court of Appeals, but it is hard to imagine anything that would interfere with that Court's jurisdiction more fundamentally than removing Petitioners to some other country where, though guiltless, they may be detained indefinitely, tortured, or executed.

## CONCLUSION

If Petitioners have due process and habeas rights, which our Supreme Court holds that they do, *see Rasul v. Bush*, 542 US 466, 483 (2004), then surely those habeas rights include not only the right to challenge indefinite detention without charges, but also the right to challenge being shackled and blindfolded and forcibly shipped to a country where Petitioners could likely face arbitrary detention, torture, or extra-judicial execution.

Everyone, every group, every agency makes mistakes now and again. U.S. officials, convinced that a detainee was a terrorist, mistakenly shipped Mr. Maher Arar, a Syrian-born

Canadian engineer, to Syria. The 34-year-old engineer was tortured in a Syrian prison for over a year before the Syrian security forces concluded that he was not a terrorist, had no links to terrorists, did not sympathize with terrorists and had no knowledge about any terrorist activities. After over a year of physical and psychological torture and confinement under inhuman conditions, Maher Arar was repatriated to Canada. (Government of Canada, *Factfinder's Report, Commission of Inquiry into the Actions of Canadian Officials in Relation to Maher Arar*, October 27, 2005; http://www.ararcommission.ca/eng/ReleaseFinal_oct27.pdf.)

Petitioners are not claiming here that Respondents deliberately seek to have them tortured. But it is just as clear, based on U.S. State Department research and Respondents' own declarations, that once the U.S. ships them off to an unspecified country the U.S. no longer controls their fate and can provide no meaningful assurance even that they are unlikely to be tortured. And the most likely destinations for Petitioners, according to Respondents, are the countries in which Petitioners' lives would be at greatest risk.

Petitioners have requested only 30 days' notice of any transfer from Guantanamo, a concrete, narrow, and minimally burdensome remedy. Based on the four balancing factors, it is clear that Petitioners have satisfied their burden. They are faced with an imminent threat of serious harms, including arbitrary detention, torture, or extra-judicial execution, which far outweighs any conceivable burden this primarily administrative chore places on the Government. Furthermore, while it is not possible to demonstrate a "mathematical probability of success," on the ultimate merits of their case, the questions raised clearly are "serious, substantial, difficult and doubtful." *Washington Metro. Area Transit Comm'n*, 559 F.2d at 844. Finally, the public interest in preserving for Petitioners the ability to vindicate their Constitutional due process and habeas rights is very strong.

18

Therefore, for the foregoing reasons, Petitioners request that their Motion for an Order

Requiring Respondents to Provide Counsel for Petitioners and the Court with 30-Days' Advance

Notice of Any Intended Removal of Petitioners from Guantanamo should be granted.

Dated:       January 31st, 2006                    Respectfully submitted,

                                                   Counsel for Petitioners:

                                                   George Clarke
                                                   Bar No.: 480073
                                                   Baker & McKenzie LLP
                                                   815 Connecticut Avenue, NW
                                                   Washington, D.C. 20006-4078, US
                                                   Tel: 202 452 7000
                                                   Fax: 202 452 7074

                                                   David Kronenberg
                                                   Douglas Sanders
                                                   Eric Sievers
                                                   Baker & McKenzie LLP
                                                   130 East Randolph Drive
                                                   Chicago, Illinois 60601
                                                   Tel: 312 861 8000
                                                   Fax: 312 861 2899


                                                   _____/S/_____

                                                   *Of Counsel*
                                                   Barbara J. Olshansky (NY0057)
                                                   Director Counsel
                                                   Gitanjali S. Gutierrez (GG1234)
                                                   Tina Monshipour Foster (TF5556)
                                                   CENTER FOR CONSTITUTIONAL RIGHTS
                                                   666 Broadway, 7th Floor
                                                   New York, New York 10012
                                                   Tel: (212) 614-6439
                                                   Fax: (212) 614-6499

## CERTIFICATION OF REPRESENTATION WITHOUT COMPENSATION

Counsel for Petitioners hereby certify, pursuant to L. Cv. R. 83.2(g), that they are representing **Petitioners** without compensation.

Dated: January 31st, 2006                    _____/S/_____

George M. Clarke III
Baker & McKenzie LLP
815 Connecticut Avenue, NW
Washington, D.C. 20006-4078
Tel: 202 452 7000
Fax: 202 452 7074

## Certificate of Service

I hereby certify that a true and correct copy of the foregoing instrument has been served by Certified Mail, Return Receipt Requested, to the following persons:

**Kenneth L. Wainstein**
U.S. ATTORNEY
District of Columbia District
Judiciary Center
555 4th Street, NW
Washington, D.C.  20530

**Alberto R. Gonzales**
ATTORNEY GENERAL OF THE UNITED STATES
U.S. Department of Justice
Robert F. Kennedy Building
Tenth Street & Constitution Ave., NW
Room 5111
Washington, D.C.  20530

**George W. Bush**
PRESIDENT, UNITED STATES OF AMERICA
The White House
1600 Pennsylvania Avenue, NW
Washington, D.C.  20301-1000

**Donald Rumsfeld**
SECRETARY, U.S. DEP'T. OF DEFENSE
1000 Defense Pentagon
Washington, D.C.  20301-1000

**Army Brig. Gen. J. Hood**
COMMANDER, JOINT TASK FORCE-GTMO
JTF-GTMO
APO AE 09360

**Brig. Gen. Hood**
UNITED STATES ARMY
Army Pentagon
Washington, D.C.  20310-0200

**Army Col. Brice Gyurisko**
COMMANDER, JDOG
JTF-GTMO
APO AE 09360

**Army Col. Brice Gyurisko**
UNITED STATES ARMY
Army - Pentagon
Washington, D.C.  20310-0200

On this the 31st day of January, 2006.