**TAB 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                                 )
FAWZI KHALID ABDULLAH FAHAD       )
      AL ODAH, et al.             )
                                 )
            Plaintiffs,           )
                                 )
      v.                          )        Civil Action No. 02-CV-0828 (CKK)
                                 )
UNITED STATES OF AMERICA,         )
      et al.,                     )
                                 )
            Defendants.           )
_____ )
```

**RESPONSE TO COMPLAINT**
**IN ACCORDANCE WITH COURT'S ORDER OF JULY 25, 2004**

**INTRODUCTION**

On July 25, 2004, the Court ordered respondents to submit to the Court by noon on July

30, 2004, a filing setting forth proposed procedures with respect to access to counsel that the

government will apply to Guantanamo Bay detainees and to petitioners in the case, including any

proposed monitoring of petitioners' conversations with counsel, and a response to petitioners'

"underlying petitions for writs of habeas corpus, specifically addressing, among other things, the

legal merits of the Government's entitlement to monitor any of Petitioners' conversations with

counsel." Procedures that the government intends to apply with respect to access by habeas

counsel to detainees at Guantanamo Bay generally are described in Exhibit A, "Procedures For

Counsel Access To Detainees At The US Naval Base in Guantanamo Bay, Cuba." See Exh. B

(Declaration of Martin J. Lucenti, Sr.), ¶ 8. Given the circumstances of this case, involving

individuals detained by United States authorities as enemy combatants in connection with

hostilities involving al Qaeda, the Taliban, and their supporters, at an important and sensitive United States naval base outside the territorial sovereignty of the United States, the procedures concerning access by counsel include, <u>inter alia</u>, a requirement that counsel obtain a security clearance; that information exchanged between counsel and a detainee undergo a classification review; and that, where appropriate, communications between counsel and detainee be monitored, <u>i.e.</u>, not just subjected to classification review.  The procedures also contain restrictions on disclosure of classified information and on the use of other information outside the preparation for or conduct of the habeas litigation.  At the same time, these necessary precautions do not compromise attorney-detainee communications: any review of information or monitoring of communications is to be performed by persons unconnected with litigation or other proceedings concerning the detainee, and those persons are forbidden to disclose information to government personnel involved in litigation or proceedings involving the detainee.

With respect to the petitioners in this case, as explained in the Declaration of the Acting Commander, Joint Task Force Guantanamo Bay, Cuba, Exh. B, a determination has been made in accordance with the access procedures that three petitioner-detainees in this case should be subject to all aspects of those procedures, including monitoring of communications and classification review.  The remainder of the petitioner-detainees in this case will not be subject to real-time monitoring of communications.

As explained below, petitioners are not entitled to relief, whether in the form of access to counsel under conditions other than those established for Guantanamo Bay detainees, or otherwise.  Petitioners have no right to relief, including the right of access to counsel, under the Constitution because petitioners, as aliens outside the sovereign territory of the United States,

lack any cognizable Constitutional rights.  Furthermore, no applicable right of access to counsel

can be found in other sources, including international treaties.  In any event, the procedures for

counsel access to Guantanamo Bay detainees are entirely reasonable steps that provide detainees

legitimate access to counsel while protecting national security interests, and thus, are fully

justified.  Petitioners are not entitled to relief.

### BACKGROUND AND PROCEDURES
### FOR COUNSEL ACCESS

On September 11, 2001, the al Qaeda terrorist network launched a vicious, coordinated

attack on the United States, killing approximately 3,000 persons.  In response, the President, as

Commander-in-Chief and with Congressional authorization for the use of force, took steps to

protect the Nation and prevent additional threats.  Among these steps, the President dispatched

the armed forces of the United States to Afghanistan to seek out and subdue the al Qaeda terrorist

network and the Taliban regime and others that had supported and protected that network.  In the

course of that campaign — which remains ongoing —  the United States and its allies have

captured or taken control of a large number of individuals, many of whom are foreign nationals.

Pending in this Court are approximately 14 cases brought on behalf of close to 60 aliens who are

held at the United States Naval Base at Guantanamo Bay, Cuba.  The cases commonly challenge

the legality and conditions of the detention of the aliens on whose behalf the cases are brought.

On June 28, 2004, the Supreme Court issued a decision in three of the cases originally dismissed

by the Court.  See Rasul v. Bush, ___ U.S. ___, 124 S. Ct. 2686 (2004).  The Court held for the

first time that federal district courts had jurisdiction to consider a petition for a writ of habeas

corpus under the habeas statute, 28 U.S.C. § 2241, brought by aliens apprehended abroad and

held at Guantanamo Bay, even though Guantanamo Bay was not within the ultimate sovereignty

of the United States.  See id. at 2693-98.  The Court expressly declined to address "whether and

what further proceedings" would be appropriate after remand of the case.  See id. at 2699.

In order to facilitate the litigation of habeas cases on behalf of Guantanamo Bay

detainees, the government intends to permit counsel for habeas petitioners access to the detainees

at issue in these cases.  So far at least 14 such habeas cases have been filed in this District before

eight different judges.  Thus, numerous counsel will potentially seek access to Guantanamo Bay

detainees.  Given the significant numbers of detainees and counsel involved, and because such

petitioners are being detained by United States authorities as enemy combatants in connection

with hostilities involving al Qaeda, the Taliban, and their supporters, and are being held at an

important and sensitive United States naval base outside the territorial sovereignty of the United

States, special procedures have been established for counsel access.  The procedures facilitate

attorney-detainee communications for purposes of the habeas litigation, while protecting against

disclosure of classified or other information that could result in damage to the national security,

and permitting appropriate authorities to act upon threats to national security.

The counsel access procedures for Guantanamo Bay detainees include the following

elements and conditions.[1]  First, counsel must hold or obtain a Secret-level United States security

clearance.  Exh. A, § III.A.  The Department of Justice Security & Emergency Planning Staff

office is overseeing the process of obtaining clearances, as appropriate, for habeas counsel who

---

[1] Additional administrative procedures are also in place to assure that counsel purporting
to represent a detainee and desiring access to the detainee is actually authorized to represent the
detainee, and to assist with the logistics of any visit by counsel to Guantanamo Bay.  Exh. A,
§ III.C., D.

need them.  Such requests for a clearance are currently being processed on an expedited basis,

with an expected processing time of 2-3 weeks.  Some counsel for petitioners in this case have

already received an interim secret clearance and been briefed on security procedures.

Second, the procedures create a system of classification review of information exchanged

between counsel and a detainee in order to ensure the proper handling, storage, and transportation

of classified information.  Exh. A, §§ VI, VII.

Third, the procedures contemplate, for some detainees, monitoring of communications

between counsel and a detainee (in addition to classification review) under circumstances

carefully designed to avoid unnecessary compromise of attorney-detainee communications.  Such

monitoring will be undertaken only "following an individualized assessment of the national

security implications of unmonitored communications between a detainee and his counsel."  Exh.

A, § IV.C.  Further, that individualized assessment must result in a conclusion that monitoring is

reasonably necessary to protect against the disclosure of information that reasonably
could be expected to result in immediate and substantial harm to the national security,
including communications regarding:

1.  The facilitation of terrorist operations or future terrorist acts;

2.  Military plans, weapons systems, or operations;

3.  Foreign government information;

4.  Foreign relations or foreign activities of the United States, including confidential
    sources;

5.  Intelligence activities (including special activities), intelligence sources or methods,
    or cryptology;

6.  Vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans
    or protection services relating to national security, which includes defense against
    transnational terrorism;

7.   Matters that are classified above the clearance level of the counsel.

Exh. A., § IV.D.  Such monitoring permits the identification and, if appropriate, dissemination to appropriate law enforcement and intelligence authorities of information reasonably reflecting a threat to national security, thus permitting any such threat to be averted. [2]  Exh. A, § X.

Under the applicable procedures, the classification review and any monitoring are to be undertaken in such a way as to avoid unnecessary compromise of attorney-detainee communications.  Monitoring and classification review will be conducted only by a Department of Defense "privilege team," i.e., DoD personnel who are and will continue to be walled off from participation in any court or military proceedings concerning the detainee.  Exh. A, §§ II.D, IV.F.  Indeed, the privilege team is forbidden to disclose any information reviewed to government personnel involved in court or military proceedings involving the detainee.  Id.  Monitored information may only be disclosed if it reflects a likely threat to national security or of immediate violence, and, then, only to the Commander, JTF-Guantanamo, who may convey the information to appropriate law enforcement and intelligence officials.  Exh. A, § X.

Fourth, the procedures prevent the disclosure of classified information to the detainee and otherwise compel the appropriate treatment of classified information by counsel.  Exh. A, § VII.  Further, given the extraordinary circumstances presented by these Guantanamo Bay detainee cases, the procedures limit counsel's dissemination of any communications with the detainee to purposes of preparing for or conducting the litigation.  Exh. A, § XI.

--------

[2] The procedures also enable the termination of face-to-face communications where it appears that monitoring is being intentionally frustrated by the detainee or counsel or where the communication is being used to further terrorist or other criminal operations or other threats to national security.  Exh. A., § V.B.

-6-

Finally, given the large number of cases, at least 14, involving numerous counsel, brought on behalf of Guantanamo Bay detainees before at least eight judges of the Court, the procedures applicable to counsel access require an acknowledgment and agreement of counsel that he or she will comply with the procedures for access to detainees at Guantanamo Bay. Exh. A., §§ III.B., XII. The acknowledgment states explicitly, however, that it is not an acknowledgment that counsel considers the access procedures legally permissible and makes clear that a challenge to the procedures is not foreclosed through signing the acknowledgment. Exh. A., § III.B. Rather, the acknowledgment serves as a necessary record that counsel are aware of and will abide by the procedures.

These procedures are justified by the extraordinary nature of these cases involving Guantanamo Bay detainees, including that the detainees may possess sensitive information, for example, information regarding the Guantanamo base or concerning agents, units, or methods involved in the detainee's capture. Further, detainees may be in possession of classified information of the same or some other nature, including information that could jeopardize the safety of U.S. and other forces. See Exh. B, ¶¶ 9-13. In addition, those involved in terrorist and supporting groups are familiar with and utilize sophisticated techniques for communicating information to individuals or groups that can be used in planning or otherwise supporting terrorist activities. These methods would include using coded communications transmitted through unwitting intermediaries. See id. ¶¶ 5, 7, 10, 14, 18.

With respect to the specific petitioners in this case, pursuant to the procedures for access, a determination has been made that three of the petitioners will be subject to both monitoring of communications and classification review. See Exh. B; Exh. A, §§ V-VII. For the reasons

-7-

reflected in the Declaration of the Acting Commander, such monitoring is necessary to protect against the disclosure of information that reasonably could be expected to result in immediate and substantial harm to national security interests.  Exh. B, ¶ 17.  These three individuals all have established ties to or influential positions in various terrorist networks or groups hostile to U.S. interests, including al Qaeda and the Taliban, as well as operational knowledge of terrorists operations.  The detainees have the demonstrated capacity and commitment to direct or encourage harm to U.S. personnel and interests, are trained in sophisticated methods of communications with such groups despite detention, and have even attempted to use the mail system at Guantanamo Bay for such purposes.  See id. ¶¶ 17-20.  Further, their knowledge of potential gaps in U.S. intelligence, as well as knowledge of counter-interrogation techniques, creates a likelihood that, if their communications are not monitored, information would be disclosed creating a risk of immediate and substantial harm to United States national security interests.  See id.

## ARGUMENT

The Court has described petitioners' complaint, for all essential purposes, as a petition for a writ of habeas corpus complaining of the conditions of petitioners' confinement, including, predominantly, lack of access to counsel.  This claim for access must be evaluated in the unique context of this case.  This case does not involve criminal detention, nor are petitioners United States citizens, nor are they confined within an area of United States sovereignty.  To the contrary, petitioners are aliens held at Guantanamo Bay, Cuba.  Further, petitioners were taken into custody as enemy combatants in connection with hostilities involving al Qaeda, the Taliban, and their supporters, and are being detained while hostilities remain ongoing for the purposes of

preventing them from re-entering those hostilities, as well as potentially obtaining information that may serve to further national security interests.

Accordingly, as explained below, petitioners cannot appeal to the Constitution or other potential sources of a right to access to counsel. To the extent petitioners seek relief based on a right to counsel, unqualified or otherwise, petitioners' application must be dismissed. The same is true with regard to all other forms of relief sought by petitioners. In any event, however, the access to counsel being provided by the government is merely to facilitate the litigation of petitioners' habeas claims, and that access is reasonably subject to the conditions imposed, which permit essential attorney-detainee communications while protecting national security interests. The fact that conditions on access to counsel have been imposed or upheld even in contexts involving a constitutional right to counsel or access suggests that the procedures established for counsel's access to aliens detained at Guantanamo Bay easily pass muster.

I.    **PETITIONERS HAVE NO RIGHT TO COUNSEL UNDER THE CONSTITUTION OR OTHER SOURCES OF LAW**

   A.    **Petitioners, As Aliens Outside The Sovereign Territory Of The United States, Lack Any Cognizable Constitutional Rights.**

Any assertion by petitioners of a Fifth Amendment due process right or any constitutional right to counsel is baseless. As aliens detained by the military outside the sovereign territory of the United States and lacking a sufficient connection to this country, petitioners have no cognizable constitutional rights.

"It is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside our geographic borders." Zadvydas v. Davis, 533 U.S. 678, 693 (2001). In particular, the Supreme Court has concluded that neither the Fourth nor

Fifth Amendments obtain with respect to aliens outside the United States territory.  See United States v. Verdugo-Urquidez, 494 U.S. 259, 266 (1990) (rejecting proposition that the Fourth Amendment "was intended to restrain the actions of the Federal Government against aliens outside of the United States territory"); Johnson v. Eisentrager, 339 U.S. 763, 783-85 (1950) (rejecting claim that aliens outside the territory of the United States are entitled to Fifth Amendment rights).  The D.C. Circuit, for its part, has repeatedly noted that a "'foreign entity without property or presence in this country has *no constitutional rights*, under the due process clause or otherwise.'"  32 County Sovereignty Comm. v. Dep't of State, 292 F.3d 797, 799 (D.C. Cir. 2002) (quoting People's Mojahedin Org. of Iran v. Dep't of State, 182 F.3d 17, 22 (D.C. Cir. 1999)) (emphasis added); see also Jifry v. FAA, 370 F.3d 1174, 1182 (D.C. Cir. 2004) ("The Supreme Court has long held that non-resident aliens who have insufficient contacts with the United States are not entitled to Fifth Amendment protections."); Harbury v. Deutch, 1999 WL 33456919, *6-7 (D.D.C. 1999), rev'd in part on other grounds, 233 F.3d 596, 603 (D.C. Cir. 2000), rev'd in part on other grounds sub nom., Christopher v. Harbury, 536 U.S. 403 (2002) (rejecting extraterritorial application of Fifth Amendment); Pauling v. McElroy, 278 F.2d 252, 254 n.3 (D.C. Cir. 1960) ("The non-resident aliens here plainly cannot appeal to the protection of the Constitution or laws of the United States.").

The bar on extraterritorial assertion of constitutional rights by aliens undoubtedly applies here.  As the Supreme Court's decision in Eisentrager makes clear, in a holding unaffected by the Supreme Court's subsequent decision in this case, in determining whether an alien is present in the United States for purposes of evaluating the availability of constitutional protection, what matters is not whether the alien is located within territory over which the United States exercises

-10-

control, but whether the alien is within territory over which the United States exercises

*sovereignty*.   In Eisentrager, the Supreme Court denied a petition for a writ of habeas corpus

brought by a group of German civilians who had been captured in China by United States forces

during World War II, convicted by a military commission of violating the laws of war and

imprisoned in Germany under the control of the United States Army.  The Court rejected the

petitioners' attempt to invoke a "constitutional right" to bring a habeas petition, reasoning that

the "prisoners at no relevant time were within any territory over which the United States is

*sovereign*, and the scenes of their offense, their capture, their trial, and their punishment were all

beyond the territorial jurisdiction of any court of the United States."  339 U.S. at 778 (emphasis

added).  The Court went on to overturn the determination by the Court of Appeals that the

prisoners possessed Fifth Amendment liberty interests, highlighting concerns about

"extraterritorial application of organic law."  Id. at 781-785.   Thus, while the petitioners in

Eisentrager were imprisoned under the control of the United States government, the absence of

United States sovereignty precluded the attachment of constitutional rights.  As the Supreme

Court later explained, the Court in Eisentrager "rejected the claim that aliens are entitled to Fifth

Amendment rights outside the *sovereign* territory of the United States."  Verdugo-Urquidez, 494

U.S. at 269 (emphasis added).  These aspects of Eisentrager were in no way undermined by

Braden v. 30th Jud. Conf. of Ky., 410 U.S. 484 (1973).

      Here, it is clear that the Guantanamo Bay Naval Base is outside the sovereign territory of

the United States.  As the Supreme Court observed in this very case, under the 1903 Lease

Agreement executed between the United States and Cuba, "'the United States recognizes the

continuance of the *ultimate sovereignty of the Republic of Cuba* over the [leased areas],' while

'the Republic of Cuba consents that . . . the United States shall exercise complete jurisdiction and control over and within said areas.'" Rasul, 124 S. Ct. at 2690-91 (emphasis added). Indeed, the Supreme Court posited a distinction between "plenary and exclusive jurisdiction" and "'ultimate sovereignty" at Guantanamo Bay even as it framed the specific question for its review. Id. at 2693; cf. United States v. Spelar, 338 U.S. 217, 221-22 (1949) (lease between for military air base in Newfoundland "effected no transfer of sovereignty with respect to the military bases concerned"); Vermilya-Brown Co. v. Connell, 335 U.S. 377, 380-81 (1948) (U.S. naval base in Bermuda, controlled by United States under lease with Great Britain, was outside United States sovereignty).[3]

Given the absence of U.S. sovereignty over Guantanamo Bay and petitioners' status as aliens, it is plain that petitioners lack cognizable constitutional rights with respect to their detention. Indeed, in a similar case, the Eleventh Circuit concluded that alien migrants located at the Guantanamo Bay Naval Base have "no First Amendment or Fifth Amendment rights which they can assert." See Cuban American Bar Ass'n, Inc. v. Christopher, 43 F.3d 1412, 1428-29 (11th Cir. 1995). As a predicate to its decision, the court specifically rejected the contention that "'control and jurisdiction' is equivalent to sovereignty" for the purpose of assessing the applicability of constitutional provisions to aliens. Id. at 1424-25. Like the court in Cuban American Bar Ass'n, this Court should dismiss any contention that the Constitution provides actionable rights to aliens located at a U.S. military facility within the sovereign territory of

_____

[3] In its Memorandum Opinion dismissing the petition in this case, this Court concluded that the military base at Guantanamo Bay is outside the sovereign territory of the United States. See Rasul v. Bush, 215 F. Supp. 2d 55, 72 (D.D.C. 2002). This conclusion was not rebutted by the D.C. Circuit or the Supreme Court.

another nation.  See also Haitian Refugee Center, Inc. v. Baker, 953 F.2d 1498, 1513 (11th Cir.

1992) (Haitians interdicted by U.S. Coast Guard on the high seas "have no recognized

substantive rights under the laws or Constitution of the United States.").

  Even if this Court were to disagree with the Eleventh Circuit and conclude that

Guantanamo Bay was the equivalent of U.S. sovereign territory for purposes of assessing the

applicability of constitutional provisions, the Supreme Court's decision in United States v.

Verdugo-Urquidez would still bar the assertion of constitutional rights by petitioners here.  In

Verdugo-Urquidez, the Court considered whether the Fourth Amendment applied to the search

and seizure by United States agents of property in Mexico owned by a non-resident alien who

had been arrested and transported to the United States prior to the search.  The Court noted that

certain previous cases "establish only that aliens receive constitutional protections when they

have come within the territory of the United States *and developed substantial connections with

this country*."  Verdugo-Urquidez, 494 U.S. at 271 (1990) (emphasis added); see also Jifry, 370

F.3d at 1182; People's Mojahedin Org., 182 F.3d at 22.  The Court thus rejected respondent's

arguments based on this line of authority, reasoning that presence in the United States that is

"lawful but involuntary [] is not the sort to indicate any substantial connection with our country."

494 U.S. at 271.  Respondent, "an alien who ha[d] had no previous significant voluntary

connection with the United States" and was being held in the United States against his will, was

not entitled to the protection of the Fourth Amendment.  Id.  Even more clearly here, petitioners –

who do not allege to have any "significant voluntary connection with the United States" and

whose detention in Guantanamo Bay by the military is instead "involuntary" – do not have a sufficient connection with the United States to give rise to constitutional protection.[4]

It bears noting that nothing in the Supreme Court's opinion in <u>Rasul</u> undermines the foregoing analysis or the conclusion that invariably flows from <u>Eisentrager</u> and its progeny– that aliens, such as petitioners, who are outside the sovereign territory of the United States and lack a sufficient connection to the United States may not assert rights under the Constitution.  To begin with, the Court in <u>Rasul</u> repeatedly emphasized that its decision that petitioners have a right to seek a writ of habeas corpus was based on an interpretation of the habeas statute, 28 U.S.C. § 2241, not on a reading of the Constitution.  The question framed by the Court in <u>Rasul</u> was "whether the habeas *statute* confers a right to judicial review" for aliens detained in Guantanamo Bay.  124 S. Ct. at 2693 (emphasis added).  The Court, in turn, "h[e]ld that § 2241 confers on the District Court jurisdiction to hear petitioners' habeas corpus challenges to the legality of their detention at the Guantanamo Bay Naval Base."  <u>Id.</u> at 2698.  The Court repeatedly distinguished the decision in <u>Eisentrager</u>, emphasizing that the Court in <u>Eisentrager</u> was concerned with the "question of the prisoners' *constitutional* entitlement to habeas corpus" and "had far less to say

---

[4] In <u>People's Mojahedin Organization</u>, the D.C. Circuit stated, "'[A]liens receive constitutional protections [only] when they have come within the territory of the United States and developed substantial connections with this country.'" 182 F.3d at 22 (quoting <u>Verdugo-Urquidez</u>, 494 U.S. at 271 (alterations in <u>People's Mojahedin Organization</u>); <u>see also</u> <u>Jifry</u>, 370 F.3d at 1182 (aliens may be accorded some constitutional protections where they "have come within the territory of the United States and established 'substantial connections' with this country . . . .").  However, in <u>National Council of Resistance of Iran v. Dep't of State</u>, 251 F.3d 192, 201-02 (2001), a separate panel of the D.C. Circuit queried, but did not decide, whether a "substantial" connection to the United States is necessary.  Even that court, however, appeared to assume that some connection was required.  <u>See</u> <u>id.</u> at 202.  Regardless, petitioners' lack of *any* "voluntary connection with the United States" makes constitutional protection unavailable.  <u>See</u> <u>Verdugo-Urquidez</u>, 494 U.S. at 271.

on the question of petitioners' *statutory* entitlement to habeas review." Id. at 2693-94 (emphases

in original); see also id. at 2694 (Eisentrager opinion "devoted . . . little attention to question[s]

of statutory jurisdiction"); id. at 2694 n.8 (the Court in Eisentrager "clearly understood the Court

of Appeals' decision to rest on constitutional and not statutory grounds"). Rasul thus left intact

Eisentrager's constitutional holding that non-resident aliens in U.S. custody overseas do not have

a constitutional right to the writ of habeas corpus. See Eisentrager, 339 U.S. at 778.[5]

More importantly, the Court in Rasul made no effort at all to revisit Eisentrager's specific

rejection of an extraterritorial application of the Fifth Amendment in that case. See id. at 785.

Indeed, nothing in Rasul detracts from Eisentrager's powerful admonition against extension of

the Amendments in the Bill of Rights to aliens detained by the military outside the United States:

> If the Fifth Amendment confers its rights on all the world except Americans
> engaged in defending it, the same must be true of the companion civil-rights
> Amendments, for none of them is limited by its express terms, territorially or as to
> persons. Such a construction would mean that during military occupation
> irreconcilable enemy elements, guerrilla fighters, and 'were-wolves' could require
> the American Judiciary to assure them freedoms of speech, press, and assembly as
> in the First Amendment, right to bear arms as in the Second, security against
> 'unreasonable' searches and seizures as in the Fourth, as well as rights to jury trial
> as in the Fifth and Sixth Amendments.
>
> Such extraterritorial application of organic law would have been so significant an
> innovation in the practice of governments that, if intended or apprehended, it
> could scarcely have failed to excite contemporary comment. Not one word can be
> cited. No decision of this Court supports such a view. None of the learned
> commentators on our Constitution has ever hinted at it. The practice of every
> modern government is opposed to it.

---

[5] The Court's conclusion that Eisentrager does not "*categorically exclude*[] aliens detained in military custody outside the United States from the 'privilege of litigation' in U.S. Courts," see Rasul, 124 S. Ct. at 2698 (emphasis added), of course, only means that Congress may provide jurisdiction for these persons by statute, not that they have a constitutional entitlement to bring suit in the absence of congressional action.

-15-

339 U.S. at 784-785 (internal citation omitted).[6]

This Court should heed the Supreme Court's warning, follow clear and still binding circuit precedent, and resist any assertion that constitutional rights may be raised by non-resident aliens detained by the military outside the sovereign United States. Petitioners' request for relief under the Due Process Clause of the Fifth Amendment, and any argument for a constitutional right to counsel,[7] should be rejected.[8]

---

[6] The cryptic dicta in a footnote in Rasul that the petitioners' have alleged that they are in "'custody in violation of the Constitution or laws or treaties of the United States,' 28 U.S.C. § 2241(c)(3)," 124 S. Ct. at 2698 n.15, cannot reasonably be read to overrule the Supreme Court's repeated holdings that aliens outside sovereign United States territory and with insufficient connection to the United States lack constitutional rights. E.g., Verdugo-Urquidez, 494 U.S. at 266; Zadvydas, 533 U.S. at 693. The Court's holding is clear that it decides only the statutory jurisdiction of a court to hear a claim like the petitioners'. At most, the footnote establishes that, once aliens have been determined neither to "have engaged . . . in combat nor in acts of terrorism against the United States," 124 S. Ct. at 2698 n.15, they may have certain rights under the treaties of the United States. Because, as we have explained below, those treaties are not self-executing and were intended by Congress to be enforced by the political branches rather than by the Courts, they would not be the proper basis for a judicial remedy. Any constitutional claims brought by an alien abroad necessarily fail, as the D.C. Circuit, has previously recognized. See People's Mojahedin Org. of Iran, 182 F.3d at 22; see also Cuban American Bar Ass'n, Inc., 43 F.3d at 1428. As the Supreme Court has repeatedly recognized, it is improper for the courts of appeals to engage in anticipatory overruling of the Court's precedents. See, e.g., State Oil Co. v. Khan, 522 U.S. 3, 20 (1997).

[7] To the extent that petitioners' lawyers may be invoking their own rights in demanding access to petitioners, such a claim fails. For example, petitioners' counsel cannot invoke a First Amendment right to associate for the purpose of engaging in litigation as a form of political expression because the detainees lack an underlying substantive legal claim to advance in litigation. See Haitian Refugee Center, 953 F.2d at 1513 (counsel had no First Amendment right to associate for purpose of litigation where clients had no recognized substantive rights); see also First Defense Legal Aid v. City of Chicago, 319 F.3d 967, 970-71 (7th Cir. 2003) (holding that an attorney does not have a derivative First Amendment right to access a client-witness in police custody because "[w]itnesses have no right to counsel under either the fifth or the sixth amendment[,]" as the "constitutional right to counsel attaches only with formal charges"). The "right to judicial review" that the Supreme Court identified in reviewing 28 U.S.C. § 2241, see Rasul, 124 S. Ct. 2693, 2698, is, of course, a procedural right, not a substantive one. Moreover, even if counsel for petitioners had a limited right to associate with the detainees, it remains the

-16-

**B.      Even If Petitioners Could Legitimately Appeal To The Constitution, Petitioners Have No Right To Counsel Under The Fifth And Sixth <u>Amendments.</u>**

Even assuming that the Constitution did apply to petitioners, which it does not, the two

constitutional bases for the right to counsel—the Fifth and Sixth Amendments—do not provide a

right to counsel in the context of this case.  The plain text of the Sixth Amendment provides that

the "accused" in a "criminal proceeding" shall "have the assistance of counsel for his defense."

U.S. Const. amend VI.  Therefore, the Sixth Amendment is not triggered until the government

commences a criminal proceeding against the accused.  <u>See</u> <u>Texas v. Cobb</u>, 532 U.S. 162, 167-68

(2001) (stating that the Sixth Amendment "does not attach until a prosecution is commenced,

that is, at or after the initiation of adversary judicial criminal proceedings--whether by way of

formal charge, preliminary hearing, indictment, information, or arraignment") (quoting <u>McNeil v.</u>

<u>Wisconsin</u>, 501 U.S. 171, 175 (1991)) (internal quotations and citations omitted).

Here, the Sixth Amendment does not apply to petitionerss because the government has

not instituted criminal proceedings against them.  Petitioners are being detained solely because of

their status as enemy combatants, not for any other criminal or punitive purpose.  This detention,

like the detention of all enemy combatants during wartime, serves two important purposes

directly related to the conduct of war.  First, it prevents "captured individuals from returning to

the field of battle and taking up arms once again."  <u>Hamdi v. Rumsfeld</u>, 124 S. Ct. 2633, 2640

---

case that "[t]he Constitution does not require the Government to assist the holder of a
constitutional right in exercise of that right." <u>Haitian Refugee Center</u>, 953 F.2d at 1513.  <u>See</u>
<u>also</u> <u>infra</u> Part II.

[8] For the same reasons, petitioners cannot assert any constitutional claim to be informed
any charges against them, have access to a court or other impartial tribunal, or meet (in person or
via teleconference) with their families or medical personnel.  <u>See</u> <u>also</u> <u>infra</u> Part II.

-17-

(2004) (plurality).  Second, detention enables the military to gather vital intelligence from enemy combatants in advancement of the prosecution of the war.  Because the right to counsel embodied by the Sixth Amendment is inapplicable to the detention of enemy combatants, the procedures imposed upon counsel's access to petitioners cannot violate the Sixth Amendment.

Petitioners also lack a right to counsel under the Self-Incrimination Clause of the Fifth Amendment.  In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court recognized that, in order to protect a suspect's Fifth Amendment right not to incriminate himself, a suspect must be warned prior to custodial interrogation that he has the right to remain silent and the right to have an attorney present.  The Court has since explained, however, that the Fifth Amendment's Self-Incrimination Clause is "a fundamental trial right of criminal defendants."  Verdugo-Urquidez, 494 U.S. at 264.  Accordingly, "a constitutional violation occurs only at trial."  Id.; see Chavez v. Martinez, 538 U.S. 760, 767 (2003) ("Statements compelled by police interrogations of course may not be used against a defendant at trial, but it is not until their use in a criminal case that a violation of the Self-Incrimination Clause occurs.") (internal citation omitted).  Because petitioners are not being subjected to a criminal trial, the right to counsel associated with the Fifth Amendment's Self-Incrimination Clause does not apply to this case.

Moreover, in the enemy combatant setting, the Due Process Clause of the Fifth Amendment does not provide petitioners with a right to counsel, much less a right to unmonitored access to counsel.  Indeed, a generalized due process right for enemy combatants to have unlimited and unqualified access to counsel cannot be squared with settled historical

-18-

practice, under which no comparable right has yet been found.[9]  Furthermore, at a minimum, any interest by petitioners in an unqualified right of access to counsel would have to be balanced against the government's own interests, including the President's plenary authority as Commander-in-Chief and the important national security interests implicated by allowing enemy combatants unsupervised access to counsel.  As the Supreme Court recently explained in <u>Hamdi v. Rumsfeld</u>, 124 S. Ct. 2633, 2646 (2004), the "ordinary mechanism that we use for balancing such serious competing interests, and for determining the procedures that are necessary to ensure that a citizen is not 'deprived of life, liberty, or property, without due process of law,' U.S. Const., Amend. 5, is the test that we articulated in <u>Matthews v. Eldridge</u>, 424 U.S. 319, 96 S.Ct 893, 47 L.Ed.2d 18 (1976)."

Thus, even in the case of citizens held within the sovereign territory of the United States, <u>Mathews</u> provides that the process due in any given instance is determined by balancing "the private interest that will be affected by the official action" against the "Government's interest, including the function involved" and the burdens the Government would face in providing greater process.  <u>Matthews</u>, 424 U.S. at 335.  To the extent any constitutional protection applies

---

[9] As the Supreme Court explained in <u>Ex Parte Quirin</u>, 317 U.S. 1, 27-28 (1942), "[f]rom the very beginning of its history this Court has recognized and applied the law of war as including that part of the law of nations which prescribes, for the conduct of war, the status, rights and duties of enemy nations as well as of enemy individuals."  That is consistent with the analysis that the Court applies in determining the scope of the Due Process Clause in other contexts. <u>Cf.</u> <u>Herrera v. Collins</u>, 506 U.S. 390, 407-408 (1993) (examining "[h]istorical practice" in assessing the scope of the "Fourteenth Amendments's guarantee of due process"); <u>Medina v. California</u>, 505 U.S. 437, 445-46 (1992) (relying on "[h]istorical practice" and "historical treatment" when analyzing scope of due process rights).  Because the unqualified right of access that petitioners seek has no foundation in any tradition or practice, the Fifth Amendment does not confer such a right.

to alien-detainees at Guantanamo Bay, it would surely be less than that afforded a citizen-

detainee in the United States  Cf. Verdugo-Urquidez, 494 U.S. at 275-78 (Kennedy, J.,

concurring) (explaining that the constitutional standards that normally apply to United States

citizens do not necessarily with the same force to "noncitizens who are beyond our territory").

"The Mathews calculus then contemplates a judicious balancing of these concerns, through an

analysis of 'the risk of an erroneous deprivation' of the private interest if the process were

reduced and the 'probable value, if any, of additional or substitute safeguards.'" Hamdi, 124 S.

Ct. at 2646 (quoting Matthews, 424 U.S. at 335).

　　　　With respect to the private interest affected by the government's official action, even if

the Constitution applied to petitioners, which it manifestly does not, they would have a liberty

interest in being free from unlawful physical detention.  See Foucha v. Louisiana, 504 U.S. 71,

80 (1993) ("Freedom from bodily restraint has always been at the core of the liberty interest

protected by the Due Process Clause from arbitrary government action.").  In considering the

degree of process due a "citizen-detainee seeking to challenge his classification as an enemy

combatant[,]" the Court explained in Hamdi  that a citizen-detainee "must receive notice of the

factual basis for his classification, and a fair opportunity to rebut the Government's assertions

before a neutral decisionmaker." Hamdi, 124 S. Ct. at 2648.  The Court, however, explained that

"exigencies of the circumstances may demand that, aside from these core elements, enemy

combatant proceedings may be tailored to alleviate their uncommon potential to burden the

Executive at a time of ongoing military conflict."  Id. at 2649; see also id. at 2650 (stating that

"the full protections that accompany challenges to detentions in other settings may prove

unworkable and inappropriate in the enemy-combatant setting").  Here, as more fully explained

-20-

infra section II, the national security burdens that the government would face by providing

greater process to petitioners in the form of unlimited and unmonitored access to counsel would

be substantial. Accordingly, the due process clause of the Fifth Amendment, even if applicable,

would not endow petitioners with an unqualified right to counsel.

### C.    Petitioners Have No Right To Counsel Under International Treaties Or The Law of War.

Not only does petitioners' claim for a right of access to counsel fail to find refuge in the

Constitution, petitioners cannot rely on international treaties or the law of war as a basis for such

a right. Although treaties are the "supreme Law of the Land," U.S. Const. art. VI, cl. 2, they

provide no basis for private lawsuits unless they are implemented by appropriate legislation or

are intended to be self-executing. See Whitney v. Robinson, 124 U.S. 190, 194 (1888) ("When

the stipulations [of a treaty] are not self-executing, they can only be enforced pursuant to

legislation to carry them into effect."). In this case, petitioners cannot identify any self-executing

or congressionally-implemented treaty that provides them with a right to counsel to challenge

their detention.

For example, under the Third Geneva Convention (GPW), even lawful enemy combatants

who are entitled to prisoner of war privileges—which does not include the detainees in the

current conflict—are not entitled to counsel to challenge their detention. Instead, Article 105 of

the GPW provides that a prisoner of war should be provided with counsel to defend against

formal *charges* brought against him in a prosecution. This provision underscores that prisoners

of war who have not been charged with specific war crimes are not entitled to counsel to

challenge the fact of their wartime detention. See Geneva Convention Relative to the Treatment

of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3317, 75 U.N.T.S. 135 (GPW), Article 105.

Similarly, the Fourth Geneva Convention, which addresses the treatment of non-combatant

civilians during times of war, provides a right of counsel only when accused persons "are

prosecuted by the Occupying Power."  See Geneva Convention Relative to the Protection of

Civilian Persons in Time of War, art. 71-72, Feb. 2, 1956, 6 U.S.T. 3516, 75 U.N.T.S. 287.  In

any event, the Third and Fourth Geneva Conventions are not self-executing and Congress has not

implemented their terms pursuant to authorizing legislation.  See Tel-Oren v. Libyan Arab

Republic, 726 F.2d 774, 808-09 (D.C. Cir. 1984) (Bork, J., concurring); see also Eisentrager, 339

U.S. at 789 n.14.

Furthermore, the International Covenant on Civil and Political Rights (ICCPR), which the

United States ratified in 1992, does not provide petitioners with a right to counsel.  Like the

Third and Fourth Geneva Conventions, the ICCPR provides a right of counsel only in "the

determination of any criminal charge."  Art. 14, 999 U.N.T.S. 171, 6 I.L.M. 368 (1992). More

importantly, however, Congress ratified the ICCPR with numerous reservations and with the

express declaration that the ICCPR is not self-executing.  See International Covenant on Civil

and Political Rights, 102d Cong., 138 Cong. Rec. S4781, S4784 (April 2, 1992).  Accordingly,

the ICCPR does not create a right to counsel enforceable in United States courts.  See Alva***,

124 S. Ct. 2739, 2767 (2004) (ICCPR does not "create obligations enforceable in the federal

courts"); Flores v. Southern Peru Copper Corp., 343 F.3d 140, 163-64 & n.35 (2d Cir. 2003);

Macharia v. United States, 238 F. Supp. 2d 13, 29 (D.D.C. 2003), aff'd 334 F.3d 61 (D.C. Cir.

2004).

Finally, to the extent petitioners seek to find a right to counsel in either the American

Convention on Human Rights (ACHR), 1144 U.N.T.S. 123, 9 I.L.M. 673 (1969), or the

American Declaration on the Rights and Duties of Man (ADRDM), O.A.S. Off. Rec. OEA/Ser.

LV/I.4 Rev. (1965), these provisions are simply multinational resolutions that have not been

ratified by Congress; thus they do not have the force or effect of law.  See Flores, 343 F.3d at

162-64 (stating that "the United States has declined to ratify the American Convention [on

Human Rights] for more than three decades"); Garza v. Lappin, 253 F.3d 918, 925 (7th Cir.

2001) (stating that the American Declaration on the Rights and Duties of Man "is an aspirational

document" that "did not create any enforceable obligations on the part of any" member nations).

In sum, to the extent petitioners claim a right of unqualified access to counsel or seek

relief based on such a right, the petition must be rejected as no such right can be found in the

Constitution or any treaties.

## II.    THE GOVERNMENT IS PROVIDING PETITIONERS ACCESS TO COUNSEL AND THE PROCEDURES GOVERNING SUCH ACCESS ARE REASONABLE AND APPROPRIATE

Notwithstanding the absence of any right to counsel on the part of the aliens held at

Guantanamo Bay, the government is permitting access, subject to conditions, to facilitate the

litigation of habeas cases brought on behalf of Guantanamo Bay detainees.[10]  Given that no right

---

[10] Any suggestion that petitioners have an unqualified right to counsel based upon the habeas corpus statute, 28 U.S.C. § 2241, or the All Writs Act, 28 U.S.C. § 1651, is also misplaced.  The district court's reasoning in Padilla ex. rel. Newman v. Bush, 233 F. Supp. 2d 564 (S.D.N.Y. 2002), aff'd in part, rev'd in part sub nom., Padilla v. Rumsfeld, 352 F.3d 695 (2d Cir. 2003), rev'd 124 S. Ct. 2711 (2004), is not to the contrary.  Padilla addressed, inter alia, whether an American citizen apprehended in the United States and designated an enemy combatant has the right to meet with counsel to challenge the factual basis for his designation as an enemy combatant.  After dismissing a constitutional basis for the right to counsel, 233 F.

to counsel exists, the conditions governing counsel's access should be considered reasonable <u>per</u>

<u>se</u>.  In any event, the procedures governing counsel access are more than reasonable and permit

petitioners to obtain assistance of counsel in this habeas proceeding, while still maintaining

essential national security protections.

      Though a case involving enemy combatants held at Guantanamo Bay is unique, the

notion of placing conditions on counsel's access to potential clients in national security contexts

is not.  In fact, even in the context of criminal trials involving accused terrorists with a Sixth

Amendment right to counsel, courts have established or upheld various special measures

---

Supp. 2d. at 600-01, the district court concluded that the "provisions and characteristics of the habeas corpus statute . . . and the court's power under the All Writs Act, 28 U.S.C. § 1651(a) (2000), to issue writs in aid of its jurisdiction, provide a statutory basis for [permitting Padilla to consult with counsel.]"  The court located that entitlement principally in 28 U.S.C. § 2243, which provides for the petitioner to allege and deny facts, and 28 U.S.C. § 2246, which allows for the taking of evidence.  Reading these provisions to grant a statutory right to present facts, the district court reasoned that vindication of these rights required affording Padilla some access to counsel.  <u>Id.</u> at 604.

      Importantly, however, the district court recognized the government's significant national security interests and rejected any assertion that access to counsel must be unlimited or unqualified.  Indeed, the district court even suggested that "there is no reason that military personnel cannot monitor Padilla's contacts with counsel, so long as those who participate in the monitoring are insulated from any activity in connection with this petition, or in connection with a future criminal prosecution of Padilla, if there should ever be one."  <u>Id.</u>

      Moreover, even assuming that a statutory basis for the right to counsel could be fashioned from the All Writs Act, the text of this statute plainly limits the court's discretionary authority only to writs that are "necessary or appropriate."  <u>See</u> 28 U.S.C. § 1651(a) ("The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.").  Given the national security interests that could be compromised by providing enemy combatants with unrestricted access to counsel and the aspects of the access to counsel being provided in this case that permit petitioners to obtain assistance of counsel, it would be neither "necessary or appropriate" to fashion a remedy that has the potential to compromise these interests.

constraining defendants and/or their counsel. See United States v. Bin Laden, 58 F. Supp. 2d

113, 121 (S.D.N.Y. 1999) (upholding requirements that counsel for defendants undergo DOJ-

initiated security clearance procedure to obtain access to classified information, noting

inadequacy of remedying unauthorized disclosure or security breach when "reasonable measures

could have prevented the disclosure altogether"); Padilla, 233 F. Supp. 2d at 604 (approving

monitoring of communications between attorneys and U.S. citizen enemy combatant); see also 28

C.F.R. § 501.3(d) (providing for monitoring of communications between prison inmates and their

counsel). Also, in United States v. El-Hage, 213 F.3d 74, 81 (2d Cir. 2000) (per curiam), the

court upheld restrictions on communications by a criminal defendant accused of terrorism-related

crimes where the restrictions were "reasonably related" to the government's interest in

preventing defendant from facilitating activities of co-conspirators. The court upheld the

restrictions over defendant's argument that restrictions interfered with his due process right to

prepare his defense. Id.

Courts considering the issue of restrictions on access to detained individuals in the

criminal justice system have essentially used a reasonableness standard, consistent with the

standard applied by the Supreme Court in reviewing claims of prisoners that restrictions placed

on their confinement violate the inmates' constitutional rights. In Turner v. Safley, 482 U.S. 78

(1987), the Court held, "[W]hen a prison regulation impinges on inmates' constitutional rights,

the regulation is valid if it is reasonably related to legitimate penological interests."[11] Id. at 89.

_____

[11] The Court described four factors "relevant in determining the reasonableness of the
regulation at issue":  (1) whether there is "a valid rational connection between the prison
regulation and the legitimate governmental interest put forward to justify it"; (2) whether the
prisoners have alternative means of exercising the right at issue; (3) "the impact accommodation

Furthermore, this reasonable relationship standard has been applied notwithstanding that a restriction constrains others besides the prisoner who may themselves assert a right of access to the inmate. In Thornburgh v. Abbott, 490 U.S. 401 (1989), the Supreme Court applied the Turner reasonableness standard in upholding a prison regulation that limited incoming publications, notwithstanding the fact that the regulation also affected the "legitimate First Amendment interest," id. at 408, of the publishers who joined the suit as plaintiffs. Id. at 409, 413, 419. The Court rejected "any attempt to forge separate standards for cases implicating the rights of outsiders."[12] Id. at 410 n.9. The military in this unique context is entitled to substantially more deference than prison officials who are dealing with prisoners who enjoy Constitutional rights.

Given that a variety of restrictions have been upheld in these contexts where constitutional rights, including the right to counsel, were affected, the procedures established for access by counsel to Guantanamo Bay detainees, who cannot prevail based upon the Constitution, easily pass muster.

---

of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and (4) "the absence of ready alternatives," i.e., alternatives that "fully accommodate[] the prisoner's rights at de minimis cost to valid penological interests." Id. at 89-91 (internal quotation marks omitted).

[12] Thus, the reasonableness standard has been applied to reject an attorney's claim that restrictions on a prisoners' unmonitored telephone calls violated the attorney's Fifth Amendment due process right to communicate with a client for purposes of practicing law and accessing the courts. See Massey v. Wheeler, 221 F.3d 1030, 1036 (7th Cir. 2000). And it has also been applied to uphold restrictions on family visits, despite disruption of family relationships. See Overton v. Bazzetta, 539 U.S. 126, 133-36 (2003), reversing Bazzetta v. McGinnis, 286 F.3d 311, 319 (6th Cir. 2002) (noting showing of disruption of family relationships).

-26-

As explained in more detail in the Declaration of the Acting Commander, Joint Task Force, Guantanamo Bay, Cuba, permitting counsel to have unmonitored and unconstrained access to a detained enemy combatant would threaten the government's compelling national security interests in several ways. Such access would enable detained enemy combatants to pass sensitive information about military detention facilities, the security at such facilities, or other military operations, including specific circumstances of capture to other terrorists through unwitting intermediary attorneys—something that members (and presumably supporters) of terrorist organizations are trained to do. See Al Qaeda Training Manual, available at www.usdoj.gov/ag/trainingmanual.htm. Indeed, many of the detainees at Guantanamo Bay are in possession of vital and highly classified information, the disclosure of which could result in immediate and substantial harm to national security. See Exh. B, ¶ 9. Even if an attorney is not used as an intermediary, unmonitored access could result in the attorney having information that the government considered uniquely classified and dangerous, such as, for example, the identity of a military captor, that could be improperly disclosed merely because the government did not have an opportunity to inform the attorney that the information is classified. See Snepp v. United States, 444 U.S. 507, 509 n.3 ("The Government has a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service.")

Unmonitored access also creates a risk that attorneys may disclose—perhaps even unknowingly—sensitive and classified information to detainees, who could then pass the information on to other detainees as well as to terrorists outside of United States custody. See

-27-

Exh. B, ¶ 10 ("Many of these detainees have received extensive training in how to pass coded messages in furtherance of their terrorist operations through unwitting counsel and others.").

To prevent the unregulated flow of sensitive information, the access procedures impose reasonable monitoring requirements on several categories of attorney-detainee communications that protect the government's national security interest without significantly compromising the attorney-detainee relationship.  See Exh. B, ¶¶ 8, 12.  As a threshold matter, any authorization for individualized monitoring is based on a list of factors.  Exh. A, § IV.D.  The procedures, therefore, avoid arbitrary application of the monitoring provisions and ensure that monitoring will only occur in those attorney-detainee communications where there is a potential for disclosure of sensitive information.[13]  See Exh. B, ¶ 12.  If monitoring is ordered, the access procedures restrict monitoring only to a "privilege team," a team of DoD attorneys, intelligence and law enforcement personnel, and translators "who have not taken part in, and, in the future, will not take part in, any court proceedings concerning the detainee."  Exh. A, § II.D.  This screening requirement ensures that no person who is privy to communications between detainees and their counsel will use that information in any judicial proceeding that could adversely affect the detainees' legal status.  Cf. Weatherford v. Bursey, 429 U.S. 545, 554-59 (1977) (holding that the constitutional right to counsel in a criminal case is violated only if intercepted

---

[13] Furthermore, these procedures are consistent with existing federal regulations regarding the monitoring of communications between prison inmates and their counsel.  See 28 C.F.R. § 501.3(d) ("In any case where the Attorney General specifically so orders, based on information from the head of a federal law enforcement or intelligence agency that reasonable suspicion exists to believe that a particular inmate may use communications with attorneys or their agents to further or facilitate acts of terrorism, the Director, Bureau of Prisons, shall . . . provide appropriate procedures for the monitoring or review of communications between that inmate and attorneys . . . .").

communications are somehow used against the defendant).  For this reason, any argument by petitioners that they will be harmed by the monitoring or chilled in their ability to consult with their attorneys is unreasonable.  Furthermore, any alternative to such monitoring would essentially result in the government abdicating its serious responsibilities to safeguard classified information, as well as to act on incoming information concerning likely threats to national security, to a private attorney.  See Exh. B, ¶¶ 8, 12.

Finally, the requirement that counsel sign an acknowledgment that he or she will comply with the procedures for access to detainees at Guantanamo Bay is also reasonable.  Exh. A., §§ III.B., XII.  The acknowledgment serves as a record of counsel subject to the procedures and deflects any confusion as to the responsibilities of counsel or attempts by counsel to profess ignorance concerning a requirement, including with respect to responsibilities for handling of classified information.  At the same time, however, the acknowledgment does not force counsel to agree that the access procedures are legally permissible and makes clear that a challenge to the procedures is not foreclosed through signing the acknowledgment.  Given the large number of cases, at least 14, brought on behalf of almost 60 Guantanamo Bay detainees, pending before eight judges of the Court, the acknowledgment serves to provide some uniformity as to the conduct of counsel, instead of having various counsel treated differently based on different rulings from judges.

The access procedures are reasonable.

## **CONCLUSION**

For the foregoing reasons, petitioners have no constitutional or other right of access to counsel, and, in any event, counsel may have access to petitioners in accordance with reasonable procedures that accommodate attorney-detainee communications while protecting government interests.   The petition for a writ of habeas corpus based on any right of access or the lack of access, or any other basis,[14] must be rejected.

---

[14] Because the Court directed briefing primarily on the issue of access to counsel, respondents have not undertaken full briefing of all issues potentially raised in this case, and we reserve the right to submit such briefing, as appropriate, including on the issues of the proper respondent to a habeas action brought on behalf of a Guantanamo detainee and whether this Court is the proper forum to entertain a habeas action against that respondent.  Indeed, the access provided by the military will allow counsel to meet with the detainees, and counsel may then wish to convert their next-friend petition into a direct petition or otherwise amend their petition. Respondent would respond to any such amended petition at an appropriate juncture.  We address briefly here, however, petitioners' Alien Tort Statute (ATS), 28 U.S.C. § 1350, and Administrative Procedure Act (APA), 5 U.S.C. § 702, claims.  As the Court held in its previous opinion in this case, Rasul v. Bush, 215 F. Supp. 2d 55, 62-64 &  n.11 (D.D.C. 2002), a habeas action couched as a claim under the ATS cannot succeed.  The ATS does not provide a waiver of sovereign immunity.  See Koohi v. United States, 976 F.2d 1328, 1332 n. 4 (9th Cir. 1992); Industria Panificadora, S.A., et al., v. United States, 957 F.2d 886, 887 (D.C. Cir. 1992); Goldstar S.A. v. United States, 967 F.2d 965 (4th Cir. 1992); Biergu v. Ashcroft, 259 F .Supp. 2d 342, 354 (D. N.J. 2003) (stating that "all courts that have addressed the issue agree that the [ATS] does not itself waive the sovereign immunity of the United States") (citations omitted).  Therefore, the Court is without jurisdiction to hear ATS claims against the federal government or agents of the federal government.

Even assuming, however, that the Court has jurisdiction to hear an ATS claim against the federal government under the sovereign immunity waiver provision of the APA, see Sanchez-Espinoza v. Reagan, 770 F.2d 202, 707 (D.C. Cir. 1985) (stating in dicta that the APA's waiver of sovereign immunity, 5 U.S.C. § 702, "is arguably available" for ATS claims against federal officials for "nonmonetary relief"), the APA's sovereign immunity waiver is limited to claims against an "agency or an officer or employee thereof."  The APA specifically excludes from its definition of an agency "military authority exercised in the field in the time of war or in occupied territory."  5 U.S.C. § 701(b)(1)(6).  Because petitioners admit that they were captured in areas where the United States was engaged in armed hostilities, see Amended Complaint ¶ 16, they cannot invoke the APA's waiver of sovereign immunity as basis for their ATS claims.

Dated:  July 30, 2004                    Respectfully submitted,


                                          PETER D. KEISLER
                                          Assistant Attorney General


                                          KENNETH L. WAINSTEIN
                                          Interim United States Attorney


                                          THOMAS R. LEE
                                          Deputy Assistant Attorney General


                                          DAVID B. SALMONS
                                          Assistant to the Solicitor General


                                          DOUGLAS N. LETTER
                                          Terrorism Litigation Counsel


                                          ROBERT D. OKUN
                                          D.C. Bar No. 457-078
                                          Chief, Special Proceedings Section
                                          555 Fourth Street, N.W.
                                          Room 10-435
                                          Washington, D.C. 20530
                                          (202) 514-7280

---

(Petitioners' APA claim (Third Claim) fails for this same reason.)

In addition, the Supreme Court's recent decision in <u>Sosa v. Alavarez-Machain</u> severely restricts the types of claims that can be brought under the ATS.  124 S. Ct. 2739, 2754 (2004) (holding that the jurisdictional grant of the ATS enables federal courts to hear "claims in a very limited category defined by the law of nations and recognized at common law").  Of particular relevance to this case, the Court held that the ICCPR as well as other aspirational declarations like the ADRDM and the ACHR, which do "not of their own force impose obligations as a matter of international law," cannot form the basis for ATS suits.  <u>Id.</u> at 2767 (holding that these agreements have "little utility under the standard set out in this opinion").  Consequently, petitioners cannot rely on these provisions to state a claim for violations of customary international law under the ATS.

-31-

  /s/ Terry M. Henry
JOSEPH H. HUNT (D.C. Bar No. 431134)
VINCENT M. GARVEY (D.C. Bar No. 127191)
TERRY M. HENRY
ALAN S. MODLINGER
ANDREW I. WARDEN
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.  Room 7144
Washington, DC  20530
Tel.:  (202) 514-4107
Fax:  (202) 616-8470

Attorneys for Respondents

# EXHIBIT A

## PROCEDURES FOR COUNSEL ACCESS TO DETAINEES
## AT THE US NAVAL BASE IN GUANTANAMO BAY, CUBA

**I. Applicability**

The following procedures shall govern access to all detainees in the control of the Department of Defense (DoD) at the US Naval Base in Guantanamo Bay, Cuba by counsel for purposes of habeas corpus or other litigation in federal court.

These procedures do not apply to counsel who are retained solely to assist in the defense of a detainee whom the President has determined to be subject to trial by military commission. Access by that counsel is covered by the Procedures for Monitoring Communications Between Detainees Subject to Trial by Military Commission and their Defense Counsel Pursuant to Military Commission Order No. 3.

**II. Definitions**

A. <u>Communications</u>:  All forms of communication between counsel and a detainee, including oral, written, electronic, or by any other means.

B. <u>Counsel</u>:  An attorney who is employed or retained by or on behalf of a detainee for purposes of representing the detainee in habeas corpus or other litigation in federal court in the United States and who is admitted, either generally or pro hac vice, in the jurisdiction where the habeas petition or other litigation is pending.  Unless otherwise stated, "counsel" also includes co-counsel, interpreters, translators, paralegals, investigators and all other personnel or support staff employed or engaged to assist in the litigation.  Neither the references herein to "counsel," nor any other part of these procedures reflect any determination about, or an acknowledgment of, an attorney-detainee relationship between counsel and the detainee.

C. <u>Detainee</u>:  An individual detained by DoD as an enemy combatant at U.S. Naval Base, Guantanamo Bay, Cuba.

D. <u>Privilege Team</u>:  A team comprised of one or more DoD attorneys and one or more intelligence or law enforcement personnel who have not taken part in, and, in the future, will not take part in, any court, military commission or combatant status tribunal proceedings concerning the detainee.  If required, the privilege team may include interpreters/translators, provided that such personnel meet these same criteria.

1

**III. Requirements for Access to and Communication with Detainees**

A. <u>Security Clearance</u>:

    1.  Counsel must hold a valid current United States security clearance at the Secret level or higher, or its equivalent (as determined by appropriate DoD intelligence personnel).

    2. Counsel who possess a valid security clearance shall provide, in writing, the date of their background investigation, the date such clearance was granted, the level of the clearance, and the agency who granted the clearance. Access will be granted only after DoD verification of the security clearance.

    3. Counsel who does not currently possess a Secret clearance will be required to submit to a background investigation and to pay any actual costs associated with the processing of the same.

B. <u>Acknowledgement of and Compliance with Access Procedures</u>

    1.  Before being granted access to the detainee, counsel will receive a copy of these procedures. To have access to the detainee, counsel must agree to comply fully with these procedures and must sign an affirmation acknowledging his/her agreement to comply with them.

    2. This affirmation will not be considered an acknowledgement by counsel that the procedures are legally permissible. Even if counsel elects to challenge these procedures, counsel may not knowingly disobey an obligation imposed by these procedures.

    3. The DoD expects that counsel, counsel's staff, and anyone acting on the behalf of the attorney will fully abide by the requirements of this document. The attorney is required to provide the DoD with signed affirmations from interpreters, translators, paralegals, investigators and all other personnel or support staff employed or engaged to assist in the litigation, prior to those individuals being utilized by the attorney.

    4. Should counsel fail to comply with the procedures set forth in this document, access to or communication with the detainee will not be permitted.

C. <u>Verification of Representation</u>

    1.  Prior to being permitted access to the detainee, counsel must provide DoD with a *Notification of Representation*. This Notification must include the counsel's licensing information, business and email addresses and phone number, as well as the name of the detainee being represented by the counsel. Furthermore, the counsel must provide sufficient details regarding the circumstances of his/her retention to demonstrate the

counsel's authority or standing to bring a habeas or other federal court action on the detainee's behalf.

2.  After meeting with the detainee, counsel must provide DoD with an *Acknowledgement of Representation*. This document must be signed by the detainee and must specifically state that the detainee is being represented in habeas or other federal litigation by counsel named in the Acknowledgement.

3.  If the counsel withdraws from representation of the detainee or if the representation is otherwise terminated, counsel is required to inform DoD immediately of that change in circumstances.

4.  Counsel must provide DoD with a signed representation stating that (a) to the best of counsel's knowledge after reasonable inquiry, the source of funds to pay counsel any fees or reimbursement of expenses are not funded directly or indirectly by persons or entities the counsel believes are connected to terrorism or the product of terrorist activities, including "Specially Designated Global Terrorists," identified pursuant to Exec. Order No. 13,224, 66 Fed. Reg. 49,079 (Sept. 23, 2001) or Exec. Order No. 12,947, 60 Fed. Reg. 5079 (Jan. 23, 1995), and (b) counsel has complied with ABA Model Rule 1.8(f).

D.  <u>Logistics of Counsel Visits</u>

1.  Counsel shall submit to the Commander or Acting Commander, JTF-Guantanamo (hereinafter Commander), any request to meet with a detainee. This request shall specify date(s) of availability for the meeting, the desired duration of the meeting and the language that will be utilized during the meeting with the detainee. Reasonable efforts will be made to accommodate the counsel's request regarding the scheduling of a meeting. Once the request has been approved, DoD will contact counsel with the date and duration of the meeting.

2.  Legal visits shall take place in a room designated by JTF-Guantanamo. No more than one attorney and one interpreter/translator shall visit with a detainee at one time, unless approved in advance by the Commander, JTF-Guantanamo.

3.  Due to the mission and location of the US Naval Base at Guantanamo Bay, Cuba, certain logistical details will need to be coordinated by counsel prior to arrival. This includes arrangements for travel and lodging. Specific information regarding these issues will be provided by JTF-Guantanamo.

**IV. Decision to Monitor Counsel Visits And Communications**

A.  When appropriate, DoD will monitor communications between the detainee and counsel to protect U.S. national security interests without compromising attorney-detainee privileged communications. Communications solely between counsel and/or translators/interpreters will not be monitored.

B.  Only the Commander, JTF-GTMO may approve monitoring communications pursuant to these procedures.

C.  Monitoring shall only be approved following an individualized assessment of the national security implications of unmonitored communications between a detainee and his counsel or agents.

D.  Prior to ordering monitoring of the attorney-detainee communications, the approval authority must conclude that it is reasonably necessary to protect against the disclosure of information that reasonably could be expected to result in immediate and substantial harm to the national security, including communications regarding:

   1.  The facilitation of terrorist operations or future terrorist acts;

   2.  Military plans, weapons systems, or operations;

   3.  Foreign government information;

   4.  Foreign relations or foreign activities of the United States, including confidential sources;

   5.  Intelligence activities (including special activities), intelligence sources or methods, or cryptology;

   6.  Vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans or protection services relating to national security, which includes defense against transnational terrorism;

   7.  Matters that are classified above the clearance level of the counsel.

E.  The Commander's written determination will remain valid, unless otherwise noted in the determination, for all subsequent communications between a given detainee and his counsel, unless and until it is rescinded by the Commander, JTF-Guantanamo or higher authority.

F.  To ensure that any attorney-detainee privileged communications are not compromised, monitoring will be conducted by a DoD privilege team.  Except as provided herein, the privilege team shall not disseminate information derived from monitored communications.


**V.  Monitoring of Counsel Visits And Communications**

A.   When authorized under these procedures, the privilege team will monitor oral communications in real time between counsel and the detainee during any meetings.

4

1. These communications will be recorded in their entirety by audio and/or video recording devices.

2. Video recordings may be retained by JTF-Guantanamo—notwithstanding the prohibition against non-privilege team members having access to records of monitored conversations—provided that the recordings do not include audio.

3. Audio recordings may be retained by JTF-Guantanamo only as provided for herein.

B.   The privilege team may terminate the meeting immediately if, at any time, the team determines that the detainee or counsel are:

1. Attempting to defeat or frustrate the monitoring of communications through the use of low-volume conversation, codes or discussions in a language other than previously agreed upon; or

2. Conveying information in furtherance of terrorist or other criminal operations or that reasonably could be expected to result in immediate and substantial harm to the national security, as determined by the Commander, JTF-Guantanamo under these procedures.

C.  To the extent the detainee divulges information to counsel that the privilege team identifies as classified, the privilege team may immediately terminate the meeting if:

1. Any discussion of such classified information is outside counsel's pre-cleared classification level, or is not related to counsel's representation of the detainee.

2. Counsel discloses any classified information to the detainee (other than information that the counsel obtained from the detainee), or if counsel discloses to the detainee that the Government has classified any information at any particular classification level.

D.  The privilege team may monitor all written materials brought into or out of the meeting by counsel or counsel's staff, including notes, drawings or other writings created by counsel and/or the detainee during or prior to meetings to determine whether any such communications convey information that reasonably could be expected to result in immediate and substantial harm to the national security, as determined by the Commander, JTF-Guantanamo under these procedures.

E.  The privilege team may also monitor mail between the counsel and the detainee to determine whether any monitored communications convey information that reasonably could be expected to result in immediate and substantial harm to the national security, as determined by the Commander, JTF-Guantanamo under these procedures.

## VI.  Classification Review of Legal Mail

A.  In order to ensure the proper handling of classified information, the privilege team may review mail between counsel and the detainee to determine its appropriate security classification.

B.  The cover sheet or envelope of any such mail shall include the annotation "Attorney-Detainee materials."

C.  After analysis and approval, if appropriate, the detainee's incoming legal mail will be sealed and forwarded to the appropriate JTF-Guantanamo staff section for delivery to the detainee, and the detainee's outgoing legal mail will be sealed and forwarded to the detainee's counsel.

D.  The privilege team will forward the detainee's legal mail after a review and analysis period not to exceed:

   a.  Five (5) business days for legal mail that is written in the English language;

   b.  Ten (10) business days for any legal mail that includes writing in any language other than English, to allow for translation;

   c.  Thirty (30) business days for any legal mail where the privilege team has reason to believe that a code was used, to allow for further analysis.

E.  Legal mail may be retained by JTF-Guantanamo only as provided for herein.


## VII.   Classification Review of Materials Brought Into or Out of the Meeting by Counsel

A.  In order to ensure the proper handling of classified information, the privilege team may review all written materials brought into or out of the meeting by counsel or counsel's staff, including notes, drawings or other writings created by counsel and/or the detainee during or prior to meetings to determine their appropriate security classification.

B.  After review by the privilege team, counsel may provide the detainee with court papers or other legal or related documents pertaining to his case, provided they do not contain any classified information.

C.  Security personnel will directly receive and distribute all materials passed between counsel and the detainee during their meeting.

D.  Copies of any documents counsel desires to leave with the detainee following the meeting must be provided to the Commander, JTF-Guantanamo at least three business days in advance.  Counsel shall annotate on the cover sheet or forwarding envelope the words "Attorney-Detainee Documents."

E.  These materials may be retained by JTF-Guantanamo only as provided for herein.

## VIII.  Telephonic Access to Detainee

A.  Requests for telephonic access to the detainee by counsel or other persons will not normally be approved.  Such requests may be considered on a case-by-case basis due to special circumstances and must be submitted to Commander, JTF-Guantanamo.

B.  Any telephonic access will be subject to appropriate security procedures, including contemporaneous monitoring and recording by the privilege team, under the same conditions as in-person counsel visits.

## IX.  Retention of Monitored Communication Materials

A.  The privilege team will retain custody of any monitored communications that conveys information that reasonably could be expected to result in immediate and substantial harm to the national security, as determined by the Commander, JTF-Guantanamo under these procedures.

B.  No copies of any other portions of monitored communications will be retained.

## X.  Disclosure of Monitored Communications

A.  No information derived from monitored communications will be disclosed outside the privilege team until after the privilege team has reviewed it for security and intelligence purposes.

B.  If the privilege team determines that monitored communications convey information that reasonably could be expected to result in immediate and substantial harm to the national security, as determined by the Commander, JTF-Guantanamo under these procedures,  it will promptly report that information to the Commander, JTF-Guantanamo.  If Commander, JTF-Guantanamo concurs in that assessment, he may disseminate the relevant portions of the monitored communications to law enforcement, military and intelligence officials as appropriate.

C.  If, at any time, the Commander, JTF-Guantanamo determines that monitored communications relate to imminent acts of violence, the contents of those communications may be disclosed immediately to law enforcement, military and intelligence officials.

D.  Monitored communications will not be disclosed to any Government personnel involved in court, military commission or enemy combatant status proceedings involving the detainee.

**XI.  Counsel's Handling and Dissemination of Information from the Detainee**

   a.  Counsel may disseminate the <u>unclassified</u> contents of the detainee's communications
       for the purpose of preparing for or conducting litigation involving the detainee.

   b.  Counsel may not divulge <u>classified</u> information provided by the detainee or related to
       his case to anyone except United States government personnel with the requisite
       security clearance <u>and</u> need to know, using a secure means of communication.  As
       soon as possible after reviewing monitored communications or conducting
       classification review of materials, the DoD privilege team will advise counsel of the
       classification levels of any classified information disclosed during the
       communication.  All classified material must be handled, transported and stored in a
       secure manner in accordance with US government requirements for handling,
       transporting and storing such information.  Any information not subject to
       classification review by the privilege team, including oral communications with the
       detainee, must be treated as classified information unless otherwise determined by the
       privilege team.

**XII.  JTF-Guantanamo Security Procedures**

   a.  Counsel and translators/interpreters shall comply with the following security
       procedures and force protection safeguards applicable to the US Naval Base in
       Guantanamo Bay, Cuba, JTF-Guantanamo and the personnel assigned to or visiting
       these locations, as well as any supplemental procedures implemented by JTF-
       Guantanamo personnel.

   b.  Contraband is not permitted in JTF-Guantanamo and all visitors are subject to search
       upon arrival and departure.  Examples of contraband include, but are not limited to,
       weapons, chemicals, drugs, and materials that may be used in an escape attempt.
       Contraband also includes money, stamps, cigarettes, writing instruments, etc.  No
       items of any kind may be provided to the detainee without the advance approval of
       the Commander, JTF-Guantanamo.

   c.  Photography or recording of any type is prohibited without the prior approval of the
       Commander, JTF-Guantanamo.  No electronic communication devices are permitted.
       All recording devices, cameras, pagers, cellular phones, PDAs, laptops and related
       equipment are prohibited in or near JTF-Guantanamo.  Should any of these devices be
       inadvertently taken into a prohibited area, the device must be surrendered to JTF-
       Guantanamo staff and purged of all information.

   d.  Upon arrival at JTF-Guantanamo, security personnel will perform a contraband
       inspection of counsel and translators/interpreters using metal detectors as well as a
       physical inspection of counsel's bags and briefcases and, if determined necessary, a
       physical inspection of his/her person.

e. Following the meeting, counsel and translators/interpreters will again be inspected using a metal detector and, if deemed necessary, by physical inspection of their persons. Counsel will then meet with the privilege team to discuss the classification levels of information disclosed during the meeting and to turn over any written materials created during the meeting for screening.

**Agreement to Comply with Access Procedures**

The undersigned hereby acknowledges receipt of these procedures and agrees, by his/her signature, to comply fully with all such procedures. This agreement will not be considered an acknowledgement by the counsel that the procedures are legally permissible. This signed acknowledgement will be provided at least five business days prior to the first scheduled meeting or communication with the detainee. The Commander, JTF-Guantanamo will maintain the original of the signed acknowledgement and agreement.

Acknowledged and Agreed:


_____          _____
      Signature                                               Date


_____          _____
      Print Name                                              Position


Business Address:    _____

                           _____

                           _____


Business Phone:    _____

Business Fax:       _____

E-mail Address:    _____


Detainee:             _____

**TAB 2**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MOAZZAM BEGG,** *et al.* | ) | |
| | ) | |
| *Petitioners,* | ) | |
| | ) | |
| **v.** | ) | **CASE NO.  1:04-CV-01137 (RMC)** |
| | ) | |
| **GEORGE W. BUSH,** *et al.* | ) | |
| | ) | |
| *Respondents.* | ) | |
| | ) | |

## MOTION FOR AN ORDER REQUIRING PARTIES TO ABIDE BY PROPOSED PROCEDURES FOR COUNSEL ACCESS AND REQUEST FOR EXPEDITION

Petitioners Moazzam Begg ("Petitioner Begg") and Feroz Ali Abbasi ("Petitioner Abbasi") (collectively "Detained Petitioners"), respectfully move for an order requiring the parties to abide by the proposed "Procedures for Counsel Access," Exhibit A.  The grounds for said motion are contained in the accompanying memorandum of points and authorities.

Respectfully submitted,

_____/s/_____
*Shayana Kadidal
D.C. Bar No. 454248
CENTER FOR CONSTITUTIONAL
   RIGHTS
666 Broadway, 7th Floor
New York, New York  10012
(212) 614-6464 (tel)
(212) 614-6499 (fax)

| | |
|---|---|
| Lawrence S. Lustberg | Clive Stafford-Smith |
| Gitanjali S. Gutierrez | JUSTICE IN EXILE |
| GIBBONS, DEL DEO, DOLAN, GRIFFINGER | 636 Baronne Street |
|    & VECCHIONE, P.C. | New Orleans, Louisiana 70113 |
| One Riverfront Plaza | (504) 558-9867 (tel) |
| Newark, New Jersey 07102 | *Counsel for Petitioner Moazzam Begg* |
| (973) 596-4493 (tel) | |
| (973) 639-6243 (fax) | |
| *Counsel for Petitioners* | |

Michael Ratner
Barbara Olshansky

CENTER FOR CONSTITUTIONAL
  RIGHTS
666 Broadway, 7th Floor
New York, New York  10012
(212) 614-6464 (tel)
(212) 614-6499 (fax)
*Counsel for Petitioners*


Dated: October 22, 2004.

# Exhibit A

## PROCEDURES FOR COUNSEL ACCESS FOR CLIENTS
## HELD AT THE US NAVAL BASE, GUANTANAMO BAY, CUBA

**I.      Applicability**

The following procedures shall govern the access to counsel for petitioners in this case for purposes of habeas corpus or other litigation in federal court during the period of their detention in the US Naval Base in Guantanamo Bay, Cuba.

These procedures do not apply to counsel who are retained solely to assist in the defense of either individual in a trial by military commission. Access by such defense counsel is covered by the Procedures for Monitoring Communications Between Clients Subject to Trial by Military Commission and their Defense Counsel Pursuant to Military Commission Order No. 3.

**II.     Definitions**

      A.     <u>Communications</u>:  All forms of communication between counsel and a client, including oral, written, or by any other means.

      B.     <u>Counsel</u>:  Unless otherwise stated, an attorney who is employed or retained by or on behalf of a client for purposes of representing him in habeas corpus or other litigation in federal court in the United States, and who is admitted, either generally or pro hac vice, in the jurisdiction where the habeas petition or other litigation is pending.  Unless otherwise stated, "counsel" also includes co-counsel, interpreters, translators, paralegals, investigators and all other personnel or support staff employed or engaged to assist in the litigation.

      C.     <u>Privilege Team</u>:  A team compromised of one or more Department of Defense ("DoD") attorneys and one or more intelligence or law enforcement personnel who have not taken part in, and, in the future, will not take part in, any domestic or foreign court or military proceeding involving the client as a party, witness, or in any other capacity.

      D.     <u>Legal Mail</u>:  Legal mail is defined as letters written between counsel and a client that are related to the counsel's representation of the client, as well as privileged documents and publicly-filed legal documents relating to that representation.

**III.    Requirements for Written, Telephonic, or Personal Access to and Communications with Clients**

      A.     <u>Security Clearance</u>:

            1.     Counsel must hold a valid current United States security clearance at the Secret level or higher, or its equivalent (as determined by appropriate DoD intelligence personnel).

            2.     Counsel who possess a valid security clearance shall provide, in writing, the date of their background investigation, the date such clearance was granted, the level of the clearance, and the agency who granted the

clearance.   Access will be granted only after DoD verification of the security clearance.

3. Counsel who does not currently possess a Secret clearance will be required to submit an application for such clearance to the Department of Justice Court Security Office.

B. <u>Acknowledgement of and Compliance with Access Procedures</u>

1. Before being granted access to the client, counsel will receive a copy of these procedures.  To have access to the client, counsel must agree to comply fully with these procedures and must sign an affirmation acknowledging his/her agreement to comply with them.

2. This affirmation will not be considered an acknowledgment by counsel that the procedures are legally permissible.  Even if counsel elects to further challenge these procedures, counsel may not knowingly disobey an obligation imposed by the procedures.

3. The DoD expects that counsel, counsel's staff, and anyone acting on the instruction of the attorney will fully abide by the requirements of this document.  Interpreters, translators, paralegals, investigators and all other personnel or support staff employed or engaged to assist in the litigation must sign an affirmation acknowledging his/her agreement to comply with these procedures prior to meeting or corresponding with the client.

4. Should counsel for the petitioner fail to comply with the procedures set forth in this order, DoD may deny access to or communication with the client and seek further relief in this Court.

5. Counsel for the government assigned to this case shall agree to comply fully with these procedures and must sign an affirmation acknowledging his/her agreement to comply with them.

6. Should counsel for the government fail to comply with the procedures set forth in this order, he/she shall notify the Court and counsel for the client promptly and seek to remedy the violation.

C. <u>Verification of Representation</u>

1. Prior to being permitted access to the client, counsel must provide DoD with a *Notification of Representation*.  This Notification must include the counsel's licensing information, business and email addresses and phone number, as well as the name of the client being represented by the counsel. Furthermore, the counsel must provide sufficient details regarding the circumstances of his/her retention to demonstrate the counsel's authority or standing to bring a habeas or other federal court action on the client's behalf.

2.    After meeting with the client, counsel must provide the DoD with an *Acknowledgement of Representation*.  This document shall be provided by DoD and shall be signed and submitted as soon as is practical.

3.    If the counsel withdraws from representation of the client or if the representation is otherwise terminated, counsel is required to inform DoD immediately of that change of circumstances.

4.    Counsel must provide DoD with a signed representation stating that (a) to the best of counsel's knowledge after reasonable inquiry, the source of funds to pay counsel any fees or reimbursement of expenses are not funded directly or indirectly by persons or entities the counsel believes are connected to terrorism or the product of terrorist activities, including "Specially Designated Global Terrorists," identified pursuant to Exec. Order No. 13,224, 66 Fed. Reg. 49,079 (Sept. 23, 2001) or Exec. Order No. 12,947, 60 Fed. Reg. 5079 (Jan. 23, 1995), and (b) counsel has complied with ABA Model Rule 1.8(f).

D.    Logistics of Counsel Visits

1.    Counsel shall submit to the Department of Justice ("DOJ") any request to meet with a client.  This request shall specify the date(s) of availability for the meeting, the desired duration of the meeting and the language that will be utilized during the meeting with the client.  Reasonable efforts will be made to accommodate the counsel's request regarding the scheduling of a meeting.  Once the request has been approved, DOJ will contact counsel with the date and duration of the meeting.

2.    Legal visits shall take place in a room designated by Joint Task Force - Guantanamo ("JTF-Guantanamo").

3.    Due to the mission and location of the US Naval Base at Guantanamo Bay, Cuba, certain logistical details will need to be coordinated by counsel prior to arrival. This includes arrangements for travel and lodging. Specific information regarding these issues will be provided by DOJ.

IV.    **Procedures for Correspondence Between Counsel and Client**

A.    Mail Sent by Counsel to a Client ("Incoming Mail")

1.    Counsel shall send incoming legal mail directly to the appropriate JTF-Guantanamo staff section for delivery to the client.  The outside of the envelop or mailer for the correspondence shall be labeled clearly with the following annotation: "Attorney-Client Materials - for mail delivery to client, [name]."  No staples, paper clips, or any non-paper items shall be included with the documents.

2.    Upon receiving the Attorney-Client Materials, personnel at the US Naval Base in Guantanamo will not open the envelop/mailer.  Within two (2) business days of receipt of the communication, personnel at the US Naval

Base will deliver the envelop/mailer to the client. If counsel desires confirmation that the communication was delivered to a client, counsel is responsible for providing a stamped, self-addressed envelop for that purpose.

3.   Counsel may send regular, non-legal incoming mail to the client through the United States Postal Service (mailing address: Client's Name, 160 Camp X-Ray, Washington, D.C. 20355). These nonprivileged communications will be reviewed by military personnel at Guantanamo under the standard operating procedures for detainee non-legal mail.

4.   Counsel is required to treat all written and verbal statements of a client as classified information, unless and until the information is submitted to the privilege team and determined to be otherwise. Accordingly, if a counsel's correspondence contains any summary or recitation of or reference to a communication with a client that has not been previously determined to be unclassified, it shall be prepared, marked, transported, and handled as classified material as required by Executive Order 12958, DOD Regulation 5200.1-R and AI 26, OSD Information and Security Supplement to DOD Regulation 5200.1R.

5.   Written (and verbal) communications with the clients shall not include information relating to any ongoing or completed military, intelligence, security, or law enforcement operations, investigations, or arrests, or the results of such activities, by any nation or agency or current political events in any country that are not reasonably related to the counsel's representation of that client; or security procedures at GTMO (including names of U.S. government personnel and the layout of camp facilities) not reasonably related to counsel's representation. Counsel shall not discuss with the client information about the status of other detainees that is not reasonably related to the counsel's representation of the client.

B.   Mail Sent by Client to Counsel ("Outgoing Mail")

1.   Clients will be provided with paper to prepare communications to their counsel. In the presence of military personnel, the client will seal the written communication into an envelop and it will be annotated as "Attorney-Client Materials - for mail delivery to counsel." Each envelop shall also be labeled with the name of the client and the counsel.

2.   Military personnel will collect the outgoing legal mail within one (1) business days of being notified by the client that the communication is prepared for sealing and mailing.

3.   After the outgoing legal mail is collected from the client, military personnel will seal the envelop into a large envelop/mailer marked as "Attorney-Client Materials" and will be annotated with the name of the client and the counsel. The envelop will be sealed and mailed or couriered in the manner required for classified materials. Within two (2) business

days of receipt from the client, the communication will be mailed to counsel for the client in c/o the DOJ Court Security Office for delivery to the habeas counsel secure work site.

4.    Clients are also permitted to send written communications to counsel through the United States Postal Service. These communications shall not be marked or treated as "Attorney-Client Materials' and will be reviewed by military personnel at Guantanamo under the standard operating procedures for client non-legal mail. Any mail sent through this process that is marked "Attorney-Client Materials" will be returned unopened to the client.

5.    Communications from clients are treated as classified, unless and until determined to be otherwise by the privilege team.

## V.    Materials Brought Into a Client Meeting by Counsel

A.    Counsel shall only bring legal mail, as defined in II.D., into any meeting with a client unless he/she has received prior approval from the Commander, JTF-Guantanamo.

B.    As stated above, written and verbal communications with the clients shall not include information relating to any ongoing or completed military, intelligence, security, or law enforcement operations, investigations, or arrests, or the results of such activities, by any nation or agency or current political events in any country that are not reasonably related to the counsel's representation of that client; or security procedures at GTMO (including names of U.S. government personnel and the layout of camp facilities) not reasonably related to counsel's representation. Counsel shall not discuss with the client information about the status of other detainees that is not reasonably related to the counsel's representation of the client.

## VI.    Materials Brought Out of a Client Meeting by Counsel

A.    Upon the completion of each meeting with a client or during any break in a meeting session, counsel will give the notes or documents used or produced during the meting to a designated courier at Guantanamo. These materials will be sealed in the presence of counsel and handled as classified materials as required by Executive Order 12958, DOD Regulation 5200.1-R and AI 26, OSD Information Security Supplement to DOD Regulations 5200.1R.

B.    Upon the completion of counsel's visit to Guantanamo, the notes or documents used or produced during the visit will be sealed in the presence of counsel and will be mailed or couriered for the counsel by government personnel for storage at counsel's secure work-site under the procedures for handling classified material.

C.    Correspondence or messages from a client to individuals other than his counsel shall not be handled through this process. If a client provides these communications to his counsel during a visit, the counsel shall give those

communications to military personnel at Guantanamo for processing under the standard operating procedures for detainee non-legal mail.

**VII.   Classification Determination of Client Communications**

A.   Counsel for the government shall make an ex parte submission under seal informing this Court of its instructions to the privilege team concerning the procedures for receiving, conducting, and communicating classification determinations of privileged attorney-client communications or information derived from these communications. Such instructions are subject to judicial modification to ensure that the attorney-client privilege is adequately protected.

B.   No information derived from these submissions will be disclosed outside the privilege team pursuant to these procedures until after the privilege team has reviewed it for security and intelligence purposes. These communications will not be disclosed to any Government personnel involved in any domestic or foreign court or military proceeding involving the client as a party, witness, or in any other capacity.

C.   Counsel may submit information learned from the client to the privilege team for a determination of its appropriate security classification, c/o the Department of Justice, Litigation Security Division, 20 Massachusetts Avenue, NW, Suite 5300, Washington, D.C. 20529-0001. The outside of the envelop or mailer shall be clearly labeled "Attorney-Client Materials - for classification review." Each envelop/mailer shall also be labeled with the name of the client and the counsel and shall indicate the number of pages contained within the document. Each page of the document shall be marked "Attorney-Client Materials" and "Classified."

D.   The submission shall be prepared, marked, transported, and handled as classified material as required by Executive Order 12958, DOD Regulation 5200.1-R and AI 26, OSD Information Security Supplement to DOD Regulation 5200.1R.

E.   The privilege team will forward its classification determination directly to counsel after a review and analysis period not to exceed:

1.   Ten (10) business days for information that is written in the English language;

2.   Twenty (20) business days for any information that includes writing in any language other than English, to allow for translations by the privilege team;

3.   Thirty (30) business days for any information where the privilege team has reason to believe that a code was used, to allow for further analysis.

F.   While conducting the classification review, the privilege team will promptly report to the Commander, JTF-Guantanamo information that reasonably could be expected to result in immediate and substantial harm to the national security. In his/her discretion, the Commander, JTF-Guantanamo may disseminate the relevant portions of the communications to law enforcement, military, and

intelligence officials as appropriate. Reasonable efforts will be made to notify counsel of all disclosures outside of the privilege team prior to disseminating the privileged communication. If, at any time, the Commander, JTF-Guantanamo determines that the communications relate to imminent acts of violence, the contents of the communications may be disclosed immediately to law enforcement, military, and intelligence officials and subsequent notice provided to counsel.

G.    The privileged Attorney-Client Materials may retained by the privilege team only as provided for herein.

## VIII.    Telephonic Access to Client

A.    Requests for telephonic access to the client by counsel or other persons will not normally be approved. Such requests may be considered on a case-by-case basis due to special circumstances and must be submitted to Commander, JTF-Guantanamo.

B.    Any telephonic access by counsel will be subject to appropriate security procedures, but shall not include contemporaneous monitoring or recording.

C.    Any telephonic access by family members or others will be subject to appropriate security procedures, including contemporaneous monitoring and recording by the privilege team to protect national security interests.

D.    The privilege team may terminate a non-counsel phone call immediately, if at any time, the team determines that the client or other person are:

1.    Attempting to defeat or frustrate the monitoring of communications through the use of low-volume conversations, code, or discussions in a language other than previously agreed upon; or

2.    Conveying information in furtherance of terrorist or other criminal operations or that reasonably could be expected to result in immediate or substantial harm to the national security, as determined by the Commander, JTF-Guantanamo under these procedures.

## IX.    Counsel's Handling and Dissemination of Information from the Client

A.    Subject to the terms of any protective order issued in this case, counsel may disseminate the <u>unclassified</u> contents of the client's communications for purposes reasonably related to their representation of that client.

B.    All classified material must be handled, transported, and stored in a secure manner in accordance with Executive Order 12958, DOD Regulation 5200.1-R and AI 26, OSD Information Security Supplement to DOD Regulation 5200.1R. Any information not subject to classification review by the privilege team, must be treated as classified information unless and until otherwise determined by the privilege team.

**X.    JTF-Guantanamo Security Procedures**

A.    Counsel shall comply with the following security procedures and force protection safeguards applicable to the US Naval Base in Guantanamo Bay, Cuba, JTF-Guantanamo, and the personnel assigned to or visiting these locations, as well as any supplemental procedures implemented by JTF-Guantanamo personnel and provided to counsel in a timely manner.

B.    Contraband is not permitted in JTF-Guantanamo and all visitors are subject to search upon arrival and departure.  Examples of contraband include, but are not limited to, weapons, chemical, drugs, and materials that may be used in an escape attempt.  Contraband also includes money, stamps, cigarettes, writing instruments, etc.  No items of any kind may be provided to the client without the advance approval of the Commander, JTF-Guantanamo.

C.    Photography or recording of any type is prohibited without the prior approval of the Commander, JTF-Guantanamo.  No electronic communication devices are permitted.  All recording devices, cameras, pages, cellular phones, PDAs, laptops, and related equipment are prohibited in or near JTF-Guantanamo.  Should any of these devices be inadvertently taken into a prohibited area, the device must be surrendered to JTF-Guantanamo staff and purged of all information.

D.    Upon arrival at JTF-Guantanamo, security personnel will perform a contraband inspection of counsel and translators/interpreters using metal detectors as well as a physical inspection of counsel's bag and briefcases, and, if determined necessary, a physical inspection of his/her person.

E.    Following the meeting, counsel will again be inspected, using a metal detector and, if deemed necessary, by physical inspection of their person.

**TAB 3**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| _____ | ) | Civil Action Nos. |
|  | ) | 02-CV-0299 (CKK), 02-CV-0828 (CKK), |
|  | ) | 02-CV-1130 (CKK), 04-CV-1135 (ESH), |
| *In re* Guantanamo Detainee Cases | ) | 04-CV-1136 (JDB), 04-CV-1137 (RMC), |
|  | ) | 04-CV-1142 (RJL), 04-CV-1144 (RWR), |
|  | ) | 04-CV-1164 (RBW), 04-CV-1166 (RJL), |
|  | ) | 04-CV-1194 (HHK), 04-CV-1227 (RBW), |
|  | ) | 04-CV-1254 (HHK), 04-CV-1519 (JR) |
| _____ | ) |  |

**RESPONDENTS' RESPONSE TO NOVEMBER 1, 2004 ORDER SETTING DEADLINE
FOR SUBMISSIONS IN RESPONSE TO PETITIONER'S
MOTION FOR AN ORDER REQUIRING PARTIES TO ABIDE BY
<u>PROPOSED PROCEDURES FOR COUNSEL ACCESS</u>**

Pursuant to the Court's November 1, 2004 Order offering all parties in the Guantanamo Bay habeas litigation the opportunity "to oppose, supplement, concur with, or otherwise comment on the proposed procedures set forth in the Motion for an Order Requiring Parties to Abide by Proposed Procedures for Counsel Access, filed on October 22, 2004 in <u>Begg v. Bush</u>, 04-CV-1137," respondents state that they are prepared to accept the "closed universe" approach proposed by Judge Kollar-Kotelly in her October 20, 2004, Memorandum Opinion and Order in <u>Al Odah v. United States of America, et al.</u>, Civil Action No. 02-0828-CKK (dkt. no. 117), with respect to all detainees other than the three detainees addressed in that Order.[1]  However, respondents respectfully submit that the procedures proposed by counsel in <u>Begg</u> are in certain respects inconsistent with Judge Kollar-Kotelly's proposal, and that, in other respects, they

_____

[1] The government continues to review Judge Kollar-Kotelly's October 20 decision with respect to the monitoring of the three detainees addressed in that Order, and has not decided whether to seek modification of that ruling or additional review.  Nevertheless, as explained above, the government has revised its counsel access procedures as they apply to other petitioners in these cases consistent with Judge Kollar-Kotelly's opinion.

unduly interfere with military prerogatives.  Accordingly, respondents urge adoption of the

government's "Revised Procedures For Counsel Access To Detainees At The US Naval Base In

Guantanamo Bay, Cuba," submitted herewith.  See Exhibit 1 ("Government's Revised

Procedures").

     The government's revised procedures are a modified version of procedures proposed in

Begg ("Begg procedures").  Under the government's revised framework, habeas counsel and

detainees may correspond without any intervening review by the privilege team.  Petitioners'

counsel will be required to treat all information learned from a detainee, including any oral and

written communications with a detainee, as classified information, unless and until the

information is submitted to the privilege team and determined to be otherwise.  As explained

below, the government's revised procedures are consistent with the approach adopted by the

court in Al-Odah; indeed, the procedures modify aspects of the Begg procedures that are

inconsistent with Al-Odah.  The government's revised procedures also modify aspects of the

Begg procedures that unreasonably alter details of the current counsel access procedures that are

more appropriately left to the discretion of the government as administrator of Guantanamo Bay

("GTMO") or that unreasonably create unacceptable GTMO security or national security risks –

aspects of the procedures that were unaffected by the Al-Odah decision.[2]

_____

    [2] Begg counsel assert that their proposed procedures merely "memorialize temporary counsel access procedures currently in place" with respect to counsel's communications with their clients in this case.  See Begg Motion at 4, 6, 16, 17-18.  No such ongoing temporary arrangements with counsel exist in the Begg case.  Due to some confusion that arose with respect to materials that were generated during Begg counsel's visit to GTMO, the first such visit by habeas counsel in these cases, the government agreed not to subject that single package of material to privilege team review pending a decision from Judge Kollar-Kotelly.  See September 24, 2004 Letter from Andrew Warden to Gitanjali Gutierrez (attached as Exhibit 2).  The government, however, rejected counsel's subsequent request to adopt on an ongoing basis

For these reasons, as elaborated below, the Court should adopt the government's revised

procedures and not the <u>Begg</u> procedures.

<b><u>ARGUMENT</u></b>

**I.    The <u>Begg</u> Procedures Do Not Comply With The Framework Adopted by Judge Kollar-Kotelly in <u>Al-Odah</u>.**

One significant reason the <u>Begg</u> procedures should not be adopted as proposed is that the

procedures, though described by petitioners' counsel as consistent with those in Judge Kollar-

Kotelly's October 20 Opinion and Order, <u>see</u> <u>Begg</u> Motion at 5-6, 22, in fact fail to include

important aspects of the approach chartered by Judge Kollar-Kotelly.  The government's revised

procedures, by contrast, are consistent with Judge Kollar-Kotelly's approach.  For example, one

of the conditions Judge Kollar-Kotelly placed on counsel access was to prohibit counsel from

sharing with the detainee any classified information learned from sources other than the

detainee.[3]  <u>See</u> <u>Al-Odah</u> Memorandum Opinion at 23.  The government's procedures include this

requirement, <u>see</u> Government's Revised Procedures at ¶ IX.D.; the <u>Begg</u> procedures intentionally

do not, <u>see</u> <u>Begg</u> Motion at 20-21.  In <u>Al Odah</u>, Judge Kollar-Kotelly also imposed an explicit

requirement that petitioners' counsel disclose to the government any information learned from a

detainee involving future events that may threaten national security or imminent violence.  <u>See</u>

<u>Al-Odah</u> Memorandum Opinion at 22.  The government's proposed procedures similarly impose

---

procedures that diverted from the counsel access procedures applicable to all the habeas cases.
<u>See</u> <u>id</u>.; <u>see also</u> Transcript of October 13, 2004 Status Conference at 49, l.11-50, l.13 (excerpt
attached as Exhibit 3).

    [3] This aspect of Judge Kollar-Kotelly's opinion is consistent with the proposal of the
government and certain petitioners with respect to the proposed protective order in this case.
<u>See</u> Proposed Protective Order (<u>Begg</u> dkt. no. 29) ¶¶ 17, 29-30; Joint Report on Protective Order
Issues (<u>Begg</u> dkt. no. 30).

-3-

such an obligation, <u>see</u> Government's Revised Procedures at ¶ IX.C.; the <u>Begg</u> procedures do not.[4]  In <u>Al Odah</u>, the Court precluded counsel from sharing classified information learned from the detainee with anyone except, perhaps, co-counsel with security clearances in the detainee's case.[5]  <u>See Al-Odah</u> Memorandum Opinion at 21, 23-24.[6]  The <u>Begg</u> procedures do not contain this prohibition; indeed, <u>Begg</u> counsel appear to reserve the issue of whether they, without the consent of the government, may share information being treated as classified with counsel in other pending habeas cases.  <u>See Begg</u> Motion at 20-21.

The inconsistency of the <u>Begg</u> counsel procedures with conditions imposed on counsel under Judge Kollar-Kotelly's decision warrants rejection of the <u>Begg</u> procedures in favor of the government's revised procedures, which are consistent with Judge Kollar-Kotelly's approach.

## II.     The <u>Begg</u> Procedures Would Create Unacceptable Risks To Security at GTMO And National Security.

Respondents also oppose implementation of the <u>Begg</u> procedures because they improperly or inadequately modify existing counsel access rules that are necessary to ensure security at GTMO and to protect against threats to national security.  First, the <u>Begg</u> procedures

---

[4] While both the <u>Begg</u> procedures and the government's revised procedures permit the government to act upon any such information learned in the course of any permitted classification review by the government, <u>see Begg</u> Procedures at ¶ VII.F.; Government's Revised Procedures at ¶¶ VII.D. & E., the <u>Begg</u> procedures impose no affirmative obligation of disclosure of such information by counsel.

[5] <u>Al-Odah</u> petitioners have filed a motion for clarification that the October 20 Memorandum Opinion and Order permits counsel to share information learned from a detainee with other cleared counsel on the case.  <u>See Al-Odah et al. v. United States of America et al.</u>, Civil Action No. 02-828-CKK (dkt. no. 134) (filed Nov. 3, 2004).

[6] The proposal of the government with respect to the proposed protective order in this case is consistent with this aspect of Judge Kollar-Kotelly's opinion.  <u>See</u> Proposed Protective Order (<u>Begg</u> dkt. no. 29) ¶ 29; Joint Report on Protective Order Issues (<u>Begg</u> dkt. no. 30) at 5-7.

-4-

provide that personnel at GTMO cannot open incoming mail to detainees. <u>See</u> <u>Begg</u> Procedures at ¶ IV.2. Such a restriction is unacceptable in light of concerns regarding the infusion of prohibited contraband into the secure environment at GTMO. The government's procedures, in contrast, permit GTMO personnel to open incoming legal mail to search the contents for prohibited physical contraband. However, GTMO personnel may not read or copy incoming legal mail as long as counsel adequately identifies the envelope or mailer as containing legal mail. <u>See</u> Government's Revised Procedures at ¶ IV.A.3. These procedures adequately protect both the government's interest in maintaining a secure facility at GTMO and petitioners' interest in safeguarding the confidentiality of attorney-client communications. Consequently, the government's procedures, which are analogous to procedures adopted by the Bureau of Prisons, are reasonable and should be adopted without modification. <u>See</u> 28 C.F.R. § 540.18; <u>Henthorn v. Swinson</u>, 955 F.2d 351, 353-54 (5th Cir. 1992) (upholding Bureau of Prisons mail regulations and procedures against constitutional challenge).

Second, in the event the privilege team, in performing a classification review requested by petitioners' counsel, discovers information that reasonably could be expected to result in immediate and substantial harm to the national security, the <u>Begg</u> procedures improperly require the privilege team to make reasonable efforts to contact habeas counsel *prior* to disseminating this information to law enforcement, military, or intelligence personnel. <u>See</u> <u>Begg</u> Procedures at ¶ VII.F. No such obligation should be imposed, however, both because the government's ability to protect national security should not be impaired and any communication that reasonably could result in future harm to the national security would not be protected by the attorney-client privilege. <u>See</u> <u>In re Sealed Case</u>, 754 F.2d 395, 399 (D.C. Cir. 1985) ("Communications

otherwise protected by the attorney-client privilege are not protected if the communications are made in furtherance of a crime, fraud, or other misconduct."); Al-Odah Memorandum Opinion at 22-23. The government's revised procedures, which do not contain a counsel notification requirement, should be upheld. See Government's Revised Procedures at ¶¶ VII.E. & F.

Third, both the government's revised counsel access procedures, as well as those proposed by Begg counsel, properly include a prohibition on the sharing with detainees of information relating to current events and security matters not related to counsel's representation, including current political events; security arrangements; status of other detainees; and information relating to ongoing or completed military, intelligence, security, or law enforcement operations, investigations, or arrests, or the results of such activities. See Begg Procedures at ¶ IV.A.5.; Government's Revised Procedures at ¶¶ IV.A.7.; V.B. The purpose of such a constraint is to preserve security and stability among the detainee population, the Guantanamo Bay facility, and those associated with the facility, without intruding upon information sharing that may be needed for purposes of appropriate representation of detainees in these cases.[7]

---

[7] As explained in the Declaration of Brigadier General Jay Hood, Commander, Joint Task Force Guantanamo Bay, Cuba, attached as Exhibit 4, permitting such restricted information into the detainee population could create risks to U.S. personnel and detainees, and could irreparably harm intelligence-gathering efforts. See Ex. 4 ¶¶ 3–7. For example, sharing the identities of security personnel or information concerning security procedures could create force protection issues and affect good order in the facility. See id. ¶¶ 3-6. Information concerning current political events or military activities could incite or cause unrest among detainees. Id. ¶¶ 3-6. Such information, if spread, might also be used by detainees to target other detainees for persecution or harm based on their nation's action. Id. ¶ 6. (An obvious example would be if detainees were informed that forces of a certain nation were conducting activities in the area surrounding a shrine or other place of interest to a detainee). Restricted information, if passed to detainees, could also permit detainees to thwart interrogations or cause cooperating detainees to decline further cooperation, thereby harming the investigations or interrogations. See id. ¶ 7. Accordingly, the communication of these types of information, to the extent not strictly necessary to the habeas representation, must be foreclosed. See id. ¶ 8.

In contrast to the <u>Begg</u> procedures, however, the government's revised procedures should be adopted by the Court because they provide counsel with specific information about the scope of the prohibition.  Because, under the government's revised procedures, the government will not be able to check incoming communications to detainees for such security-related information, a situation that obviously increases the risk of the introduction of such information to the detainee population, the government's revised procedures add specific examples of the types of information falling with the prohibition, so that counsel have a clearer understanding of what

---

Information liable to lead to such harms, as explained by General Hood, would include:

a.  The status of current political or military events.  This includes:  the progress and conduct of the war in Afghanistan, Iraq and other operations conducted during the Global War on Terrorism, election predictions and results, international disputes and the opinions of foreign governments or nongovernmental organizations;

b.  Historical perspective on jihadist activities.  This includes:  discussions of the Afghanistan jihad, jihadist movements in other countries, the demise or progress of extremist and terrorist groups, the presence and activities of foreign fighters in Iraq;

c.  Any information or mention of the fate, whereabouts or activities of any leaders of al Qaida, the Egyptian Islamic Jihad and other terrorist organizations comprising the al Qaida Associated Movement or their associations or affiliates;

d.  Information about allegations of abuse or mistreatment made by other detainees (including former detainees) at Guantanamo or other facilities;

e.  Information pertaining to assignment or reassignment of present and former detention personnel; and

f. Information regarding any plans for release or continued detention of detainees; changes, upgrades or additions to detention facilities; the operation of the detention facility or changes or enhancements to security procedures at Guantanamo.

<u>Id.</u> ¶ 5.

types of information-sharing would not be appropriate.  <u>See</u> Government's Revised Procedures at ¶¶ IV.A.7.; V.B.  The examples track the examples provided by General Hood.  <u>See</u> <u>supra</u> note 7. Similarly, the government's procedures, consistent with the concerns raised by such information and the judgment of General Hood that its disclosure to detainees be avoided in the absence of "strict[] and specific[] necess[ity]," <u>see</u> Ex. 4 ¶ 8, revise the caveat permitting the sharing of such types of information only when the information is "directly" related to the representation.  The potential threat to safety, security, and intelligence interests from the introduction of such information into the detainee population warrant these revisions to and clarifications of the prohibition, and should not interfere with communications necessary for litigation of these habeas cases.

**III.    The <u>Begg</u> Procedures Unreasonably Alter Details Of Existing Government Procedures Regarding Counsel Access to Detainees Held At GTMO, Details More Appropriately Reserved To The Judgment Of The Government Than To That Of Petitioners' Counsel.**

In addition to the matters described above, the <u>Begg</u> procedures unreasonably alter – frequently without any supporting explanation – many details of the government's counsel access procedures, details more appropriately reserved to the judgment of the government than to that of petitioners' counsel:

1.    The <u>Begg</u> procedures modify without explanation the paragraph addressing the applicability of the government's counsel access procedures.  <u>Compare</u> Begg Procedures at ¶ I, <u>with</u> Government's Revised Procedures at ¶ I.  The government previously determined that the counsel access procedures should not apply to counsel who are retained solely to assist in the defense of a detainee whom the President has determined to be subject to trial by military

commission.  This restriction is reasonable in light of the significant differences between habeas

litigation in federal court and military commission proceedings.  Because petitioners offer no

explanation for the changes to this paragraph, the government's revised procedures should be

adopted in full.

       2.      The <u>Begg</u> procedures also inexplicably remove the definition of the term

"Detainee" from the government's existing provisions.  <u>See</u> <u>Begg</u> Procedures at ¶ II.  In place of

the word "detainee," the <u>Begg</u> procedures consistently refer to the term "client," which is not

appropriate give that most of these cases remain next-friend petitions and many counsel have yet

to meet their detainee and obtain consent to the representation.  In contrast to the <u>Begg</u>

procedures, the government's revised procedures contain a clear and concise definition of the

terms "counsel" and "detainee" in order to provide all parties with notice of to their

responsibilities and privileges under the procedures.  <u>See</u> Government's Revised Procedures at ¶

II.  Additionally, the <u>Begg</u> Procedures modify without explanation other definitions in paragraph

II of the government's revised counsel access procedures, including the terms "communications,"

"counsel," and "privilege team."  The government's definitions are both reasonable and precise,

thus they should be adopted by the Court without modification.

       3.      The <u>Begg</u> procedures unreasonably limit the requirement relating to when counsel's

staff sign an affirmation acknowledging their agreement to comply with the counsel access

procedures.  <u>See</u> <u>Begg</u> Procedures at ¶ III.B.3.  In order to ensure that all staff members working

on the GTMO cases comply with the counsel access procedures, the government's revised

procedures provide that all staff must sign an affirmation upon utilization of those individuals by

counsel in a fashion that implicates the counsel access procedures (<u>e.g.</u>, the first time an

interpreter translates or transcribes information provided by a detainee).  See Government's

Revised Procedures at ¶ III.B.3.  This requirement ensures that counsel and support staff who

participate in the GTMO litigation will be aware of and abide by the governing counsel access

procedures.

       4.     The government objects to the inclusion in the Begg Procedures of the requirement

that counsel for the government must sign an affirmation acknowledging their agreement to

comply with habeas counsel access procedures.  See Begg Procedures at ¶¶ III.B.5-6.  The

government's "Revised Procedures For Counsel Access To Detainees At The US Naval Base In

Guantanamo Bay, Cuba" are simply that:  procedures that permit non-government counsel to

access detainees held at GTMO for the purpose of conducting habeas litigation.  With the

exception of arranging the logistics of counsel visits, see Government's Revised Procedures at ¶

III.D, the government's revised procedures do not implicate government counsel.  Moreover,

government counsel will not have any contact with individual detainees, nor will government

counsel be privy to privileged communications between habeas counsel and detainees.  For these

reasons, any requirement that government counsel sign an affirmation agreeing to comply with

the GTMO counsel access procedures is unwarranted.[8]

---

[8] Under the government's revised procedures, only the privilege team has access to communications between counsel and detainees.  Further, privilege team involvement is limited only to situations in which counsel submits information to the privilege team for a classification determination.  See Government's Revised Procedures at ¶ VII.  To protect against any potential violations of the attorney-client privilege, the privilege team cannot be comprised of any personnel who have taken part in, and, in the future, will not take par in, any government personnel involved in court, military commission or enemy combatant status proceedings involving the detainee.  Additionally, the privilege team is prohibited from disclosing any information except as permitted by the access procedures (i.e., in cases of discovered threats to national security or imminent violence, see id. at ¶ VII).  See id. at ¶¶ II.D. & VII.

5.      Without any explanation, the <u>Begg</u> Procedures improperly remove the presumption that no more than one attorney and one interpreter should visit with a detainee at one time, without advance approval by the Commander, JTF-Guantanamo.  <u>Compare</u> <u>Begg</u> Procedures at ¶ III.D.2., <u>with</u> Government's Revised Procedures at ¶ III.D.2.  As a threshold matter, the Commander, JTF-Guantanamo to date has approved every request from habeas counsel for multiple attorneys to attend a meeting with a single detainee.  Nevertheless, given the limitations on facilities and meeting spaces at GTMO, the one attorney-one detainee presumption is reasonable and should be preserved.  It is important that all counsel visiting GTMO are accommodated in a safe manner and that personnel at GTMO have discretion with respect to meeting facilities used for habeas counsel visits.  For these reasons, the court should adopt the government's revised procedures with respect to the number of counsel presumptively permitted to meet with a single detainee.

6.      With respect to the logistics of arranging counsel visits to GTMO, the Court should adopt the government's revised procedures without modification based on government counsel's previous experience arranging visits for habeas counsel.  <u>See</u> Government's Revised Procedures at ¶ III.D.  The government's revised procedures provide the most efficient mechanism for distributing information to counsel and arranging logistical details of a visit.

7.      In contrast to the <u>Begg</u> procedures, the government's revised procedures contain more detailed labeling and document handling procedures to ensure that counsel, detainees, and GTMO personnel properly distinguish between legal mail and non-legal mail.  <u>See</u> Government's Revised Procedures at ¶¶ IV-VI.  These procedures generally provide that GTMO personnel will handle all incoming and outgoing legal mail as privileged, provided the exterior of the envelope

or mailer is clearly annotated and sent to the appropriate address.  See id.  Such labeling and

mailing requirements are similar to and expand on those previously adopted in the government's

supplemental mail procedures, and they can help prevent confusion and any inadvertent

misrouting or mishandling of information.

8.      The Begg procedures do not provide correct addresses where privileged mail and

documents may be sent.  See Begg Procedures at ¶¶ IV.A.1., IV.B.3., VI.B., VII.C.  Due to the

government's concerns about public dissemination of this information, which is intended solely

for legal communications between counsel and detainees, the government will provide all

counsel in the GTMO litigation with the proper addresses at a later date.  Non-legal

communications between detainees and persons other than counsel are addressed in paragraphs

IV.A.5. & IV.B.3. of the government's revised procedures.

9.      The Court should adopt the government's revised procedures regarding the

mechanics of obtaining from the privilege team classification determinations regarding

communications with a detainee.  Compare Government's Revised Procedures at ¶ VII, with

Begg Procedures at ¶ VII.  Although the Begg Procedures address many of the same topics, the

government's revised procedures are more complete and provide all parties with additional

details regarding their duties and responsibilities.[9]  For these reasons, the Court should adopt

paragraph VII of the government's revised procedures without modification.

10.     The Begg procedures also improperly modify the government's procedures

_____

[9] For example, the time guidelines for privilege team review suggested in the Begg
procedures are adopted in the government's revised procedures, except that the guidelines are
reasonably keyed to the privilege team's receipt of material to be reviewed to account for any
uncertainties in mail delivery.

regarding telephonic access to detainees.  More specifically, the <u>Begg</u> procedures attempt to

regulate and limit any monitoring of telephone calls between detainees and persons other than

counsel.  <u>See</u> <u>Begg</u> Procedures at ¶¶ VIII.C., D.  This requirement is unreasonable and improper

because no privileged relationship exists between detainees and non-counsel.  The government's

revised procedures properly note that monitoring of telephone calls between detainees and non-

counsel may be conducted, as appropriate.  <u>See</u> Government's Revised Procedures at ¶ VIII.C.

    11.    Finally, the Court should adopt paragraph X of the government's revised

procedures as written because these provisions address base security procedures at GTMO,

matters that fall more appropriately within the judgment of the government as opposed to

petitioners' counsel.  <u>Compare</u> Government's Revised Procedures at ¶ X, <u>with</u> <u>Begg</u> Procedures

at ¶ X.  For instance, the government's revised procedures explain the types of physical

contraband prohibited at GTMO and the search policies of the base.  Any attempt by petitioners

to modify GTMO's basic security procedures is wholly improper.

<u>**CONCLUSION**</u>

    For the foregoing reasons, the Court should adopt the government's revised procedures as

uniform counsel access procedures in these cases.  <u>But</u> <u>see</u> <u>supra</u> note 2.


Dated: November 4, 2004                     Respectfully submitted,

                                            PETER D. KEISLER
                                            Assistant Attorney General

                                            KENNETH L. WAINSTEIN
                                            United States Attorney

                                            BRIAN D. BOYLE

-13-

Principal Deputy Associate Attorney General

DAVID B. SALMONS
Assistant to the Solicitor General

DOUGLAS N. LETTER
Terrorism Litigation Counsel

ROBERT D. OKUN
Assistant United States Attorney
Chief, Special Proceedings Section

/S/ Andrew I. Warden
JOSEPH H. HUNT (D.C. Bar No. 431134)
VINCENT M. GARVEY (D.C. Bar No. 127191)
TERRY M. HENRY
LISA A. OLSON
JAMES J. SCHWARTZ
PREEYA M. NORONHA
ALAN S. MODLINGER
ROBERT J. KATERBERG
ANDREW I. WARDEN   (IN Bar No. 23840-49)
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.  Room 7144
Washington, DC  20530
Tel:  (202) 514-4107
Fax:  (202) 616-8470

Attorneys for Respondents

-14-

# EXHIBIT 1

## REVISED PROCEDURES FOR COUNSEL ACCESS TO DETAINEES
## AT THE US NAVAL BASE IN GUANTANAMO BAY, CUBA

### I. Applicability

The following procedures shall govern access to all detainees in the control of the Department of Defense (DoD) at the US Naval Base in Guantanamo Bay, Cuba (GTMO) by counsel for purposes of habeas corpus litigation in federal court.

These procedures do not apply to counsel who are retained solely to assist in the defense of a detainee whom the President has determined to be subject to trial by military commission. Access by that counsel is covered by the Procedures for Monitoring Communications Between Detainees Subject to Trial by Military Commission and their Defense Counsel Pursuant to Military Commission Order No. 3.

### II. Definitions

A.  <u>Communications</u>:  All forms of communication between counsel and a detainee, including oral, written, electronic, or by any other means.

B.  <u>Counsel</u>:  An attorney who is employed or retained by or on behalf of a detainee for purposes of representing the detainee in habeas corpus or other litigation in federal court in the United States and who is admitted, either generally or pro hac vice, in the jurisdiction where the habeas petition or other litigation is pending.  Unless otherwise stated, "counsel" also includes co-counsel, interpreters, translators, paralegals, investigators and all other personnel or support staff employed or engaged to assist in the litigation.  Neither the references herein to "counsel," nor any other part of these procedures reflect any determination about, or an acknowledgment of, an attorney-detainee relationship between counsel and the detainee.

C.  <u>Detainee</u>:  An individual detained by DoD as an enemy combatant at U.S. Naval Base, Guantanamo Bay, Cuba.

D.  <u>Privilege Team</u>:  A team comprised of one or more DoD attorneys and one or more intelligence or law enforcement personnel who have not taken part in, and, in the future, will not take part in, any court, military commission or combatant status tribunal proceedings concerning the detainee.  If required, the privilege team may include interpreters/translators, provided that such personnel meet these same criteria.

E.  <u>Legal Mail</u>:  Letters written by counsel that are related to the counsel's representation of the detainee, as well as privileged documents and publicly-filed legal documents relating to that representation.

**III.  Requirements for Access to and Communication with Detainees**

A.  <u>Security Clearance</u>:

    1.    Counsel must hold a valid current United States security clearance at the Secret level or higher, or its equivalent (as determined by appropriate DoD intelligence personnel).

    2.    Counsel who possess a valid security clearance shall provide, in writing, the date of their background investigation, the date such clearance was granted, the level of the clearance, and the agency who granted the clearance.  Access will be granted only after DoD verification of the security clearance.

    3.    Counsel who does not currently possess a Secret clearance will be required to submit to an application for clearance to the Department of Justice, Litigation Security Division.

B.  <u>Acknowledgment of and Compliance with Access Procedures</u>

    1.    Before being granted access to the detainee, counsel will receive a copy of these procedures.  To have access to the detainee, counsel must agree to comply fully with these procedures and must sign an affirmation acknowledging his/her agreement to comply with them.

    2.    This affirmation will not be considered an acknowledgment by counsel that the procedures are legally permissible.  Even if counsel elects to challenge these procedures, counsel may not knowingly disobey an obligation imposed by these procedures.

    3.    The DoD expects that counsel, counsel's staff, and anyone acting on the behalf of the attorney will fully abide by the requirements of this document.  Counsel is required to provide the DoD with signed affirmations from interpreters, translators, paralegals, investigators and all other personnel or support staff employed or engaged to assist in the litigation, upon utilization of those individuals by counsel in a fashion that implicates these procedures.

    4.    Should counsel fail to comply with the procedures set forth in this document, access to or communication with the detainee will not be permitted.

C.  Verification of Representation

    1.    Prior to being permitted access to the detainee, counsel must provide DoD with a *Notification of Representation*.  This Notification must include the counsel's licensing information, business and email addresses and phone number, as well as the name of the detainee being represented by the counsel.  Furthermore, the counsel must provide sufficient details regarding the circumstances of his/her retention to demonstrate the counsel's authority or standing to bring a habeas or other federal court action on the detainee's behalf.

    2.    After meeting with the detainee, counsel must provide DoD with an *Acknowledgment of Representation*.  This document must be signed by the detainee and must specifically state that the detainee is being represented in habeas or other federal litigation by counsel named in the Acknowledgment.  This document shall be provided by DoD and shall be signed and submitted as soon as is practical.

    3.    If the counsel withdraws from representation of the detainee or if the representation is otherwise terminated, counsel is required to inform DoD immediately of that change in circumstances.

    4.    Counsel must provide DoD with a signed representation stating that (a) to the best of counsel's knowledge after reasonable inquiry, the source of funds to pay counsel any fees or reimbursement of expenses are not funded directly or indirectly by persons or entities the counsel believes are connected to terrorism or the product of terrorist activities, including "Specially Designated Global Terrorists," identified pursuant to Exec. Order No. 13,224, 66 Fed. Reg. 49,079 (Sept. 23, 2001) or Exec. Order No. 12,947, 60 Fed. Reg. 5079 (Jan. 23, 1995), and (b) counsel has complied with ABA Model Rule 1.8(f).

D.  Logistics of Counsel Visits

    1.    Counsel shall submit to the Department of Justice (DoJ) any request to meet with a detainee.  This request shall specify date(s) of availability for the meeting, the desired duration of the meeting and the language that will be utilized during the meeting with the detainee.  Reasonable efforts will be made to accommodate the counsel's request regarding the scheduling of a meeting.  However, the space and security measures at GTMO  limit the number of counsel who may visit and the number of detainees who can be seen during the visit.  Once the request has been approved, DoJ will contact counsel with the date and duration of the meeting.

2.  Legal visits shall take place in a room designated by JTF-Guantanamo.  No more than one attorney and one interpreter/translator shall visit with a detainee at one time, unless approved in advance by the Commander, JTF-Guantanamo.

3.  Due to the mission and location of the US Naval Base at Guantanamo Bay, Cuba, certain logistical details will need to be coordinated by counsel prior to arrival. This includes arrangements for travel and lodging.  Specific information regarding these issues will be provided by DoJ.

4.  In order to travel to GTMO, all counsel must have a country and theater clearance for that specific visit.  In order to begin processing country and theater clearances, counsel must have confirmed flight information for travel to GTMO and a valid current United States security clearance at the Secret level or higher, or its equivalent (as determined by appropriate DoD intelligence personnel).  Country and theater clearances require twenty (20) days to process.  Accordingly, counsel shall provide DoD, through DoJ, with the required information no later than 20 days prior to the GTMO visit date, or as soon as a visit is scheduled.  Requests for visits made inside of 20 days will not normally be granted.

## IV.  Procedures for Correspondence Between Counsel and Detainee

A.  Mail Sent by Counsel to Detainee ("Incoming Mail")

1.  Counsel shall send incoming legal mail to the following address for delivery to the detainee: **<<address to be provided by government counsel>>**.  This address is reserved exclusively for incoming legal mail sent by counsel to the detainee.  In the event mail is sent to this address by persons other than counsel or non-legal mail is sent to this address, it shall be processed in accordance with the standard operating procedures for detainee non-legal mail.

2.  The outside of the envelope or mailer for incoming legal mail shall be labeled clearly with the following annotation:  "Attorney-Detainee Materials-For Mail Delivery to Detainee."  Each envelope or mailer shall be labeled with the name of the detainee and shall include a return address for counsel sending the materials. Each page of legal mail shall be labeled "Attorney-Detainee Materials."  No staples, paper clips or any non-paper items shall be included with the documents.

3.  Upon receiving legal mail from counsel for delivery to the detainee, personnel at GTMO may open the envelope or mailer to search the contents for prohibited physical contraband.  Legal mail shall not be read or copied if counsel routes and adequately identifies the contents of the envelope or mailer as provided by paragraphs IV.A.1., 2.  Incoming mail that does not comply with the terms of paragraphs IV.A.1., 2 may be reviewed by military personnel at GTMO under the standard operating procedures for detainee non-legal mail.

4.      Within two (2) business days of receipt of legal mail, personnel at GTMO shall deliver the envelope or mailer to the detainee.  If counsel desires confirmation that the documents were delivered to the detainee, counsel is responsible for providing a stamped, self-addressed envelope for that purpose.  The detainee shall be responsible for mailing any confirmation of delivery to counsel as outgoing legal mail.  This method shall be the sole and exclusive means by which confirmation of delivery is provided to counsel.

5.      Written correspondence to a detainee not falling within the definition of legal mail shall be sent through the United States Postal Service to the following address: **<<address to be provided by government counsel>>**.  Non-legal mail includes, but is not limited to, letters from persons other than counsel, including family and friends of the detainee.  These non-privileged communications will be reviewed by military personnel at GTMO under the standard operating procedures for detainee non-legal mail.

6.      Counsel is required to treat all information learned from a detainee, including any oral and written communications with a detainee, as classified information, unless and until the information is submitted to the privilege team and determined to be otherwise.  Accordingly, if a counsel's correspondence contains any summary or recitation of or reference to a communication with a detainee that has not been previously determined to be unclassified, the correspondence shall be prepared, marked, transported and handled as classified material as required by Executive Order 12958, DOD Regulation 5200.1-R and AI 26, OSD Information and Security Supplement to DOD Regulation 5200.1R.

7.      Written and oral communications with a detainee, including all incoming legal mail, shall not include information relating to any ongoing or completed military, intelligence, security, or law enforcement operations, investigations, or arrests, or the results of such activities, by any nation or agency or current political events in any country that are not directly related to counsel's representation of that detainee; or security procedures at GTMO (including names of U.S. Government personnel and the layout of camp facilities) or the status of other detainees, not directly related to counsel's representation.  Information falling within this prohibition includes, without limitation, the following, to the extent not directly related to counsel's representation of the detainee: (a) discussion of current political or military events, including the progress and conduct of the war in Afghanistan, Iraq and other operations conducted during the Global War on Terrorism, election predictions and results, international disputes and the opinions of foreign governments or nongovernmental organizations; (b) discussion of historical perspective on jihadist activities, including discussions of the Afghanistan jihad, jihadist movements in other countries, the demise or progress of extremist and terrorist groups, the presence and activities of foreign fighters in Iraq; (c) discussion or mention of the fate, whereabouts or activities of any leaders of al Qaida, the Egyptian Islamic Jihad and other terrorist organizations

comprising the al Qaida Associated Movement or their associations or affiliates; (d) discussion about allegations of abuse or mistreatment made by other detainees (including former detainees) at GTMO or other facilities; (e) discussion pertaining to assignment or reassignment of present and former detention personnel; and (f) discussion regarding any plans for release or continued detention of detainees; changes, upgrades or additions to detention facilities; the operation of the detention facility or changes or enhancements to security procedures at GTMO.

B.  Mail Sent by Detainee to Counsel ("Outgoing Mail")

    1.    Detainees will be provided with paper to prepare communications to counsel.  In the presence of military personnel, the detainee will seal the written communication into an envelope and it will be annotated as "Attorney-Detainee Materials-For Mail Delivery To Counsel."  Each envelope shall be labeled with the name of the detainee and the counsel.  Envelopes annotated with the name of persons other the detainee's counsel (including family/friends or other attorneys) shall be processed according to the standard operating procedures for detainee non-legal mail.

    2.    After the outgoing legal mail is collected from the detainee, the envelope will be sealed into a larger envelope by military personnel at Guantanamo which will be marked as "Attorney-Detainee Materials-For Mail Delivery To Counsel" and will be annotated with the name of the detainee and the counsel.  The envelope will be sealed and mailed in the manner required for classified materials.  Within two (2) business days of receipt from the detainee, the communication will be mailed to the following address:  **<<address to be provided by government counsel>>**.

    3.    Detainees also are permitted to send non-legal mail, including written communications to persons other than counsel, through the United States Postal Service.  These communications shall be reviewed by military personnel at Guantanamo under the standard operating procedures for detainee non-legal mail.

    4.    In the event any non-legal correspondence or messages from a detainee to individuals other than his counsel (including family/friends or other attorneys) are sent to counsel as, or included with, legal mail, counsel shall return the documents to military personnel at GTMO for processing according to the standard operating procedures for detainee non-legal mail.

**V.  Materials Brought Into A Meeting With Detainee And Counsel**

    A.    Counsel shall bring only legal mail, writing utensils and paper into any meeting with a detainee unless counsel has received prior approval from the Commander, JTF-GTMO.

B.      Written and oral communications with a detainee, including all documents brought into a meeting with a detainee, shall not include information relating to any ongoing or completed military, intelligence, security, or law enforcement operations, investigations, or arrests, or the results of such activities, by any nation or agency or current political events in any country that are not directly related to counsel's representation of that detainee; or security procedures at GTMO (including names of U.S. Government personnel and the layout of camp facilities) or the status of other detainees, not directly related to counsel's representation. Information falling within this prohibition includes, without limitation, the following, to the extent not directly related to counsel's representation of the detainee: (a) discussion of current political or military events, including the progress and conduct of the war in Afghanistan, Iraq and other operations conducted during the Global War on Terrorism, election predictions and results, international disputes and the opinions of foreign governments or nongovernmental organizations; (b) discussion of historical perspective on jihadist activities, including discussions of the Afghanistan jihad, jihadist movements in other countries, the demise or progress of extremist and terrorist groups, the presence and activities of foreign fighters in Iraq; (c) discussion or mention of the fate, whereabouts or activities of any leaders of al Qaida, the Egyptian Islamic Jihad and other terrorist organizations comprising the al Qaida Associated Movement or their associations or affiliates; (d) discussion about allegations of abuse or mistreatment made by other detainees (including former detainees) at GTMO or other facilities; (e) discussion pertaining to assignment or reassignment of present and former detention personnel; and (f) discussion regarding any plans for release or continued detention of detainees; changes, upgrades or additions to detention facilities; the operation of the detention facility or changes or enhancements to security procedures at GTMO.

## VI. Materials Brought Out Of A Meeting With Detainee and Counsel

A.      Upon the completion of each meeting with a detainee or during any break in a meeting session, counsel will give the notes or documents used or produced during the meeting to a designated individual at Guantanamo. These materials will be sealed in the presence of counsel and will be handled as classified material as required by Executive Order 12958, DOD Regulation 5200.1-R and AI 26, OSD Information Security Supplement to DOD Regulation 5200.1R.

B.      Upon the completion of the counsel's visit to Guantanamo, the notes or documents used or produced during the visit will be sealed in the presence of counsel and placed in an envelope labeled as "Attorney-Detainee Meeting Documents–For Delivery to Counsel." The envelope will be sealed into a larger envelope by military personnel at Guantanamo which will be marked as "Attorney-Detainee Meeting Documents-For Mail Delivery To Counsel" and will be annotated with the name of the detainee and the counsel. The envelope will be sealed and mailed in the manner required for classified materials. Within two (2)

business days following the completion of the counsel's visit to Guantanamo, the package will be mailed to the following address:  **<<address to be provided by government counsel>>**.

C.   Correspondence or messages from a detainee to individuals other than his counsel (including family/friends or other attorneys) shall not be handled through this process.  If a detainee provides these communications to his counsel during a visit, counsel shall give those communications to military personnel at Guantanamo so they can be processed under the standard operating procedures for detainee non-legal mail.

## VII.  Classification Determination of Detainee Communications

A.   Counsel may submit information learned from a detainee to the privilege team for a determination of its appropriate security classification.  Counsel shall memorialize the information submitted for classification review into a written memorandum outlining as specifically as possible the information for which counsel requests a classification determination.  All documents submitted for classification review shall be prepared, handled and treated in the manner required for classified materials, as provided by as required by Executive Order 12958, DOD Regulation 5200.1-R and AI 26, OSD Information Security Supplement to DOD Regulation 5200.1R.

B.   Counsel shall send all materials submitted for classification review to the following address:  **<<address to be provided by government counsel>>**.  The outside of the envelope or mailer shall be clearly labeled "Attorney-Detainee Meeting Documents-For Classification Review By Privilege Team."  Each envelope or mailer will be annotated with the name of the detainee and the counsel.  Each page of the document submitted for classification review shall be marked "Attorney-Detainee Materials" and "Classified."  The envelope or mailer will be sealed and mailed in the manner required for classified materials.

C.   As soon as possible after conducting the classification review, the privilege team will advise counsel of the classification levels of the information contained in the materials submitted for review.  The privilege team will forward its classification determination directly to counsel after a review and analysis period not to exceed, from the time of receipt by the privilege team:

1. Ten (10) business days for information that is written in the English language;

2. Twenty (20) business days for any information that includes writing in any language other than English, to allow for translations by the privilege team;

3. Thirty (30) business days for any information where the privilege team has reason to believe that a code was used, to allow for further analysis.

D.     While conducting classification review, the privilege team will promptly report any information that reasonably could be expected to result in immediate and substantial harm to the national security to the Commander, JTF-Guantanamo.  In his discretion, the Commander, JTF-Guantanamo may disseminate the relevant portions of the information to law enforcement, military and intelligence officials as appropriate.

E.     If, at any time, the privilege team determines that information in the documents submitted for classification review relate to imminent acts of violence, the privilege team shall report the contents of those documents to Commander, JTF-Guantanamo.  In his discretion, the Commander, JTF-Guantanamo may disseminate the relevant portions of the information to law enforcement, military and intelligence officials.

F.     The privilege team shall not disclose any information submitted by counsel for classification review outside the privilege team, except as provided by these procedures or as permitted by counsel submitting the information.

## VIII.  Telephonic Access to Detainee

A.     Requests for telephonic access to the detainee by counsel or other persons will not normally be approved. Such requests may be considered on a case-by-case basis due to special circumstances and must be submitted to Commander, JTF-Guantanamo.

B.     Any telephonic access by counsel will be subject to appropriate security procedures, but shall not include contemporaneous monitoring or recording.

C.     Any telephonic access by persons other than counsel will be subject to appropriate security procedures, including contemporaneous monitoring and recording.

## IX.  Counsel's Handling And Dissemination Of Information From Detainee

A.     Subject to the terms of any applicable protective order, counsel may disseminate the unclassified contents of the detainee's communications for the purpose of preparing for or conducting litigation involving that detainee.

B.     Counsel is required to treat all information learned from a detainee, including any oral and written communications with a detainee, as classified information, unless and until the information is submitted to the privilege team and determined to be otherwise.  All classified material must be handled, transported and stored in a secure manner, as provided by Executive Order 12958, DOD Regulation 5200.1-R and AI 26, OSD Information Security Supplement to DOD Regulation 5200.1R.

C.    Counsel shall disclose to DoJ or Commander, JTF-Guantanamo any information learned from a detainee involving future events that threaten national security or involve imminent violence.

D.    Counsel may not divulge classified information not learned from the detainee to the detainee. Counsel may not otherwise divulge classified information related to a detainee's case to anyone except those with the requisite security clearance and need to know, as determined by the government, using a secure means of communication.

## X. JTF-Guantanamo Security Procedures

A.    Counsel and translators/interpreters shall comply with the following security procedures and force protection safeguards applicable to the US Naval Base in Guantanamo Bay, Cuba, JTF-Guantanamo and the personnel assigned to or visiting these locations, as well as any supplemental procedures implemented by JTF-Guantanamo personnel.

B.    Contraband is not permitted in JTF-Guantanamo and all visitors are subject to search upon arrival and departure. Examples of contraband include, but are not limited to, weapons, chemicals, drugs, and materials that may be used in an escape attempt. Contraband also includes money, stamps, cigarettes, writing instruments, etc. No items of any kind may be provided to the detainee without the advance approval of the Commander, JTF-Guantanamo.

C.    Photography or recording of any type is prohibited without the prior approval of the Commander, JTF-Guantanamo. No electronic communication devices are permitted. All recording devices, cameras, pagers, cellular phones, PDAs, laptops, portable electronic devices and related equipment are prohibited in or near JTF-Guantanamo. Should any of these devices be inadvertently taken into a prohibited area, the device must be surrendered to JTF-Guantanamo staff and purged of all information.

D.    Upon arrival at JTF-Guantanamo, security personnel will perform a contraband inspection of counsel and translators/interpreters using metal detectors as well as a physical inspection of counsel's bags and briefcases and, if determined necessary, a physical inspection of his/her person. Security personnel may provide counsel with a briefing concerning the security measures at GTMO. There will be restrictions on counsel's movement and activities during the visit.

E.    Counsel shall not be permitted to interview or question members of the Joint Task Force about their duties or interactions with detainees without first obtaining permission from the Commander, Joint Task Force Guantanamo.

F.    Counsel will meet with a detainee in conference facilities provided by GTMO. These facilities are subject to visual monitoring by closed circuit TV for safety and security reasons.  (The only other method of visual observation available is for the door to remain open with military police sitting outside the door.).  No oral communications between counsel and detainee will be heard.

G.    Counsel will only be permitted to meet with a detainee counsel represents in habeas corpus litigation in federal court in the United States.

H.    At the conclusion of a meeting with a detainee, counsel and translators/interpreters will again be inspected using a metal detector and, if deemed necessary, by physical inspection of their persons.