IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **Thabid (aka Dawut Abdurehim)** ) | |
| **Ali (aka Anvar Hassan)** ) | |
| ) | No. 1:05cv02398 |
| **Petitioners,** ) | |
| *v.* ) | |
| **GEORGE W. BUSH,** *et al.*, ) | |
| **Respondents.** ) | |

**RENEWED MOTION FOR ORDER FOR
30-DAYS ADVANCE NOTICE OF ANY INTENDED REMOVAL OF PETITIONER
FROM GUANTANAMO AND TO PRESERVE EVIDENCE**

Petitioners respectfully renew[1] their motion for an order, pursuant to Rule 65 of the Federal Rules of Civil Procedure and the All Writs Act, 28 U.S.C. §1651, which requires Respondents to provide the Court and counsel for Petitioners with 30 days' advance notice of any intended removal of Petitioners from Guantanamo Bay Naval Base in Cuba. Related to this renewed motion, Petitioners also move for an order which requires Respondents to preserve all evidence related to Petitioners capture, detention, and any release. The grounds for this motion are set forth in detail below. However, in essence, Petitioners have reason to believe that they

---

[1] On April 12, 2006, Petitioners filed a Motion for Order Requiring Respondents to Provide the Court and Counsel for Petitioner with 30-days Advance Notice of Any Intended Removal of Petitioner From Guantanamo. Such motion was opposed by Respondents and denied without prejudice by the Court on March 31, 2006.

may be precipitously (and perhaps imminently) rendered to a foreign country which is hostile to their lives, liberties, and fundamental human rights.

## STATEMENT OF FACTS

Petitioner Thabid and Petitioner Ali are ethnic Uyghurs (Uighurs) and citizens of China who are being detained as "enemy combatants" at the Guantanamo Bay Naval Base in Cuba. As was detailed in the petition for writs of habeas corpus each filed on December 14, 2005, each Petitioner asserts that he was never an "enemy combatant" and was not properly or legally classified as an "enemy combatant." Given this Court's August 18, 2006 Order, requiring Respondent to provide a factual return with respect to Petitioners habeas corpus petitions, Petitioners are concerned that Respondent may decide to render Petitioners from Guantanamo on a precipitous basis similar to Respondent's prior actions with respect to other Uyghur detainees as discussed in detail below.

On Friday, May 5, 2006, Respondents precipitously removed five other Uyghur detainees from Guantanamo Bay, detainees who also had previously been detained based on their alleged status as "enemy combatants," and shipped them to a refugee camp in Albania. Sean McCormack, *Release of Five Ethnic Uighurs from Guantanamo,* U.S. Department of State Press Statement, Washington, DC (May 5, 2006) (Attachment A). Without any explanation, notice to the Court, or notice to counsel for those detainees, Respondents dumped those five Uyghurs in the poorest country in Western Europe where they know no one and where no one speaks their language. See Comments of Argita Totozani, Albania's National Commissioner for Refugees ("[t]here is not a Uighur community (here). They don't speak any Albanian . . . There is no integration possibility for them here. We realize[] their future is not in Albania."), Bruce

Konviser, *A strange kind of freedom Wrongly sent to Guantanamo, rejected by the world,* The Toronto Star (June 13, 2006) at ¶5 (Attachment B).

Respondents gave no reason for either the speed of this previous transfer nor the choice of Albania. The timing is suggestive, however. The detainees arrived in Albania on Friday May 5, 2006. On May 7, 2006, Vice President Dick Cheney publicly endorsed Albania's much hoped-for bid to join NATO. Neil A. Lewis, *Freed From Guantanamo but Stranded Far From Home,* New York Times (August 15, 2006) at ¶16 (Attachment C). On Monday, May 8, 2006, the D.C. Circuit was scheduled to hold a hearing to determine the legality of the detention of Uyghurs at Guantanamo Bay. Further, a senior Justice Department official, speaking anonymously, admitted that there was an intense push to avoid a situation in which the appeals court could order the Uyghurs admitted into the United States. Attachment C at ¶13. Based on their rendition, Respondents argued that the rendered petitioners were now beyond the reach of the Court's jurisdiction and their lawsuits were therefore mooted. The D.C. Circuit agreed and granted the Respondent's emergency motion to dismiss an appeal by those petitioners as moot in an Order, dated August 14, 2006. *Qassim v. Bush*, 2006 US App. Lexis 20937 (D.C. Cir. 2006). Based on these previous actions, Petitioners are concerned that this Court's August 18, 2006 Order requiring a factual return may provide a similar "triggering event" for Respondents' rendering of Petitioners from Guantanamo and to a foreign country.

Respondents may or may not have secured assurances from the government of Albania that the previously rendered Uyghurs would not be turned over to China. Any such assurances are now, however, questionable. Albania has faced repeated requests from China and the Shanghai Corporation Organization to hand over the five Uyghurs. Liu Jianchao, a Foreign Ministry spokesman of China, revealed that Albania's decision to accept the five Uyghurs caused

China to lodge formal complaints with Albanian and U.S. governments over the transfer. Edward Cody, *China Demands That Albania Return Ex-U.S. Detainees*, Washington Post (May 10, 2006) at ¶2 (Attachment D).  According to this report, Liu Jianchao commented that the five Uyghurs accepted by Albania "are by no means refugees but terrorist suspects, and so (we think) they should be returned to China."  Attachment D at ¶3.  In addition, China's has recently succeeded in influencing the return, to China, of Uyghurs residing in both Uzbekistan and Kazakhstan.  Uyghur Human Rights Project, *Chinese influence on neighboring states leads to extradition, suppression of Uyghurs* (July 5, 2006) at ¶¶ 1-2 (Attachment E).

Assurances by China that Uyghurs, if returned, will be treated humanely are also highly questionable given reports that China has failed to adhere to assurances that it has provided to states in the past, including assurances to the United States, related to the return of Chinese and Tibetan nationals. Amnesty International, *Fear of forcible return / Fear of torture / Fear of execution,* AI Index: AMR 51/147/2003 (Dec. 4, 2003) at ¶5 (Attachment F).  China has perpetrated and continues to perpetrate human rights offenses against its Uyghur citizens. Uyghurs are prevented from learning and practicing their religion and human rights organizations report that Uyghurs have been detained in China in connection with their peaceful religious practices, in violation of international standards of belief and religion. Amnesty International*, Uighurs fleeing persecution as China wages its "war on terror,"* AI Index: ASA 17/021/2004 (July 7, 2004) at 5 (Attachment G).

Specific concerns have also been raised for those Uyghurs who return to China after residing abroad.  According to Amnesty International, "[t]he fate of Uighurs returned to China is often difficult to establish due to tight restrictions on information, including the threat of reprisals against family members who pass such information abroad." Attachment G at 19.

Amnesty International has, however, documented specific cases where Uyghur asylum seekers and refugees, residing in countries such as Nepal and Pakistan, have been forcible returned to China, detained, reportedly tortured and in some cases sentenced to death and executed. Attachment G at 19-31. Such cases include that of Shaheer Ali, a Uyghur activist, who was recognized, in 2001, as a refugee by the United Nations High Commissioner for Refugees in Nepal, but forcibly returned to China in 2002 and executed shortly thereafter. Attachment G at 20. Based on these events, Petitioners have reason to fear for their safety if they are rendered to a foreign country that may not be able to withstand requests for their ultimate return to China.

The threat to the safety of Petitioners, if returned to China, is further heightened by the apparent treatment of Uyghurs, held at Guantanamo Bay, during a visit by an official Chinese delegation in September 2002. Amnesty International reports on allegations that during this visit, "Chinese officials took photographs of the Uyghurs and interrogated them about their backgrounds." Attachment G at 33-34. In addition, it is alleged that "detainees were subjected to intimidation and threats, and to 'stress and duress' techniques such as environmental manipulation, forced sitting for many hours, and sleep deprivation, some of which allegedly occurred on the instruction of the Chinese delegation." Attachment G at 34.

In recognition of China's treatment of Uyghurs, the former U.S. Secretary of State, himself acknowledged and declared that the United States would not return the Uyghurs, then due for release from Guantanamo Bay, to China. *Powell says detained Uighurs will not be returned to China*, Agence France-Presse (August 13, 2004) (Attachment H). In addition, human rights organizations vehemently oppose the extradition or deportation of Uyghurs to China. Human Rights Watch considers that "[i]n view of China's record of arrest, imprisonment, torture, and even execution of religious prisoners, no country should participate in

deportation, extradition, or rendition of Uighurs to China." Human Rights Watch, *Devastating Blows Religious Repression of Uighurs in Xinjiang*, Vol.17, No. 2(C) (April 2005) at 9 (Attachment I). According to Human Rights Watch, "*[n]o country* should cooperate in the return to China of Uighurs accused of crimes, including terrorism, until the proper treatment of returnees can be independently monitored and their rights to a fair trial assured. China's practice of systemic torture of state security detainees and the particularly high rates of executions in the Xinjiang make such returns unsafe and likely to violate the Convention Against Torture and the U.N. Refugee Convention." Attachment I at 81 (emphasis added).

## ARGUMENT

Under the All Writs Act, 28 U.S.C. § 1651(a), this Court has the inherent power to issue orders in support of its jurisdiction. *See SEC v. Vision Communications, Inc.*, 74 F.3d 287, 291 (D.C. Cir. 1996); *Envtl. Def. Fund v. EPA*, 485 F.2d 780, 784 n.2 (D.C. Cir. 1973). Petitioners' requests meet the most fundamental purpose of preliminary injunctive relief, "to preserve the status quo between the parties pending a final determination of the merits of the action." 13 Moore's Federal Practice 3d, § 65.20 (2004).

Each of the four factors to be weighed in awarding preliminary injunctive relief favors the requested injunction here: (1) Petitioners will suffer irreparable harm if the injunction is denied; (2) no harm will be suffered by Respondents if the injunction is granted; (3) Petitioners are likely to succeed on the merits of their claims; and (4) there is a clear public interest in preventing the United States Government from rendering individuals to foreign countries for detention and torture. *See Al-Fayed v. CIA*, 254 F.3d 300, 303 & n.2 (D.C. Cir. 2001); *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998); *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998).

Petitioners stand to suffer immeasurable and irreparable harm – from torture to possible death – at the hands of a foreign government. Transfer to another country, even if "only" for continued imprisonment, also circumvents Petitioners' rights to adjudicate the legality of their detention in this Court. By contrast, Respondents, who have already held Petitioners for several years, are asked only to provide counsel and the Court with adequate *notice* of any intended removal of Petitioners from Guantanamo and to preserve the evidentiary record surrounding their capture, detention, and possible release to aid later Court review or other investigation. Respondents can suffer no conceivable harm from complying with such a request.

Petitioners are at least likely to succeed on the merits of their claims. Petitioners have properly invoked the jurisdiction of this Court. *See Rasul v. Bush*, 124 S. Ct. 2686, 2698 (2004). This Court, in *In re Guantanamo detainees*, 355 F.Supp.2d 443, (D.D.C. 2005), previously ruled that detainees in similar circumstances to Petitioners have stated actionable claims under the Due Process Clause and the Geneva Conventions. For the United States Government to remove Petitioners to countries that would afford no such protections would be to flout this principle and defeat the Court's jurisdiction. Such a transfer would also violate basic international legal norms embodied not only in the Geneva Conventions but also in the International Covenant on Civil and Political Rights and the Convention Against Torture and Other Cruel and Degrading Treatment or Punishment. Such norms include the international legal principle of *non-refoulement*, whereby no state shall expel or return individuals to a territory "where their lives or liberty are at risk or where they are likely to face torture." *See generally* Attachment G at 18.

Finally, public policy favors requiring Respondents to provide advance notice to counsel and the Court of any intended removal of Petitioners from the Court's jurisdiction. Even if the Executive Branch is persuaded that such an action is within its power, the public good requires

that a federal litigant – properly before the Court and represented by counsel – at least be provided with an opportunity to *know* of any contemplated transfer into the hands of those who might torture him, detain him indefinitely, or transfer him to a country where such events might occur.[2]

---

[2] The Human Rights Committee of the Office of the High Commissioner for Human Rights considers that the United States "should take all necessary measures to ensure that individuals, including those it detains outside its own territory, are not returned to another country by way of inter alia, their transfer, rendition, extradition, expulsion or refoulement if there are substantial reasons for believing that they would be in danger of being subjected to torture or cruel, inhuman or degrading treatment or punishment… [and] should exercise the utmost care in the use of diplomatic assurances and adopt clear and transparent procedures with adequate judicial mechanisms for review before individuals are deported. . . ." *CONSIDERATION OF REPORTS SUBMITTED BY STATES PARTIES UNDER ARTICLE 40 OF THE COVENANT - ADVANCED UNEDITED VERSION - UNITED STATES OF AMERICA*, Human Rights Committee, Eighty-seventh session, CCPR/C/USA/Q/3/CRP.4 (10-28 July 2006) at ¶16 (Attachment J).

**CONCLUSION**

Petitioners in the instant case are men who, while charged with no crime, have been incarcerated for over four years.  Due to their ethnic backgrounds and religious beliefs they are subject to severe persecution and discrimination throughout the world from an emerging superpower that has a long reach.  Precipitous rendition from Guantanamo could quite easily result in their eventual torture or death.  The notice and evidentiary preservation requests herein merely will allow Petitioners' counsel (and this Court) to know of such rendition prior to its actual occurrence so as to allow the formulation of a response to that transfer or at least preparation for the inevitable.  Granting the motion results in no conceivable harm to the security interests of this great Nation and, for the reasons discussed above, the motion should be granted.

Dated: August 30, 2006

Respectfully submitted,

Counsel for Petitioners:

/s/ George M. Clarke III
George M. Clarke III
Baker & McKenzie LLP
815 Connecticut Avenue, NW
Washington, D.C. 20006-4078, US
Tel: 202 452 7000
Fax: 202 452 7074

David Kronenberg
Douglas Sanders
Eric Sievers
Baker & McKenzie LLP
130 East Randolph Drive
Chicago, Illinois 60601
Tel: 312 861 8000
Fax: 312 861 2899