No. 1:05cv02398

**Attachment G**

## TABLE OF CONTENTS

Introduction ................................................................................................... 1

Overview of the human rights situation in the XUAR ................................... 2

    Uighur prisoners of conscience ............................................................ 6

    Estimates of arrests and sentences since March 2002 .......................... 9

    Combating "terrorism": China's propaganda war intensifies ............... 10

    Official definitions of "terrorism" ....................................................... 14

The plight of Uighurs abroad ...................................................................... 17

    International legal standards on the principle of *non-refoulement* ...................... 17

    The fate of Uighur activists forcibly returned to China ...................... 19

    Exporting repression: harassment of Uighur returnees, exiles or their families . 34

Conclusion and Recommendations ............................................................. 38

    To the Chinese authorities ................................................................. 38

    To other governments ......................................................................... 39

# People's Republic of China
## Uighurs fleeing persecution as China wages its "war on terror"

*"We need to take the initiative and go on the offensive, crack down on gangs as soon as they surface and strike the first blow. We must absolutely not permit the three vicious forces to build organizations, have ringleaders, control weapons and develop an atmosphere. We need to destroy them one by one as we discover them and absolutely not allow them to build up momentum"*, Zhang Xiuming, deputy secretary of the XUAR committee of the Chinese Communist Party (CCP), 17 January 2004.[1]

*"In Xinjiang, not one incident of explosion or assassination took place in the last few years....Last year Xinjiang's public security situation was very good..."* Ismael Tiliwaldi, Chair of the XUAR government, 12 April 2004.[2]

## Introduction

The following document examines recent developments in the continuing political crackdown in the Xinjiang Uighur Autonomous Region (XUAR) of the People's Republic of China and the plight of members of China's mainly Muslim Uighur community fleeing human rights violations in the region.[3] Amnesty International has published a number of reports on its concerns in the region since the 1990s, including two major reports in April 1999 and March 2002.[4] Repression has continued in the region over the last two years, in the context of an ongoing political and security crackdown against the so-called "three evils" of "separatists, terrorists and religious extremists", as China continues to use "anti-terrorism" as a pretext to suppress all forms of political or religious dissent in the region.

The Chinese authorities continue to deny representatives of international human rights organizations, including Amnesty International, access to China to conduct primary research. Much of the information contained in this report was obtained through sources outside China, including research conducted by Amnesty International in Turkey, Kazakstan and Kyrgyzstan in October 2003. These countries have sizeable Uighur populations, some of whom have arrived there recently from China. In several cases,

---

[1] "China's Xinjiang chief urges intensified crackdown on 'three forces'", *Zhongguo Xinwen She*, 17 January 2004.

[2] "Governor says China's Xinjiang has seen no terrorist attacks for years," *Xinhua*, 12 April 2004.

[3] This region is known to Uighur nationalists as "East Turkestan" or less commonly, "Uyghurstan".

[4] See Amnesty International, *People's Republic of China: Gross Violations of Human Rights in the Xinjiang Uighur Autonomous Region*, April 1999 (ASA 17/19/99) and *People's Republic of China: China's anti-terrorism legislation and repression in the Xinjiang Uighur Autonomous Region*, March 2002 (ASA 17/10/2002).

respondents asked that their names and other identifying details be withheld as they feared for their own safety or the safety of relatives living in the XUAR.

Anyone in the XUAR found passing information to the outside world about human rights abuses is at risk of arbitrary detention, torture and other serious human rights violations. High levels of repression have severely curtailed the flow of information from the region on human rights violations over recent years.

One example is the general lack of publicly available information about death sentences and executions in the region over the last two years. Amnesty International has documented reports of such cases on a yearly basis for the whole of China, including the XUAR. Until 2002, sentences and executions were regularly being reported in the media in the XUAR - the only place in China where people were sentenced to death for political crimes.[5] Now, however, death sentences and executions are only rarely being reported in the official media in the region, apparently because the authorities have become more sensitive to concerns raised by the international community over such cases.

The first section of this report gives an overview of the human rights situation in the XUAR, including recent developments in China's official propaganda campaign against "terrorism". The second section describes the plight of Uighurs in other countries, including those who apply for asylum. According to Amnesty International's research, several disturbing trends have emerged or intensified over recent months, including harassment by the Chinese authorities of relatives of Uighurs who flee abroad; increasing attempts by the Chinese authorities to curtail the political and human rights activities of Uighur activists in other countries; and growing fears among many Uighurs abroad, including asylum seekers and refugees, of being forcibly returned to China.

## Overview of the human rights situation in the XUAR

Amnesty International has been reporting on human rights violations against members of the ethnic Uighur community in the XUAR for many years. Repression of alleged "separatists" and "religious extremists" has continued since the early 1990s following the mass protests and violent riots of April 1990 in Baren township.[6] They intensified following further demonstrations and disturbances in various cities including Gulja, Khotan and Aksu in the mid-1990s and the initiation of a "strike hard" campaign against

---

[5] The execution of a Tibetan, Lobsang Dhondup, in Sichuan province in January 2003 for "causing explosions" and related offences after an unfair trial extended the scope of the death penalty for political offences outside the XUAR. See Amnesty International, *People's Republic of China: Executed "according to law"? The death penalty in China,* 17 March 2004 (ASA 17/003/2004).
[6] See Amnesty International (ASA 17/19/99) op cit. and *People's Republic of China: Secret Violence: Human rights violations in Xinjiang,* 1992  (ASA 17/050/1992).

crime throughout China in 1996 which made "separatists" in the XUAR a key target (as well as in Tibet and Inner Mongolia). Reports of serious human rights violations, including arbitrary detentions, unfair trials, torture and executions, increased once again following the brutal suppression of an initially peaceful demonstration by Uighurs in the city of Gulja (Yining) in February 1997, which resulted in several days of serious unrest in the city.[7] More recently, "separatists, terrorists and religious extremists" have once again been made a key target of a renewed national "strike hard" campaign against crime which was initiated in April 2001 and which has never formally been brought to a close.

The Chinese government's use of the term "separatism" refers to a broad range of activities, many of which amount to no more than peaceful opposition or dissent, or the peaceful exercise of the right to freedom of religion. Over the last three years, tens of thousands of people are reported to have been detained for investigation in the region and hundreds, possibly thousands, have been charged or sentenced under the Criminal Law; many Uighurs are believed to have been sentenced to death and executed for alleged "separatist" or "terrorist" offences, although the exact number is impossible to determine.[8]

At the same time, the government has increased restrictions on the religious rights of the Muslim population in the region, banning some religious practices during the holy month of Ramadan, closing many mosques and independent religious schools, increasing official controls over the Islamic clergy, and detaining or arresting religious leaders deemed to be "unpatriotic" or "subversive". Regional authorities have also launched political campaigns to "clean up" cultural and media circles and some government departments in Xinjiang to rid them of "undesirable elements."[9]

Human rights violations perpetrated in the XUAR are based on restrictions which apply nationwide. For example, repression of any acts which are deemed to "incite separatism" or "splittism", including acts of free expression and other non-violent activities, is underpinned by Article 103 of the Chinese Criminal Law (which may equally be applied to Tibetan or Inner Mongolian activists as to Uighur nationalists).[10] Similarly,

---

[7] See below for further information.
[8] For further information about Amnesty International's concerns about the application of the death penalty in China. see ASA 17/003/2004, op. cit.
[9] See Amnesty International, ASA 17/10/2002, op cit.
[10] Article 103: *Whoever organizes, plots, or acts to split the country or undermine national unification, the ringleader, or the one whose crime is grave, is to be sentenced to life imprisonment or not less than ten years of fixed-term imprisonment; other active participants are to be sentenced to not less than three but not more than ten years of fixed term imprisonment; and other participants are to be sentenced to not more than three years of fixed term imprisonment, criminal detention, control, or deprivation of political rights.*

*4      Uighurs fleeing persecution as China wages its "war on terror"*

religious practice is curtailed in China as a matter of national policy and any act of religious observance or worship outside formal, official channels may be subject to sanction, in violation of international human rights standards. The severity of restrictions imposed on any specific religion or belief system varies according to official policy, such as whether or not a particular group is the target of a political campaign. In the case of Muslims in the XUAR, religious repression has intensified during the official campaign against so-called "religious extremists," launched in recent years, with the result that controls imposed on Uighur Islam have become much harsher than on Islam among other peoples in China.[11]

Several additional factors have combined to lend a degree of severity to human rights violations in the XUAR over recent years and increased the level of discontent among the Uighur population in the region. The failure of the authorities to address grievances held by many Uighurs about serious and widespread violations of their economic, social and cultural rights remains a source of tension in the region.[12] Unemployment remains high among Uighurs and the continued influx of Han Chinese workers into the region has reportedly squeezed Uighurs further out of the labour market. The vast majority of Uighurs are farmers; they are not proficient in Chinese and have limited educational and employment opportunities. Yet, in recent years, reports indicate that Uighur families have increasingly been forced from their land by Han Chinese property developers without adequate consultation or compensation.[13] Restrictions on cultural rights have also been tightened in recent years, including the reported banning and burning of tens of thousands of Uighur books[14] and the imposition of an official

---

*Whoever instigates to split the country and undermine national unification is to be sentenced to not more than five years of fixed term imprisonment, criminal detention, control, or deprivation of political rights; ringleaders or those whose crimes are grave are to be sentenced to not less than five years of fixed term imprisonment.*

[11] See *The Xinjiang Problem* by Graham E Fuller and S.Frederick Starr, Central Asia-Caucasus Institute, John Hopkins University, December 2003, p.19.

[12] See Amnesty International, ASA 17/19/99, op cit.

[13] In a recent incident, at least 16 people were reportedly detained by the police in Yili prefecture for protesting at what they said was an unfair relocation package due to the construction of a reservoir and water power station project. See: "Police in Xinjiang detain protesters", *RFA*, 14 June 2004.

[14] For example, eyewitnesses apparently reported that in June 2002 books collected from No.1 Secondary School in Kashgar City were piled up and burned. For further information, see "*Uyghur language and culture under threat in Xinjiang*" by Dr Michael Dillon, 14 August 2002, Central Asia-Caucasus Analyst. Books which have been banned or burnt reportedly include books on Uighur history and culture, such as *A Brief History of the Huns and Ancient Literature* and *Ancient Uighur craftsmanship*. For further information, see *Criminalizing Ethnicity: Political Repression in Xinjiang* by Nicolas Becquelin in Human Rights in China, China Rights Forum, No.1, 2004 , p.45.

policy banning Uighur as a language of instruction for most courses at Xinjiang University from September 2002.[15]

The authorities have also justified religious repression in the XUAR in terms of combating "fundamentalist" or "extremist Islamic" activities.[16] Xinjiang analysts have noted that the vast majority of Uighurs practice moderate forms of Sufi or Sunni Islam, unconnected with more radical, so-called "wahabbist" Islamic movements. Nevertheless, the spread of such beliefs in the region has reportedly increased since the 1990s with growing connections between some Uighurs and fundamentalist Islamist movements, particularly in Central Asia, Pakistan and Afghanistan.[17] The extent of religious repression, however, goes far beyond the need to combat violent activities. Amnesty International has documented numerous cases of Uighurs being detained in the XUAR in connection with their peaceful religious practices, in violation of international standards on freedom of belief and religion.[18]

Amnesty International is concerned that the high levels of repression in the XUAR are narrowing the space for any independent expression of Uighur ethnic, cultural or religious identity. Such expression, particularly when it takes the form of peaceful criticism, dissent or dissatisfaction, is often deemed by the authorities to constitute "separatist", "terrorist" or "illegal religious" activities, leading to arbitrary detention, torture and other serious human rights violations. Amnesty International continues to urge the Chinese authorities to make a clear distinction between violent acts and peaceful expression of dissent, or social, cultural or religious identity.

---

[15] See "Xinjiang University to teach major subjects in Chinese", *Xinhua*, 7 June 2002. Fears about growing restrictions on the use of Uighur as a language of instruction were heightened further in March 2004 when it was reported that fifty ethnic minority schools in the XUAR would be merged with ethnic Chinese schools over the next five years and that teaching should be conducted in Chinese as much as possible. See "China imposes Chinese language on Uyghur schools", *RFA*, 16 March 2004.
[16] See *Dislocating China: Muslims, Minorities and Other Subaltern Subjects,* by Dru C. Gladney, Hurst & Co. London, 2004, pp.252-253
[17] See: *The Uyghurs in Xinjiang: the malaise grows* by Rémi Castets, China Perspectives No.49, Sept-Oct 2003.
[18] See, for example, Amnesty International, ASA 17/18/99, pp.10-11 and ASA 17/010/2002, pp.13-16, op. cit. Professor Dru C Gladney, a specialist on Xinjiang and Muslims in China, has also noted that the government has consistently rounded up any Uighur suspected of being "too" religious, especially those identified as Sufis or Wahabbis, see *China's Minorities: the case of Xinjiang and the Uyghur people,* paper submitted to the UN Sub-commission on Promotion and Protection of Minority Rights, Working Group on Minorities, Ninth Session, 12-16 May 2003, UN Doc. E/CN.4/Sub.2/AC.5/2003/WP.16.

## Uighur prisoners of conscience

The continued detention of prisoners of conscience in the XUAR is evidence that China's policies of repression in the region stretch far beyond concerns with combating acts of violence or "terrorism". Given official restrictions on access and information, the total number of those detained solely for engaging in peaceful acts of freedom of expression, association or other rights in the region is impossible to determine. Many of those falling within this category are believed to be held without charge or trial in "re-education through labour" camps or other places of detention. However, the two individuals, whose cases are described below, received long prison sentences and continue to be imprisoned, despite repeated calls for their release from other governments, human rights mechanisms of the United Nations, and non-governmental organizations, including Amnesty International.

**Rebiya Kadeer**, aged 57 and a mother of eleven was sentenced in a secret trial in March 2000 to eight years' imprisonment by the Urumqi Intermediate People's Court on charges of "providing secret information to foreigners" under Article 111 of the Chinese criminal law.[19] During the trial neither Rebiya Kadeer nor her lawyer were allowed to speak in her defence. The verdict of her trial describes the "secret information" as copies of the publicly available newspapers, *Kashgar Daily, Xinjiang Legal News, Yili Daily* and *Yili Evening News,* that she sent to her husband – a former political prisoner from the XUAR who has lived in the USA since 1996. Her appeal was rejected in November 2000, and the verdict was confirmed.

Rebiya Kadeer had travelled to the USA together with her husband in 1996, but she later returned to the XUAR. In 1997, the Chinese authorities placed her under surveillance and confiscated her passport. According to Wang Lequan, the secretary of the regional Communist Party Committee, this was reportedly because "her husband was engaged in subverting the government and separatist activities outside the country".[20] This appeared to refer to his activities as a broadcaster with the radio stations, *Voice of America (VOA)* and *Radio Free Asia (RFA).*

Rebiya Kadeer was detained in August 1999 on her way to meet a member of a United States Congressional Research delegation which was visiting China at the time. She was accused of having in her possession a list of ten people "suspected of having a

---

[19] Article 111: *Whoever steals, secretly gathers, purchases, or illegally provides state secrets or intelligence for an organization, institution, or personnel outside the country is to be sentenced from not less than five years to not more than 10 years of fixed-term imprisonment; when circumstances are particularly serious, he is to be sentenced to not less than 10 years of fixed-term imprisonment, or life sentence, and when circumstances are relatively minor, he is to be sentenced to not more than five years of fixed-term imprisonment, criminal detention, control, or deprivation of political rights.*
[20] See "*A Door to the North*" by Ivo Dokoupilu, available on Transitions Online website at: http://www.tol.cz/jul99/specr10992.html, (retrieved on 24 November 1999).

connection with national separatist activists." Her family was not allowed to visit her for the first 15 months of her detention, and since then family visits have been restricted and closely monitored by the prison officials. On some occasions family visits have been cancelled, often at short notice. She is currently being held at Urumqi Women's Prison and reportedly suffers from chronic gastritis and occasional high blood pressure. She is on daily medication.

At the time of Rebiya Kadeer's detention in August 1999, her son Ablikim Abdurehim and her secretary Kahriman Abdukirim were also detained and sentenced without charge or trial to two and three years' "re-education through labour" terms respectively. Both were reportedly ill-treated in detention. In December 2002, four of Rebiya Kadeer's children living in the XUAR were briefly detained, apparently to prevent them from meeting with a senior US official visiting the region.

Rebiya Kadeer's sentence was reduced by one year in March 2004, reportedly because she had "recognised her mistakes and was resolved to stand on the side of the Party and people".[21] She is now due for release on 12 August 2006. According to reports, the Chinese authorities may consider further sentence reductions if Rebiya Kadeer continues to demonstrate "genuine repentance and willingness to reform."[22]

Rebiya Kadeer was once celebrated as a model Uighur businesswoman, and in 1995 her success won her a place in China's official delegation to the United Nations Fourth World Conference on Women in Beijing. In 1997 she was involved in creating the "Thousand Mothers Movement" – a forum promoting the rights of ethnic minority women, and creating employment opportunities for them. The forum was launched in Rebiya Kadeer's department store in Urumqi, and at a second meeting of the "Thousand Mothers Movement", she spoke about the power of women and her desire to help Uighur mothers, many of whom wished to work to help sustain their families, but had no opportunity to do so. Rebiya Kadeer had also been an official member of the Chinese People's Political Consultative Conference (CPPCC), a broad-based official body which includes representatives of the Chinese Communist Party, other official political parties, mass organizations and other key figures. In 1998, however, she was banned from re-election to the CPPCC, ostensibly because she had "failed" to condemn her husband's "separatist" activities in the USA.

Amnesty International welcomes the recent reduction in her prison sentence, but remains deeply concerned at Rebiya Kadeer's continued imprisonment in violation of her fundamental human rights to freedom of expression and association. The organization

---

[21] "China reduces sentenced of jailed Muslim businesswoman", *Associated Press (AP)*, 4 March 2004.
[22] See comment by John Kamm of the San-Francisco-based *Duihua (Dialogue) Foundation* in "Rare sentence reduction for leading Uighur activist in China", *Agence France Presse (AFP)*, 3 March 2004.

considers her to be a prisoner of conscience and reiterates its calls for her immediate and unconditional release.

**Tohti Tunyaz**, an ethnic Uighur historian aged 44, has now served six years of his 11-year sentence on charges of "illegally acquiring state secrets" and "inciting separatism" under Articles 111 and 103 of the Criminal Law. He is being held in the XUAR No.3 Prison in Urumqi.

Before his arrest in China on 11 February 1998, Tohti Tunyaz was a postgraduate student at the University of Tokyo in Japan. He was specializing in China's policy towards ethnic minorities, and had travelled home to the XUAR to collect material for his thesis on the region's history before the establishment of the People's Republic of China in 1949, in particular the period of the East Turkestan Republic between 1944-49. He was arrested during this visit and convicted in March 1999 by the Urumqi Intermediate People's Court. His sentence was later confirmed on appeal. He is due for release in February 2009.

The charge of "illegally acquiring state secrets" referred to a list of 50-year-old documents Tohti Tunyaz obtained with the help of an official librarian in the XUAR. During his trial, the charge of "inciting separatism" was linked with a book entitled "The Inside Story of the Silk Road" that the Chinese authorities claimed Tohti Tunyaz had published in Japan. However, according to his professor, he had not published such a book, or any book that "incites separatism".

Tohti Tunyaz writes under the pen-name Tohti Muzart, which refers to a river in Baicheng County in Aksu Prefecture of the XUAR, where he was raised. In 2002 PEN American Center honoured Tohti Tunyaz with the PEN/Barbara Goldsmith Freedom to Write Award. His family lives in Japan.

In May 2001, the United Nations Working Group on Arbitrary Detention (WGAD) adopted an opinion on Tohti Tunyaz's case which stated that the deprivation of liberty of Tohti Tunyaz was arbitrary and contravened several of the articles of the Universal Declaration of Human Rights, including rights to freedom of thought, opinion and expression. The WGAD also emphasized that:

"Mr Tohti Tunyaz cannot be sentenced merely for writing a research paper, which, even if it were published, lay within his right to exercise the freedoms of thought, expression and opinion which are enjoyed by everyone and which can by no

means be regarded as reprehensible if exercised through peaceful means, as they were in this case."[23]

To date, the Chinese authorities have failed to comply with WGAD's ruling to "remedy the situation" and Tohti Tunyaz remains in prison. Amnesty International considers him to be a prisoner of conscience and continues to call for his immediate and unconditional release.

## Estimates of arrests and sentences since March 2002

The Chinese authorities continue to withhold publication of detailed statistics about the detention and imprisonment of individuals across the country. China also continues to prevent access for international human rights organizations to conduct independent research on such issues.

In addition, growing levels of repression in the context of China's political crackdown in the XUAR have heightened the risks faced by those who attempt to publicise such information unofficially, including by passing information about arrests and sentences to individuals and organizations in other countries. The imprisonment of Rebiya Kadeer, detailed above, has sent a message to other Uighur activists that even passing local newspaper reports to the outside world may be considered a criminal offence. A combination of all of these factors make it impossible to make an accurate assessment of the number of those arrested and detained for political reasons in the XUAR.

At the annual session of the 10th National People's Congress in Beijing in March 2003, Han Zhubin, China's then procurator-general, publicised statistics which revealed that in the five years between 1998-2002, procuratorates nationwide approved the arrest of 3,402 individuals and prosecuted 3,550 people on charges of "endangering state security".[24] This high figure seems to indicate an intensive effort by the Chinese authorities to crack down on any behaviour deemed to pose a threat to "state security" or the "socialist system", which would include purported acts of "terrorism" or "separatism". While these are national figures, it is likely that a significant number are cases of Uighurs detained and sentenced in the XUAR for "inciting separatism".

---

[23] United Nations Working Group on Arbitrary Detention, "Opinion No. 7/2001 (People's Republic of China): Communication addressed to the Government on 26 April 2000, concerning Tohti Tunyaz", United Nations Economic and Social Council, Document No. E/CN.4/2002/77/Add.1, 11 December 2001.
[24] *Xinhua*, 11 March 2003. See also *Dialogue*, Spring 2003/Issue 11 by the *Duihua Foundation* for an analysis of these statistics at www.duihua.org)

In March 2002, Amnesty International estimated that thousands of people had been detained in the XUAR during the six months following September 2001, with at least scores charged or sentenced under the Criminal Law – most of them Uighurs.[25] Given the intensification in the official crackdown on the "three evil forces" of "separatism, terrorism and religious extremism" in the region, it is likely that the numbers have increased significantly since then.

In September 2003, exile Uighur sources reported that tens of thousands of people had been detained as alleged "separatists" or "terrorists" since March 2002 in the context of security operations in various cities in the XUAR aimed at confiscating or burning Uighur books and other media believed to promote independence.[26] They also estimated that from April to August 2002, 5,000 people were detained in Kashgar alone during a security operation aimed at unofficial Islamic activities. Around 150 of these people were reportedly executed.[27] Amnesty International has been unable to verify these figures.

On 24 September 2003, the Chinese authorities publicly announced a renewed security crackdown in the region, which was due to last for 100 days from 1 October 2003 (National Day) to Chinese New Year in late January 2004. Amnesty International is concerned that this is likely to have led to a significant increase in the number of Uighurs detained and/or sentenced for alleged "separatist" or "terrorist" offences.

## Combating "terrorism": China's propaganda war intensifies

Following the attacks in the USA on 11 September 2001, the Chinese authorities have actively sought to justify their crackdown in the XUAR as part of the international "war on terror" in an attempt to garner international support for their actions. Since then, the Chinese authorities have widely publicised the occurrence of a number of explosions and other violent activities attributed to armed Uighur nationalist groups during the 1980s and 1990s and used this as a pretext to justify the government's crackdown in the region in terms of "counter-terrorism".

Over the last three years, Uighur nationalists who would formerly have been branded as "separatists" have increasingly been labelled "terrorists". At the end of December 2001, China amended the provisions of its Criminal Law with the stated purpose of making more explicit the measures it already contained to punish "terrorist" crimes. In March 2002, Amnesty International published a report analysing these

---

[25] See Amnesty International, ASA 17/010/2003, op cit.
[26] See *East Turkistan: Genocide, prison, torture and linguacide in the name of 'Anti-Terrorism'*, ETIC Report 2003, available at www.uygur.org/enorg/h_rights/report_2003.html.
[27] See *Dong Tuerqisidan Renquan Wenti [East Turkestan Human Rights Problems], March 2002 – August 2003*, ETIC, available (in Chinese) at http://www.uygur.org/china/et/2004/0213.htm.

amendments and expressing concern that the new provisions enlarge the scope for application of the death penalty in China and could be used to further suppress freedom of expression and association.[28]

The crackdown on "separatists, terrorists and religious extremists" has continued over the last three years, even though there have been no official reports of attacks by "terrorist" groups. According to a Chinese government report published on 21 January 2002, which listed "terrorist" incidents in the region over the past ten years, the most recent explosion allegedly carried out by a "terrorist" group took place in April 1998 in Yecheng and the only other recent incident of violence imputed to "terrorists" since 1999 was the murder of one court official in Kashgar prefecture in February 2001.[29]

The absence of such incidents since then has recently been confirmed by local officials. On 12 April 2004, the Chair of the XUAR regional government, Ismael Tiliwaldi stated in a press conference that "not one incident of explosion or assassination took place in the last few years".[30] He added that "terrorists" had "incurred public wrath like a rat running across the streets."[31] In an apparent attempt to promote the economic potential of the region, he claimed that the public security situation in the region was "very good" and that "300,000 foreign tourists and more than ten million domestic tourists tour Xinjiang each year". "Not one of the 500 foreigners permanently residing in Xinjiang runs into trouble."

Nevertheless, in December 2002, China again highlighted the alleged threat posed by "East Turkestan terrorist forces" in a White Paper on National Defense, published by the State Council, which included a long section identifying "terrorism" as a key security issue. The paper reiterated that "China, too, is a victim of terrorism," and that "the 'East Turkistan terrorist forces' are a serious threat to the security of the lives and property of the people of all China's ethnic groups, as well as to the country's social stability."[32]

---

[28] See Amnesty International, ASA 17/10/2002, op cit.

[29] See *"East Turkestan terrorist forces cannot get away with impunity"*, issued by the Information Office of China's State Council and published in the official People's Daily newspaper on 21 January 2002. This document asserted that "East Turkistan terrorist forces" had conducted "a campaign of bombing and assassinations" consisting of more than 200 incidents resulting in 162 deaths and 440 people injured.

[30] "Governor says China's Xinjiang has seen no terrorist attacks for years", *Xinhua,* 12 April 2004.

[31] The analogy of "rats running across the street" is commonly used to describe targets of political crackdowns in China, including recently, the Falun Gong spiritual movement, see Amnesty International, *People's Republic of China: Continuing abuses under a new leadership – summary of human rights concerns,* October 2003 (ASA 17/035/2003), pp.13-14

[32] *China's National Defense in 2002,* issued on 9 December 2002 by the State Council Information Office, available at http://www.china.org.cn/english/2002/Dec/50743.htm. Nicolas Becquelin has pointed out that in contrast, China's previous White Paper on defense, published in 2000, made only four scattered and general references to "terrorism". See China Rights Forum, Issue 1, 2004, op cit.

In apparent response to international criticism about its policies in the XUAR, in May 2003, China's State Council released a new White Paper entitled *The History and Development of Xinjiang,* which asserted that the rights of ethnic minorities in the region were fully protected, including freedom of religious belief.[33] The paper also stated that "[a]fter the September 11 incident, the voices calling for an international anti-terrorist struggle and cooperation have become louder and louder. In order to get out of their predicament, the 'East Turkestan' forces once again have raised the banner of 'human rights,' 'freedom of religion' and 'interests of ethnic minorities,' and fabricated claims that 'the Chinese government is using every opportunity to oppress ethnic minorities,' to mislead the public and deceive world opinion in order to escape blows dealt by the international struggle against terrorism." However, the paper failed to acknowledge or address concerns raised repeatedly by international human rights NGOs, United Nations experts and others about serious and widespread human rights violations against the Uighur community in the region over many years.

On 15 December 2003, the Chinese Ministry of Public Security issued a list of "East Turkestan terrorists" and "terrorist organizations" abroad.[34] This named four organizations: the East Turkestan Liberation Organization (ETLO), the East Turkestan Islamic Movement (ETIM), the World Uyghur Youth Congress (WUYC) and the East Turkestan Information Centre (ETIC) and eleven individual members of these groups: Hasan Mahsum, Muhanmetemin Hazret, Dolkun Isa, Abdujelil Karakash, Abdukadir Yapuquan, Abdumijit Muhammatkelim, Abdula Kariaji, Ablimit Tursun, Huadaberdi Hasherbik, Yasin Muhammat and Atahan Abuduhani. At the time of publication, the Chinese authorities called on other states to take international action by tracking these people down and handing them over to China.

Commentaries also appeared in the official Chinese press detailing "terrorist" incidents allegedly carried out by the individuals listed. In keeping with previous patterns, this information was uncorroborated and no credible evidence was provided to substantiate these claims. Indeed, much of the "evidence" appeared to have been obtained from other individuals under interrogation. In view of the ongoing and widespread use of torture and ill-treatment by police in China, particularly to extract "confessions" from detained suspects, Amnesty International believes any "evidence" obtained in this way must be treated with deep suspicion.[35]

---

[33] Available at http://www.china.org.cn/e-white/20030526/4.htm.
[34] "Combating terrorism, we have no choice," *People's Daily,* 16 December 2003, available online at: http://english1.peopledaily.com.cn/200312/18/eng20031218_130652.shtml
[35] For further information about the extent and nature of torture in China, see Amnesty International, *People's Republic of China: Torture – a growing scourge in China – time for action,* February 2001, ASA 17/004/2001.

Two of the organizations, WUYC and ETIC, headed by Dolkun Isa and Abdujelil Karakash respectively, are legally constituted non-governmental organizations based in Germany which publicise reports of human rights abuses against Uighurs in China and advocate self-determination or independence for the region.[36] They have stated on numerous occasions that they are opposed to the use of violence.[37] Following the publication of the list, a spokesman for the German Ministry of the Interior reportedly stated that he was aware of the WUYC, but did not classify them as "extremist" and that he did not know anything about ETIC.[38] Amnesty International is concerned that China's inclusion of these groups in its list is an attempt to curb their peaceful political and human rights monitoring activities, and to conflate peaceful political activism with violent acts of "terrorism".

The listing of ETIM and ETLO was in keeping with previous allegations made by China against these groups. Both were highlighted in China's official report on "East Turkestan terrorists" of January 2002 and China's allegations against ETIM were bolstered in August 2002 when the US, closely followed by the UN[39], formally classified ETIM as a "terrorist organization" after repeated lobbying from China. The grounds that formed the basis for this decision, aside from China's previous allegations, remain unclear.

A report produced by the US Congressional Research Service (CRS) in December 2001 had documented a number of armed groups allegedly operating in the region, but had failed to mention ETIM.[40] Its list of armed groups included: the United Revolutionary Front of Eastern Turkestan, the Organization for the Liberation of Uighurstan, the Wolves of Lop Nor, the Xinjiang Liberation Organization, the Uighur Liberation Organization, the Home of East Turkestan Youth and the Free Turkestan Movement. China's official statement on "East Turkestan terrorists" published in January 2002 listed several groups allegedly responsible for violence, including ETIM, ETLO, the Islamic Reformist Party 'Shock Brigade', the East Turkestan Islamic Party, the East Turkestan Opposition Party, the East Turkestan Islamic Party of Allah, the Uyghur Liberation Organization, the Islamic Holy Warriors and the East Turkestan International Committee.

---

[36] WUYC has since merged with another Uighur political group, the East Turkestan National Congress (ETNC) to form the World Uyghur Congress (WUC).

[37] Xinjiang analysts have also noted that the vast majority of the East Turkestan independence and information organizations disclaim violence. For a list of such groups, see *"Cyber-separatism: virtual voices in the Uyghur opposition"* in Gladney, 2004 op. cit.

[38] "China publishes Xinjiang 'terrorists' list", *Jane's Intelligence Review*, 3 March 2004.

[39] More specifically, the United Nations Security Council Sanctions Committee on al-Qaeda and the Taliban.

[40] *China's Relations with Central Asian States and Problems with Terrorism*, CRS Report for Congress, 17 December 2001.

Academics have noted the general lack of information available on any of the groups listed above and it remains unclear on what basis the US agreed to specifically single out ETIM as a "terrorist organization".[41] Since then, the US has refused to meet Chinese demands to formally add ETLO to its list. In a rare interview, conducted by *Radio Free Asia* on 24 January 2003, the secretive leader of this organization, Mehmet Emin Hazret reportedly stated: "[o]ur principle goal is to achieve independence for East Turkestan by peaceful means. But to show our enemies and friends our determination on the East Turkestan issue, we view a military wing as inevitable."[42] He reportedly denied allegations that ETLO had previously been involved in attacks and rejected links between his group and ETIM, which, he claimed, he had never heard of until it was listed in China's official report of January 2002.[43]

## Official definitions of "terrorism"

In January 2003, a young poet was reportedly arrested after he recited a verse during a performance at a Kashgar concert hall.[44] A local Chinese Communist Party official reportedly clarified that his poem "attacked government policy regarding ethnic minorities" and that "he wanted to destroy the unity between Uighur and Han". He reportedly added that "we regard this as **terrorism in the spiritual form**, but we want to educate not punish him."[45] No further details about the poet or his fate have become available. Amnesty International is concerned that the vague term "spiritual terrorism" – not concretely prescribed, let alone defined, in China's criminal law - appears to have been used in this case as a pretext for arrest.[46]

Amnesty International has previously raised concerns about China's recent interpretation of the demonstration and ensuing unrest in Gulja in February 1997 as an act

---

[41]  Gladney notes that an Internet search for many of these organizations and their backgrounds reveals little, if any, information. See: *China's Minorities: the case of Xinjiang and the Uyghur people,* paper submitted to the UN Sub-commission on Promotion and Protection of Minority Rights. Working Group on Minorities, Ninth Session, 12-16 May 2003, UN Doc. E/CN.4/Sub.2/AC.5/2003/WP.16.
[42]  "Separatist leader vows to target Chinese government", *RFA,* 29 Jan 2003.
[43]  Ibid.
[44]  See "Pressure to conform in West China", *Christian Science Monitor,* 29 September 2003.
[45]  Ibid. Emphasis added. "Education" could represent a wide range of sanctions ranging from enforced political study classes to "Re-education through Labour", an administrative punishment imposed by the police without charge or trial, for up to three years.
[46]  Amnesty International documented a similar case of the arrest of a poet, Tursunjan Amat, following his recital of a verse in Urumqi in January 2002. (See ASA 17/10/2002, op cit, p.17). Official Chinese sources have since denied that he was ever detained. Unofficial sources indicate that he was released, some weeks, or possibly months, later.  See also the case of Uighur poet, Ahmadjan Osman, below.

of "terrorism" instigated by ETIM[47], otherwise cited as the East Turkestan Islamic Party of Allah (ETIPA).[48] Independent eyewitness reports received by Amnesty International indicate that the incident was a demonstration by local people calling for equal rights for Uighurs which degenerated into violence and rioting after the security forces used excessive force in an attempt to forcibly disperse the protestors. According to some eyewitness accounts, several members of the security forces opened fire on the demonstrators leading to an unknown number of deaths and injuries. Hundreds of detained demonstrators were reportedly hosed down with icy water in the cold February weather, resulting in frostbite and, in some cases, amputations of fingers, hands or feet. In the following days, thousands of residents were detained when soldiers and riot police carried out systematic searches through the streets, arresting and beating people, including children, in the process. Thousands of people were detained, many of them were tortured and at least two people died in custody, apparently as a result of torture or ill-treatment.[49]

Official moves to link the Gulja protests with "terrorists" were reinforced most recently during the trial of Shaheer Ali, a Uighur nationalist from Khotan in the XUAR, who was convicted and executed as a "terrorist" and alleged leader of ETIPA in March 2003 after being forcibly returned from Nepal the previous year. (This case is described in more detail below.)

In February 2003, Amnesty International wrote to the chair of the XUAR regional government, Ismael Tiliwaldi, asking for details about those believed to remain in prison in connection with the Gulja incident, calling for an independent inquiry into allegations of human rights violations that took place at that time, and requesting further information to substantiate official claims of ETIM/ETIPA's involvement.[50] To date, Amnesty International has received no response to this letter.

Like several other provisions in the Chinese Criminal Law, "terrorism" and related offences remain vaguely defined giving the authorities wide leeway to interpret such crimes in a broad manner.[51] This is of particular concern given the 2001 amendments to the Criminal Law, detailed above, which increase penalties for so-called "terrorist" offences, including in some cases the application of the death penalty, a

---

[47] In their report, "East Turkestan terrorist forces cannot get away with impunity" of 22 January 2002 (op. cit), the Chinese authorities described this incident as a 'serious riot during which the terrorists shouted slogans calling for the establishment of an Islamic Kingdom'.
[48] During a press conference on 12 September 2002, Kong Quan, a spokesperson from the Chinese Ministry of Foreign Affairs stated that ETIM had other names such as the 'East Turkestan Islamic Party of Allah' or the 'East Turkestan Islamic Party' (*Xinhua,* 12 Sept 2002).
[49] For further information see Amnesty International (ASA 17/18/99) op. cit.
[50] For further information, see Amnesty International: *People's Republic of China: No justice for the victims of the 1997 crackdown in Gulja (Yining),* 4 February 2003 (ASA 17/011/2003).
[51] See Amnesty International, ASA 17/10/2002, op. cit.

punishment which Amnesty International opposes under all circumstances as a violation of the right to life.

There is no internationally accepted legal definition of the terms "terrorism" or "terrorist"[52] and recent attempts by Chinese officials to define such terms at the national level are unconvincing. During the news conference, in which he introduced the list of alleged "terrorists" in December 2003, Zhao Yongchen, deputy director of the counter-terrorism department of the Ministry of Public Security gave the following criteria for 'defining' terrorist organizations:

- An organization or organizations that engage in terrorist activities endangering national security or social stability, and harm life and property through violence and terror (regardless of whether it is based in or outside of China);
- Possessing established organizational leadership and division of labour or systems for division of labour.

And in addition to the above two criteria:

- Currently or previously involved in the organization, planning, instigation, conduct or implementation of terrorist activities;
- Funding and supporting terrorist activities;
- Establishing bases for terrorist activities or organizing, recruiting and training terrorists;
- Collaborating with international terrorist organizations by receiving funding or training from these organizations or engaging in terrorist activities with them.

He went on to define "terrorists" as:

- Those who have established links with terrorist organizations and who engage in terrorist activities which harm state security or the lives and property of people (whether they are Chinese or foreign citizens).

And in addition to this, they must:

- organise, lead or belong to a terrorist organization;
- organise, plan, instigate, propagate or incite the implementation of terrorist activities;

---

[52] For further information, see Amnesty International, *Rights at risk: Amnesty International's concerns regarding security legislation and law enforcement measures,* January 2002 (ACT 30/001/2002).

- fund and support terrorist organizations and terrorists to assist them in the conduct of terrorist activities;
- receive funding or training from the above-mentioned terrorist organizations or other international terrorist organizations to engage in terrorist activities.[53]

While this is a relatively detailed list of categories, it provides no concrete definition of the terms "terror", "terrorism" or "terrorist", potentially giving the authorities a free hand to interpret such crimes in a sweeping rather than a narrow sense.

Amnesty International recognizes the duty of states under international human rights law to protect their populations from violent criminal acts. However, such measures should be implemented within a framework of protection for all human rights. The presence in any community of some violent groups or individuals must not be used to as a pretext to curtail the fundamental human rights of the community as a whole. Indeed, experience across the world shows that such policies are likely to lead to further violence, as those who wish to express their grievances peacefully find that all channels for such expression are closed.

# The plight of Uighurs abroad

## International legal standards on the principle of *non-refoulement*

*No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment [...]*. Article 7, International Covenant on Civil and Political Rights (ICCPR), 1966

*No State Party shall expel, return ("refouler") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture*. Article 3, Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, 1984 (hereafter, Convention against Torture)

*No Contracting State shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion*. Article 33, Convention Relating to the Status of Refugees, 1951 (hereafter, Refugee Convention).

---

[53] *"Zhongguo rending kongbu zuzhi he kongbu fenzi de juti biaozhun"* ("China sets concrete criteria for terrorist organizations and terrorists"), *Xinhua*, 15 December 2003, available at http://news.xinhuanet.com/legal/2003-12/15/content_1232510.htm.

The international legal principle of *non-refoulement* bars all states from returning individuals to a country where their lives or liberty are at risk or where they are likely to face torture. This is a binding principle of customary international law which is also laid out in international treaties such as the Refugee Convention and the Convention against Torture. The right not to be subjected to *refoulement* has been elaborated further by UN human rights bodies, including the Committee against Torture (CAT) and the Human Rights Committee (HRC), which monitor States' compliance with the Convention against Torture and the ICCPR respectively.

The CAT has reiterated the absolute nature of the protection afforded by Article 3 of the Convention against Torture and has taken the view that "Article 3 applies irrespective of whether the individual concerned has committed crimes and the seriousness of those crimes"[54] and that "the nature of the activities in which the person engaged is not a relevant consideration in the taking of a decision in accordance with Article 3 of this Convention"[55] In addition, the HRC has noted that "[s]tates parties must not expose individuals to the danger of torture or cruel, inhuman or degrading treatment or punishment upon return to another country by way of their extradition, expulsion or refoulement".[56]

Statements made by the UN Special Rapporteur on torture (SRT) have added weight to the decisions taken by the CAT and HRC. In particular in his report in 2002, the SRT reiterated the link between the non-derogable nature of the prohibition of torture and the principle of non-refoulement when he stated:

> "[i]t is submitted that the principle contained in the Human Rights Committee's statement and the above provision of the Convention against Torture represents an inherent part of the overall fundamental obligation to avoid contributing in any way to a violation of the prohibition of torture and other cruel, inhuman or degrading treatment or punishment. It must be emphasized that the protection offered by the principle of non-refoulement is of an imperative nature. In this regard, the Special Rapporteur notes the findings of the Committee against Torture to the effect that "the nature of the activities in which the person engaged is not a relevant consideration in the taking of a decision in accordance with article 3 of the Convention" and that article 3 applies "irrespective of whether the

---

[54] *M.B.B. v Sweden, Communication Number 104(1998), CAT/C/22/D/104/1998.*
[55] See for example *Seid Morten Aemei v Switzerland, Communication Number 34 (1995), CAT/C/18/D/34/1995.*
[56] Human Rights Committee, General Comment 20, Article 7, Compilation of General Comments and General Recommendations Adopted by Human Rights Treaty Bodies, U.N. Doc. HRI\GEN\1\Rev.1 at 30 (1994), available at: http://www1.umn.edu/humanrts/gencomm/hrcom20.htm.

individual concerned has committed crimes and the seriousness of those crimes".[57]

## The fate of Uighur activists forcibly returned to China

Over recent years, Amnesty International has monitored growing numbers of forced returns of Uighur asylum seekers and refugees to China from several neighbouring countries, including Nepal, Pakistan, Kazakstan and Kyrgyzstan. Several Uighurs accused of committing criminal offences have also been forcibly returned, either clandestinely or under the terms of extradition agreements between China and other countries.

Such cases appear to have increased with the intensification of China's crackdown in the XUAR following the attacks in the USA of 11 September 2001, and in some cases there is evidence that the Chinese authorities have instigated or taken part in such returns. The fate of Uighurs returned to China is often difficult to establish due to tight restrictions on information, including the threat of reprisals against family members who pass such information abroad. However, in some recent cases, returnees are reported to have been subjected to serious human rights violations, including torture, unfair trial and even execution.

Amnesty International opposes the return of anyone to a country where they might face torture, execution or other serious human rights violations. The following are examples of countries where Uighurs are at particular risk of forcible return or where Uighurs are known to have been been forcibly returned to China over recent years, particularly since the events of 11 September 2001.

**Nepal**

*Nepal has been party to the ICCPR and the Convention against Torture since 1991, but has not ratified the Refugee Convention. The Office of the United Nations High Commissioner for Refugees (UNHCR) plays a key role in assessing asylum seeker applications in Nepal, including Uighur cases.*

---

[57] *Civil and Political Rights including the questions of torture and detention, report of the newly appointed Special Rapporteur on torture, Mr Theo van Boven,* Commission on Human Rights 58th Session, 26 February 2002, UN Doc. E/CN.4/2002/137 at paragraph 14. At the UN Commission on Human Rights this year, a reference was made for the first time in the Torture Resolution (2004/41) to the principle of non-refoulement. This resolution was adopted by consensus, reiterating that the principle of *non-refoulement* in respect of torture and cruel, inhuman or degrading treatment or punishment is part of customary international law.

20    *Uighurs fleeing persecution as China wages its "war on terror"*

*China's relations with Nepal have long been complicated by the presence of over 20,000 exile Tibetans in Nepal, many of whom have campaigned for religious freedom and independence for Tibet. During an official visit to China in July 2002, King Gyanendra of Nepal reportedly promised that his country would seek greater cooperation from China on the issue of Tibet and that he would not allow people inside Nepal to "agitate against China".[58] In return, former Chinese President Jiang Zemin reportedly offered "moral support" for the Nepalese authorities' struggle with "Maoist rebels" in Nepal.[59] Until recently, few Uighurs are known to have fled to Nepal from China. However, since 2000, at least 16 Uighurs are reported to have arrived in Nepal to seek asylum. Several cases of refoulement which have emerged over the last two years have shown that the country is not a safe country of asylum for Uighur exiles.*

In one recent case, a Uighur activist, **Shaheer Ali** (also known as Shir Ali, Xieraili, Wujimaimaiti Abasi or Ghojamamat Abbas) was executed after being forcibly returned from Nepal to China. He had been recognised as a refugee by UNHCR in Nepal and was awaiting resettlement at the time of his detention and subsequent forcible return (*refoulement*).

Shaheer Ali was a young Uighur nationalist from the city of Khotan (Hetian) in the south of the XUAR. According to his testimony, which he requested be withheld until he was "in a safe place", he had been imprisoned and tortured in China in 1994 in connection with his political activities. He fled to Nepal via Tibet in November 2000 and applied for recognition as a refugee with UNHCR. He was recognised as a refugee in May 2001. In spite of this, he was detained by the Nepalese immigration authorities in December 2001 and held in Hanuman Dhoka district police office in Kathmandu for several weeks.

He is believed to have been taken away from the police office by a group of Nepalese police and officials from the Chinese embassy in Nepal on or around 10 January 2002 and forcibly returned to China shortly thereafter. One, possibly two, other Uighur detainees were taken away at the same time. One of them, **Abdu Allah Sattar** (also known as Abdullah Sattar), had been detained at the same time as Shaheer Ali and is also presumed to have been forcibly returned to China. Amnesty International has received no further information on his current whereabouts. The identity of the third possible returnee remains unclear.

Amnesty International received no further information on the fate of Shaheer Ali until October 2003, when it was reported in the official Chinese media that he had been executed. The exact date of Shaheer Ali's execution is unclear, but he was reportedly

---

[58] *Kathmandu Post*, 12 July 2002.
[59] Ibid.

sentenced to death in March 2003 after being convicted of various offences including "separatism", "organizing and leading a terrorist organization" and "illegal manufacture, trading and possession of weapons and explosives". His sentence was confirmed on appeal by the Xinjiang High People's Court.

According to a report on the official Chinese website www.tianshan.net on 21 October 2003, the court accused Shaheer Ali of leading a number of "terrorist" organizations, including the East Turkestan Islamic Party of Allah (ETIPA).[60] The court claimed that he had instructed members of the group to carry out various bombings, assassinations and other activities. It also stated that he conspired and engaged in "large-scale incitement and propaganda to split the country" which culminated in the Gulja (Yining) incident of 5 February 1997, which was described as an incident of "beating, smashing and looting".[61]

Shaheer Ali was tried in secret and it is not known what evidence was presented in court to substantiate the accusations against him. According to interviews that Shaheer Ali gave to *Radio Free Asia* while he was in Nepal and which were made public after his death, he claimed to belong to a group called the East Turkestan Islamic Reform Party which he described as a 'non-militant' organization.[62] He also described eight months of torture while imprisoned in Guma (Pishan) county, XUAR, in 1994, including being beaten with shackles, shocked in an electric chair and having metal nails pushed under his toenails, in an attempt to make him confess to various offences.

The execution of Shaheer Ali led to renewed concern about the fate of Abdu Allah Sattar (mentioned above) and another Uighur, **Kheyum Whashim Ali** (also known as Washim Ali), who was forcibly returned from Nepal in mid-2002. Kheyum Whashim Ali was recognised as a refugee by UNHCR in Nepal in October 2001, but was arrested and detained by the Nepalese immigration authorities soon afterwards. He was transferred to Hanuman Dhoka district police office on 1 May 2002 apparently for "investigation", although the charges against him were unclear. He was reportedly taken to the office of the Chief District Officer in Kathmandu on 23 May 2003 before being taken away again to an unknown location. According to one eyewitness, Kheyum Whashim Ali was in tears as he was being taken away.

It is not known exactly when Kheyum Whashim Ali was forcibly returned to China, but in February 2003, Amnesty International received reports that he was detained in Michuan prison, around 40km outside Urumqi, the regional capital. Later reports from

---

[60] As noted below, the Chinese authorities reportedly consider ETIPA to be another name for ETIM.
[61] Article available in Chinese on official *Xinjiang Xinwenwang* website at http://www.xjnews.com.cn/news/2003-10-21/20031021111742.htm.
[62] "Executed Uyghur refugee left torture testimony behind", *RFA,* 23 October 2003.

unofficial sources indicated that he was being held in isolation in a single cell; his face was swollen and he lacked mobility in his legs, allegedly as a result of torture or ill-treatment. Unconfirmed reports suggest that he has been charged with "subversion, separatism, involvement with an illegal organization and collecting money to buy weapons". To date, it remains unclear whether Kheyum Whashim Ali has been tried and sentenced. Amnesty International is seriously concerned for his safety.

Amnesty International considers that the obligation not to return an individual to a country where they face torture or other serious human rights violations should be fulfilled by the receiving country, in this case, Nepal. Nepal is not party to the Refugee Convention, but is nevertheless still bound by the principle of *non-refoulement* which is a fundamental principle of customary international law. China is a party to the 1951 Refugee Convention and the apparent involvement of Chinese officials in these cases in the receiving country raises serious questions over China's commitment to uphold international law. One of the fundamental principles of international refugee protection is that the granting of asylum is a peaceful and humanitarian act and that, as such, it cannot be regarded as unfriendly by any other state.[63] China risks undermining this important principle and the whole international framework of refugee protection through actions that put undue pressure on states hosting Chinese asylum-seekers and refugees, asylum-seekers themselves and other Chinese nationals in exile.[64]

Concerns about China's involvement are heightened by another well-publicised incident in Nepal last year, involving the *refoulement* of 18 Tibetans, including three women and eight children, in a joint operation carried out by officials from Nepal and China.[65] Eyewitnesses described the Tibetans as being carried crying and screaming into a vehicle believed to be owned by the Chinese embassy before being driven in the direction of the border by Chinese and Nepalese officials. The operation was carried out on 31 May 2003 in the face of widespread international concern expressed by UNHCR, governments and NGOs. The 18 were detained upon arrival in Tibet. Some of those who were later

---

[63] See, for example, the Declaration on Territorial Asylum, adopted by General Assembly resolution 2312 (XXII) of 14 December 1967.
[64] China's failure to uphold its international obligations under the Refugee Convention, to which it is a party, is illustrated more directly by its treatment of North Korean asylum seekers and refugees who cross the border into northern China from North Korea. China has officially classified such people as "economic migrants", denying them access to refugee determination procedures, including through UNHCR, despite evidence that many have genuine claims to asylum. Meanwhile, China has forcibly returned hundreds of North Koreans to an uncertain fate in North Korea, possibly including torture and execution, in violation of its obligations under the Refugee Convention. For further information, see Amnesty International, *Democratic People's Republic of Korea: Starved of Rights: Human Rights and the Food Crisis in the Democratic People's Republic of Korea*, January 2004 (ASA 24/003/2004), pp.29-33.
[65] See Amnesty International, *Nepal: forcible return of Tibetans to China unacceptable*, 2 June 2003 (ASA 31/021/2003).

released described being subjected to torture and ill-treatment in detention, including being kicked, beaten, prodded with electroshock batons, having sewing needles inserted under their fingernails, being forced to stand naked for long periods of time and being subjected to humiliating comments about their religious beliefs. Most were released a few months later, but at least one of them, believed to be the guide for the group, known as Tashi, was reportedly transferred to a prison in the Tibet capital, Lhasa. His current legal status and condition remain unclear, but he is believed to have received particularly harsh treatment because of his role as the guide.[66]

**Pakistan**

*Pakistan is not party to the ICCPR, Convention against Torture or the Refugee Convention. It is nevertheless still bound by the principle of non-refoulement, which is a fundamental norm of customary international law. UNHCR plays an essential role in conducting refugee status determination in Pakistan, including on Uighur cases.*

*There are close trading links between the XUAR and Pakistan via the Karakorum highway and Pakistan has also reportedly been the source of numerous Islamic materials that have been smuggled into the XUAR in recent years.[67] Thousands of Uighurs are reported to have travelled backwards and forwards to Pakistan for business and religious purposes, particularly to study in Pakistan's madrassas. In addition, several camps used to train "terrorists" have reportedly been located in Pakistan, and some reports suggest that Uighurs have been among those trained in such camps.[68] China has also claimed that around 600 Uighurs escaped from Afghanistan to northern Pakistan in the context of the conflict in Afghanistan in 2001, but Amnesty International has been unable to verify this claim.*

*Following the 11 September 2001 attacks in the USA, China and Pakistan have sought to strengthen their cooperation in combating acts of "terrorism". In December 2003, it was reported that Pakistani troops had killed Hasan Mahsum, the leader of the East Turkestan Islamic Movement (ETIM), in the South Waziristan region of Pakistan on 2 October 2003. It is unclear why this announcement was delayed, but the information was publicised just a few days after China published its official list of Uighur "terrorists" and "terrorist organizations" based abroad, which was headed by Hasan Mahsum's name (see below).*

---

[66] For a detailed description of this incident see "Dangerous Crossings: Conditions impacting the flight of Tibetan refugees", *International Campaign for Tibet (ICT)*, June 2004. See also "Tibetan refugee describes torture, extortion in Chinese jail", *RFA*, 24 December 2003; "Seven of 18 Tibetans repatriated from Nepal still imprisoned", *World Tibet Network News, ICT*, 23 December 2003; and *Tibet Press Watch, ICT* January/February 2004.
[67] See Dillon, 2004, op cit, p.138.
[68] See Congressional Research Service Report, 17 December 2001, op. cit.

*In March 2003, the two countries agreed to enter into an extradition treaty to facilitate the exchange of prisoners. The treaty was formally signed during a visit to Beijing by Pakistani President Pervez Musharraf in November 2003. According to the official Chinese media, President Musharraf stated during the visit that "his country will never allow anybody, including the terrorist force of 'East Turkestan', to use the territory of Pakistan to carry out any form of anti-China activities".[69] In January 2004, it was further reported that China had forwarded a list of Chinese "terrorists and outfits linked to al-Qaeda" to Pakistan, asking the authorities to initiate action against these groups.[70] Amnesty International has not seen a copy of this list, but is concerned that it may contain individuals who have engaged in peaceful political activism or independent religious practices, as well as those who may be involved in violent activities. In May 2004, a XUAR public security official, Ma Mingyue, was quoted in the Pakistani press as saying that some "terrorists" and ETIM members from Xinjiang were hiding in the Pakistani cities of Lahore and Rawalpindi.[71]*

At least seven Uighurs are known to have been forcibly sent back to China from Pakistan since the beginning of 2002, some of whom had been recognised as refugees by UNHCR and were awaiting resettlement in other countries. The cases detailed below are those which Amnesty International has been able to document. However, it is feared that other Uighurs may also have been secretly returned from Pakistan in violation of their fundamental human rights and in violation of Pakistani domestic law on extradition.[72]

In May 2002, it was announced by Chinese officials at a news conference in Urumqi, that **Ismail Kadir** (or Ilham Kadir), alleged to be the "third highest leader" of ETIM, had been returned to China in March 2002 following his arrest in Pakistan earlier the same month.[73] Official reports suggested that he had been captured by Pakistani authorities in Kashmir. Overseas Uighur activists, however, claim that he was arrested in the city of Rawalpindi, northern Pakistan, home to a sizeable community of exile Uighurs.[74] They have also disputed official allegations that he was an ETIM member. Since his forcible return to China, no further information has become available about Ismail Kadir's place of detention or legal status. Given his alleged background, Amnesty

---

[69] "China, Pakistan Highlight Cooperation in Beijing", *Xinhua*, 4 November 2003.
[70] See: "Now China hands over list of terrorists to Pakistan", *Press Trust of India*, Islamabad, 17 January 2004, and "China corners Pak on terror", *Times of India*, 17 January 2004.
[71] ANI, 29 May 2004, Islamabad.
[72] For further information on transfers of foreign nationals from Pakistan in the context of the "war on terror", see Amnesty International: *Pakistan: Transfers to US custody without human rights guarantees*, June 2002 (ASA 33/011/2002).
[73] "China says terror suspect handed over by Pakistan", *AP*, 27 May 2002.
[74] See: http://www.uyghuramerican.org/statements/letter-to-colin.html

International fears that he may have been subjected to torture, and possibly sentenced to death and executed, as is often the case with such prisoners.

On 2 February 2002, two Uighurs, **Ismayil Abdusemed Haji** (also known as Ilham), and **Abdulhakim** were arrested in Rawalpindi, and unconfirmed reports suggest that they were handed over to China immediately without any legal process.[75] Some reports indicate that Chinese officials in plain clothes accompanied Pakistani police at the time of their arrest. It is possible that Ismayil Abdusemed Haji may be a pseudonym for Ismael Kadir, mentioned above. Amnesty International has received no further information about the fate of the two men.

**Elham Tohtam, Ablitip Abdul Kadir** and **Enver Tohti** (or **Enver Dawut**) all went missing in Rawalpindi, northern Pakistan on or around 22 April 2002. All had reportedly applied to UNHCR for asylum and were awaiting the results of their applications. Elham Tohtam was picked up by the police at around 6.30am and, according to eye-witnesses, blind-folded and led away to an unknown destination. Elham Tohtam is originally from Gulja city in the XUAR and was detained and tortured there in 1996 and 1999 for his suspected political activities. In April 1999, fearing further persecution, he fled first to Kyrgyzstan, then Kazakstan. In November 2000 he went to Pakistan where he lived with his wife and four children in Rawalpindi. He had approached UNHCR in Islamabad and the Australian government for emergency visas to Australia, where he has family members. Both Ablitip Abdul Kadir and Enver Tohti are also from Gulja. Ablitip Abdul Kadir lived together with his wife and three of his children in Pakistan. Unofficial sources suggest that the three were detained upon their return to China, although the charges against them and other details about their imprisonment remain unknown.

Three other Uighurs from Gulja are reported to have been arrested in Rawalpindi at around the same time. Their names are **Golamjan Yasin, Tilivaldi** and **Ablikim Turahun**. One Uighur from Kazakstan, identified as **Ezizhan**, and one Kyrgyz from Gulja, identified as **Zayir** (or Zaher), are also reported to have been arrested. Their fate remains unknown.

More recently, on 16 July 2003, two Uighurs, **Abdulwahab Tohti** and **Muhammed Tohti Metrozi** went missing in Rawalpindi. Both were reportedly engaged in pro-independence activities in the XUAR before fleeing to Pakistan. Muhammed Tohti Metrozi had become a student leader in Pakistan and had already been recognised as a refugee by UNHCR in Pakistan. He was awaiting resettlement to Sweden.

They both "disappeared" after Muhammed Tohti Metrozi received a telephone call from an official who reportedly worked for the Pakistani Intelligence Bureau asking

---

[75] See Amnesty International, ASA 33/014/2002, op cit.

them to come for a meeting. They went to meet the official and unconfirmed reports suggest that the two were transferred to China around three days later. As of August 2003, they were reported to be detained in Urumqi.

Amnesty International recently received information from an unofficial source that Muhammed Tohti Metrozi was tried on or around 10 April 2004 in Urumqi. The accusations against him reportedly related to sheltering Uighur activists who fled from China to Pakistan, belonging to a "separatist" group and applying to UNHCR for asylum. Muhammed Tohti Metrozi reportedly rejected these accusations, but the outcome of the trial, his health condition, and his exact place of detention remain unknown. No further information is available about the fate of Abdulwahab Tohti.

Fears of the safety of those returned are heightened by an earlier case in Pakistan when, in 1997, a group of around 14 Uighur religious students were arrested in Gilgit close to the Chinese border and handed over to the Chinese authorities without any legal process. They were reportedly summarily executed on the Chinese side soon after being driven across the border.

## Central Asia: Kazakstan and Kyrgyzstan

*The ICCPR has been ratified by Kyrgyzstan, and signed, but not ratified, by Kazakstan. Both states are parties to the Convention against Torture and the Refugee Convention. However, Kazakstan does not allow Uighurs access to the national asylum procedure, reportedly due to the delicate relationships between these countries and China. In Kyrgyzstan, Uighur asylum seekers can theoretically apply to a national procedure for protection, but do not do so, apparently for fear that the Kyrgyz authorities will pass this information on to the Chinese authorities. UNHCR therefore plays the key role in assessing refugee protection claims in these countries.*

*Their shared border with China and their large native Uighur populations make Kazakstan and Kyrgyzstan the most common first countries of 'refuge' for Uighurs fleeing the XUAR. Yet, they are possibly the most unsafe countries of asylum for Uighurs. In the context of its policies in the XUAR, China has made great efforts to ensure that its Central Asian neighbours cooperate in returning Uighurs who are suspected of being "separatists, terrorists or religious extremists". This relationship has been strengthened in recent years under the auspices of the Shanghai Cooperation Organization (SCO) which groups China, Russia, Kazakstan, Kyrgyzstan, Uzbekistan and Tajikistan. The Secretariat of the SCO was formally established in Beijing in January 2004 and a regional "anti-terror" centre was officially opened in Tashkent, Uzbekistan, in June 2004. Largely spearheaded by China, the organization has been described as a "major force"*

*in combating "terrorism" by Chinese officials[76] and one of its key aims appears to be to quell the activities of Uighur nationalists in both the XUAR  and Central Asia.  China also has extradition agreements with both Kazakstan and Kyrgyzstan.[77]*

*According to the official Chinese media, during a visit to the XUAR in May 2004, President Nazarbayev of Kazakstan said that 'Kazakstan will always adhere to the one-China policy and is willing to strengthen cooperation with China in the combat against terrorism, separatism and extremism for regional peace and stability'.[78] This, and other statements made by SCO members, suggest that China's neighbours appear to have adopted the China's concept of "separatism", which encompasses peaceful opposition activities, and are ready to cooperate with China to crack down on such activities. Amnesty International is concerned that such cooperation appears to be aimed at ensuring the forcible return of Uighurs to China, notwithstanding the high risks they face of serious human rights violations, including torture, arbitrary detention and even execution.*

Both Kazakstan and Kyrygzstan are home to large Uighur communities, comprising Uighur nationals of these countries as well as those who have arrived from the XUAR more recently.[79] Local Uighur activists in both countries have expressed alarm at a recent series of media reports which purport to denigrate Uighurs as a whole, including by describing Uighurs generally as "separatists" or "terrorists". Activists in the region have suggested that such articles may be instigated by local "pro-China forces" and the Chinese security forces.[80]

Uighur asylum seekers in both Kazakstan and Kyrgyzstan face an ever-present risk of being detained by the police as "illegal immigrants", which puts them in greater danger of being forcibly returned to China. One Uighur asylum seeker, who wished to remain anonymous, reported that the police had said "you are a separatist, you are a terrorist" when they arrested him recently in the Kyrgyz capital, Bishkek. When he presented an official document stating that he was a person of concern to UNHCR, they

---

[76] "Official says Shanghai group 'major force' in combating terrorism", *Xinhua*, 15 January 2004.
[77] China and Kazakstan signed an extradition treaty in July 1996 (see "Brief Introduction to Relations between China and Kazakstan", *Xinhuanet*, 21 May 2003); Extradition treaty ratification documents were formally exchanged between Kygyzstan and China in March 2004 (see "Kyrgyzstan, China endorse extradition accord", *Kabar news agency*, 29 March 2004)
[78] "Kazakh president holds talks with Xinjiang party leader during China visit", *Xinhua*, 19 May 2004.
[79] There are officially reported to be around 250,000 Uighurs in Kazakstan and 50,000 in Kyrgyzstan, but the real figures may be much higher.
[80] See, for example, "Newspaper slur angers Uighurs", *Institute for War and Peace Reporting (IWPR)*, 25 January 2004.

reportedly replied: "this is like toilet paper – it won't help you." He was taken to a detention centre but released later the same day following intervention by UNHCR.

Local NGOs working with Uighur asylum seekers in Kazakstan and Kyrgyzstan have also reported growing numbers of cases where Uighurs in these countries have "disappeared" and are presumed to have been forcibly returned to China. Unconfirmed reports suggest that Uighurs attempting to cross the border from China are regularly sent back into China by border guards on the Kazak/Kyrgyz side of the border unless they are able to demonstrate that they are travelling for legitimate trading or other purposes. It is extremely difficult for local NGOs to obtain detailed information about such cases.

Some NGOs in Kazakstan and Kyrgyzstan who assist Uighurs from China have reportedly been subjected to threats, intimidation and harassment, often from unknown or unidentified sources, apparently aimed at preventing them from conducting their advocacy activities. NGOs assisting Uighurs in Kazakstan have reported increased levels of surveillance and monitoring of Uighurs by border guards on the Chinese side of the border, checking to see whether people were carrying sensitive information, including information about alleged human rights violations, such as details about political prisoners and prisons. One activist told Amnesty International that he used to have several contacts in the XUAR who used to regularly pass on information on human rights violations, but this network has now disappeared. He assumes that his informants have either been arrested or are in hiding.

Another Uighur said that on a recent trip home to the XUAR via the Kazak border, he was surprised to discover that guards on the Chinese side of the border, who used to be Chinese nationals of Kazak and Uighur ethnicity, are now all Han Chinese. He reported that he was treated in a discriminatory manner by the guards, a conflict which was exacerbated by communication difficulties – he could not speak Chinese and they could not speak Uighur or Russian. He was eventually allowed to pass through the border on payment of a small fee.

Local NGOs in the region who assist Uighurs from China estimated that Kazakstan may have returned around 20 Uighurs, and Kyrgyzstan around 50 Uighurs in recent years, but the exact number is impossible to determine. On 23 May 2002, two Uighurs, **Memet Sadik (or Mamet Sadyk) and Memet Yasin (or Mamet Yasyn)** were reportedly handed over to China by the Kyrgyz authorities on suspicion of being "international Islamic terrorists".[81] According to a spokesman from the US embassy in Beijing, they were suspected of being ETIM members who were planning "terrorist attacks" in Kyrgyzstan, including an attack on the US embassy in the Kyrgyz capital,

---

[81] See *East Turkestan: Genocide, prison, torture and linguacide in the name of "Anti-terrorism"*, ETIC report 2003, 5 Sept 2003, p.13, quoting Kyrgyz news agency.

---

Bishkek.[82] Kazak Commercial Television later reported that they had been arrested in a "joint operation by Chinese, US and Kyrgyz special services", adding that "a detailed chart of localities and explosives had been seized from them."[83] The report concluded by stating that "the fact that both the terrorists are ethnic Uighurs provides grounds that they are linked to the East Turkestan Islamic Movement." The case was later cited by the US in part justification for its decision to formally list ETIM as a "terrorist organization" (see below). No further information is available about the current whereabouts or legal status of the two men. Amnesty International fears that they may be sentenced to death or may have already been executed.

On 31 March 2004, it was reported in the official Chinese media that two men, **Rahmutulla Islayil** and **Arken Yakuf**, both Uighurs from Urumqi, had been executed after being transferred to China from Kyrgyzstan in July 2002.[84] They were reportedly sentenced to death in January 2004 after being convicted of the murder of a Chinese diplomat and his chauffeur in the Kyrgyz capital, Bishkek, in June 2002. Shortly after their arrest in Bishkek, the Kyrgyz Interior Minister reportedly suggested that the crime was not political in nature, but was rather the accidental result of a struggle for power between criminal gangs.[85] However, at the time of their handover to China, it was announced that according to Kyrgyz Foreign Ministry data, the two were "active members" of the East Turkestan Liberation Organization (ETLO), a group that had previously been condemned by China as a "terrorist organization".[86]

Official Chinese sources indicate that they were "officially arrested" (i.e. charged) in China on 31 October 2002.[87] They were sentenced to death on 12 January 2004 by the Urumqi Intermediate People's Court.[88] Their appeal to the Xinjiang Regional High People's Court was rejected, and the court issued the execution order on 25 March 2004.[89] No further details have been made public about the nature of the evidence against them or the circumstances of their trial.

Several other Uighurs of Chinese nationality have been convicted and imprisoned in Kyrgyzstan for serious offences and may be at risk of extradition to China where they would be at high risk of torture and execution. **Bakhramjan Alimov** (or Berhamjan), **Askar Tohti** (or Askar Tokhti) and **Ali Mahsum** (or Ali Mansum) were sentenced in

---

[82] See "US Warns of Plot by Group in W. China", *Washington Post*, 29 August 2002.
[83] "Kyrgyz, US, Chinese special services allegedly detain two Uighur 'terrorists'" *Kazak Commercial TV*, 10 September 2002.
[84] "Murderers of Chinese envoy to Kyrgyzstan executed", *Xinhua*, 30 March 2004.
[85] *Kyrgyz public educational TV*, 4 July 2002.
[86] ITAR-TASS, *BBC Monitoring*, 9 August 2002.
[87] *Xinhua*, 30 March 2004, op cit.
[88] Ibid.
[89] Ibid.

March 2001 in connection with bomb explosions which killed four people in the city of Osh, Kyrgyzstan in 1998.[90] Bakhramjan Alimov and Askar Tohti were sentenced to death, but were not executed due to a moratorium on executions in Kyrgyzstan. Ali Mahsum received a 25-year prison term. Supporters of the men claimed that they had nothing to do with the bombings, but rather that they had been targeted and prosecuted because of their ethnic origin.

More recently, on 31 December 2002 in the Kyrgyz capital, Bishkek, three Uighurs, **Ablimit, Tohti Niyaz** and **Kayser Jalal** were reportedly sentenced to 16, 17 and 25 years in prison respectively for forming an "unlawful East Turkestan organization" and "illegal possession of weapons." Their lawyers reportedly claimed that they were convicted on the basis of fabricated evidence.[91] Amnesty International fears that the formal ratification of an extradition treaty between China and Kyrgyzstan in March 2004 increases the risk that they will be returned to China where they are likely to face torture and execution.

In April or May 2003, **Abdukakhar Idris**, a Uighur asylum seeker reportedly "disappeared" in Almaty, Kazakstan. He is believed to have been detained and forcibly returned to China. According to a copy of his testimony, obtained by a local NGO before he went missing, Abdukakhar Idris, aged 22, is a former tailor and bookkeeper from Kashgar in the southern part of the XUAR. He fled across the border in April 2001 after being detained for investigation for three months in connection with his funding of a sports club which the authorities suspected of being a front for Uighur oppositional activities. Abdukakhar Idris was detained in the Kazak border town of Panfilov on 19 April 2001 and reportedly sentenced to one year in prison by Panfilov District Court on 19 September 2001 for "illegally crossing the border". He was released early, on 7 March 2002, after which he approached UNHCR for asylum. He then lived in hiding in Almaty, until he went missing around one year later after reportedly being taken from his home by Kazak police. No further information is available about his current whereabouts, legal status or state of health.

In late 2001, two Uighurs, **Ahat Memet** (aged 21) and **Turgan Abbas** (aged 27), both Islamic students from Yerken county, Kashgar prefecture, went missing in Kazakstan and are believed to have been forcibly returned to China. They had fled from the XUAR in August 1999, after their release from Yerken detention centre, Kashgar prefecture, where they had reportedly been detained and interrogated for one month on suspicion of engaging in "illegal religious" and "separatist" activities. They were reportedly arrested on their arrival in Kazakstan and sentenced in April 2000 to eighteen

---

[90] They were sentenced together with two others of Turkish and Russian nationality: Ahmet Gyunan and Nazar Chotchayev who received death sentences in connection with the same case.
[91] See: *Brief Report on the situation with human rights of Uighurs in Kyrgyzstan*, ETIC, 16 Feb 2002.

months in prison for "illegally crossing the border". Following their release, they applied to UNHCR in Almaty for refugee status. Shortly afterwards, they moved to Charyn village, 250 km outside Almaty, after reportedly being harassed by the police. Unofficial sources report that they were taken away from their home in Charyn by uniformed officers, and that the two were being detained in Panfilov in December 2001. Since then, there was no further news of their fate until it emerged earlier this year that the two were reportedly imprisoned in the XUAR. There are no further details about their exact whereabouts, legal status or state of health.

Amnesty International's concerns for their safety are heightened by an earlier case of forcible return from Kazakstan in February 1999 which reportedly resulted in death sentences and possible execution. **Hemit Memet, Kasim Mapir (or Kasim Mahpir)** and **Ilyas Zordun**, three young Uighur asylum seekers, who had reportedly participated in the Gulja demonstration of 5 February 1997, were forcibly returned to China by the Kazak Ministry of National Security on 11 February 1999. They had been arrested as they tried to cross the border into Kazakstan. It was later reported that two brothers of Hemit Memet, **Saydakhmet Memet and Zulfikar (or Zulikar) Memet,** had also been arrested in the XUAR for "assisting terrorists". They were held in Yengi Hayat prison in Gulja city and Zulfikar Memet was reportedly tortured in detention, including by having his fingernails pulled out. He was reportedly executed in secret in June 2000. Saydakhmet Memet was sentenced to six years in prison.

The fate of Hemit Memet, Kasim Mapir and Ilyas Zordun remains unclear. Some reports suggest that Hemit Memet was sentenced to death in a secret trial in July 1999, and that all three men had been executed in August 1999. Subsequent reports indicated however, that they did not face trial until March 2001, when they were given suspended death sentences after being convicted of "splitting the country, illegal storage of firearms, and illegally crossing the border". Amnesty International also received unconfirmed reports that they had been tortured in detention in order to force them to confess, but further details of their treatment remain unclear.

## USA: Uighurs held in Guantánamo Bay

*The United States of America (USA) has been party to the ICCPR since 1992 and the Convention against Torture since 1994. As a party to the 1967 Protocol relating to the Status of Refugees since 1968, it is also bound to accord protection to refugees under international refugee law.*[92]

---

[92] This protocol was adopted to extend the scope of the provisions of the Refugee Convention to take account of 'new refugee situations' that had arisen since 1951.

*The USA is home to a community of approximately 1,000 Uighurs, some of whom lobby the US government on their human rights and political concerns. Many expressed dismay when in August 2002, the USA complied with repeated requests from China to place the East Turkestan Islamic Movement (ETIM) on its list of "terrorist organizations", fearing that this would lead to an escalation in human rights violations in the XUAR. This listing, which was endorsed by the United Nations on 11 September 2002, corroborated China's previous condemnation of the group. Amnesty International has been unable to obtain credible, independent information which corroborates allegations that ETIM has been responsible for acts of violence. However, the group is little known and is believed to be relatively small and unrepresentative of many within China's Uighur community who have advocated respect for fundamental rights and freedoms or tried to exercise these rights peacefully. Since this listing was confirmed, official rhetoric has intensified in the Chinese media against "separatists, terrorists and religious extremists" in the XUAR as China has sought to interpret this move by the USA and the UN as an endorsement of its crackdown against all forms of dissent in the region.*

*The Chinese authorities have made regular references to this decision in their official reporting on the subject of "East Turkestan terrorists", ostensibly to demonstrate that the US supports China on this issue. For example, following bomb attacks in Spain in March 2004, the chair of the XUAR regional government, Ismael Tiliwaldi, reportedly stated that China would never allow such attacks to happen in the XUAR. He attributed the apparent lull in 'separatist' activities in the region to economic development and the decision by the US to add ETIM to its list of "terrorist groups".[93] Other statements made by the US urging China not to use the "war on terror" as a pretext to crack down on peaceful political dissent in the XUAR have never been reported in the official Chinese media.*

Amnesty International remains concerned about the treatment and fate of around 22 Uighurs who have been detained for more than two years in US military custody in Camp Delta, Guantánamo Bay, without charge or trial or access to any court, to legal counsel or to relatives. They were transferred there in early 2002 after being captured in the context of the international armed conflict in Afghanistan. In late 2001, China had officially called on the US to transfer any Uighurs captured in Afghanistan to its custody, but the US had reportedly refused to hand them over due to "differing interpretations of what constitutes a terrorist."[94]

The total number of Uighurs detained in the context of the conflict in Afghanistan remain unclear. Wang Lequan, the CCP Secretary and leading Chinese official in the XUAR, has reportedly claimed that around 300 were captured by US forces, 20 were killed, 600 had escaped to northern Pakistan and around 110 had returned to China and

---

[93] "China will never allow Madrid-like bomb attacks in Xinjiang: official", *AFP*, 12 March 2003.
[94] See "Uighurs taken in Afghanistan must be returned to China", *Reuters*, 11 December 2001.

been captured.[95] Amnesty International is unable to verify these figures, but if they are accurate, large numbers of Uighurs allegedly captured by the US remain unaccounted for.

In December 2003, Amnesty International issued an urgent appeal in response to reports that the US authorities were secretly negotiating with China the terms for the repatriation of those held in Camp Delta.[96] The organization expressed fears that the Uighurs would be at high risk of torture and possible execution if they were forcibly returned to China or to any third country where they would be at risk of subsequent transfer to China. These fears were heightened in May 2004, when it was reported that the US was reviewing the Uighurs' status to determine whether they posed a 'continuing threat', in which case they might be returned to China if the Chinese authorities could provide "persuasive documentation" of their links to "terrorist organizations".[97]

According to an unnamed US official quoted in the *Far Eastern Economic Review* (FEER), such detainees would only be returned 'if Beijing provides assurances that they will be treated in ways consistent with U.S. obligations under United Nations and other international conventions.'[98] Amnesty International has documented several cases where China has apparently failed to live up to human rights guarantees made to other governments, including the US government, indicating that such assurances should not be trusted.[99]

The same official also stated that the US would likely seek resettlement of the Uighurs in third countries if the above conditions could not be satisfied.[100] On 22 June 2004, another senior US official, who asked not to be named, reportedly stated that the US had been unable to find a country willing to take the Uighurs, but that they could not be sent back to China.[101]

Amnesty International's fears for the safety of the Uighur detainees are heightened by treatment which was allegedly meted out to them during a visit by an official Chinese delegation to Guantánamo Bay in September 2002. Amnesty International has received credible allegations that during this visit, which reportedly

---

[95] "China says terror suspect handed over by Pakistan", *AP*, 27 May 2002. Estimates given for the number of Uighurs in Afghanistan vary from 300 to 3,000, but, as academics have noted, these are extremely difficult to verify. See, for example: *Xinjiang - China's Muslim Far Northwest*, by Michael Dillon, RoutledgeCurzon, 2004, p.157.
[96] See Amnesty International Urgent Action, AMR 51/147/2003, and related updates, AMR 51/029/2004, AMR 51/044/2004, AMR 51/090/2004.
[97] *FEER*, 20 May 2004.
[98] Ibid.
[99] See Amnesty International, AMR 51/147/2003, op cit.
[100] *FEER*, 20 May 2004, op cit.
[101] "China torture fears hamper jail releases", *Financial Times*, 22 June 2004.

lasted between one and two weeks, Chinese officials took photographs of the Uighurs and interrogated them about their backgrounds. It is alleged that during this time, the detainees were subjected to intimidation and threats, and to "stress and duress" techniques such as environmental manipulation, forced sitting for many hours, and sleep deprivation, some of which allegedly occurred on the instruction of the Chinese delegation.

Chinese officials have since dismissed these allegations as "groundless."[102] Asked about these allegations during a Pentagon briefing on 3 June 2004, General James T. Hill of the US military would only confirm that various government delegations "have come and they have talked to their detainees", but stated that "we don't talk about what countries come" to Guantánamo. He said that foreign government delegations talk to their nationals "following our rules and under our direct supervision". Government memoranda released by the US administration in June 2004 show that various interrogation techniques have been approved for use at Guantánamo which go beyond normal US army doctrine and violate the international legal prohibition on torture and cruel, inhuman or degrading treatment. Methods authorized by the US Secretary of Defense in December 2002, for example, included sensory deprivation, stress positions, hooding, up to 20-hour interrogations, removal of clothing, forced shaving, and use of dogs to inspire fear. Numerous former detainees have alleged that they were ill-treated in US custody in Guantánamo or Afghanistan.

## Exporting repression: harassment of Uighur returnees, exiles or their families

Amnesty International has long been aware of measures reportedly taken by the Chinese authorities in the XUAR to monitor and restrict contacts between local Uighur families and their relatives abroad. Exile Uighur activists have reported that their telephone calls with their families are monitored by the authorities, making it impossible to discuss issues deemed sensitive by the authorities for fear of reprisals against their relatives. Other measures include denial of passports or other travel documents to family members who remain in the XUAR, effectively preventing them from visiting or joining their relatives abroad unless they travel illegally.[103]

Recent reports suggest that levels of control and repression have been stepped up over the last two years, as the authorities have apparently targeted families in an attempt to force Uighur exiles to return or prevent them from engaging in political activities abroad. One exile Uighur activist who works as a journalist told Amnesty International

---

[102] "China dismisses Amnesty report of help in abusing Guantanamo prisoners", *AFP*, 27 May 2004.
[103] Article 322 of the Chinese Criminal Law makes "illegally crossing a national boundary" an offence punishable with up to one year in prison.

that during a telephone call with members of his family in the XUAR in October 2003, his relatives said that the Chinese authorities knew every detail about his life abroad, including his telephone number and home address. Officials from the Chinese department of state security had apparently visited the family home saying that the journalist's activities were "bad and dangerous". The authorities had also apparently threatened other members of the family that they would not be given passports if he continues with his activities abroad. Other more distant relatives had apparently shunned his family for fear of reprisals.

In February 2004, seven Uighur acrobats, including five men and two women, from the Xinjiang Acrobatic Delegation, made a decision to leave their troupe and apply for asylum during a visit to Canada. It was subsequently reported that members of their families in the XUAR had been subjected to threats and intimidation from the local authorities in an apparent attempt to make them change their mind.[104]

One of them, a contortionist named **Aygul Memet**, aged 28 and the mother of a young daughter, reportedly stated: "They [local officials] threatened my family that if I did not go back, they would not see me again because they would not allow them to leave the country or let me go back."[105] She also claimed that the authorities had threatened to confiscate her family's house if she did not return.[106] Another acrobat, **Gulnar Wayit**, said: "My family was very happy for me, but they told me to stop calling them or it would give them more troubles...."[107]

The acrobats have reportedly claimed asylum on numerous grounds, including that they were not allowed to visit mosques for prayers; they were forced to eat during fasting periods; and that they were forced to eat pork and drink alcohol. A juggler, **Dilshat Sirajidin** stated: "We performed for the government and they used us to create this image of ethnic unity. We didn't have a choice. We had no right to oppose."[108] In reaction to these reports, Wang Lequan, the secretary of the XUAR Communist Party, claimed that the seven had been "deceived by overseas Xinjiang separatists", and that most were being held in Canada "against their will".[109] He added that their families wanted them to come home and that they would be treated "leniently" if they returned.[110]

---

[104] See "We had no rights: Acrobats", *Toronto Star,* 4 February 2004.
[105] Ibid.
[106] "Muslim women forced to drink, dance with male Chinese officials", *RFA,* 23 February 2004.
[107] *Toronto Star,* 4 February 2004, op cit.
[108] "The Uyghur acrobats who did the flip on China", by Stephen Sullivan, *Media Monitors Network,* 8 February 2004, available at
http://usa.mediamonitors.net/headlines/the_uygur_acrobats_who_did_the_flip_on_china.
[109] "Uighur acrobats from China defect after performance in Canada," *AFP,* 8 February 2004.
[110] Ibid.

**Mahmut Akatal,** a Uighur trader living in Turkey, who received Turkish citizenship following his departure from China in 1989, told Amnesty International that his son was detained for one month in Xinhe county, Aksu prefecture, after Mahmut Akatal gave an interview to the US-based broadcasting station, *Radio Free Asia,* in May 2003 about his arbitrary detention in the XUAR following a visit home in 1997. The police reportedly interrogated his son about why his father had moved to Turkey. He was released one month later after his relatives paid a fine. The family now has to obtain permission from the police if they want to travel outside Xinhe.

According to his testimony, during his own visit home in 1997, Mahmut Akatal was held in police custody for a total of 13 months in Urumqi and Aksu, followed by a period of five months' detention with charge or trial in a "Re-education through Labour" camp in Aksu. He was detained in connection with taking part in a Uighur pro-independence rally in Istanbul, although he denied his involvement. During police interrogation, he claimed he was beaten, deprived of sleep and threatened with dogs. In Aksu "Re-education through Labour" Camp he was forced to do hard labour, despite medical problems. He said the camp contained around 500 prisoners. All were Uighur political prisoners, including some who had been detained for reading the Koran. Following his release, Mahmut Akatal sued the authorities for wrongful detention, and eventually won his case – a positive, but unusual, event in China. The local authorities however refused to comply with a court order to pay him compensation, and he is still trying to win this from Turkey.

Mahmut Akatal's detention in 1997 indicates that the arbitrary detention and harassment of suspected Uighur nationalists who return to China is not a new phenomonen. However, recent moves by the Chinese authorities suggest that such measures are increasingly being employed as a deliberate strategy to curtail the peaceful political activities of Uighur pro-independence supporters abroad.

More recently, another Uighur activist, **Ahmed Yasin**[111] who had lived in Turkey for seven years and had also received Turkish citizenship, was detained by the police for ten days during a visit home to the XUAR in mid-2002. Ahmed Yasin had been involved in peaceful political activities in Istanbul including participating in demonstrations outside the Chinese consulate there. He claimed he had since been in contact with six other Uighurs based in Turkey, who had had similar treatment when they returned to the XUAR, but that most of them were too scared to publicise their experiences.

According to his testimony, upon arrival in the XUAR, Ahmed Yasin, was detained for ten days in a hotel, in which ten plain-clothes police and intelligence officers occupied both rooms adjoining his room. He was interrogated by successive police

---

[111] Not his real name

officers during this period, who videotaped and audiotaped the whole process. To his surprise, the officers were able to provide detailed information about various aspects of his life in Istanbul, including his home address, telephone number and work address, which the officers said they had obtained from informants operating within the Uighur community in Istanbul. One of the officers reportedly said: "We know everything that is happening in Istanbul – it's like watching TV".

During his interrogation, Ahmed Yasin was forced to write down all the political organizations and activities that he had been involved with in Turkey and threatened with imprisonment if he refused to cooperate. Eventually on the tenth day of interrogation, he agreed to sign a statement saying that he would not get involved with any movement that would "destroy China's unity". The officials then put on their uniforms and stood next to him to take a photograph of him holding the statement. He was then released and allowed to visit his family before returning to Turkey. Ahmed Yasin has since avoided getting involved in any Uighur political activities in Turkey for fear of punishment when he visits China again.

Amnesty International has received numerous reports of the Chinese authorities urging other countries to prevent or cancel political events organized by diaspora Uighur groups.[112] China's efforts to put pressure on other countries in connection with its own nationals, have also been highlighted by the recent expulsion from Syria of a renowned Uighur poet, **Ahmadjan Osman**, aged 40, a Chinese national who had been living in Syria for the last 15 years and had married a Syrian woman. Syria's decision to deport Ahmadjan Osman in early January 2004 came less than a month after China published its blacklist of "terrorist" suspects living abroad. The poet's name was not among those listed, but Ahmadjan Osman claimed that the Chinese authorities had put pressure on Syria to expel him, fearing that his poetry may become a rallying point for Uighur nationalists abroad.[113] He also believed that his occasional reporting for the US-based radio station, *Radio Free Asia,* may have been a factor in his expulsion. Ahmadjan Osman applied for asylum after he arrived in Turkey from Syria and was recognised as a mandate refugee by UNHCR in March 2004.[114]

---

[112] For example, China reportedly took such a stance towards the East Turkestan United Congress, which took place in Munich, Germany in April 2004 and an annual meeting of the Uyghur American Association in Washington DC in May 2004. The German and US authorities, however, resisted pressure to cancel these events and most participants were reportedly granted visas to attend.

[113] "Uyghur poet expelled by Syria seeks refugee status", *RFA,* 11 Feb 2004.

[114] The deportation of Ahmadjan Osman occurred in the context of an ongoing pattern of repression by the Syrian authorities of Islamist activists both from within the country and abroad. Such activists have long been labelled as "terrorists" and risk systematic torture or ill-treatment. Since the events of 11 September 2001 and in the context of its "cooperation" in combating "terrorism" the Syrian government has extradited Islamist activists to other countries and has tortured or ill-treated Syrians sent back to the country, including by the USA.

# Conclusion and Recommendations

The ongoing crackdown on the so-called "three evil forces" of "separatists, terrorists and religious extremists" is continuing to result in serious and widespread human rights violations directed against the Uighur community in the XUAR. The human rights situation in the region has deteriorated further following the events of 11 September 2001 as China uses the international "war on terror" as a pretext to justify its policies of repression in the region.

As part of this crackdown, there is evidence that China has increased its pressure on other states to forcibly return Uighurs based abroad who are suspected of so-called "separatist" or "terrorist" offences. In some cases, the Chinese authorities appear to have been actively involved in effecting such returns. Some of those who have been forcibly returned, including those who have sought asylum or been recognised as refugees, have reportedly been subjected to serious human rights violations, including torture, unfair trial and execution. The fate of other returnees remains unknown, often as a result of tight surveillance and other restrictions imposed by the local authorities on those who may be in a position to disclose such information.

The Chinese authorities have also put pressure on other states to curtail the peaceful activities of diaspora Uighur groups and individuals which attempt to document human rights abuses, support independence for the region and/or lobby the international community about their concerns.

In view of the serious and widespread human rights abuses in the XUAR, Amnesty International makes the following recommendations to the Chinese authorities and the wider international community:

## To the Chinese authorities:

- put an end to the extensive violations of civil, political, economic, social and cultural rights which are resulting from the current political crackdown in the XUAR, including arbitrary detention and imprisonment, incommunicado detention, unfair trials, executions after summary trials, and sweeping restrictions on religious, cultural and social rights;

- release all those detained in the XUAR in violation of their fundamental human rights, including Rebiya Kadeer, Tohti Tunyaz and other prisoners of conscience;

- make a clear distinction between activities which involve the peaceful exercise of civil, political, economic, social and cultural rights and those that would be internationally recognized as criminal acts; ensure that the grounds for detaining people are strictly limited to those activities which are internationally recognised as criminal offences;

- ensure that the detention and treatment of people suspected of having committed violent or other criminal acts for political ends, as well as their prosecution and trial, conform to international human rights standards;

- take effective measures to address long-standing grievances within the Uighur community about serious and widespread violations of their economic, social, cultural, civil and political rights;

- stop putting pressure on other states to forcibly return asylum seekers and refugees in violation of these states' obligations under international refugee and human rights standards;

- stop putting pressure on other states to prevent Uighur diaspora organizations and individuals from engaging in peaceful and legitimate activities in line with their fundamental human rights.

## To other governments, in particular the USA, Nepal, Pakistan, Kazakstan, Kyrgyzstan and other South Asian and Central Asian countries:

- with due recognition to the granting of asylum as a peaceful and humanitarian act, ensure that Uighur asylum seekers are given access to independent refugee determination procedures, including through the auspices of UNHCR where appropriate;

- refrain from returning to China any Uighur asylum seekers pending the outcome of their refugee status applications, and refrain from returning any Uighur asylum seekers to other countries where they would be at risk of forcible return to China and/or other human rights violations;

- refrain from returning to China any national of the PRC who is alleged to be associated with independent Islamic movements or "separatist" opposition

activities in China, who may be at risk of torture, the death penalty or other serious human rights violations upon their return to China;

- ensure that no Uighur asylum seekers are detained as a matter of routine, or otherwise in contravention of international standards, pending the outcome of their refugee status applications;

- ensure that Uighurs who have been recognised as mandate refugees by UNHCR, who cannot find effective protection in a first country of asylum, are able to be resettled in third countries as swiftly as possible;

- express concern about the extensive human rights violations currently taking place in the XUAR with the Chinese government.