No. 1:05cv02398

**Attachment I**

Human Rights Watch                                April 2005 Vol. 17, No. 2(C)

# Devastating Blows
## Religious Repression of Uighurs in Xinjiang

Map 1 ........................................................................................................................... 1

Map 2 ........................................................................................................................... 2

I. Summary ................................................................................................................... 3

    A note on methodology ............................................................................................ 9

II. Background ............................................................................................................ 10

    The political identity of Xinjiang ......................................................................... 11

    Uighur Islam .......................................................................................................... 12

    A history of restiveness ......................................................................................... 13

    The turning point—unrest in 1990, stricter controls from Beijing ................... 14

    Post 9/11: labeling Uighurs terrorists ................................................................. 16

    Literature becomes sabotage ................................................................................. 19

    The international response—acquiescence and quid pro quos ........................... 21

III. National Law and Policy on Religion ............................................................... 25

IV. A Repressive Framework: Regulation of Religion in Xinjiang ..................... 28

    Policies Hidden from the Public .......................................................................... 30

    Regulation in 1994-2001: "Keeping a handle on" the imams and party cadres ........... 31

    The 2001 draft amendments to the 1994 Regulations: narrowing the scope of "normal" religious activities ............................................................................... 33

    A Manual for Urumqi Municipality Ethnic Religious Work ............................. 42

V. Implementation: Restrictions on Freedom of Religion in Practice ............... 47

    Registration of religious organizations: a no-win situation .............................. 48

    The "reeducation" of imams in 2001 and 2002 ................................................. 49

    Control and conformity: supervision of mosques in 2001 ............................... 54

    The persecution of clerics and the demolition of mosques ............................. 55

    A Case of "Extremism" ........................................................................................ 57

VI. Controlling Religion in the Education System ................................................. 58

    Minors barred from "participating in religious activities" in Xinjiang ............ 58

    Purging the schools of religion ............................................................................ 60

    Enforcement through surveillance ....................................................................... 63

    Special campaigns .................................................................................................. 64

VII. Anti-Crime Campaigns and Religious Repression ........................................ 65

    Unrelenting crackdowns ....................................................................................... 66

    Sweeps by law enforcement agencies ................................................................. 69

VIII. Religious "Offenders" in Detention ............................................................... 71

IX. Freedom of Religion and China's Responsibility under International Law ............... 75

X. Recommendations ................................................................................... 79

    To the government of the People's Republic of China: .................................. 79

    To the international community: ................................................................... 81

    To international organizations and mechanisms: ......................................... 82

    To international donors and aid groups working in Xinjiang, including the World

    Bank and the Asian Development Bank ...................................................... 83

Appendices ................................................................................................... 84

Acknowledgements ...................................................................................... 113

**Map 1**



Map 1: Provinces and Autonomous Regions of the People's Republic of China

**Map 2**



Map 2: Xinjiang Uighur Autonomous Region and Surrounding Area, including Eight Border Countries

# I. Summary

*"Xinjiang will always keep up the intensity of its crackdown on ethnic separatist forces and deal them devastating blows without showing any mercy."*[1]

Xinjiang Party Secretary Wang Lequan, January 2003

China is known for tight constraints on freedom of religion. This is particularly evident in its northwest Xinjiang Uighur Autonomous Region (XUAR), an oil-rich area that borders eight other nations. Here the Muslim faith of Uighurs, the largest non-Chinese ethnic group in the region, is under wholesale assault by the state. Uighurs have enjoyed autonomy in the past. Many now desire greater autonomy than is currently allowed; others demand a separate state. Uighurs are thus seen in Beijing as an ethno-nationalist threat to the Chinese state. Islam is perceived as feeding Uighur ethnic identity, and so the subordination of Islam to the state is used as a means to ensure the subordination of Uighurs as well.

Documents obtained and interviews conducted by Human Rights Watch reveal a multi-tiered system of surveillance, control, and suppression of religious activity aimed at Xinjiang's Uighurs. At its most extreme, peaceful activists who practice their religion in a manner deemed unacceptable by state authorities or Chinese Communist Party (CCP) officials are arrested, tortured, and at times executed. The harshest punishments are meted out to those accused of involvement in separatist activity, which is increasingly equated by officials with "terrorism." Because of fears in Beijing of the power of separatist messages, independent religious activity or dissent is at times arbitrarily equated with a breach of state security, a serious crime in China and one that is frequently prosecuted.

At a more mundane and routine level, many Uighurs experience harassment in their daily lives. Celebrating religious holidays, studying religious texts, or showing one's religion through personal appearance are strictly forbidden at state schools. The Chinese government has instituted controls over who can be a cleric, what version of the Koran may be used, where religious gatherings may be held, and what may be said on religious occasions.

---

[1] Wang Lequan: [Xinjiang] will deal devastating blows to ethnic separatist forces," China News Agency, January 14, 2003 [王乐泉：将给与民族分裂势力以毁灭性打击，中国新闻社，2003 年 1 月 14 日].

Violations of these strictures can result in expulsion, fines, entries into the personal file that the state keeps on every Chinese citizen, harassment of one's family, and administrative punishments, including short-term detention and administrative detention in China's notorious and discredited reeducation through labor (RTL) program.

This report, based on previously undisclosed regulations and policy documents, as well as interviews in Xinjiang and elsewhere, makes it clear that systematic repression of religion continues in Xinjiang as a matter of considered state policy. It explains key changes in official terminology that signal important policy shifts and describes the principles that are expected to guide the actions of officials.

This report details for the first time the complex architecture of law, regulation, and policy in Xinjiang that denies Uighurs religious freedom. These include:

- the current regulations governing religious activities in Xinjiang;
- a manual for government and Party cadres on implementing policy on minority religious affairs, circulated internally in 2000, that elaborates many of the repressive practices subsequently codified in the regulations;
- regulations prohibiting the participation of minors in any religious activity;
- documents acknowledging vast increases in the number of Uighurs imprisoned or held administratively for alleged religious and state security offenses, including through the discredited reeducation through labor system; and
- regulations detailing how religious and ethnic minority matters come to be classified as "state secrets."

These documents are deemed extremely sensitive and are accordingly restricted to internal Party or Party and government circulation. They are made public for the first time in this report and a selection can be found in the appendices.

In November 2004, China promulgated stringent new national religious regulations, effective March 1, 2005.[2] According to article one of the new regulations, two of the main purposes are to ensure "freedom of religious belief" and to regulate "the

---

[2] State Council (Order N. 426), Regulations of Religious Affairs, promulgated November 30, 2004, effective March 1, 2005 [中华人民共和国国务院令（第４２６号），宗教事务条例，2004 年 11 月 30, 2005 年 3 月 1 日起施行], [online], http://www.china.org.cn/chinese/2004/Dec/732346.htm (retrieved February 14, 2005)].

administration of religious affairs," objectives consistent with earlier policy statements, regulations, and practice. Although it cannot be predicted what the effects of implementation will be, the new regulations add additional layers of complexity to an already burdensome regulatory structure. It would appear that the government's unstated aims are twofold: to make it more difficult than ever for a religious body or a church, mosque, temple, monastery, or congregation to exist without State approval; and to solidify oversight of the personnel, finances, and activities of every approved religious body or site. Because of certain similarities between the new national regulations and the pre-existing regulatory structure in Xinjiang (stricter than elsewhere in China with the exception of Tibet), it appears that policies in place in Xinjiang may have influenced the new national standards.

While China's constitution, many of its laws, and various government white papers on religion and ethnic minorities contain guarantees of religious freedom, the reality is that Muslims in Xinjiang have only as much religious freedom as local and national authorities choose to allow at any given moment. For many who experience state repression, arbitrariness is the touchstone: what is permissible for some can result in harsh punishment for others, particularly those suspected of having separatist tendencies, leadership qualities, or disloyal political views. Genuine freedom of religion, that is, the right of individuals to freely practice their religion with others, is conspicuously absent for Uighurs in Xinjiang.

Informants interviewed for this report gave accounts of how the legal and regulatory framework is implemented in Xinjiang—from the annual training of imams for conformity with a government role, to the destruction of "non-conforming" mosques, to the control of religious publications, to purges of schools.

Since the mid-1990s, state control of Islam has evolved from a focus on clergy to harassment of laity. We heard often that mosques are under comprehensive government control and surveillance, designed to discourage attendance, especially by children or young adults. Students and civil servants reported that it was impossible for them to publicly engage in any religious activity other than observing the Muslim ban on eating pork. Others told of people losing jobs, or even being arrested, because they were perceived as too religious. Both practicing and non-observant Muslims explained that there is almost no public latitude for religious expression. Hardly any young practicing Uighur Muslim we spoke with was without a story of harassment.

One of the most common devices for religious repression in Xinjiang is the annual "strike hard" campaign against general criminality. While "strike hard" is carried out

throughout the country and leads to abuses wherever it is implemented, in Xinjiang it is used to crack down on Uighur religious activity on the theory that such activity is a cover for separatist activity.

Although official statistics on arrests, sentencing, and executions are kept secret, the contents of local media reports monitored by Human Rights Watch are consistent with estimates that thousands are detained every year for "illegal religious activity." In September 2004, Xinjiang's Chinese Communist Party Secretary acknowledged that the authorities had prosecuted twenty-two cases of groups and individuals involved in "separatist and terrorist activities" in the first eight months of the year, and had passed fifty sentences, including an unspecified number of death sentences, which at the time had not been carried out. Xinjiang leads the nation in executions for state security "crimes," with over 200 people sentenced to death since 1997.

Beijing asserts that heavy-handed measures are necessary to address its concerns about Uighur separatist activity and Islamic-based terrorism in the region. Although there is no question that some Uighur extremists have advocated violent overthrow of Chinese rule, such individuals are a small minority, even among Uighur political activists. If anything, as described below, recent evidence shows a decline in militant activity in the region. Chinese fears likely have been exacerbated by its relatively weak control of the region compared to other areas, and the region's hard-to-police border with eight countries. In addition, in recent years, Xinjiang has become an economic asset to China, with discoveries of oil that make it an attractive investment destination. This has led to strategic and security concerns finding their way to the top of political decision-making about Xinjiang. One result is that all policies in Xinjiang have an "anti-separatism" element; stamping down on freedom of religion is seen as a useful tool in this campaign.

For Beijing, Xinjiang falls into the same broad category of political concerns as Taiwan and Tibet. Demands for separation and/or autonomy are seen in Beijing as a threat to the continued viability of the Chinese state—they are a dangerous signal to the many parts of the country with large ethnic-minority populations—and the rule of the Chinese Communist Party (CCP).

Thus, a primary purpose of this highly repressive regulatory framework is the enforcement of loyalty to the Chinese Communist Party and the state. Public expression of dissent or deviance from the Party line is associated in Party documents, the press, and the courts with "harming national unity," "disuniting nationalities," or even "harming State security," charges which carry very heavy penalties under China's

criminal law.[3] This aggressive response to real or potential dissent is reflected in the bellicosne tone of official speeches and policy documents, in which authorities are called upon to "smash," "suppress," "eliminate," and "wipe out" unlawful religious activities and to "rectify," "reeducate," and "wage war against" non-conforming believers and clergy.

Separatist sentiments are a reality in Xinjiang, though they provide no justification for the broad denial of basic rights. There appears to be strong popular support for genuine autonomy from China in a province more than 3,000 kilometers from Beijing, with a distinct history, ethnic make-up, and culture. In spite of large-scale Chinese migration, more than half of the population continues to be of Central Asian origin and Muslim. Much like Tibetans, the Uighurs in Xinjiang are concerned for their cultural survival in the face of a government-supported influx of ethnic Chinese migrants.

China's efforts to control Uighur religion are so pervasive that they appear to go beyond suppression to a level of punitive control seemingly designed to entirely refashion Uighur religious identity to the state's purposes. Non-Uighur groups are not perceived as presenting a secessionist threat for Xinjiang and are subject to less stringent controls. The other ethnic groups in Xinjiang (Kazakhs, Tajiks, Uzbeks, Mongols, and others) have independent states outside China and are not perceived to have similar ethno-nationalist aspirations. Among the major Islamic groups, only the Uighurs do not.

For most Uighurs the paramount issue is not religion *per se*, but the perceived threat that religious repression poses to their distinct identity coupled with their acute feeling of being colonized. They view the tight restrictions placed by the Chinese authorities on Uighur Islam as an attempt to debase their very identity, as Islam is an essential component of their traditional identity and culture.

Apparently for precisely this reason, religious activity among Uighurs is presumptively illegitimate unless approved by the CCP apparatus. Despite the Chinese government's claim that it guarantees the right to freedom of religion, such respect applies only to what is essentially "state-sanctioned" religion.

Genuine freedom of religion, which includes the right to manifest, in public or private, alone or in community with others, one's religion or belief in worship, observance, practice, and teaching, is plainly absent for Uighurs in Xinjiang.

---

[3] See Human Rights in China and See Human Rights Watch/Asia (joint report), "Whose Security? 'State Security' in China's New Criminal Code," *A Human Rights Watch Report*, vol. 9, no. 4, April 1997.

China's attempts to suppress Islam as a motive force for separatism by confining it to tight state control is not only profoundly violative of human rights, but is a policy that is likely to alienate Uighurs, drive religious expression further underground, and encourage the development of more radicalized and oppositional forms of religious identity. Moderate voices that could mediate tensions between the state and this minority population are likely to dwindle.

Since September 11, 2001, China has attempted to position its repression of Uighurs as part of the global "war on terror." By exploiting the climate that followed the attacks on the United States and the fact that some Uighurs were found fighting in Afghanistan, China has consistently and largely successfully portrayed Uighurs as the source of a serious Islamic terrorist threat in Xinjiang. This perception seems to have now become dominant with the Chinese public, which because of the lack of a free media has little ability to compare sources of information and come to independent judgments about this claim.

The incorporation of the "terrorist" label into the public discourse has in turn heightened distrust between the Uighur and ethnic Chinese communities in Xinjiang. Uighurs interviewed in the region point out that opponents to Chinese rule in the area have been given many labels over the last half-century: they were described by the state as feudal elements and as ethnic nationalists in the 1950s and 1960s, as counter-revolutionaries in the 1970s and 1980s, as separatists in the 1990s, and now, since 2001, as terrorists.

In the immediate aftermath of the attacks on the United States, China successfully lobbied Washington to support its efforts to place the "East Turkestan Islamic Movement" (ETIM) on a United Nations list of banned terrorist organizations. While small pro-independence organizations have in the past resorted to violence, since 1998 there have been no reports of significant militant activity. This is not to suggest that there may not be individuals or groups who continue to embrace violence to further their political goals. But Chinese officials admit that in recent years separatist activity has actually decreased and is not a threat to the viability of the state. China has opportunistically used the post-September 11 environment to make the outrageous claim that individuals disseminating peaceful religious and cultural messages in Xinjiang are terrorists who have simply changed tactics.

Human Rights Watch urges China to reconsider its approach to religion and human rights in Xinjiang. China's friends and neighbors, many of them Islamic states, and groups like the Organization of the Islamic Conference should insist that China make

public all regulations on religion applicable to Xinjiang. China should be pressured to invite and allow unfettered access to the U.N. Special Rapporteur on Freedom of Religion or Belief and invite the U.N. Working Group on Arbitrary Detention to return to China for the express purpose of visiting Xinjiang on terms fully consistent with its mandate.

In view of China's record of arrest, imprisonment, torture, and even execution of religious prisoners, no country should participate in deportation, extradition, or rendition of Uighurs to China. Foreign investors in Xinjiang should insist on religious freedom within their workplaces and ensure that their operations do not in any way abet the lack of religious freedom in Xinjiang. The United States should not, for political convenience, acquiesce in any future demands from China to place organizations on lists of terrorist organizations without sufficient evidence.

### A note on methodology

This report is based on previously unavailable documentary sources as well as interviews with Uighur individuals at different times over a period of three years. In Xinjiang, Human Rights Watch visited urban and rural areas and interviewed people from all walks of life, including students, teachers, private and state-sector employees, business owners, unemployed individuals, farmers, migrant workers, clerics and journalists. We visited mosques, schools, universities, hospitals, bazaars, restaurants, tourist sites, and other public places. Interviews were also conducted in the street, in trains, buses, and private cars.

Because of the highly repressive climate prevailing in Xinjiang, Uighur individuals have a legitimate fear of being seen, heard, or even suspected of talking with outsiders about government policies. Respondents frequently observe that many people serve as government agents, willingly or unwillingly, making it unsafe to talk publicly about sensitive issues such as religion and ethnicity. In private and secure settings, however, most interviewees freely expressed their views.

To protect interviewees, in this report we have used pseudonyms and omitted the place of interview where necessary to protect the identity of persons who spoke with us. Where pseudonyms are used, the citations so indicate.

There is no international standardized romanization for the Turkic-Uighur language, and the term "Uighur," the transcription we use in this report, is found in a variety of other spellings, including Uygur, Uyghur, and Weigur. In Chinese, the name is transliterated as

*Weiwu'er* [维吾尔]. People's names also differ markedly, depending on whether the original name is in Uighur, in Chinese transliteration, or in the abbreviated form used in official documents. Thus, for example, the Uighur name *Abdulkerim* is transliterated in Chinese as *Abbudoukelimu* [阿布都克里木], but will appear as *Abudou* [阿布都] in official documents. Places have different names in Chinese than in indigenous languages. Thus the city of Yining [伊宁] is called Ghulja in Uighur, and Hetian [和田] is known as Khotan.

For the sake of uniform orthography and wider recognition, this report has adopted the official Chinese transliteration of place names in the Xinjiang Uighur Autonomous Region, which we refer to simply as "Xinjiang."

## II. Background

Located in the farthest northwest corner of China, Xinjiang was first formally incorporated into the Chinese empire in 1884. Bordered by eight central Asian countries, in many ways it remains a remote outpost of the People's Republic of China, lagging in many socio-economic indicators and sharing few cultural or historical ties with Beijing.

Xinjiang is the only Chinese province or "autonomous" region with a Muslim majority. Indeed, along with Tibet it is the only administrative region in China in which ethnic Chinese still constitute a minority.

The non-Chinese population of Xinjiang of approximately nine million is almost entirely Muslim. The overwhelming majority of this group, approximately eight million, are Uighurs.

Chinese domination of Xinjiang has never been fully accepted. This is particularly true among Uighurs. A major source of tension has been the large migration of ethnic Chinese to Xinjiang, which many non-Chinese believe has had disastrous effects on local culture, language, and traditions. Many non-Chinese say that as a result they fear being overrun culturally, economically, and politically by ethnic Chinese. Many assert that this is the aim of Chinese state policy.

To understand the way that China has attempted to equate independent Uighur culture and religion with separatism, and by extension with "terrorism," it is useful to

understand the history of the region. The following summary includes a study of China's efforts to economically integrate the area, the role of Islam in Uighur identity, and instances of violent resistance to Chinese rule and government crackdowns.

### The political identity of Xinjiang

The ancestors of the Uighur people were most likely nomadic tribes originating from Mongolia who settled in the oases of the Tarim basin (the southern half of Xinjiang) around the seventh century. They were gradually converted to Islam from the tenth to the seventeenth century. The region was formally annexed to the Manchu Qing Empire in 1759, but effective control was loose due to the numerous uprisings that regularly shook the region. From 1866 to 1876, Xinjiang was under the rule of the Kashgar-based warlord Yakub Beg, before being reconquered in 1877 by the Qing troops and integrated formally into the empire as their "New Dominion," *Xinjiang* [新疆], in 1884. The fall of the Qing Empire in 1911 opened an era of rule by competing local warlords.

In 1944, a Soviet-backed independent East Turkestan Republic (ETR) was set up in the three western districts of Yili, Tacheng, and Ashan, with Yining as the capital. In 1947, it joined in a formal government with the nationalist forces controlling the rest of Xinjiang.

As the outcome of the Chinese civil war turned to the advantage of the Chinese Communists, Stalin, who had little interest in supporting a Muslim nationalist regime in the backyard of his own Central Asian Soviet republics, pressed for negotiations between the East Turkestan Republic and the Chinese Communist Party for a peaceful takeover of Xinjiang. The plane carrying the East Turkestan representatives on their way to Beijing in August 1949 for the negotiations crashed, killing all the occupants in circumstances that have led to widespread suspicion. This removed the local nationalist leaders from the scene and made way for the incorporation of Xinjiang into the newly born People's Republic of China.

Beijing immediately started a policy of large-scale migration into the region, and the proportion of ethnic Chinese increased from 6 percent in 1949 to 41.5 percent by the time of Mao's death in 1976. The relative liberalization of the 1980s initiated by Deng Xiaoping's "Opening and Reform" allowed for greater autonomy for Xinjiang. This included respect for certain cultural and religious practices. Ancient mosques were restored and new ones built, cultural traditions that had gone underground resurfaced, and individual economic activities were tolerated again. The number of Chinese cadre and personnel stationed in Xinjiang began to decrease, and by the end of the 1980s, the

share of the Chinese population had dropped to 37.5 percent. In the 1990s, however, through a combination of economic and land ownership incentives, Beijing engineered a rapid acceleration of the ethnic Chinese influx to Xinjiang. About 1.2 million people settled in Xinjiang during the decade, pushing the proportion of the ethnic Chinese population to 40 percent of the total of some 18.5 million people at present.[4]

Ethnic Chinese migrants have tended to benefit from the economic development of Xinjiang to a far greater degree than Uighurs, a source of much tension. Profound socio-economic disparities between Uighurs and Chinese are reflected in the fact that the former have on average about ten years less life expectancy than the Chinese settlers in the region.[5]

### Uighur Islam

The Uighurs have long practiced a moderate, traditional form of Sunni Islam, strongly infused with the folklore and traditions of a rural, oasis-dwelling population. Today most Uighurs still live in rural communities, although large cities have emerged in the region. Their history as commercial and cultural brokers between the different people connected by the Silk Road (through which Buddhism was introduced to China from India two millennia ago) gave rise to a markedly tolerant and open version of Muslim faith and a rich intellectual tradition of literature, science, and music. Nineteenth-century travelers to Kashgar noted that women enjoyed many freedoms, such as the right to initiate divorce and run businesses on their own

Sufism, a deeply mystical tradition of Islam revolving around the cult of particular saints and transmitted from master to disciples, has also had a long historical presence in Xinjiang. In daily life, Islam represents a source of personal and social values, and provides a vocabulary for talking about aspirations and grievances. The *imam* is traditionally a mediator and a moderator of village life, and performs many social functions as well as religious ones.

---

[4] "Analysis of the characteristics of population migrations in the western regions during the 1990s," *Social Science Review*, vol. 19, no. 2, April 2004, pp. 14-15 [90 年代中后期西部地区千亿人口特征分析，*科学纵横*，2004 年 4 月（总第 19 卷第 2 期），14-15 页].The Chinese authorities have consistently refused to acknowledge publicly any influx of migrants from interior China into Xinjiang.

[5] The 1990 national census showed that the mortality of ethnic minorities in Xinjiang was 3.6 times higher than for the Han population. Life expectancy was 61.62, against 71.4 for the Han population and 70 for China overall ("The quality and labor situation of the population from Xinjiang ethnic minorities," *Journal of Xinjiang University*, September 1999, vol. 7, no. 3 [新疆少数民族人口的素质与就业，*新疆大学学报*，1999 年 9 月第 7 卷第 3 期]).

As the borders of Xinjiang became more porous in the 1980s, a number of young Uighurs went clandestinely to Pakistan to receive the religious education they could not obtain under China's policies. Upon their return, they enjoyed great prestige due to their ventures abroad and their knowledge of Koranic theology, far beyond that typical among local imams. Small-scale, localized underground religious organizations started to emerge. A long history of tension and opposition to Chinese domination already existed (see below). In this period it began to take on an Islamic color.

There is no evidence that Salafism, the radical Islamic ideology connected to many *jihadist* movements around the world, has taken root to any significant extent in Xinjiang. Proponents of rebellion against Chinese rule have used the vocabulary of Islam and religious grievances against Beijing to justify their actions. These are not, however, mainstream views.

Recent reports suggest that Hizb ut-Tahrir (Party of Liberation), a movement which advocates the establishment of a pan-Central Asian caliphate and whose headquarters is located in London, has recently made inroads in Southern Xinjiang, but it has so far never advocated violence. Hizb ut-Tahrir is the object of rigorous repression in Uzbekistan and other Central Asian countries. It remains illegal in China.

### A history of restiveness

There has long been strong Uighur objection to Chinese rule in Xinjiang. In the middle of the twentieth century, as noted above, the western part of the region enjoyed independence as the Soviet-aligned East Turkestan Republic and effective control by China was not achieved until shortly after the establishment of the communist state in 1949. As a result, memories of a distinct political and administrative identity are strong in certain areas and among certain sections of the community.

A pan-Turkic ideology inspired the brief life of the modern independent state and, today, the political views of various Uighur groups based in Central Asia or farther afield in Turkey, Germany, and even the United States, remain mainly of pan-Turkic inspiration. These organizations in most cases have secular and democratic aspirations. They come from conventional political traditions and have not supported the use of violence for their objectives, whether for the achievement of "real autonomy" or "independence" for the country they still call East Turkestan. In Xinjiang itself, no unified movement has surfaced. In fact, for reasons of language, geography, and religion (Xinjiang's different Muslim ethnic groups of Kazakhs, Mongols, Tajiks, Chinese-speaking Hui, and Uighurs have distinct places of worship—Hui Mosques, Uighur Mosques, etc.), this is complicated and unlikely. Even if the groups themselves had the

will to join forces, Chinese restrictions on freedom of assembly, the formation of independent organizations, and the publication or circulation of political and cultural materials would make it all but impossible for these groups to acquire a broad base of support or to take on any collective form. No opposition groups are allowed to exist in any public form.

However, a number of small opposition groups are known to exist secretly.[6] They tend to gravitate around two geographic poles: Yining and the Yili valley, in the western part of Xinjiang close to the border with Kazakhstan, and Kashgar and Hetian, in southern Xinjiang. The opposition groups that are present in the southern part of Xinjiang, notably in the Kashgar and Hetian areas, are thought to be more oriented towards the incorporation of religious ideals within their political programs. Some small groups have advocated the establishment of an Islamic state in Xinjiang and reject Chinese sovereignty.

The pro-independence groups in Xinjiang are overwhelmingly ethno-nationalist movements—that is, they are articulated along ethnic lines, not religious ones. This appears to be the case among both religious and secular groups.

### The turning point—unrest in 1990, stricter controls from Beijing

In 1990 a major, Islamic-inspired insurrection in Baren county, northwest of Kashgar, led China to launch a long-term strategy to assert tighter control over Uighur society. Until then, Xinjiang had remained a distant indigenous periphery. But for Beijing this challenge to the state was the turning point in its policies towards the Uighurs and Xinjiang.

China's reaction was linked to major changes in regional and world politics: the loss of control by Moscow of its eastern European satellites and the imminent collapse of the Soviet Union and emergence of the new central Asian republics. China feared that Uighur ethno-nationalist aspirations in Xinjiang could be stirred up by the example of— and possible support from—the newly independent central Asian people across its borders.

Beijing then launched an ambitious plan to accelerate the integration of Xinjiang with China by stepping up ethnic Chinese migration to Xinjiang. At the same time, it

---

[6] James Millward, *Violent Separatism in Xinjiang: A Critical Assessment (Policy Studies No. 6)*, (Washington DC: East-West Center Washington, 2004), [online] http://www.eastwestcenter.org/res-rp-publicationdetails.asp?pub_ID=1479.

committed major resources to economic growth in Xinjiang, chiefly through the exploitation of Xinjiang's natural resources, above all oil and gas. These policies coincided with impressive economic growth in China, which made it possible to commit the capital and labor to carry them out. This led to tremendous changes in Xinjiang, as new roads, industries, cities, and waves of new migration ensued. The political calculus in Beijing was straightforward: in the 1990s many Chinese policy makers took the view that economic development reduces local nationalism and aids national integration. The transfer of ethnic Chinese labor was and is still seen widely in Chinese policy making circles as aiding political integration and ultimately removing reasons for political unrest. These polices in fact may have exacerbated political tensions because of a predictable local reaction to mass migration and the fact that many of the economic gains were unevenly distributed and favored the Han segment of the population. Uighurs felt increasingly marginalized and left behind.

These tensions became evident in February 1997 when a number of residents of Yining, a town fifty kilometers from the Kazakh border, staged a demonstration to protest Chinese policies in Xinjiang, in particular, restrictions on religious and cultural activities, as well as the migration of Chinese settlers to the region. The protesters requested that the provisions of the legislative autonomy regulations that govern all ethnic minority regions in China be respected. These guarantee the right of minority nationality populations to set up "organs of self-government," as well as to retain some control over their local affairs and economic resources.[7]

The protest was peaceful. However, the security forces, composed of the Public Security Bureau and the People's Armed Police, brutally put down the protest and shot a number of unarmed demonstrators. Three days of rioting followed. This led to further harsh reactions by the authorities. Casualty figures for the Yining riots vary depending on the source, but a conservative estimate suggests that nine people died and hundreds were injured.

In subsequent weeks, the authorities responded with arrests of thousands of Uighurs. Suspected activists were rounded up and public sentencing rallies were held across the region. The government also instituted new, far-reaching policies focused on religion as a supposed source of opposition. Mosques and religious schools were closed down.

---

[7] Law of the People's Republic of China on Regional National Autonomy, 1984 [中华人民共和国民族区域自治]. The law was amended in 2001. See "National autonomy law revised to support Western Development policy," Tibetan Information Network, March 13, 2001.

A month later, in March 1997, separatists detonated bombs simultaneously on three public buses in the provincial capital of Urumqi, killing nine and seriously wounding sixty-eight. This is the only known occasion in recent decades when Uighur activists are known to have attacked civilians indiscriminately. Subsequently, attacks were also carried out on police stations, military installations, and individual political leaders.

Among the actions attributed to separatist forces include the August 1998 wounding of a prison official in Kashgar by a booby trap package placed on his doorstep. Also in August 1998 two prisons in Yining prefecture were attacked by an armed group. Nine prison guards were killed; eighty prisoners managed to escape. Eighteen prisoners allegedly managed to flee to Kazakhstan according to the Hong Kong daily newspaper *Ming Pao*.[8] Despite the indisputably violent character of these incidents, government claims that the 1990s witnessed an escalation of violence are not accepted by all independent observers. For instance, the historian and Xinjiang expert James Millward writes that:

> Although the relatively few large-scale incidents in the 1990s were better publicized than those of the 1980s, they were not necessarily bigger or more threatening to the state. There have been, moreover, few incidents of anti-state violence—none large-scale—since early 1998. And none of them since the 1997 Urumqi bus bombings, alleged to be the work of Uighur terrorists, have targeted civilians.[9]

### Post 9/11: labeling Uighurs terrorists

Although the Xinjiang authorities began to publicly acknowledge anti-state violence in Xinjiang in the mid-1990s, they generally suggested that it was carried out only by "a handful of separatists" and stressed that the region was stable and prosperous. In early September 2001, the Xinjiang authorities had stressed that "by no means is Xinjiang a place where violence and terrorist accidents take place very often," and that the situation there was "better than ever in history."[10]

However, immediately after the September 11 attacks on the United States, the authorities reversed their stance. For the first time they asserted that opposition in

---

[8] Human Rights Watch, "China: Human Rights Concerns in Xinjiang," *A Human Rights Watch Backgrounder*, October 2001, [online], http://www.hrw.org/backgrounder/asia/china-bck1017.htm.

[9] Millward, *Violent Separatism in Xinjiang*, p. 10.

[10] Bao Lisheng, "Chinese Officials Say Not Much Terrorism in Xinjiang," *Ta Kung Pao*, September 2, 2001 (in Chinese).

Xinjiang was connected to international terrorism. They also asserted that in some cases the movement had connections to Osama bin Laden himself. China claimed that "Osama bin Laden and the Taliban in Afghanistan had provided the 'Eastern Turkestan' terrorist organizations with equipment and financial resources and trained their personnel," and that one particular organization, the "Eastern Turkestan Islamic Movement" (ETIM) was a "major component of the terrorist network headed by Osama bin Laden."[11]

By October the Chinese Foreign Ministry spokesman declared that, as "a victim of international terrorism," China hoped that "efforts to fight against East Turkestan terrorist forces should become a part of the international efforts and should also win support and understanding."[12]

On November 12, 2001, China told the U.N. Security Council that anti-state Uighur groups had links with the Taliban in Afghanistan and claimed that they were supported from abroad by radical Islamist organizations. Siding with the U.S. in the new "global war against terrorism," the Chinese government initiated an active diplomatic and propaganda campaign against "East Turkestan terrorist forces." This label was henceforth to be applied indiscriminately to any Uighur suspected of separatist activities. There has been no sign of any attempt by the Chinese authorities to distinguish between peaceful political activists, peaceful separatists, and those advocating or using violence.

In its efforts to win support for its post-September 11 equation of Uighur separatism with international terrorism, China has released a number of documents describing in some detail the alleged activities of Uighur terrorists groups in China. The first of these was published by the Information Office of the PRC State Council in January 2002, under the title: "East Turkestan Terrorist Forces Cannot Get Away with Impunity."[13] It offers the most comprehensive account to date of anti-state violence in Xinjiang and provides a catalog of violent acts allegedly committed by separatist groups in Xinjiang over the past decade. The document asserts that "East Turkestan terrorist forces" had conducted "a campaign of bombing and assassinations" consisting of more than 200

---

[11] "Terrorist Activities Perpetrated by 'Eastern Turkestan' Organizations and Their Links with Osama bin Laden and the Taliban," November 21, 2001, posted on the official website of the Permanent Mission of the People's Republic of China to the United Nations, [online] http://www.china-un.org/eng/zt/fk/t28937.htm (retrieved October 5, 2003).

[12] "China Asks Help Against Muslims," Associated Press, October 11, 2001.

[13] "East Turkestan' Terrorist Forces Cannot Get Away with Impunity," January 21, 2002, issued by the State Council Information Office, [online] http://www.china-un.ch/eng/23949.html. [国务院新闻办，"东突"恐怖势力难脱罪责,"2002 年 1 月 21 日, http://news.sohu.com/74/76/news147717674.shtml].

incidents resulting in 162 deaths and 440 people injured over the preceding decade.[14] This was the first time the Chinese authorities provided detailed specifics about violence in Xinjiang. The document also asserted that Uighur organizations responsible for the violence had received training and funding from Pakistan and Afghanistan, including direct financing from Osama bin Laden himself.[15]

The document has a highly charged ideological tone and contains numerous inconsistencies. It also lacks any independent intelligence to support its conclusions.[16] In particular, the central claim that all instances of anti-state violence, and all "separatist groups," originated from a single "East Turkestan terrorist organization" runs counter to known intelligence about the situation in Xinjiang. Even more problematic are the inconsistencies in the account of specific acts of violence within the document itself.

Human Rights Watch has no way of corroborating or disproving the incidents alleged in the January 2002 report. But as James Millward has written in his monograph, *Violent Separatism in Xinjiang: A Critical Assessment*:

> [There] are problems in the document's treatment of events in the 1990s. While its preface claims that terrorist acts killed 162 (and injured 440) over the past decade, the document itself enumerates only 57 deaths. Most of these people died in small-scale incidents with only one or two victims. The selection criteria for including these incidents, as well as many that resulted in no deaths, while excluding acts that led to the remaining 105 deaths are unclear. But if we are safe in assuming that the document likely mentions all spectacular acts of separatist violence, including those involving high loss of life, then we are left to conclude that over a hundred deaths from "terrorism"—nearly two-thirds the claimed total—occurred in small-scale or even individual attacks. Though definitions of terrorism are notoriously arbitrary, it seems legitimate to question what makes the unlisted acts "terrorist" or "separatist" as opposed to simply criminal.[17]

---

[14] Ibid.

[15] Ibid.

[16] For a detailed analysis of the problems of the January 2002 State Council Information Center report, see James Millward, *Violent Separatism in Xinjiang*.

[17] Millward, *Violent Separatism in Xinjiang*, pp. 12-13.

In December 2003, the Chinese government released a second report designed to legitimize its policies in Xinjiang and to enlist the support of the international community. The document listing "East Turkestan terrorist groups and individuals" was issued by the Ministry of Public Security and gave the names of four "Eastern Turkestan" terrorist organizations and eleven individual members of these groups, and called for international support to stop their activities, including a request for Interpol to issue arrest warrants.[18] The document points to the presence of Chinese Uighurs in Pakistan and Afghanistan, including some among the Taliban forces. It suggests that all Uighur opposition to Chinese domination, including non-violent resistance, is connected to international radical-Islamic terrorism.

---

### Literature becomes sabotage

Chinese authorities have not produced extensive evidence of specific activities carried out by what it has termed "terrorist forces" in Xinjiang over the past few years. Instead, Chinese authorities now argue that "separatist thought" is the new approach followed by dissident organizations that previously used violent tactics. This argument allows the authorities to accuse a dissenting writer or a non-violent group advocating minority rights of terrorist intentions and crimes.

The alleged link between terrorist organizations and the ideological content of publications surfaced immediately after September 11:

"Xinjiang independence elements have changed their combat tactics since the September 11 incident," stated a high-ranking Xinjiang official. "They have focused on attacking China on the ideological front instead of using their former frequent practice of engaging in violent terrorist operations."[19]

The official charged that those using "literary means" and "arts and literature" to "distort historical facts" were the same people responsible for "violent terrorist operations" in the past. He accused them of "taking advantage of art and literature to tout the products of opposition to the people and to the masses and of advocating ethnic splittist thinking."

---

[18] "Combating terrorism, we have no choice," *People's Daily Online*, December 18, 2003. The identified "Eastern Turkestan" terrorist organizations were the Eastern Turkestan Islamic Movement (ETIM), the Eastern Turkestan Liberation Organization (ETLO), the World Uighur Youth Congress (WUYC), and the Eastern Turkestan Information Center (ETIC).

[19] China News Agency, March 13, 2002, FBIS, March 25, 2002. [CHI-2002-0313].

In February 2002, the Xinjiang Party Secretary instructed the local authorities to crack down on these "separatist techniques" and detailed the "forms of infiltration and sabotage carried out in the ideological sphere by ethnic separatist forces":[20]

1. using all sorts of news media to propagate separatist thought;

2. using periodicals, works of literature and art performances; presenting the subject in satires or allegories that give free reign to and disseminate dissatisfaction and propagate separatist thought;

3. illegally printing reactionary books and periodicals; distributing or posting reactionary leaflets, letters and posters; spreading rumors to confuse the people; instilling the public with separatist sentiment;

4. using audio and video recordings, such as audio tapes, CDs or VCDs, to incite religious fanaticism and promote "holy war";

5. forging alliances with outside separatist and enemy forces, making use of broadcasts, the Internet, and other means to intensify campaigns of reactionary propaganda and infiltration of ideas into public opinion;

6. using popular cultural activities to make the masses receptive to reactionary propaganda encouraging opposition."[21]

From the wording of the document, published in the Party's official newspaper, the *Xinjiang Daily*, it appears that Xinjiang authorities equate any expression of dissatisfaction (*buman qingxu* 不满情绪), even metaphorical or ironical, with separatist thought (*fenlie sixiang* 分裂思想). The term "spreading rumors" (*zaoyao* 造谣) used in the article is the same as that used in criminal law: "incitement to subvert the political power of the state and overthrow the socialist system by means of *spreading rumors*, slander or other means" (Article 105), an offense for which the punishment can be life imprisonment. The document asserts that the "expression of dissatisfaction" in works of art is a form of criminal activity and is liable to criminal punishment. Furthermore, the document uses the terms "sabotage" and "infiltration" to characterize such activities, thus reinforcing the idea that they are equivalent to violent action.

The fact that "popular cultural activities" (*minjian wenhua huodong* 民间文化活动) are denounced as forms of "separatist" activity appears to be aimed at deterring people from engaging in activities that promote their history, culture, or tradition. Ethnic minority individuals and Uighur organizations abroad had complained in the past about similar official attitudes toward legitimate cultural pursuits, but prior to this official pronouncement their allegations had only been supported by circumstantial evidence, not stated explicitly as high-level Party policy.[22]

Such comments indicate that the Chinese authorities are trying to erase the distinctions among cultural and minority rights activists, pro-independence activists, and those who use violence. This suggests an historical shift: while before September 11, 2001, not all minority rights or

---

[20] "For the first time Xinjiang reveals the six forms of sabotaging operations of the separatist forces in the ideological sphere," Xinjiang Information Network, February 1, 2002 ["新疆首次披露民族分裂势力在意识形态领域破坏活动的六种形式," 新疆新闻网, 2002-02-01].

[21] Ibid.

[22] "Separatist Artist under Watch," *South China Morning Post*, January 15, 2002.

cultural rights activists or those on the "ideological front" (which presumably covers all critics of CCP policy) were considered to be terrorists, after September 11 they are, or should be, assumed to be terrorists.

In effect, China is claiming that terrorists have now become secret peaceful activists, presumably waiting for the right moment to revert to their former methods. This is a very dangerous set of assumptions that can be acted upon by the Chinese or Xinjiang security services at any time to justify arrests, heavy sentences, and the death penalty.

The case of Tursunjan Emet, a Uighur poet from Urumqi, illustrates this point. On January 1, 2002, Emet recited a poem in Uighur at the end of a concert at the Xinjiang People's Hall in the capital Urumqi. The Party committee ruled that the poem had an "anti-government" message and labeled the case as an "ethnic separatist crime in the area of the ideological front."[23] The Chairman of the Xinjiang provincial government immediately called for an investigation, vowing to purge all who "openly advocate separatism using the name of art," and urged cadres to use "politics" as the only standard in judging artistic and literary work. Emet went into hiding immediately after the incident. He was then detained, probably in late January 2002.[24] Official Chinese sources have since denied that he was ever detained. Unofficial sources indicate that he was released, some weeks, or possibly months, later.[25]

In a similar case, on February 2, 2005, the Kashgar Intermediate Court sentenced Uighur author Nurmemet Yasin to ten years imprisonment for publishing a story allegedly "inciting separatism." In late 2004, Yasin published "The Blue Pigeon" in the *Kashgar Literature Journal*.[26] A month later, he was arrested in Bachu County. His story told of a blue pigeon that traveled far from home. When it returned, different colored pigeons captured him and locked him in a birdcage. Although the other pigeons fed him, the blue pigeon opted to commit suicide rather than remain imprisoned in his hometown.

In part because pro-independence Uighurs use a blue flag, Chinese authorities read the story as referring to Uighur resentment of the government's policies in Xinjiang. The court tried Yasin in closed hearings; RFA sources claimed he was denied access to a lawyer.

It is therefore now official policy that criticism or minority expression in art and literature can be deemed a disguised form of secessionism, its author a criminal or even "terrorist."

### The international response—acquiescence and quid pro quos

The new Chinese description of the nature and level of violence and separatism in Xinjiang led to a significant change in the international approach to Xinjiang. The U.S.

---

[23] Ibid; China News Agency, March 13, 2002, FBIS, March 25, 2002 [CHI-2002-0313].

[24] "Surge in Arrests and Prosecutions for Endangering State Security," *Newsletter of the Dui Hua Foundation*, Issue 11, Spring 2003.

[25] Amnesty International, "People's Republic of China: Uighurs fleeing persecution as China wages its 'war on terror'," July 7, 2004 [AI Index: ASA 17/021/2004].

[26] Radio Free Asia Uighur Service, February 8, 2005, [online] http://origin.rfaweb.org/yughur/xewerler/tepsili_xewer/2005/02/08/orkishi/, (retrieved February 10, 2005).

government, keen after September 11 to enlist Chinese support in its efforts against Islamist terrorism, agreed to a Chinese request that it co-sponsor the inclusion of a little-known Uighur organization, the East Turkestan Islamic Movement (ETIM), on the U.N.'s list of terrorist organizations purportedly linked to al-Qaeda and subject to the freezing of assets. Although American officials declared that they had "independent evidence" of such a connection, the State Department press release explaining this decision quoted verbatim a document issued by the Chinese government in 2002 that similarly outlawed ETIM. The U.S. statement even mistakenly attributed all the terrorist incidents described in that document solely to ETIM, a claim that even the Chinese authorities had not made.[27]

The "independent evidence" referred to by the State Department appears to have originated from the arrest a few weeks earlier in Kyrgyzstan of a group of Uighurs who were allegedly planning an attack on the U.S. embassy.[28] Kyrgyzstan deported to China two persons alleged to be ETIM members who had "plotted to attack the U.S. Embassy in Kyrgyzstan as well as other U.S. interests abroad."[29] In their rush to find corroborative evidence, U.S. officials seem never to have questioned the reports from Kyrgyz authorities, who have a record of trumping up terrorism charges against Uighurs. U.S. officials have privately indicated unease at the decision to list ETIM. In December 2003 the U.S. declined to support China's request to list another Uighur organization, the East Turkestan Liberation Organization.[30]

The U.S. has also publicly insisted that the ETIM listing and the international war on terror should not be used by China to justify internal repression against political opponents or minorities. President Bush stressed in October 2001 in Shanghai that, "The war on terrorism must never be an excuse to persecute minorities."[31] U.S. Ambassador Clark Randt similarly stated in January 2002 that "Being a valuable member of the coalition does not mean that China… can use terrorism as an excuse to persecute its ethnic minorities."[32] However, the U.S. has not withdrawn or formally qualified its

---

[27] See "Criminalizing Ethnicity: Political Repression in Xinjiang," *China Rights Forum*, no. 1, 2004.

[28] "U.S. has Evidence ETIM Plans Attack," *People's Daily Online*, August 30, 2002.

[29] U.S. Department of State, *Patterns of Global Terrorism 2002*, [online] http://www.state.gov/s/ct/rls/pgtrpt/.

[30] "China seeks co-op worldwide to fight 'East Turkestan' terrorists," Xinhua News Service, December 15, 2003.

[31] "U.S., China Stand Against Terrorism: Remarks by President Bush and President Jiang Zemin," press conference at the Western Suburb Guest House in Shanghai, People's Republic of China), [online] http://www.whitehouse.gov/news/releases/2001/10/20011019-4.html.

[32] "United States-China Relations in the Wake of 9-11," speech by Ambassador Clark T. Randt, Jr., United States Ambassador to China, The Asia Society, Hong Kong, January 21, 2002, [online] http://www.asiasociety.org/speeches/randt2.html.

condemnation of the ETIM from the U.N. list. In the process, it has handed China a major propaganda victory against its political opponents in Xinjiang.

China has also been very active in enrolling the support of its Central Asian neighbors in the crackdown against Uighur ethno-nationalist aspirations. It is the driving force behind the Shanghai Cooperation Organization (SCO), a regional security body composed of China, Russia, Kazakhstan, Kyrgyzstan, Tajikistan, and Uzbekistan set up in 1996 (Uzbekistan joined in 2001). The SCO was established in part to address Chinese concerns about a number of small Uighur political and opposition movements that, in the first years of independence for the former Soviet republics, set up organizations in the region, giving Uighur exiles a much closer base for their operations than the previous generation of activists, who had been based in Turkey and, later, Germany. Under pressure from Beijing, since 1996 these Central Asian countries have effectively silenced independent Uighur organizations on their soil and on several occasions have repatriated refugees in response to requests by China. Some of those repatriated refugees were executed upon their return.[33]

Since the co-option by China and other states of the notion of the "war against terror," international co-operation has been leveraged in the Central Asian region by means of mutual agreement about those regarded by these states as political opponents. These cases have not always involved activists involved in the use of violence. In October 2004, China and Russia made a joint call for international efforts to help in their respective fights against opponents, with the Russians seeking help against Chechen rebels and the Chinese seeking help against Uighur separatists. The statement referred to "terrorists" and "separatists" in Chechnya and Xinjiang, whom it said "are part of international terrorism" and "should be the targets of the international fight against terrorism."[34] The wording of the Chinese part of the statement referred both to terrorism and separatism, but implied that they were interchangeable:

> China understands and firmly supports all measures taken by Russia to resume the constitutional order of the Republic of Chechnya and to fight against terrorism. Russia firmly supports all measures taken by

---

[33] Amnesty International, "People's Republic of China: Uighurs fleeing persecution as China wages its 'war on terror,'" July 7, 2004 [AI Index: ASA 17/021/2004].

[34] "Leaders unite in terrorism stand," *South China Morning Post*, October 15, 200; Ministry of Foreign Affairs of the PRC: "China and Russia Issue a Joint Statement, Declaring the Trend of the Boundary Line between the Two Countries Has Been Completely Determined," October 14, 2004 (available on the website of the ministry at www.fmprc.gov.cn).

China to fight against the terrorist and separatist forces in "East Turkestan" and to eliminate terrorist jeopardy.[35]

The Kazakh government acknowledged in November 2004 that it had extradited fourteen Uighurs to China and Kyrgyzstan since 1997.[36] Pakistan has boasted that it has eliminated Uighur "terrorists" in its northern areas.[37] Beijing has also pressured Pakistan and Nepal for the repatriation of refugees. In January 2002, Nepal forcibly repatriated three Uighurs who had been granted refugee status by the UNHCR and were awaiting relocation to a third country.[38] One of them, Shaheer Ali, was executed shortly thereafter after being convicted for separatism. He left a detailed account of torture inflicted on him in Chinese jails before his death.[39]

China has asked the United States to send to China the twenty-two or twenty-three Chinese Uighurs held at Guantanamo Bay in Cuba.[40] The detainees had allegedly been fighting alongside Taliban forces in Afghanistan at the time of the U.S. invasion, and were arrested by Pakistani authorities when fleeing into Pakistan when the U.S. offensive against the Taliban started. Despite the fact that the Pentagon ascertained that these prisoners had "no intelligence value," a Chinese mission was reportedly permitted to interrogate the prisoners at the Guantanamo detention facility.[41] Following reports in December 2003 that the U.S. was about to release some of the Uighurs without charge, and was considering handing them over to China,[42] Human Rights Watch and others raised concerns over Chinese authorities' track record of swiftly executing repatriated "separatists."[43] The first reports that the U.S. government had ruled out return to China

---

[35] Ministry of Foreign Affairs of the PRC: "China and Russia Issue a Joint Statement, Declaring the Trend of the Boundary Line between the Two Countries Has Been Completely Determined," October 14, 2004, [online] www.fmprc.gov.cn.

[36] "Kazakhstan Reveals Uighur Extraditions," Radio Free Europe/Radio Liberty, November 16, 2004.

[37] Human Rights Watch interview with senior Pakistani intelligence official, February 2004. To protect the confidentiality of sources, we have removed potentially identifying details from citations to interviews we conducted in Xinjiang and elsewhere, including the specific date and in some cases the location of the interview.

[38] Amnesty International, "Urgent Action Appeal: Fear of forcible return," April 22, 2002, [UA 119/02].

[39] "Executed Uighur refugee left torture testimony behind," Radio Free Asia, October 23, 2003. Shaheer Ali spoke to RFA's Uighur Service in May 2001, describing eight months of torture from April to December of 1994 in the Old Market Prison, in Guma (in Chinese, Pishan) county, in the Xinjiang Uighur Autonomous Region. In several Human Rights Watch interviews conducted by telephone from Nepal, Shirali described how he was beaten with shackles, shocked in an electric chair, repeatedly kicked unconscious, and then drenched in cold water to revive him for more torture.

[40] Demitri Sevastopuolo, "U.S. fails to find homes for Uighur detainees," *Financial Times*, October 28, 2004.

[41] "US fails to find homes for Uighur detainees," *The Financial Times*, October 28, 2004.

[42] "Eleven Turks at Guantanamo base," United Press International, February 6, 2004.

[43] "U.S.: Don't Send Detainees Back to China," Human Rights Watch, November 26, 2003, [online] http://www.hrw.org/press/2003/11/us112603.htm.

because of the risk that the Uighurs might be tortured or executed appeared in June 2004.[44] In August 2004, U.S. Secretary of State Colin Powell declared publicly that the U.S. would not return the Uighurs.[45] The Chinese embassy in Washington continues to press for their repatriation. It has declared that Beijing considers the Uighurs at Guantanamo to be "East Turkestan terrorists" who should be returned to China.[46]

While there are genuine security concerns in Xinjiang, they are manipulated by Chinese authorities for political and economic ends. When it is expedient, the authorities insist that only "an extremely small number of elements" are engaged in separatism and that the situation is "stable." In March 2005, the head of the Xinjiang government, Ismail Tiwaldi, confirmed that "there have been no terror attacks in Xinjiang in recent years," thus corroborating his statement of the previous year that "Xinjiang ha[d] not recorded a single violent incident, nor any assassination case [in 2004]," and that "there hadn't been even a small incident," throughout 2003.[47] When, however, the government desires international support for its crackdown on Uighur challenges to Chinese authority, including peaceful activities, it raises the specter of Islamic terrorism.

## III. National Law and Policy on Religion

*We will never allow the use of religion to oppose the Party's leadership and the socialist system or undermine the unification of the state and unity among various nationalities.*[48]

On its face, China's 1982 constitution guarantees freedom of religion. Article 36 states:

Citizens of the People's Republic of China enjoy freedom of religious belief. No state organ, public organization or individual may compel citizens to believe in, or not to believe in, any religion; nor may they discriminate against citizens who believe in, or do not believe in, any religion.

---

[44] "China torture fears hamper jail releases," *The Financial Times*, June 22, 2004.

[45] "Powell Says Detained Uighurs Will not be Returned to China," Agence France-Presse, August 13, 2004].

[46] "US fails to find homes for Uighur detainees," *The Financial Times*, October 28, 2004.

[47] "Head of China's northwest Muslim Xinjiang region says area safe from terror attacks," Associated Press, March 13, 2005 ; "Xinjiang confident of reining in rebels," *South China Morning Post*, March 13, 2004.

[48] "Jiang Zemin, Zhu Rongji address National work conference," Xinhua, December 12, 2001, FBIS, December 19, 2001 [CHI-20011-1212].

> The state protects normal religious activities. No one may make use of religion to engage in activities that disrupt public order, impair the health of citizens or interfere with the educational system of the state. Religious bodies and religious affairs are not subject to any foreign domination.[49]

This ambiguous formulation does not answer many questions about what is permissible and what is not. More important is the policy of the Chinese Communist Party on religion, which dates from the leadership of Deng Xiaoping, who reversed the Mao-era policy of attempting to eradicate religion from society.

The essence of current CCP policy is to tolerate religious beliefs and practices that do not threaten the Party or state but to closely regulate and, where it is deemed necessary, aggressively repress beliefs and practices perceived as a threat.[50] In practice, since the late 1970s China has allowed believers greater latitude for worship in exchange for accepting a regulatory structure designed to limit church autonomy and stifle congregational growth.[51]

The most recent national policy parameters on religion were established at the National Conference on Religious Work, convened jointly by the Chinese Communist Party Central Committee and the State Council in December 2000. The conference articulated four fundamental principles that underlie regulation of religion in China today.

The first principle is "freedom to believe or not believe in religion." This principle reflects both the toleration of individual belief and its essential isolation from other social activities. It allows non-threatening forms of religious observance to be carried out within approved temples, churches, or mosques, and at home. Conversely, it is also invoked to curtail any form of proselytization and to prohibit religious observance at all state-managed institutions such as schools, universities, government offices, state-owned enterprises, prisons, and labor-camps.

The second principle, of "non-interference in religious activities," refers to the fact that only state-controlled religious organizations can organize and implement religious activities. Links to foreign religious institutions are proscribed.

---

[49] Constitution of the People's Republic of China, Art. 36 [中华人民共和国宪法, 第三十六条]

[50] Human Rights Watch, *China: State Control of Religion* (New York: Human Rights Watch, 1997).

[51] Mickey Spiegel, "Control and Containment in the Reform Era," in Jason Kindopp and Carol Lee Hamrin, eds., *God and Caesar in China* (Washington D.C.: Brookings Institution Press, 2004), p. 41.

The third principle of "separation of politics from religion" effectively prohibits critical commentary by religious figures or followers and frequently is invoked to justify government crackdowns on religious expression or dissent.

The final principle, of "the interdependence between rights and obligations associated with religious activities," inserts conditionality into the exercise of religious freedom. Religious activities are deemed "lawful" only when practitioners fulfill a fixed set of conditions (the "obligations").

For those trying to practice religion in China, the critical issue is to determine what constitutes "legitimate and protected belief" and what crosses the line into "unlawful activity." As one legal scholar has stressed, "this determination is made according to [Chinese Communist Party] policies, which in turn are reflected in the provisions of the constitution and in specific laws and regulations."[52]

China currently recognizes as "lawful" (*hefa* 合法) religious activities that are sanctioned and controlled by the government. Any activity that is not state-sanctioned is regarded as an "illegal religious activity" and is liable to "rectification" or "suppression" by administrative or judicial measures. To be considered lawful, religious activities must fulfill all the following conditions:

- belong to one of the five official religions recognized by the government (Buddhism, Taoism, Catholicism, Protestantism, and Islam);
- be carried out by officially-accredited religious personnel;
- take place in government-approved places of religious activities; and
- be within the ideological bounds fixed by the Party.

Each of the five recognized religions must also conform its doctrine to specific requirements. For example, Catholicism must not refer to allegiance to the Vatican, while Islam must oppose "separatism" and "illegal religious activities."

The "Law on Regional National Autonomy" likewise stipulates in article 11 that "[t]he organs of self-government of national autonomous areas shall guarantee the freedom of

---

[52] Pitman B. Potter, "Belief in Control: Regulation of Religion in China," *The China Quarterly*, Issue 174 (2003).

religious belief to citizens of the various nationalities."[53] However, the "autonomy law" also imposes significant limits that invite selective, politically motivated crackdowns on believers. Article 11 prohibits the use of religion to "to engage in activities that disrupt public order, impair the health of citizens or interfere with the educational system of the state." Beijing reserves an important power with respect to the autonomy law: the central government may overrule regulations passed in autonomous areas and restrict religious activities in the interest of national security, public order, health, or education.

## IV. A Repressive Framework: Regulation of Religion in Xinjiang

> *...the intensified effort to administer religious affairs according to law...should be regarded as an important radical measure to oppose ethnic splittism and preserve social and political stability.*[54]

At its heart, the control of religious activities in Xinjiang is a way of opposing "ethnic splittism" (*minzu fenlie* 民族分裂). Xinjiang's Party Secretary Wang Lequan stressed in 1991 that the "major task" facing the authorities in Xinjiang was to "manage religion and guide it in being subordinate to ... the central task of economic construction, the unification of the motherland, and the objective of national unity," a vision of subordination that has hardly changed since.[55]

Although China has increasingly faced international criticism for its religious policies in Xinjiang,[56] it has persistently rejected such criticism. In May 2003, the Information

---

[53] Law of the People's Republic of China on Regional National Autonomy, 1984, amended 2001. [中华人民共和国民族区域自治法(2001 修正)].

[54] Editorial, *Xinjiang Daily* [新疆日报], October 13, 2002, FBIS, November 5, 2002 [CHI-2002-1029].

[55] "Xinjiang Party Secretary Economic Development, Separatism," *Outlook* [瞭望], June 25, 2001, no. 26, pp. 52-53, FBIS, July 25, 2001 [CHI-2001-0710]. Wang Lequan reiterated these views in October 2002 while presiding over a regional party and government conference on religious work, to wit: "Our proposal of letting religions and the socialist society adapt to each other (...) ask religious personnel (...) to subordinate themselves to and serve the highest state interests and overall national interest in the religious activities they undertake (...) oppose all illegal activities that use religion to harm the socialist motherland and the people's interests." Editorial, Xinjiang Daily [新疆日报], October 13, 2002, FBIS, November 5, 2002 [CHI-2002-1029].

[56] The former United Nation High Commissioner for Human Rights, Mary Robinson, raised concerns on Xinjiang on her two visits to China, in November 2001 and August 2002. ("Robinson warns China on repression," BBC News Online, November 8, 200; "U.N. slams China 'anti-terror' crackdown," CNN.com, August 20, 2002).
The European Parliament called in 2003 and 2004 for the adoption of a resolution on China at the U.N. Commission on Human Rights, citing the situation in Xinjiang (European Parliament, "European Parliament resolution on the EU's rights, priorities and recommendations for the 59th Session of the U.N. Commission on

Office of the State Council released a White Paper[57] on the "History and Development of Xinjiang."[58] The White Paper is the government's most recent and comprehensive statement on the situation of ethnic minorities in Xinjiang. It marshals various facts and statistics to make the case that ethnic minorities are thriving in Xinjiang. These include the existence of some 24,000 religious venues in Xinjiang; the role played by ethnic minorities in the administration of religion and religious policies; the allocation of "specialized funds for the maintenance and repair of the key mosques"; the establishment of "an Islamic college specializing in training senior clergymen"; "guaranteed access to scriptures and other religious publications"; and, above all, the fact that "all religious bodies independently carry out religious activities within the scope prescribed by law."[59]

---

Human Rights," January 30, 2003; European Parliament, "European Parliament resolution on the EU's rights, priorities and recommendations for the 60th Session of the U.N. Commission on Human Rights in Geneva," January 19, 2004).

The United States Congressional-Executive Commission on China has noted "harsh repression and restrictions on religious activity" in Xinjiang in its 2003 annual report to the Congress. (Congressional-Executive Commission on China, Annual Report 2003, October 2, 2003). Similar concerns are found in its previous report (Congressional-Executive Commission on China, Annual Report 2002, October 2, 2002).

Human Rights Watch, Human Rights in China, and Amnesty International have published a number of reports on the situation in Xinjiang. See "U.S.: Don't Send Detainees Back to China," Human Rights Watch, November 26, 2003, [online] http://www.hrw.org/press/2003/11/us112603.htm; Human Rights Watch, "China: Human Rights Concerns in Xinjiang," October 2001, [online], http://www.hrw.org/backgrounder/asia/china-bck1017.htm; Human Rights Watch, "China: State Control of Religion: Update #1," March 1998; Human Rights in China, "Criminalizing Ethnicity: Political Repression in Xinjiang," China Rights Forum, January 2004; Amnesty International, "People's Republic of China: Uighurs fleeing persecution as China wages its 'war on terror'," July 7, 2004 [AI Index: ASA 17/021/2004]; Amnesty International, "China: International community must oppose attempt to brand peaceful political activists as 'terrorists'," December 19, 2003 [AI Index: ASA 17/040/2003]; Amnesty International, "People's Republic of China: No justice for the victims of the 1997 crackdown in Ghulja (Yining)," February 4, 2003 [AI Index: ASA 17/011/2003]; Amnesty International, "People's Republic of China: China's anti-terrorism legislation and repression in the Xinjiang Uighur Autonomous Region," March 2002 [AI Index: ASA 17/10/2002].

[57] The "White Papers" of the Chinese government summarize the official view of human rights and explicitly aim to refute foreign criticism. The first paper was published two years after the 1989 Tiananmen massacre, in November 1991, soon followed by other white papers on specific issues, such as religious freedom, ethnic minorities, Tibet, and so on. As reputed scholars have pointed out, "One explicit aim of the White Paper was to refute foreign criticism and present an alternative and more rosy picture of the situation in China." Steven C. Angle and Marina Svensson, The Chinese Human Rights Reader: Documents and Commentary, 1900-2000, (London and Armonk: M.E. Sharpe, 1991), p.356.

[58] Information Office of the State Council Of the People's Republic of China, White Paper: History and Development of Xinjiang, May, 2003, Beijing, [online] http://www.china.org.cn/e-white/20030526/ [中华人民共和国 国务院新闻办公室: 新疆的历史与发展 (白皮书) , 2003 年 5 月, [online]

http://news.xinhuanet.com/zhengfu/2003-06/12/content_916235.htm].

[59] White Paper, Section VIII "Upholding Equality and Unity Among Ethnic Groups, and Freedom of Religious Belief."

The White Paper states that, "The right to freedom of religious belief for various ethnic groups is fully respected, and all normal religious activities are protected by law," specifically citing the enactment by the Xinjiang government of the Provisional Regulations for the Administration of Religious Activity Venues in the Xinjiang Uighur Autonomous Region—a regulation that was abruptly rescinded in May 2004[60]—and "other regulations in accordance with the constitution and the law."

However, there is a significant discrepancy between official materials published for international and public consumption and those intended for internal circulation. These secret regulations and policy statements—documents that are used as immediate guides to the implementation of laws and policies—are not publicly available and provide a much stricter framework for religious activity. Given the internal nature of most such policy instructions, most of these documents, and the detailed picture of regulation they present, have not been available until now. They are described below.

---

### Policies Hidden from the Public

While white papers, the constitution, national legislation, and certain national and provincial policy statements are available to the public and reported in newspapers, there is a large and growing category of Chinese regulations and policies that the government and Party deliberately keep hidden.

Two specific regulations—revealed here for the first time—establish a draconian ban against unauthorized disclosure of information regarding almost any national minority or religious matter or policy, even if unrelated to national security. One regulation was jointly promulgated in 1995 by the State Secrets Protection Bureau (*Guojia mimi baoshou ju* 国家保密局) and the State Council Ethnic Affairs Commission. [61] The other regulation was promulgated at the same time by the State Secrets Protection Bureau and the State Administration of Religious Affairs (formerly the Religious Affairs Bureau).[62] Salient information classified as state secrets includes:

---

[60] The "Provisional Regulations for the Administration of Religious Activity Venues in the Xinjiang Uighur Autonomous Region" [新疆维吾尔自治区宗教活动场所管理暂行规定] were repealed in May 2004. It is unclear whether newer regulations were adopted to replace them. ("The government of the Xinjiang Uygur Autonomous Region repeals 10 governmental regulations in administrative clean-up," *Xinjiang Economic Daily*, May 24, 2004 ["新疆维吾尔自治区清理行政审批废止１０项政府规章," 新疆经济报, 2004 年 5 月 24 日]).

[61] "Regulations on State Secrets and Specific Classification Limits in Religious Affairs Work," Promulgated by the State Administration of Religious Affairs and the State Secrets Protection Bureau, October 12, 1995 [国务院宗教事务局，国家保密局：宗教工作中国家秘密及其密级具体范围的规定，1995 年 10 月 12 日].

[62] "Regulations on the Specific Scope of State Secrets and Classification of Ethnic Work," Promulgated by the State Ethnic Affairs Commission and the State Secrets Protection Bureau, March 17, 1995.

1. government analyses of "situations and trends that seriously undermine ethnic relations as well as state unity and social instability caused by ethnic issues" must be classified as "top-secret," as must public security measures "drafted to counter the use of religion in political infiltration and serious illegal activities" or measures taken to manage public security incidents relating to ethnic affairs and religion;

2. draft works classified as "highly confidential" including policies and analyses prepared "in response to religious situations and trends," "important strategies, policies, and measures related to ethnic affairs work," and "proposals and measures drafted to handle ethnic conflicts";

3. foreign affairs matters such as "policies and measures drafted to counter major foreign affairs problems related to religious" and "measures in external propaganda work" that "need to be controlled internally."


The regulations also list matters that must be treated as "internal" (*neibu* 内部), that is not to be publicized or announced without authorization. These include most documents relating to religious and ethnic policies which would routinely be public information in other countries. Among them are drafts of religious laws and regulations; reports, opinions and suggestions by religious representatives regarding religious affairs; "analyses of developments with overseas religious organizations and their personnel"; "information and statistics unsuitable for the public regarding religious organizations, institutions and activities"; and the "content of state organ meetings unsuitable for the public."


While there is no criminal liability for disclosure of "internal" material, in practice many people in China have been sentenced for doing so because state secret laws allow authorities to classify material retrospectively. Some of the regulations and policies referred to in this report are treated as "internal" or are simply unavailable to the public.

## Regulation in 1994-2001: "Keeping a handle on" the imams and party cadres

Until their revision in 2001, religious activities in Xinjiang were governed by a set of regulations issued in 1994, which echoed the national regulations.[63] In the intervening years, a series of Communist Party directives indicated that Xinjiang would be targeted for special, effectively discriminatory treatment. For example, in 1996, Document Number 7 from the Political Bureau of the Central Committee, while still operating within the framework of the 1994 Regulations, laid the outline for a considerable toughening of regulations concerning religion and for the curbing of religious freedom that continues to this day.[64]

---

[63] Xinjiang Uighur Autonomous Region People's Congress, "Xinjiang Uighur Autonomous Region Regulations on Religious Affairs," July 16, 1994, effective October 10, 1994. [新疆维吾尔自治区人大常委会：新疆维吾尔自治区宗教事务管理条例。发布日期：1994 年 7 月 16 日, 实施日期：1994 年 10 月 1 日]. On national regulations see Human Rights Watch, *China: State Control of Religion*.

[64] Document No. 7 urged authorities to "[l]egally strengthen the leadership and control over religion," "[t]ake strong measures to prevent and fight against the infiltration and sabotaging activities of foreign religious forces,"

In October 1998, less than two months after an inspection tour of Xinjiang by President Jiang Zemin, local authorities created a new and comprehensive set of instructions on control of religion. These were based on directives originating from the central government.[65] The "October 1998 Instructions" called for a tightening of regulations governing the management of religious personnel, religious places, the content of religious teachings, and the "fight" against all non-governmental religious activities. In violation of the guarantee of religious freedom enshrined in the Chinese constitution, the document explicitly instructed local authorities to establish "a political verification dossier to make sure imams meet political requirements," the aim being no less than keeping "a handle on the imam's ideological state at all times." [66]

The instructions also established a system of annual revision of the accreditations given to imams. This required imams to attend "patriotic education" courses and seminars, and to demonstrate their ideological conformity. Religious leaders were required to "stand on the side of government firmly and express their viewpoints unambiguously." Any who failed to meet these requirements would be "stripped of imam status."[67]

In 2000, the "Interim Provisions on Disciplinary Punishments for Party Members and Organs that Violate Political Discipline in Fighting Separatism and Safeguarding Unity" [the "2000 Interim Provisions"] provided a wide range of sanctions against Party members involved in religious activities. The provisions include strict rules for religious practice by Communist Party members in Xinjiang, and in effect the freedom of religious belief. Although the issue was openly debated in the Chinese press during the 1990s, the CCP has always demanded that its members be atheists. Thus, the enactment of special regulations specifically to enforce this in Xinjiang can be seen as part of an effort to "step up the struggle against national separatism" and to "root out reactionary religious behaviors."[68]

---

"[r]estrict all illegal religious activities," and "[s]everely control the building of new mosques." "Record of the Meeting of the Standing Committee of the Political Bureau of the Chinese Communist Party concerning the maintenance of Stability in Xinjiang (Document 7)," reproduced in Human Rights Watch, "China: State Control of Religion: Update #1."

[65] "Unequivocally Oppose National Separatism, Illegal Religious Activities," *Xinjiang Daily* [新疆日报], August 16, 1998, in "Xinjiang Official on Opposing Separatism," FBIS, October 18, 1998 [CHI-98-291].

[66] Ibid.

[67] Ibid.

[68] "Interim Provisions on Disciplinary Punishments for Party Members and Organs that Violate Political Discipline in Fighting Separatism and Safeguarding Unity," Discipline Inspection Commission of the Xinjiang Uighur Autonomous Regional CPC Committee, December 14, 2000. The Interim Regulations were published in the *Xinjiang Daily* [新疆日报], May 8, 2001 in "Xinjiang Regulations on Party Discipline in Anti-Separatism Efforts," FBIS, September 17, 2001 [CHI-2001-0529].

The 2000 Interim Provisions state that sanctions must be taken against "persons in the Party who have a strong religious belief and are keen on organizing and participating in religious activities." Furthermore, such persons are held responsible if they "connive at and harbor a situation wherein Party members, Party and government functionaries … teachers and students … are engaged in religious activities that will interrupt the order of their work … such as religious services, scriptural studies, and Ramadan."[69] Restrictions also apply in the field of publication, for people who "participate in the printing, reproduction, compilation, publication, and issuance of propaganda materials on religious subjects in violation of relevant stipulations … that impair the unification of the motherland and national unity."[70] The control extends well into the private life of Party members, who are forbidden to "establish contacts with overseas religious organizations," "go on an overseas pilgrimage without authorization," or even "send their children and families to private schools and private classes for scripture studies."[71]

### The 2001 draft amendments to the 1994 Regulations: narrowing the scope of "normal" religious activities

The 2000 Interim Provisions were only the first sign of more stringent regulations to come. In July 2001, a series of comprehensive amendments to the 1994 Regulations was adopted by the Chairmen's Committee of the Xinjiang People's Regional Congress[72] and submitted for deliberation to the Standing Committee (hereafter the "2001 Amendments").[73] These amendments represented a new regulatory regime extraordinarily hostile to religious activity in Xinjiang.[74]

The 2001 Amendments, yet to be made public, introduced considerable restrictions beyond those in the 1994 Regulations. They were appended to compilations of religious

---

[69] Ibid.

[70] Ibid.

[71] Ibid. See also Convention on the Rights of the Child, art. 14(2), which protects the rights of parents "to provide direction to the child."

[72] This ad hoc Committee comprised the Chairmen of the nationalities, religious, foreign affairs and overseas Chinese Committees of the Standing Committee of the Xinjiang Uighur Autonomous Region Congress.

[73] "Draft Amendments to the Xinjiang Uighur Autonomous Region Regulations on the Management of Religious Affairs Adopted by the 23rd Session of the Standing Committee of the 9th People's Congress of Xinjiang Uighur Autonomous Region," submitted on July 16, 2001 [新疆维吾尔自治区人民代表大会常务委员会第九届人民代表大会常务委员会参日但侧会议通过：新疆维吾尔自治区宗教事务管理条例修正案（草案），2001 年 7 月 16 日].

[74] The 2001 Amendments represent a codification of practice in Xinjiang's religious affairs bureaus and committees. When submitting the 2001 Amendments for ratification in July 2001, the Conference of Chairmen reported it had conducted investigations and studies for nearly six months, and "extensively solicited opinions, held seven discussion meetings with the relevant departments, retired leading cadres, experts and scholars, religious groups and well-known patriotic religious personages …members of the Standing Committee," as well as hearing "the opinions and suggestions of nineteen relevant units."

regulations circulated solely to local religious affairs bureaus for their internal use. From an analysis of references in other official documents, however, one can deduce that the amended regulations have superseded provisions in effect prior to their promulgation and that they govern religious activities in Xinjiang today.

The 2001 Amendments severely tighten the already restrictive provisions of the 1994 Regulations on Religious Activities in five main areas. These are:

> a) narrowing the scope of "normal religious activities;
>
> b) the extension of the "anti-separatist" clause, previously applied only to the clergy, to *all* "citizens who profess a religion;
>
> c) increased control over registration and operations of religious organizations;
>
> d) tightened control over religious publications; and
>
> e) heavier sanctions and penalties.

### a) Narrowing the protection of "normal religious activities"

One of the most critical features of the 2001 Amendments on religious activities in Xinjiang was deletion of the phrase "protection of normal religious activities" from the stated purposes of the regulations in the opening article. The 1994 Regulations specifically stated that one of their purposes was the "protection of normal religious activities" (*weihua zhengchang de zongjiao huodong* 维护正常的宗教活动). The revision in the amended article states that the purpose of the Amendments is to "regulate religious activities according to law, strengthen the management of religious affairs, and guide religion to adapt to socialist society." The change suggests that the focus of the amended regulations is to further limit the scope of acceptable religious activities.

It is difficult to overstate the importance of this change. The guarantee of "normal religious activities" has been at the heart of the religious policy of the CCP at the national level since 1982 and is guaranteed by the constitution (article 36). Even though the authorities have always been the only judge of what is "normal" and what is "illegal," the deletion of a legally acknowledged entitlement to "normal religious activities" as the stated purpose of the regulation further restricts the ability of religious practitioners to negotiate categories of action that should be presumed to be lawful.

The 2001 Amendments implicitly condition the enjoyment of rights on the respect of obligations. A comparison of the 2001 Amendments with the 1994 Regulations demonstrates the heightened emphasis on the control, as opposed to the protection, of

religious activity. For example, in article 1 of the 2001 Amendments the purpose of "protecting normal religious activities" has been deleted and replaced by "regulating" such activities "according to law" and "guiding" religion to "adapt to socialist society." Article 1 now reads:

> These regulations are formulated to protect the citizens' freedom of religious belief, [protect normal] *regulate* religious activities *according to law*, [and] strengthen the management of religious affairs, *and guide religion in such a way that it adapts to socialist society. The regulations are drawn up in accordance with* the constitution, the relevant laws and statutes, and in the light of the actual conditions prevailing in the autonomous region. (italics and square brackets indicate 2001 insertions and deletions from the 1994 text respectively).

Article 26, dealing with the registration and operation of religious organizations, was similarly amended: the guarantee that religious organizations can conduct "normal religious activities" was removed and replaced by the more specific limitation that they can "organize religious activities and perform religious functions according to law."

The only explicit protections for religious activities offered by the 2001 Regulations can be found in the new articles detailing the "rights and obligations" of religious personnel and religious organizations. Article 12 states that:

> Clergy enjoy the following rights and privileges. They may:

> (1) engage in religious and church (mosque) activities according to law;
> (2) participate in the management of the place for religious activities where he or she belongs;
> (3) receive religious education; engage in religious academic research and exchange.

The corresponding duties appear in the next article:

> Clergy shoulder the following responsibilities. They must:

> (1) love the country and the faith, abide by the laws and statutes of the state;

(2) accept the supervision of the religious affairs bureaus of the people's government, the religious organization(s), and the democratic management organization of the places for religious activities;

(3) protect buildings, cultural objects, facilities and the environment of the places for religious activities.

Religious organizations are subject to a similar bifurcation of their rights and obligations. Article 27 of the 2001 Regulations states that "Religious organizations enjoy the following rights:

(1) the protection of the rights and interests of citizen believers, the clergy, and the places for religious activities; and the guidance and supervision of the operation of the places for religious activities;

(2) the confirmation and supervision of their clergy and other personnel;

(3) the enjoyment of the ownership and the right to use their buildings and other property according to law; and to independently dispose of their income;

(4) the management of economic entities for the purpose of self-support.

Along with these "rights," article 28 states that religious organizations must "perform the following duties:

(1) abide by the laws and statutes of the state, accept control and supervision by the religious affairs bureaus and other relevant departments of people's governments at various levels;

(2) propagate and carry out the policy of freedom of religious belief;

(3) reflect the aspirations and demands of the citizen believers;

(4) educate citizen believers in patriotism, abiding by the law, and living in harmony;

(5) engage in training activities to enhance the capabilities of the clergy;

(6) assist the religious affairs bureaus of people's governments in successfully managing religious affairs;

(7) guide citizen believers to participate in building socialist modernization."

In determining whether clergy are qualified to enjoy their delineated "rights and privileges," the authorities clearly are granted ample grounds to assess subjectively whether the required duties are fulfilled. For example, whether an imam "reflects the aspirations and demands of the citizen believers" or "guides citizen believers to

participate in building socialist modernization" is not susceptible to a uniform, predictable, or objective interpretation. These are political terms, the meaning of which has frequently changed in recent years. The new formulation has removed any grounds for a clergy member or a citizen charged with "illegal religious activities" to argue in his or her defense that the actions for which he or she was accused were in fact "normal religious activities," as protected by previous legislation.

### b) Extension of the "anti-separatist" clause, previously applied only to the clergy, to all "citizens who profess a religion"

One of the intrusive demands on Muslim clerics set forth in Article 8 of the 1994 Regulations was the obligation to demonstrate loyalty to the Chinese state. The 2001 Amendments take this requirement and extend it to "all citizens who profess a religion."[75] These requirements make religious freedom conditional on support for the government and Party leaders.

The requirement that believers "oppose" whatever is seen as "national splittism and illegal religious activities" is undefined in the regulations. Assessments are to be made by the authorities on the basis of Party instructions, which vary from time to time and are necessarily interpreted in practice in highly subjective ways by local officials. It is a catch-all clause that hands virtually unlimited power to the authorities to investigate or arrest any religious practitioner in disfavor with officials, a phenomenon that appears to be reflected by the high number of political sentences handed down in Xinjiang courts, particularly for certain groups of defendants (see section VI below).

### c) Increased control over the registration and operation of religious organizations

Article 26 of the 2001 Amendments specifies that organizations can only begin activities after being approved, thus prohibiting activities while registration is pending.[76] The

---

[75] "Citizens who profess a religion must support the leadership of the Chinese Communist Party and the socialist system, love their country and abide by its laws, safeguard the unification of the motherland and national solidarity, and oppose national splittism and illegal religious activities." (art. 9).

[76] "Religious organizations are mass organizations representing the legal rights and interests of the clergy and citizen religious believers. A religious organization must be examined and approved by the religious affairs department of a people's government above the county level. It must then be approved by and registered with the Civil Affairs department at the same level. Only then can it begin its activities. Those religious organizations that are qualified may obtain the status of legal persons." (art. 26).

registration and operation of religious organizations require approval by both a Religious Affairs Bureau and a Civil Affairs Bureau above the county level.[77]

The 2001 Amendments also narrows the right of registered religious organizations to sponsor seminaries, schools, or scripture classes. The requirement in the 1994 Regulations that these activities have prior approval has been retained, but the 2001 Regulations now emphasize that no one at all may teach "scripture students" without prior approval.[78]

The prohibition on teaching without prior approval appears to apply to individuals as well as institutions and professionals. It thus establishes an unusually onerous restriction on the free exercise of religion, not otherwise known to exist in contemporary China. Traditionally, in the countryside, parents would arrange for their children to receive some religious education, along with story-telling and folk songs, from someone knowledgeable or from a community elder, especially around the time of festivals or ceremonies such as weddings. Increasingly, however, the authorities have prohibited these kinds of semi-public meetings from touching on religious issues, on the pretext that they constitute "illegal religious activities."[79]

Although these prohibitions do not seem to apply to a parent teaching a child, parents told Human Rights Watch they feared instructing their own children because they worried that their children might inadvertently display signs of religious awareness and attract the suspicion of authorities. Uighur government employees also consider themselves at risk if they instruct their children or other relatives in religion.

---

[77] The precise registration procedure is detailed in: National Bureau of Religious Affairs, "Measures regarding the registration of places of religious activities," April 13, 1994 [国务院宗教事务局: 宗教活动场所登记办法, 1994 年 4 月 13 日].The regulation specify that registration can be downgraded to a one or two year "temporary registration" if problems are found, or suspended for "rectification (zhengdun [整顿])."

[78] "Religious seminaries and schools and scripture classes approved by the people's government should strengthen the training of patriotic religious personnel. No organization or individual may operate religious seminaries, schools or scripture classes without approval. Clergy may, in accordance with the relevant provisions of the autonomous region and with approval (by the relevant authority), teach scripture students, and train young patriotic clergy. No organization or individual may secretly teach scripture students without approval." (art. 11).

[79] Xinjiang Party Secretary Wang Lequan himself warned against the use of "folk cultural activities" [民间文化活 动] as a carrier to entice part of the masses to receive reactionary propaganda to enter in opposition," which he likened to "forms of infiltration and sabotage efforts carried out in the ideological sphere by the ethnic separatist forces." (Xinjiang Information Network), February 1, 2002, [新疆新闻网, 2002 年 02 月 1 日].

Even more restrictive is the prohibition on religious activities that "span different localities." This outlaws religious personnel from conducting activities in places other than where they are registered. It also covers mass activities that span different localities.[80]

The amended regulations also strictly prohibit pilgrimages (*chaojin yundong* 朝觐运动) not organized by the government.[81] Authorities can use these provisions to control activities well beyond proselytism or missionary work. The so-called "on-the-spot" principle prevents, for instance, an imam from Hetian from preaching in Urumqi, or a Kashgar mosque from conducting a ceremony that convenes believers from different parts of Xinjiang. Authorities can also use this provision more broadly to prevent believers from establishing links with religious establishments in other geographical areas and from even visiting mosques or religious places in different areas of Xinjiang or China without permission.

The supervision of places of religious activities also constitutes a new feature of the 2001 Amendments. Under article 16, religious organizations are now required to "accept control and supervision by the religious affairs bureaus and other relevant departments of the people's governments at various levels," as well as to "assist the religious affairs bureaus of people's governments in successfully managing religious affairs."

The clergy is similarly required to "accept" supervision and routine checks. These regulations stipulate that those who violate the law or are "found incompetent" should be dismissed and the matter put on record at the county level Religious Affairs Bureau (art. 14).[82] Political loyalty to the state and Party is an essential element establishing the "competence" of religious personnel, although interpretations of this undefined term vary widely. For instance, at the Xinjiang Conference on Religious Work, which took place in October 2002 in Urumqi, Xinjiang Party Secretary Wang Lequan instructed the authorities to "be sure that [religious public figures] are politically qualified." By making political loyalty a pre-condition of the compulsory official approval of religious

---

[80] "Religious activities must be carried out according to on-the-spot principle. No organized mass religious activity that spans different localities is allowed. Clergy are not allowed to administer religious activities in different localities. Missionary work in any form by non-clergy personnel is prohibited." (art. 16).

[81] "Pilgrimage activities are to be organized by the religious affairs departments of the people's governments and religious organizations. No other organization or individual may organize such activities." (art. 17).

[82] "During their tenure, the clergy should accept the routine check by the religious organization. Those who are found to be incompetent to carry out their duty or who have violated the law should be removed from their positions by the religious organizations, which had originally examined and approved their credentials. The matter should be reported to the religious affairs department of the county-level people's government and put on record." (art. 14).

personnel—credentials that have to be regularly renewed—the authorities ensure that only pro-government figures can engage in religious activity and that any clerics who step out of narrow ideological strictures will be sanctioned or expelled.

### d) Tightened control over religious publications

The fourth significant control mechanism introduced in the 2001 Amendments concerns the dissemination of religious publications. The amendments mandate prior governmental approval for the sale and distribution of religious material, including the distribution of leaflets.[83]

The Amendments also introduce criteria that will make it more difficult to secure such approval. These criteria ban any publication by religious groups operating at a level below the provincial level; only the very largest institutions in Xinjiang are registered at that level, and these are few in number. Article 25 of the 1994 Regulations stipulated that "religious organizations wishing to publish … should complete the formalities for permission in accordance with the relevant stipulations." The amended article now reads: "Religious organizations *of the Autonomous Region's level* … should complete the formalities…" No provision is made for religious organizations below the provincial level.

In effect this means that approval for the publication of such documents has now been shifted from the local to the provincial level, presumably entailing delay and a higher level of scrutiny. As a result, publication activity outside of Urumqi has dwindled as publishing venues active in producing Uighur literature in the 1980s, such as the Kashgar People's Publishing House, cease to produce any material that might run afoul of this regulation.

The scope of the type of publications that must be regulated in this way has also been expanded. Article 31 states that:

> Those religious organizations in the autonomous region wishing to publish, reprint or issue scriptures, classics or publish interpretations of classics, religious doctrines, or cannons should complete the formalities for permission in accordance with the relevant stipulations of the state

---

[83] "No organization or individual is allowed to sell illegal religious publications or illegally imported religious publications. It is prohibited to distribute anywhere religious leaflets or religious publications that have not been approved by the relevant department of the people's government." (art. 24).

and the autonomous region. No organization or individual may publish, print, reprint or issue religious publications without permission.

As before, individuals and non-religious organizations do not have the right to publish religious material outside of the government-approved system. The regulations also articulate the ban on bringing into China from abroad religious publications deemed to endanger state security or the public interest.[84]

### e) Heavier sanctions and penalties

The 2001 Amendments also introduce a range of administrative sanctions and penalties for religious sites or organizations that violate the regulations. They permit fines to be levied for violations, ranging from 200 to 2,000 *yuan* (approximately U.S. $25-$250). The average income in Xinjiang is about 1,800 yuan a year. The previous regulations did not stipulate any fines.

Other forms of punishment range from "criticism and education" to "cancellation of registration." More alarming, the new amendments specify that certain "grave" violations may now constitute the crime of "endangering state security." Whereas the 1994 Regulations provided only for offenses to be dealt with "according to the PRC management of public order dispositions" or generally according to criminal law.[85]

The regulations leave it to the Xinjiang Religious Affairs Bureau to ascertain whether the violation is "minor" or "serious" and if it warrants a fine or an administrative punishment.

The comprehensive nature of the 2001 Amendments, which impose political control over every aspect of religious activity, creates a legal net that can catch virtually anyone the authorities wish to target—a useful tool against Uighur ethno-national aspirations. In addition to providing new grounds for prosecuting offenders, the 2001 Amendments

---

[84] The 1994 Regulations stipulated: "Bringing in religious publications or other religious objects from abroad is regulated by the relevant rules of the state and the autonomous region." (art. 25) The 2001 Amendments add the following provisions: "Religious publications containing substance that endangers state security of the People's Republic of China or public interest of society may not be brought into the country. Religious publications or other religious objects illegally carried into the country from abroad discovered by public security, frontier defense or customs must be documented and handed over to the religious affairs department of the local people's government for investigation and disposal." (art. 32). The importing of such religious material was already an offense under the 1994 national regulations on religion.

[85] "Those who use religion to engage in activities that endanger national security should be punished by the national security or public security organs according to law. Those who engage in activities that constitute a crime will be called to criminal account by a judicial organ according to law." (art. 35).

systematize collective responsibility in cases of violations and allow the administrative and security authorities to carry out even broader repression of dissent by considering all forms of religion to be potentially disguised forms of separatism. Their repressive character is best interpreted as an alignment of the regulatory framework with actual practices, particularly as experienced by the Uighur population.

### A Manual for Urumqi Municipality Ethnic Religious Work

The repressive framework imposed by the 2001 Amendments most probably derives from practical experience, and incorporates provisions already codified in the guidelines of religious affairs bureaus at various levels of government and of CCP religious affairs committees that supervise their work. These organs have the power to register, inspect and supervise religious organizations and sites, accredit clerics and approve religious publications. They effectively serve as an administrative arbiter of legitimate religious activities, relegating to illegality all the activities they do not endorse.

This section provides a previously undisclosed look at how these restrictive principles are put into practice in Xinjiang's capital, Urumqi. The extracts presented below are excerpted from a 2000 handbook entitled *A Manual for Urumqi Municipality Ethnic Religious Work*, edited by the Ethnic Religious Work Committee of the Urumqi Nationalities Religious Affairs Bureau Work Committee (Manual). The Manual is "to be used to conduct education and serve cadres for nationalities religious affairs in their work."[86]

The Manual is probably the most comprehensive and detailed account of actual religious policies in Xinjiang to surface outside of China. It is also indisputably authoritative, as it was published by the institution in charge of controlling religion in the regional capital.

The Manual is structured as responses to 146 different questions, ranging from Party doctrinal topics ("What are the four fundamental principles and guiding principles on religious work set forth by Comrade Jiang Zemin?") to specific issues that religious affairs cadres have to deal with ("What qualifications must religious personnel possess?"), and government policies ("What measures has the Urumqi Municipality Committee taken in the recent years to protect social stability?").

---

[86] Urumqi Municipality Ethnic Religious Affairs Committee, "A Manual for Urumqi Municipality Ethnic Religious Work," June 2001. [乌鲁木齐市民族宗教事务委员会: 乌鲁木齐市民族宗教工作-普法读本，乌鲁木齐，2000 年 6 月]. Quote taken from the afterword, p. 73.

The close correspondence between the Manual's guidelines and the 2001 revised amendments tends to support the conclusion that the latter were designed to integrate and rationalize stipulations that were developed by the religious affairs bureaus. The Manual gives a rare glimpse into the actual policies of the religious affairs bureaus in Xinjiang, in particular in regards to the definition of illegal religious activities, the inspection of places of religious activities, and the censorship of religious publications.

## a) What are illegal religious activities? What are their main forms?

Question No. 87 in the Manual is answered by a list of sixteen forms of illegal activity:

> "In the category of illegal religious activity is any religious activity that violates the country's constitution, laws and regulations or the Autonomous Region's management of religious affairs' regulations, dispositions or rules.
>
> The main forms of illegality are:
> 1) compelling people to believe;
> 2) compelling people to participate in religious activities;
> 3) privately organizing religious study schools;
> 4) using religion to meddle (*ganyu* 干预) in administration, justice and education, weddings, family planning or cultural activities (*wenhua yule huodong* 文化娱乐活动);
> 5) without having obtained authorization, engaging in religious activities spanning different localities or organizing other religious activities;
> 6) beautifying, revamping or enlarging places for religious activities without having obtained authorization;
> 7) restoring abolished religious feudal privileges and oppressive exploitative systems;
> 8) printing religious propaganda material without authorization;
> 9) receiving foreign contributions from religious organizations and individuals without authorization;
> 10) going abroad to study religion or carrying out religious activities in conjunction with foreign religious organizations without authorization;
> 11) privately setting up a religious "spot" and conducting proselytism without registration and authorization;

12) slandering the authorities, plotting to murder patriotic religious figures, fighting against the leading authorities of religious places and organizations, premeditatedly evading supervision, and stirring up trouble;

13) engaging in religious infiltration, setting up religious organizations, conducting proselytism and so on, by hostile enemy forces;

14) advocating "holy war," inciting religious fanaticism, developing religious extremist forces, spreading rumors, distorting history, advocating separatism, opposing the Party and the socialist system, sabotaging social stability or the unity of nationalities, inciting the masses to illegally rally and demonstrate, attacking the organs of the Party, government, army or public security;

15) using religion to breed separatist elements and reactionary backbone elements or to establish reactionary organizations; to carry out other activities that are harmful to the good order of society, production and life, and to criminal activities;

16) spreading evil cults."[87]

Beyond painting a very dark picture of repression of religion, the list is notable in several respects. It is more extensive than even the already-extensive list set out in either the 1994 Regulations or the 2001 Amendments, particularly in two main areas: the supervision of places of worship, and the publication of any material related to religion or "sensitive" questions.

In addition, many of the prohibitions represent blatant and substantial curtailment of basic civil and political rights beyond those relating to the right to freedom of religious belief. For example, "inciting the masses to illegally rally and demonstrate" implicates freedom of assembly; "distorting history" or "using religion to meddle in ... cultural activities" violates free expression; the injunction on "going abroad to study religion" or engaging in religious activities that "span different localities" tramples on freedom of movement. The list also contains catch-all "offenses" that allow the authorities to deny religious freedom under virtually any pretext, as for example using religion "to carry out other activities that are harmful to the good order of society," or "to breed separatist elements and reactionary backbone elements."

---

[87] Manual, pp. 37-38.

*b) Inspection of mosques and collective responsibility*

The Manual provides useful insights into how mosques are actually monitored and inspected. A "democratic management team" *(minzhu guanli zuzhi* 民主管理组织*)*, composed of clerics and religious personnel vetted by the Religious Affairs Bureau, is responsible for each mosque, as described below:

> The teams are in charge of daily management, establishing a completed system of regulations, and ... maintaining the "annual inspection handbook" *(nianjian tongzhi shu* 年鉴通知书*)* which is a "self-supervision, self-inspection" instrument...The management teams must respect the laws and regulations, carry out religious activities and not engage in external religious illegal activities, have their finances in order, [have their] registration in order, [have] democratic management, and must permit annual inspection within the limits fixed by regulations.[88]

Annual inspections are conducted by the Religious Affairs Bureau according to national "[m]easures regarding the Annual Inspection of Places of Religious Activities," adopted in 1996.[89] After inspection, each religious site is given a certificate that it is either "conforming" *(hege* 合格*)*, or "non-conforming" *(bu hege* 不合格*)*.

The Manual indicates that management teams are to be held accountable in case of non-conformity and can be "investigated" and referred to higher authorities:

> If the case is not serious, the authorities can issue a warning, stop the activities or withdraw the registration. For especially grave violations, the case must be transmitted to the people's government of the same level to be suppressed according to law.[90]

These provisions, with their characteristic vagueness, bestow a significant degree of discretion on the authorities in deciding whether to certify mosques or on what basis to impose sanctions.

---

[88] Manual, p. 28.

[89] The procedure for inspecting places of religious activities are set by the National Bureau of Religious Affairs, "Measures regarding the Annual Inspection of Places of Religious Activities" [国家宗教事务局:宗教活动场所年度检察办法], July 29, 1996.

[90] Manual, p. 29.

### c) Censorship of publications "touching upon Islamic religion"

The Manual reveals for the first time the details of a draconian system of censorship of religious publications.[91] Not only does publication require approval from the Xinjiang Religious Affairs Bureau and the Xinjiang News Publishing Department, but all publications also undergo multiple rounds of censorship, including at the printing and distribution stage. The content must be in line with precise guidelines, and cadres are instructed to defer to the higher authorities for any publication involving "sensitive questions," such as "the implementation of religious policies" or issues related to "national minorities' religious beliefs, taboos and customs."[92]

These highly restrictive stipulations, which explicitly forbid "non-religious group(s)" and individuals from "publishing religious material," are mirrored by strict censorship on the content of publications:

> Any item to be published (including news and articles) related to research and appraisal of Islamic religion must uphold the Marxist point of view of religion, and use the yardstick of the Party's and the government's religious policies and regulations... For any sensitive question (*mingan wenti* 敏感问题), if it discusses the implementation of religious policies or foreign policies and touches upon the questions of national minorities religious beliefs, taboos, customs and so on, the publishing unit must report to the management department at the higher level to seek approval. It is imperative to seek in a timely manner the views of the provincial level and national level Islamic Association or the Religious Affairs Bureau.[93]

The explicit mention of the existence of a category of "sensitive questions" which must be reported "to the higher level" demonstrates that management of religion and nationalities affairs in Xinjiang is a matter of top-level political concern. One of the

---

[91] "What are the national regulations on publishing material affecting Islamic religion? [Question 79] The State has concrete regulations regarding the publication of material affecting Islamic religion. It is necessary to obtain the examination and approval of the religious affairs bureau at the provincial level of the people's government, and to report to the corresponding governmental level of the News Publishing Department. This kind of material can only be distributed and circulated within government-approved mosques. If the volume is high, examination and authorization by the national Religious Affairs Bureau and a permit from the News Publishing Department are required. Non-religious groups and individuals, without exception, are not authorized to print and publish. Those who violate the above regulations are to be dealt with according to illegal publishing activities." Manual, pp. 33-34.

[92] Manual, pp. 33-34.

[93] Ibid.

allegedly "sensitive question(s)" on which extra censorship is required is "the implementation of religious policies."

The Manual then turns to the publishing and distribution system, specifically singling-out "publications related to Islamic religion":

> Commercial presses that do not have a "publishing unit" state license should never, without exception, accept commissions for any kind of publication related to Islamic religion…Distribution units should not distribute books, magazines, journals and musical material of religious nature from non-official publishing units.[94]

Finally, the Manual prescribes sanctions for publishing units that produce content "violating the Party's policies of nationalities and religion" and which "have created in society a severe and negative influence." These range from administrative penalties of "suspension and rectification" (*tingye zhengdun* 停业整顿) to confiscation of the printing license," as well as judicial penalties.[95]

Rather than drawing a clear line between legal and illegal publications, the Manual describes a system that institutionalizes the almost absolute discretion of the authorities to decide what to allow and what to censor. The sheer number of permits necessary to carry out any type of activity related to religious practice—most of them based on political criteria—give authorities wide discretion to crack down on clerics, activities, and publications that do not unconditionally endorse Party views.

## V. Implementation: Restrictions on Freedom of Religion in Practice

This section surveys three critical areas where the implementation of Xinjiang's religious regulations and policies violate the basic political and religious rights of believers: the registration of religious organizations, the training or "reeducation" of religious personnel, and the ban on the construction of new mosques.

---

[94] Ibid.

[95] Ibid.

### *Registration of religious organizations: a no-win situation*

The requirement that any type of religious organization be registered is one of the most effective means by which the authorities restrict most forms of religious activity.

By law, any association of believers has to register with the authorities, even if their activities are not strictly or exclusively religious, as in the case of traditional community gatherings or charitable groups. The registration and operation of religious organizations require approval by both the religious affairs bureaus and the civil affairs bureaus above the county level.[96]

Any religious body may apply to register. However, Xinjiang authorities routinely deny registration to independent religious bodies on the grounds that no religious activity is allowed without state control. This opens the door for individual believers to be persecuted on the grounds that they belong to or participate in an illegal religious organization.

Most Uighurs interviewed for this report said that they would not dare to try to register a non-profit organization because they were certain that their application would be rejected and that the attempt would put them under suspicion with the authorities. Asked whether they would try to register an organization, a small group of college students in Kashgar gave this response:

> No way! This is impossible! The government would immediately accuse you of being a separatist, of encouraging illegal religious activities. This is too dangerous. You can bring a lot of problems on your head if you do that. They can expel you from school. The cadre in your native village will go and ask your parents why you are "making trouble" (*naoshi* 闹事), that sort of thing.[97]

Independent religious practitioners are thus in a no-win situation. If they ask to register they are denied registration but draw attention to themselves; if they congregate without

---

[96] The precise registration procedure is detailed in National Bureau of Religious Affairs, "Measures regarding the registration of places of religious activities," April 13, 1994 [国务院宗教事务局: 宗教活动场所登记办法, 1994 年 4 月 13 日].The regulations specify that registration can be downgraded to a one or two year "temporary registration" if problems are found, or suspended for "rectification."

[97] Human Rights Watch interviews in Kashgar, July 1999.

having registered they can be charged with participating in or forming an "illegal organization."

This is not merely a theoretical dilemma, judging by the high number of people detained in Xinjiang for political or religious offences. Many are detained in Xinjiang's reeducation through labor camps for belonging to an "illegal organization." An article co-signed by the vice-director of the Xinjiang Reeducation through Labor Bureau reveals that as of 2001 almost half of the detainees serving time for separatism and religion-linked offenses were detained on charges of "[belonging to] illegal organizations and [engaging in] illegal religious activities."[98]

In August 1999, for example, a group of eighteen young adult Uighurs were sentenced by a Xinjiang court for alleged separatist activities. The charges included: "inciting [others] to split China, organizing meetings, taking oaths, accepting membership, and possessing illegal publications and counterrevolutionary videos for propaganda purposes," according to the Chinese-language newspaper *Wen Wei Po* [文汇报], based in Hong Kong.[99] There is no mention in the report of any evidence that the defendants had engaged in violent acts. Shirmehemet Abdurishit, the alleged leader of the group, was sentenced to a fifteen-year jail term, while the other seventeen defendants, whose names were never released, were sentenced to jail terms of up to fourteen years.[100] The verdict was upheld by a higher court in December 2003.[101]

### The "reeducation" of imams in 2001 and 2002

*Religious work "should be regarded as an important, radical measure to oppose ethnic splittism and preserve social and political stability."*[102]

Xinjiang Party Secretary Wang Lequan, October 2002

---

[98] Ren Jieling, Li Yulin, "A Cursory Discussion of the Characteristics of "Three Categories of Persons" Undergoing Rehabilitation Through Labor and How to Manage Them," *Crime and reform studies,* 2001 [任杰灵，李毓林"浅谈"三类劳教人员"表现特征及管理的对策,"*犯罪与改造研究*，2001 年第 4 期].

[99] Quoted in "Bingtuan Supreme Court Affirms Jail Terms for Uighur Youths," *Radio Free Asia,* December 23, 2003.

[100] "Bingtuan Supreme Court Affirms Jail Terms for Uighur Youths," *Radio Free Asia,* December 23, 2003.

[101] Ibid.

[102] Editorial, Xinjiang Daily [新疆日报], October 13, 2002, FBIS, November 5, 2002 [CHI-2002-1029].

In furtherance of the government's objective of "keeping a handle on the ideological state of the imam at all times,"[103] the Chinese authorities in Xinjiang conduct "religious training campaigns" and "political reeducation campaigns." These are similar to the notorious "patriotic education campaign" waged in Tibet against Buddhist monks and nuns since 1996.[104] The sessions, led and monitored by Party and government officials, are designed to compel religious personnel to openly express their opposition to "hostile forces"—in Tibet, the "Dalai lama clique," and in Xinjiang, "separatist forces."

The provincial, municipal, and district religious affairs bureaus regularly conduct training of clerics. The training of religious personnel (as well as the evaluation of the clerics) is carried out by the Third Bureau (*Zongjiao sanchu* 宗教三处) of the Xinjiang Ethnic Religious Affairs Committee [民族事务委员会 (宗教事务局)].[105] The Third Bureau "plans the training of religious personnel," "reinforces the management of religious institutes and scriptures classes," and "is responsible for the political education of religious personnel."[106] The United Front Work Department[107] and the China Islamic Association at the provincial and prefectural levels also contribute to the training sessions.[108]

Since 2001, the frequency of these trainings apparently has increased from once every few years to once a year for the 8,000 registered imams above the township level.[109] The campaigns in 2001 and 2002 systematized the ideological control imposed on clerics.

The 2001 campaign was officially "the largest-scale religious training" since the founding of the People's Republic of China, with 8,000 imams above the village level undergoing

---

[103] "Unequivocally Oppose National Separatism, Illegal Religious Activities," *Xinjiang Daily* [新疆日报], August 16, 1998, in "Xinjiang Official on Opposing Separatism," FBIS, October 18, 1998 [CHI-98-291].

[104] See Tibetan Information Network and Human Rights Watch (joint report), *Cutting Off the Serpent's Head: Tightening Control in Tibet* (New York: Human Rights Watch, 1996).

[105] Website of the Xinjiang Uighur Autonomous Region People's Government: http://www.xj.gov.cn/zfjg/mzz.php (retrieved May 26, 2004).

[106] Ibid.

[107] The United Front Work Department is responsible for the elaboration of polices and plans regarding ethnic and religious affairs, as well as "coordinating the relevant departments to carry out the fight against the activities of domestic and overseas separatist enemy forces such as the Dalai clique." (Source: Official Website of the United Front Department, http://www.zytzb.cn/zytzbwz/index.htm (in Chinese)).

[108] The sessions lasted 10 days on average in 2001. *Xinjiang Daily*, December 21, 2001 [新疆日报，2001年1月21日].

[109] "Mosque Leaders' Reeducation Campaign Stepped Up," *South China Morning Post*, November 14, 2001; *Xinjiang Daily* [新疆日报], December 21, 2001, FBIS, January 23, 2002 [CHI-2002-0117].

"political reeducation" between March 15 and December 23, 2001.[110] The twenty-day "reeducation" sessions were aimed at "reestablishing correct ideological understanding and improving the political qualities of the religious leaders."[111] In March 2002, it was announced that Islamic scripture schools would train 8,000 "patriotic religious personalities," "2,000 of them to be trained by the region and 6,000 by the localities."[112]

"Reeducation" and training sessions are obligatory and involve clerics from different areas of Xinjiang, who are divided into ethnically homogeneous working groups (Uighurs, Huis, Kazakh, etc.).[113] Clerics are forced to listen to speeches by Party and government officials and must answer questions, orally and in writing, concerning the regulations pertaining to religious activities, Party doctrine, and positions on separatism. Each participant must submit a "study report" at the end of the training.[114]

During "exchange of experience" sessions (*huxiang jingyan huiyi* 互相经验会议), clerics are asked to address the other participants with precise accounts of "difficulties" or "incidents" they have encountered in their work. For instance, an imam will describe how "illegal" religious classes were held, or how the mosque used some "illegal" religious book. They may also relate how they failed to warn the authorities about "elements" that were "agitating," or about inviting a cleric from another area without prior authorization. Clerics also have to admit personal errors and how they have nurtured "incorrect" ideas. They also have to point out examples of such erroneous actions on the part of other members of the group.[115]

These sessions are purposely designed as loyalty tests. If clerics do not offer precise accounts, they are viewed as being insincere about opposing separatism. But if they admit mistakes, they are considered guilty of violating regulations. This serves to put continuous pressure on the clerics. The imam's "attitude" (*taidu* 态度—in this context a euphemism for political loyalty) is monitored by instructors during the training. Final evaluations are recorded in the imam's personal file, which is kept by the religious affairs bureaus.

---

[110] *Xinjiang Daily* [新疆日报], December 21, 2001, FBIS, January 23, 2002 [CHI-2002-0117].

[111] "Mosque Leaders' Reeducation Campaign Stepped Up," *South China Morning Post*, November 14, 2001.

[112] *Xinjiang Daily* [新疆日报], March 12, 2002, FBIS, March 14, 2002 [CHI-2002-0329].

[113] "Mosque Leaders' Reeducation Campaign Stepped Up," *South China Morning Post*, November 14, 2001; *Xinjiang Daily* [新疆日报], December 21, 2001, FBIS, January 23, 2002 [CHI-2002-0117].

[114] Ibid.

[115] Human Rights Watch interviews with relatives of two clerics, Kashgar, July 2000.

Clerics who do not fulfill the ideological criteria can be put through further "education session(s)" and have their accreditation suspended or removed. Local sources pointed out that these sessions were particularly taxing for old clerics from the countryside, who are forced to travel and are suddenly plunged into arcane testing of their ideological loyalty to the Party.[116]

The *Xinjiang Daily,* the official organ of the Xinjiang CCP Committee, portrays these sessions in a positive light, suggesting clerical appreciation for the "training":

> During the study, imam-students were very enthusiastic and listened attentively to lectures. Some of them were aged and weak but persevered in attending classes, actively took part in discussions, and wrote study reports.[117]

The same article reported that after the 2001 campaign clerics declared: "Now we have set our mind at rest and seen the light as if we had just walked out of a dense fog."

According to secondary accounts given to Human Rights Watch,[118] the climate of the training sessions is similar to accounts given by people forced to write self-criticisms during the Maoist era. Each session is a cat-and-mouse game, where the safest way to be left off the hook is to admit to relatively minor mistakes, if need be by inventing them. Such sessions are a core component of the political "reeducation" campaigns conducted for clerics since 2001.

The content of the courses, in which "political studies are combined with training in religious knowledge," was "scientifically determined" by an *ad hoc* small group set up with leaders from the Regional Party Committee, the XUAR government, the State Administration of Religious Affairs, and the China Islamic Association:

> The leading group deeply explored and scientifically determined the contents of courses by proceeding from the perspective of guiding religion in adapting to the socialist society and maintaining the lasting political stability of Xinjiang," reported the *Xinjiang Daily* … Imam-students systematically studied General Secretary Jiang Zemin's

---

[116] Ibid.

[117] *Xinjiang Daily* [新疆日报], December 21, 2001, FBIS, January 23, 2002 [CHI-2002-0117].

[118] Human Rights Watch interviews with relatives of two clerics, Kashgar, July 2000.

important speeches on religious issues, the Party's ethnic and religious policies, relevant state laws and regulations, the history of Xinjiang, and the history of Xinjiang religions.[119]

The authorities also propagated selections of text from the Koran that were deemed suitable. "New Edition of Selections from the Koran" (*Xinbian Kuerlan bian* 新遍苦而滥编) was published by the Xinjiang Religious Affairs Bureau in August 2001. Religious bureaus of all districts, prefectures, and cities organized in a planned manner the work of testing, explaining, training, and diffusing the book, "obtaining great results," according to official reports.[120]

In October 2002, a Party- and government-sponsored regional conference on religious work was called in Urumqi to sum up the work of 2002 and lay out the plan for 2003. The Xinjiang Party Secretary, Wang Lequan, gave clear instructions to ensure that religious public figures were "politically qualified" and ordered his subordinates to further "monitor" and "expunge" religious publications.

> We must strengthen the management of religious public figures, and be sure that they are politically qualified. This is a demand of the first order. Political qualifications are the following: an ardent love for the motherland, support for Communist Party leaders and the socialist system, opposition to national splittism and illegal religious activities, the defense of national unity and the unification of the motherland, and a conscious compliance with the nation's laws and policies ... We must implement a reinforcement of the management of the places of religious activity and the content of the texts, actively explore methods to effectively monitor the content of the texts expounded by religious figures, and unify a standardized expounding and explanation of the texts.[121]

---

[119] *Xinjiang Daily* [新疆日报], December 21, 2001, FBIS, January 23, 2002 [CHI-2002-0117].

[120] *Xinjiang Annals 2002* (Urumqi: Xinjiang Yearbook Publishing House), 2003, p. 333. [新疆年鉴 2002, 乌鲁木齐：新疆年鉴出版社，2003，第 333 页].

[121] *Xinjiang Daily* [新疆日报], October 13, 2002, FBIS, November 5, 2002 [CHI-2002-1029].

### Control and conformity: supervision of mosques in 2001

Alongside efforts to step up ideological indoctrination of clerics, since 2001 the authorities have radically stepped up the monitoring and inspection of mosques. Among other things, inspections verify the accreditation of imams, ascertain that no "illegal" teaching is taking place, and ensure that government regulations are posted and available.

In line with instructions from the Central Party Committee in Beijing and the annual inspection regime prescribed in the Manual, the Xinjiang authorities initiated a campaign in 2001 to increase supervision of Uighur mosques. In August 2001, the Xinjiang Party Committee and the Xinjiang government convened a conference to discuss annual inspections of places of religious activities. This led to the design of a five-year-plan under an ad hoc "small leading group." The group was set up the following November, and two teams, one for northern Xinjiang and one for southern Xinjiang, were charged with "coordinating and reinforcing the work of annual inspection of conformity."[122]

According to the Xinjiang Religious Affairs Bureau, Xinjiang's 23,909 mosques were inspected in 2001. One hundred forty-one mosques were found to be "non-conforming" and targeted for "rectification." No figures are available for the following years.

In addition to the annual inspection of mosques, the authorities in 2001 established a "three-level religious control network" (*sanji zongjiao guanli wangge* 三级宗教管理网格), combining village, township, and district levels. The system establishes permanent monitoring of Uighur mosques by "leading cadres of ethnic minorities" who "maintain contacts with mosques and dialogue with religious personalities" and who control the mosque's inspection log in which details about the clerics in charge, dates, results and recommendations of inspections, and other relevant information is recorded. The following account of the work to "strengthen the management of religious affairs" in Aksu prefecture of Xinjiang gives a picture of how the system works:

> The City Religious Affairs Bureau issued an evaluation handbook to each of the liaison personnel for recording their work truthfully. The handbooks are examined and archived periodically… Aksu prefecture appointed ten ethnic minority leading cadres at the deputy county level as liaison personnel as well as 657 leading minority cadres… to establish contacts with 416 mosques … The liaison personnel visited mosques once a week to talk and befriend religious personalities, to propagate the

---

[122] *Xinjiang Annals 2002*, p. 334.

party's policies toward ethnic nationalities and religions, and to provide education and guidance on patriotism.[123]

### The persecution of clerics and the demolition of mosques

Chinese authorities are careful not to appear to be targeting Islam specifically, and they keep closures of mosques and the non-reaccreditation of imams secret. It is difficult to assess the number and scale of such actions. However, information found in scattered official sources suggests that retaliation against non-conforming mosques and clerics is prevalent and has gained new vigor since late 2001. At that time, authorities in Xinjiang imposed even more control on mosques, effectively banning any new construction work on mosques in Xinjiang. Although Uighur exile organizations have long claimed that such a ban was implemented after the 1997 Yining uprising, the measure was never officially confirmed and is not found in material issued by the Religious Affairs Bureau. However, in October 2002 the Xinjiang Party Secretary appeared to confirm the existence of the ban in a speech relayed by the *Xinjiang Daily*:

> At this time, the places for religious activities throughout the Autonomous Region are adequate to meet the needs of the normal religious activities of religious believers. In principle we should not have to build new places for religious activities.[124]

The Party Secretary also underscored limitations imposed on the preservation of existing mosques. He declared that, "any maintenance and repair of places for religious activities must reflect real needs and be concrete, safe and practical" and he stressed the ban on sharing costs of repairs with independent, non-governmental sources, such as private businessmen, without permission from the relevant authorities.[125]

The destruction of a mosque by the authorities was reported in Hetian prefecture in southern Xinjiang in October 2001. Local worshipers demonstrated against the action; the demonstration was immediately put down by security forces. According to media reports, an official of Hetian Nationalities and Religious Affairs Bureau declared that about five people had opposed the conversion of a mosque into a carpet factory and appealed to regional and Beijing authorities when the project began, but eventually

---

[123] *Xinjiang Daily* [新疆日报], March 13, 2002, FBIS, March 14, 2002 [CHI-2002-0329].

[124] *Xinjiang Daily* [新疆日报], October 13, 2002, FBIS, November 5, 2002 [CHI-2002-1029].

[125] Ibid.

agreed to the factory conversion, which took place "because the mosque was located beside a school and considered too loud and a bad influence."[126]

The persecution of clerics did not start only after September 11, 2001. Official media sources reported in May 2001 that seven imams were arrested and two "underground mosques" destroyed in the provincial capital Urumqi. The charges against the men were not made public.[127] According to official documents, Yusaiyin Wubulibei, former Imam of the Shayibake Mosque in Urumqi, was demoted and put under investigation by the Public Security Bureau in April 1999 for having "preached against the religious policies of the Party" and "exacerbated contradictions within the patriotic clergy."[128] No further information regarding the charges against him was available at the time of writing.

In Yili prefecture alone, local government sources state that seventy "illegal constructions or renovations of religious sites" were demolished and forty-four imams stripped of their "credentials" (*zige* 资格) between 1995 and 1999.[129] The official *Urumqi Yearbook* of 1999 cites the closure of "twenty-one illegal religious sites" and the arrest of a group of reactionary religious students in the regional capital Urumqi in 1998.[130] It recounts that the authorities "smashed up" numerous illegal preaching spots, confiscated two hundred volumes of reactionary books, and two hundred reactionary tapes and reactionary propaganda materials.[131]

The government has been careful to maintain a few showcase mosques that have undergone extensive renovation, such as the Id-Kah Mosque in Kashgar. Local residents complain that the ban on renovations and extensions is particularly stringent for Uighur mosques and more lax for mosques attended by Hui Muslims, who are ethnically distinct from Uighurs.

---

[126] The mosque was apparently turned into a carpet factory. "Mosque razed, 180 arrested," *South China Morning Post*, October 14, 2001; "Arrests of mosque protesters denied," *South China Morning Post*, October 16, 2001.

[127] Human Rights Watch, "China: Human Rights Concerns in Xinjiang," October 2001, [online], http://www.hrw.org/backgrounder/asia/china-bck1017.htm.

[128] *Yining Municipality Annals*, Urumqi: Xinjiang People's Press, 2002 [伊宁市志, 乌鲁木齐：新疆人民出版社, 2002].

[129] *Urumqi Yearbook 2000* (Urumqi: Xinjiang People's Press), 2001, pp.250-251. [乌鲁木齐年鉴 2000, 乌鲁木齐: 新疆人民出版社, 2001, 250-251 页].

[130] *Urumqi Yearbook 1999* (Urumqi: Xinjiang People's Press), 2000 [乌鲁木齐年鉴 1999, 乌鲁木齐:新疆人民出版社, 2001, 250-251 页].

[131] Ibid.

### A Case of "Extremism"

China typically justifies the detention or defrocking of clerics as a response either to "illegal activities"—often activities integral to the free exercise of religion—or to "religious extremism," a code term for terrorism. The general repression of religion in Xinjiang casts doubts on the legitimacy of many of these punishments, but very few independent and reliable accounts have surfaced.

The case presented here is particularly significant because it is found in a high-level document issued by the Study Group of the Xinjiang CCP Committee, the highest political authority in Xinjiang, as an example of what constitutes "extremism." [132] It thus carries the full weight of the Party leadership and sets a political line that all Party members, including prosecutors, judges, and government cadres, should refer to in deciding on a case or carrying out decisions.

The report depicts the following incident as an example of what is termed "narrow-minded nationalist thinking" (*xiazhai minzuzhuyi sixiang* 狭窄民族主义思想):

"In the country, a few dangerous people with narrow-minded nationalist thinking are pushing national-ethnic self-respect and self-belief to extremism, inciting scorn and discrimination of other national-ethnic cultures...They one-sidedly debate a hot social issue, and fan feelings of dissatisfaction (*buman qingxu* 不满情绪) among the masses."

In July and August 1999, the imam of the Sidituwei mosque in Hetian prefecture said in front of three or four thousand people during the Friday prayer:

"Because they are unemployed, Uighur women and youngsters have turned into prostitutes and vagrants. Pray Allah to save their souls, to give them jobs. Let the sound of our tears move Allah. A crowd of one thousand were thus led to cry loudly."

This speech by the imam would normally be understood to be a piece of everyday social commentary, the expression of which would be covered by the rights to free expression and peaceful assembly. The choice of this speech as an example thus sends an unambiguous signal to all Party and government cadres that raising "hot social issues" (*shehui redian wenti* 社会热点问题), and spurring "feelings of dissatisfaction" is equivalent to separatism.

---

[132] Study Group of the Xinjiang Party Committee, "Investigative report on correctly apprehending and resolving Xinjiang's nationality problem under the new situation," February 2001 [中共新疆维吾尔自治区委组织部课题组：关于正确认识和处理形势下新疆民族问题的调查报告，2001 年 2 月].

## VI. Controlling Religion in the Education System

### *Minors barred from "participating in religious activities" in Xinjiang*

Although China prohibits religion within the state educational system nationwide,[133] there is no law prohibiting children from participating in public or private state-sanctioned religious activities.[134]

The situation is markedly different in Xinjiang, where article 14 of the XUAR regulation entitled *Implementation Measures of the Law on the Protection of Minors* states that "parents and legal guardians may not allow minors to participate in religious activities."[135] The implementation of the ban seems to vary from place to place, but some mosques display signs prohibiting the entry of anyone under eighteen years of age.[136] Uighur Muslims report that the ban is implemented against them more harshly than against members of other ethnic or religious groups, but it applies to all religions in the region.[137] This ban on religious activity among children has no basis in Chinese law and is not known to exist anywhere else in China. The national Law on the Protection of Minors[138] does not include this clause. Neither do similar implementation measures adopted by other provinces. Even Tibet does not have such stringent regulations. The Chinese

---

[133] The constitution stipulates that religion should not "interfere with the educational system of the State" (art. 36), while the Education Law states that "No organization or individual may make use of religion to conduct activities that interfere with the educational system of the State." (art. 8).

[134]The U.N. Convention on the Rights of the Child states: "For the purposes of the present Convention, a child means every human being below the age of eighteen years unless under the law applicable to the child, majority is attained earlier." Convention on the Rights of the Child, art. 1, adopted November 20, 1989 (entered into force, September 2, 1990). In the report, the terms child or children is sometimes used to .acknowledge the relationship between two or more persons.

[135] Standing Committee of the Xinjiang Uighur Autonomous Regional People's Congress, Implementation Measures of the Law on the Protection of Minors, September 25, 1993 [新疆维吾尔自治区人民代表大会常务委员会: 新疆维吾尔自治区实施'未成年人保护法'办法, 1993 年 9 月 25 日].

[136] Statement by Dr. Jacqueline Armijo (Acting Assistant Professor, Religious Studies, Stanford University) to the United States Congressional-Executive Commission on China, July 24, 2003 (http://www.cecc.gov/pages/hearings/072403/armijo.php#_edn1).

[137] Implementation of the ban for Xinjiang Catholics has been reported as recently as September 2003. A Catholic priest in Yining city, Father Song Zunsheng, reported to UCA News in September 2003 that government officials had banned people younger than eighteen, as well as all students, teachers, soldiers, and government officials from practicing any religion and taking part in any religious activity. He reported that two government officials guarded the entrance of the city's only church from April to June 2003 and drove away any children who may have wanted to enter it. "Government Restrictions Hamper Church Development in Remote Muslim Area," UCA News, September 22, 2003.

[138] Standing Committee of the National People's Congress, Law of the People's Republic of China on the Protection of Minors, September 9, 1991 [国 人 民 代 表 大 会 常 务 委 员 会: 中华人民共和国未成年人保护法), 1991 年 9 月 4 日].

government has always denied the existence of such a prohibition, which contradicts both China's own constitution[139] and international legal obligations.[140]

In Kashgar, people complained that even talking about religion to their children was fraught with risks. One Kashgar educator put it this way:

> This is a Uighur school and we are mostly Uighurs working here. But neither at home nor at work are you supposed to talk to the children about religion. You just talk about it and it is illegal. Even with my own son, I am not supposed to tell him about Islam. How can this be possible?[141]

Parents cannot avoid these strictures by sending their children abroad to study. In addition to barring private religious education in Xinjiang, the 1996 directives also imposed strict controls on exchanges with the outside world, stressing that "elementary and high school students from the border regions are not allowed to attend the elementary and high schools of foreign countries."[142] The directives instruct relevant authorities to "severely restrict elementary and high schools from developing cultural exchange programs with schools in foreign countries" and to "tightly limit cultural exchange activities such as foreign teachers teaching at Xinjiang schools."[143] Instead, the directives establish political loyalty as the principal criterion for allowing students to study abroad.[144]

---

[139] Constitution of the People's Republic of China, Art. 36 [中华人民共和国宪法, 第三十六条].

[140] The International Covenant on Economic, Social and Cultural Rights (ICESCR), which China ratified in March 2001, enshrines the rights of the parents to provide religious education: "States parties undertake to have respect for the liberty of parents (…) to ensure the religious and moral education of their children in conformity with their own convictions." (art. 13). The Convention on the Rights of the Child (CRC), to which China is also a party, stipulates that "States Parties shall respect the right of the child to freedom of thought, conscience and religion." (art. 14). See also the Convention against Discrimination in Education (CDE) which prohibits "any distinction, exclusion, limitation or preference which, being based on…religion…has the purpose or effect of nullifying or impairing equality of treatment in …" (art. 1). China ratified the CDE on February 12, 1965.

[141] Human Rights Watch interview with informant B, Kashgar, June 2002.

[142] "Record of the Meeting of the Standing Committee of the Political Bureau of the Chinese Communist Party concerning the maintenance of Stability in Xinjiang (Document 7)," reproduced in Human Rights Watch, "China: State Control of Religion: Update #1," March 1998.

[143] Ibid.

[144] "When choosing students for study abroad, pay great attention to their attitude and their actual behavior. Do not send those without a good attitude. Concerned branches should tightly control their criteria in this respect when investigating and permitting students with political backgrounds to go abroad for study with their own money." Ibid.

### *Purging the schools of religion*

In Xinjiang, restrictions on religion in state educational institutions go far beyond prohibiting the teaching of religion. Xinjiang authorities are actively hostile to any action that may encourage religious interest among the young. The Urumqi Manual (discussed in Chapter IV, above) details the following "policy restrictions" on religion in the educational system at all levels, including the university level:

1.  no religious activities to be carried out at schools;

2.  no religious classes or preaching of religious beliefs, no obstruction to education on morality and scientific culture;

3.  no coercing or seducing students to take up religious beliefs; no activities that would enhance the development of religious followers;

4.  no school at the secondary level or below may adopt teaching materials that promote religious belief; all teaching materials on religion adopted by the university must be examined by the administrative department responsible for education above the province level [in Beijing];

5.  no teacher may violate the rules by leading the students to participate in religious activities; foreign teachers are forbidden to engage in the preaching of religion at school.[145]

The political sensitivity of religion, and particularly religion as it contributes to Uighur social and cultural identity, is evident from the case of a Uighur professor at a higher education institution in Xinjiang who was banned from teaching local musical traditions. He described these events:

> That is how it has gone with me, and mind you I am not what you would call a fervent Muslim. Only during class I would often talk about religious songs. They are widespread; it is absurd that you are not allowed to speak about it. It is an important part of our musical history and tradition, which is what I was supposed to teach. But then, the next term they [the school authorities] tell me not enough students enrolled in my course, which is not true. So I have not taught for a year now. They have not dismissed me and I should not complain too much because I still eat the bread of the Communist Party, but I just walk

---

[145] Manual, p. 31.

around campus or sit at my desk. It is a total waste, but it is better not to talk about it.[146]

Beginning in 2001, schools in numerous localities across Xinjiang underwent "clean-ups". Books which had "separatist content" were removed from libraries, teachers were investigated and reportedly fired, and students were warned that they were monitored and would be expelled if they did not conform to the new ideological requirements.

A report issued by the Hetian CCP Committee on January 5, 2002, ordered educational authorities to "clean up and reorganize the schools, their leaders, and the teaching body so as to turn schools into a stronghold against separatism and infiltration."[147]

> Do not allow religion to corrupt the schools; do not allow anyone to teach school children ethnic separatism or to publicize religious ideas. Remove textbook contents which inspire ethnic separatism and publicize religious ideas. ... Since we launched our battle against Eastern Turkestan separatist forces, we found that religion, illegal religious activities and extremist religious thought have severely influenced, disturbed and infiltrated society and villages, and in particular education.[148]

Virtually any dissent or outward expression of religious belief is banned in schools. Forms of dress or outward appearance deemed too closely associated with traditional practices of Islam, such as men with beards or women with headscarves, are banned from schools. In Kashgar, for instance, a female teacher in a public education institution told Human Rights Watch how this ban affected practicing Muslim women teachers:

> My husband allows me to work here, even if he is upset that now all state jobs forbid you to wear even a little scarf over your head, or something as small as a handkerchief. I am lucky: many colleagues of mine were told by their husbands that they could not go out in the street and into work with their heads uncovered, and simply had to quit their jobs.[149]

---

[146] Human Rights Watch interview with informant C, Urumqi, June 2002.

[147] "Separatists Alleged to have infiltrated Xinjiang Schools," Agence France-Presse, January 31, 2002.

[148] Ibid.

[149] Human Rights Watch interview with informant B, Kashgar, June 2002.

Even performing the most basic requirements of the Islamic faith, such as reading the Koran, engaging in daily prayer, and fasting during the holy month of Ramadan, have been prohibited. In November 2001, a female student was reportedly expelled for disobeying school orders to stop performing five daily prayers. She was praying in her dormitory room when discovered.[150] The same report quoted a member of the staff of the Kashgar Teachers' College as saying, "Teachers and administrators have been asked to sign statements saying they will accept responsibility if any student in their class is caught fasting."[151]

Uighur students at Xinjiang University, Kashgar Teachers' College, and Yining Teacher's College all told Human Rights Watch that all religious attitudes and practices are forbidden, praying is impossible for fear of reprisals, and the mere fact of having a Koran or any religious publication is considered grounds for expulsion.

Non-teaching personnel in schools also have had to discard religious practices. A relative of a Uighur working in an office in a Kashgar school interviewed by Human Rights Watch recounted that simply sporting a beard was too much:

> I managed to set up some business with other relatives, and that is my
> pride. I was working before in an office, dealing with food supplies for
> schools, but then they said: "No beards allowed in here. Not even
> mustaches." I thought how can they tell me what I do with myself? This
> is our tradition, nobody's business. So I had an opportunity to leave, and
> I left. But if you cannot find another job, in the private sector, you either
> shave or starve.[152]

Such anecdotal accounts about interference with even the private exercise of religious freedom by students and teachers were confirmed by an official document obtained by Human Rights Watch. A letter was sent by the authorities of the Xinjiang School of Forestry to some parents on July 15, 1999, quoting regulations from the Autonomous Region Education Commission. The letter warned the parents that their children "have been praying and keeping fast, [and have been] involved in some religious activities" and that "if this behavior is seen again the students will be expelled." The document states that "praying, keeping fasts and other religious activities" are explicitly banned by an

---

[150] "China cracks down on its Muslims," Agence France-Presse, November 23, 2001.

[151] Ibid.

[152] Human Rights Watch interview with informant D, Kashgar, June 2002.

official directive, "Document No. 5 (1996) of the Autonomous Region Education Commission," and by "our school rules."

These restrictions are still in place. In November 2004, an official from a county-level Chinese Communist Party religious affairs committee told Radio Free Asia that they had been ordered to report anyone fasting during the month of Ramadan:

> "We have an agreement with the Chinese government that I am responsible for preventing students from fasting during Ramadan," said the official, who declined to be identified. "If I find out that any of them have been fasting I have to report it."[153]

### Enforcement through surveillance

> *"Education branches should pay special attention to the investigation and organization of teaching in schools."*[154]
>
> Political Bureau of the Chinese Communist Party

In Xinjiang today, both students and teachers are subjected to surveillance by school authorities, the CCP, and Party-affiliated organizations. In addition, there is an elaborate network of section directors, class heads, and others who are held responsible if any case of dissident behavior appears. The denunciation of any "suspect" act is strongly encouraged, resulting in a general climate of fear and mutual suspicion.

For example, in Kashgar Teacher's College, students complained that there were random searches in the dormitories at least twice a year, and that anyone caught possessing religious or politically sensitive materials risked expulsion from the college. The students expressed a constant fear that they might be overheard and mentioned cases of fellow students having been expelled for expressing political opinions, criticisms of the Party or government policies, or because they had "talked about religion." Uighur sources allege that a schoolteacher in Kashgar's Mush district, Abdhurahman, was dismissed on the grounds of "possession of incorrect books" and "religious activities."[155]

---

[153] "China Steps Up Religious Controls Over Muslim Uighurs," Radio Free Asia, November 17, 2004.

[154] "Record of the Meeting of the Standing Committee of the Political Bureau of the Chinese Communist Party concerning the maintenance of Stability in Xinjiang (Document 7)," reproduced in Human Rights Watch, "China: State Control of Religion: Update #1," March 1998.

[155] World Uighur Network News (WUNN), April 4, 2002. The information was not corroborated by other media.

Political "witch-hunts" within schools in Xinjiang are confirmed by the authorities themselves, who acknowledge having set up "information networks" (*xinxi wang* 信息网) in schools linked to the Public Security Bureau. In 2001, Liu Baojian, the Party's Deputy-Secretary of Kizilsu Tadjik Autonomous Prefecture, stated:

> In every school we have established an information network integrated with the local police station, with the teachers in charge of a class acting as the basis [of a network] comprised of classroom heads, section heads, teaching offices and school directors.[156]

He added candidly that the objective was to "control (*zhangwo* 掌握) the evolution of the thinking of the pupils ... in order to teach and 'guide' them."[157]

### *Special campaigns*

As a complement to the structural elements of political control described above, the authorities have launched periodic campaigns to enforce patriotic education and indoctrinate students against separatist ideology and illegal religious activities. The May 2001 campaign illustrates this approach. In an article entitled "Closely Monitor the Education of Youngsters" published in the *Xinjiang Daily* on May 15, 2001, the Xinjiang Propaganda Department emphasized that "education is the most important front in the fight against separatism." The article continued:

> The stability of schools is not only related to the stability of the whole society, but also to the long-term stability of Xinjiang. Strengthening the educational training of youngsters and the political thinking of the teachers is a very important part of the work of preserving the social stability of Xinjiang and opposing on a daily basis the battle against separatism.[158]

Two days later, the authorities declared that an anti-crime "Strike Hard" campaign—periodic drives against serious crime conducted throughout China—was to be extended

---

[156] "Comprehensive Public Order: Urging Stability from the Small to the Large," *Xinjiang Legal Daily*, May 17, 2001 ["宗治:由小到大促稳定," 新疆法制报 ， 2001 年 5 月 17 日].

[157] Ibid.

[158] "Highly monitor the education training of young pupils," *Xinjiang Daily*, May 15, 2001 ["高度重视对青少年的倍养教育," 新疆日报, 2001 年 5 月 15 日].

to the education system, "Strike Hard Rectification Does Not Forget to Educate Youngsters about the Legal System,"[159] read a headline in the Xinjiang Daily, announcing that institutes of higher learning throughout the region were to be subjected to a "three rectification" drive.[160] Speaking at a "reeducation" mobilization meeting in February 2002, Xinjiang Party Secretary Wang Lequan stressed again the fact that political loyalty was to be placed above anything else.[161]

According to parents, students, and teachers across Xinjiang with whom Human Rights Watch spoke, the political climate deteriorated sharply in 2001-2002, with the authorities organizing numerous rallies against separatism which teachers and students were forced to attend. One Uighur teacher in Kashgar interviewed for this report described this process of ongoing indoctrination:

> I have had no holidays for three years, because when we do have holidays we are supposed to go and study anti-separatism, anti-this and anti-that. I cannot tell you the stuff we have to study. Still, if you want to work, or need the pay, what else can you do? You go and read that stuff as if it made sense.[162]

As described in the next section, these propaganda campaigns against separatism often converged with anti-crime sweeps of putative "separatists."

## VII. Anti-Crime Campaigns and Religious Repression

The Chinese government has periodically engaged in "Strike Hard" anti-crime campaigns that sweep up thousands, sometimes tens of thousands, of alleged criminals in their wake. Intended to instill a sense of security in a public concerned about the increase in crime that has accompanied economic growth, these campaigns commonly result in the unlawful arrest and even wrongful execution of large numbers of people.[163]

---

[159] "Strike Hard Rectification Does Not Forget to Educate Youngsters about the Legal System," *Xinjiang Legal Daily*, May 17, 2001 ["严打整顿不忘青少年法制教育," 新疆法制报, 2001 年 5 月 17 日].

[160] Ibid.

[161] *Xinjiang Daily* [新疆日报], February 9, 2002, FBIS, March 25, 2002.

[162] Human Rights Watch interview with informant B, Kashgar, June 2002.

[163] See Human Rights Watch, World Report 2002, section "China and Tibet," available at http://hrw.org/wr2k2/asia4.html. Legal scholars have written in details about the causal relation between "strike hard" campaigns and abuses. For instance, Professor Scott Tanner writes that "Police and procuratorial experts agree with the judgment of international human rights monitors that during "strike hard" anti-crime campaigns

According to Amnesty International, over 200 death sentences were recorded in Xinjiang as a result of such campaigns between 1997 and 2003, mostly under state security charges.[164] Only a fraction of death penalty sentencing appears in the press, and undisclosed overall figures are classified as state secrets.

The last recorded instance of an execution for a separatist crime was in March 2003. The alleged offender, Shaheer Ali, had been forcibly repatriated from Nepal despite having been recognized as a refugee by the United Nation High Commissioner for Refugees (UNHCR). After repatriation he was tried secretly on separatism and terrorism charges.[165]

Local officials, anxious to show they are giving full attention to the campaigns, frequently appear to be more concerned with numbers than evidence. The characteristics of the Strike Hard campaign in Xinjiang mirror those observable in China more generally: summary trials, pressure on the judiciary to process a large number of cases in an extremely short time, and mass sentencing rallies. But in Xinjiang, religion appears to be as much the target as crime.

Chinese officials in Xinjiang equate the campaigns waged against ordinary crime with those targeting separatism, terrorism, and purported "illegal religious activities." The CCP frequently claims that "separatists and anti-China forces use the cloak of religion to fan national separatism."[166]

### *Unrelenting crackdowns*

Since 1996, the authorities have conducted at least nine province-wide anti-crime campaigns in Xinjiang that specifically included purported "illegal religious activities":

---

professionalism is further undermined, causing torture cases to spike. Local Communist Party leaders, who are also under evaluated by their superiors on the state of local social order, turn up the pressure on local police to solve cases quickly. According to one police official, many officers "find it hard to resist this fast and effective interrogation technique." "Torture in China: Calls for Reform from within China's Law Enforcement System," Prepared Statement to Accompany Testimony Before the Congressional-Executive Committee on China, July 26, 2002, available at www.cecc.gov.

[164] Amnesty International, "People's Republic of China: No justice for the victims of the 1997 crackdown in Gulja (Yining)," February 4, 2003, [AI Index: ASA 17/011/2003].

[165] Amnesty International, "China: Further information on Fear of Forcible Return," October 24, 2003, [AI Index: ASA 17/037/2003].

[166] *Protect the Unity of the Motherland: a Handbook* (Urumqi: Xinjiang People's Publishing House, 1996), p. 162. [维护祖国统一：简明读本 (乌鲁木齐：新疆人民出版社)，第 162 页].

1996: First "Strike Hard" campaign specifically targeting "splittism and illegal religious activities";

1997: "Rectification of Social Order" campaign;

1998: "People's war" drive against "separatist and religious extremists";

1999: "Special 100 Days Strike Hard Fight" and "General Campaign against Terrorism";

2000: "Focused Rectification of Religious Places Campaign";

2001: Two-year "Strike Hard" launched, to last until June 2002;

2002: Post-September 11 "High Pressure Strike Hard" campaign;

2003: Launch of a special "100 Days Strike Hard" in October;

2004: "High Pressure Strike Hard" campaign against "separatism, religious extremism and terrorist forces" extended indefinitely.

Official accounts of these campaigns usually claim hundreds of arrests. Summary trials and sentencing is common, as courts are under orders to reduce judicial process to a minimum under the principle known as "the two basics" (*liang ge jiben* 两个基本). This principle sets out that only "basic truth" and "basic evidence" are required to proceed. According to instructions given by Xinjiang Party Secretary Wang Lequan at the outset of the 2001 Strike Hard campaign: "As long as the basic truth is clear and as long as the basic evidence is verified, prompt approval of arrest, prosecution, and court decisions are required."[167]

Security and judicial bodies are also put under pressure to achieve arrest, sentencing, and mass rally quotas. This ideologically charged climate regarding any perceived form of dissent nullifies the already minimal procedural protections enjoyed by defendants in the Chinese judicial system.

Judges and court personnel in Kashgar are explicitly instructed to follow "political criteria" in carrying out their work. On the basis of the principle that "political criteria come first in the combat against separatism," in 2003 the authorities designated as a target for "investigation and rectification" court officials whose "political ideas are not strong, who waver at the critical moment, and who do not want to shoulder leading

---

[167] *Xinjiang Daily* [新疆日报], April 16, 2001, in "Xinjiang Party Secretary Addresses Meeting on Public Order," FBIS, [CHI-2001-052].

responsibilities [in the fight against separatism]," according to an official account published on a website of the Supreme People's Court.[168]

These anti-crime campaigns are specifically intended to include the targeting of religious activity. According to government accounts, the 1998 "People's War" campaign, which led to the arrest of "several hundred terrorists,"[169] imposed a "tightening of control on religion."[170] Authorities closed twenty-one "illegal religious spots" and arrested one group of reactionary "Talebs" (religious students) in Urumqi.[171] In 1999, the "Special 100 Days Strike Hard" campaign featured religion, as one of the "three elements" targeted for crackdown. They included "leading elements of religious extremist forces," "hardcore ethnic separatists," and "violent terrorists."[172]

In 2000, the crackdown focused on "the rectification of religious venues" and led to the arrest of religious activists preaching "a Holy War" in Hetian, Kashgar, Aksu, Ili, and other places.[173] The authorities reported that they had closed sixty-four "illegal teaching venues" and seized a large number of "illegal publications" and "reactionary tapes and videotapes."[174] The reports also mentioned that religious activists preaching "a Holy War" had been contained in Hetian, Kashgar, Aksu, Ili, and other places.[175] In April 2001, China's Minister of Public Security disclosed that he had instructed the Autonomous Region in Xinjiang to carry out a two-year Strike Hard campaign aimed at "eliminating separatism and illegal religious activities."[176]

Information on the extent of the post-September 11 anti-crime campaigns has been severely curtailed, but local accounts tell of an even more tense and repressive climate. As the Chinese government embarked on an effort to convince international observers

---

[168] "Visible achievements in the political strengthening of Kashgar Intermediate Court," Chinacourt.org, February 19, 2003 [喀什中院政治建院凸显成效," 中国法院网, 2003-02-19].

[169] "Hundreds of Muslim Activists Arrested," *South China Morning Post*, February. 2, 1999.

[170] Ibid.

[171] Urumqi Yearbook 1999, p. 85.

[172] Xinjiang Yearbook 2000 (Urumqi: Xinjiang Yearbook Publishing House, 2001) [新疆年鉴 2001, 乌鲁木齐：新疆年鉴出版社 , 2001], p. 95.

[173] Xinjiang Yearbook 2001 (Urumqi: Xinjiang Yearbook Publishing House, 2002) [新疆年鉴 2002, 乌鲁木齐：新疆年鉴出版社 , 2002].

[174] Ibid.

[175] Ibid.

[176] Quoted in "PRC's Xinjiang Anti-Crime Campaign Targets Muslim Separatists," Agence France-Presse, April 27, 2001.

of the legitimacy of its crackdown on Xinjiang's Uighurs, local media apparently stopped carrying periodic reports on the results of these campaigns, which often had featured information such as numbers of people arrested and convicted, names of such individuals, and details of their sentences. A report on January 1, 2002 provided a rare insight into the extent of the post-September 11 crackdown, indicating that security forces had arrested 166 "violent terrorists and other criminals" in a campaign from September 20 to November 30, 2001.[177]

In 2002 and 2003, the authorities continued to wage a "strike hard, high pressure" campaign against the purported "three forces"—separatists, religious extremists, and terrorists. Official media reported in January 2004 that, "during the past twelve months, Xinjiang suppressed a number of terrorist and separatist gangs, and arrested numerous criminals."[178] No accounts of the trials were disclosed.

In September 2004, Xinjiang Party Secretary Wang Lequan disclosed that in the first eight months of the year, Chinese authorities had prosecuted twenty-two cases of groups and individuals for alleged "separatist and terrorist activities." He said that courts in Xinjiang had passed fifty sentences, including an unspecified number of death sentences[179] Because stringent state secrets regulations apply to religious and ethnic affairs, more time will be needed before the true picture of the scale and intensity of the most recent campaigns emerges.

### Sweeps by law enforcement agencies

According to local residents in the Yili, Kashgar, and Hetian prefectures, the past few years have seen an increase in intrusive and targeted sweeps conducted by law enforcement agencies, generally the Public Security Bureau in conjunction with the People's Armed Police. Security forces seal off an area, such as a neighborhood or a village, and conduct house-to-house searches. Law enforcement officers examine identity cards and household residence permits (*hukou* 户口), interrogate residents about the whereabouts of family members, and randomly search houses for "illegal publications." The definition of illegal publications includes copies of the Koran not printed by government presses. People whose papers are not in order, or who do not

---

[177] *Xinjiang Daily* [新疆日报], January 1, 2002.

[178] "Xinjiang deepens the Strike hard against the 'three forces': A number of terrorist gangs already suppressed 'Xinjiang'," China News Agency, January 17, 2004 ["深挖严打'三股势力'已打掉一批恐怖团伙," 中新网, 2004 年 1 月 17 日].

[179] "China convicts 50 to death in 'terror crackdown,'" *Reuters*, September 13, 2004.

have a city residence permit while living in a city, or who in some other way fall outside of the regulations are taken away in trucks or minibuses waiting at the periphery, and then transported to public security facilities for further checks.

Indirect accounts tell of the often brutal character of these house searches. Because law enforcement agencies refuse to reveal the location where detainees are held after these sweeps, it is particularly difficult for relatives to know what actually happens to the detainees. Some people put in custody during sweeps are detained for long periods without charge; others are convicted or sent to reeducation through labor. Others are released.

Charges brought for offenses related to religion generally range from "disrupting public order" to "endangering state security." Most of those detained are fined, and relatives maintain that in many cases corrupt officials force the family to "buy" their relatives freedom. "Problem" households—in which a family member has fallen afoul of the law, is imprisoned, is on the run, or is simply out of the country—are particularly vulnerable during sweeps.

The manner in which sweeps are conducted suggests that intimidation is one of the objectives. As one villager told Human Rights Watch:

> In my home village [in Aktush prefecture], the militia regularly come to check villagers. They come during the night, searching house by house, and if they find religious material they take you for questioning. They say it's "illegal religious publications." My father is a simple farmer, what does he know if his Koran is illegal or not?[180]

Many Uighurs interviewed for this report claimed that law enforcement agencies and officials are systematically using the campaign against separatism and illegal religious activities to elicit bribes, to impose arbitrary fines, and to blackmail families to pay for the release of their relatives in custody. One informant returning from Hetian told Human Rights Watch that following a crackdown on "illegal religious activities" in the area in spring 2003, many families had to pay for the release of their relatives, most of them young men between sixteen and twenty-five years old.[181] Complaints about widespread corruption among law enforcement officers are common. According to a young farmer from a village near Hetian:

---

[180] Human Rights Watch interviews with informant E, Kashgar, July 1999.

[181] Human Rights Watch interview with an overseas scholar, Hong Kong, September 2003.

Corruption! There is so much of it. You have to pay for everything, give presents to officials, to the police, etc. We even have to pay for the militia because officially "the people's militia is supported by the people." They take your property right in your home, but what can you do. If you complain to the authorities, they will retaliate or even label you a "trouble maker." They call you "separatist" and you are finished. We are Uighurs, so we have no rights.[182]

## VIII. Religious "Offenders" in Detention

The campaigns waged against "separatism" and "illegal religious activities" which gained momentum after 1996-1997 appear to have propelled a huge influx of Uighur prisoners into Xinjiang's detention facilities.

There is a wide range of options available to the authorities in both the criminal and administrative systems for the prosecution of politically and religiously active Uighurs. In both systems, political instructions from the CCP and government have legal effect. For example, police and judges use CPP instructions to interpret the term "separatism" in the Criminal Code.

The conviction rate for criminal cases brought through the judiciary in the PRC is 98 percent, meaning that being indicted almost automatically results in a conviction.[183] Most testimonies by Uighurs who have been detained claim that they suffered from various forms of torture.[184] Of course, this makes convictions quite straightforward in a justice system with little regard for fair trial standards or the right to adequate defense counsel.

There are no "religious" crimes in Chinese law, so most "illegal religious activities" are prosecuted as other criminal or administrative offenses. The most serious are crimes of "endangering state security," including "splitting the state" (*fenlie guojia* 分裂国家), "sabotaging the unity of the country" (*pohuai guojia tongyi* 破坏国家统一)[185] or incitement

---

[182] Human Rights Watch interview with informant F, Hetian, July 1999.

[183] Law Yearbook of China (Beijing: China Legal Publishing House, 2003), [中国法律年鉴（北京：中国法律出版社），2003].

[184] See Amnesty International, "Gross Violations of Human Rights in the Xinjiang Uighur Autonomous Region," April 1999 [AI Index: ASA 17/18/99].

[185] Criminal Law of the People's Republic of China, Art. 103 [中华人民共和国刑法，第一百零三条].

to these acts. Defendants charged with endangering state security have diminished procedural protections and face politically motivated prosecutions and harsh punishments.[186] Ordinary criminal provisions, more routinely applied, typically include those targeting illegal assembly, illegal processions, and the broad category of "disrupting public order." Finally, the authorities make wide recourse to extra-judicial punishment such as reeducation through labor (RTL).

In prisons and RTL camps, Uighur political and religious prisoners are openly classified as a special category of detainees. Authorities refer to them as the "three types" (*san lei renyuan* 三类人员) or the "three categories of people" (*san zhong ren* 三种人). The "three types" designates detainees who have "harmed state security, joined illegal organizations, or distributed illegal religious material"; the "three categories" designates those who have "endangered state security, committed crimes with a view toward endangering state security, or are reactionary religious students or religious fanatics."[187]

Official sources show that among Uighur prisoners in Xinjiang there is an unusually high proportion of criminals sentenced for state security offenses. A rare documentary source obtained by Human Rights Watch, a scholarly paper from a Ministry of Justice compendium, shows that in 2001 9.2 percent of convicted Uighurs—one out of eleven, —were serving prison time for alleged "state security crimes." This probably amounts to more than 1,000 Uighur prisoners.[188]

The sweeping scope of the law makes it difficult to discern which cases involved genuine criminal activity, such as violence against the state, and which were punishment for peaceful exercise of rights such as dissent or religious practice.

Ordinary criminal provisions are even more frequently applied to religious dissenters. Defendants have almost no recourse to challenge the charges levied against them. In most cases, the sentence is decided in advance by the authorities.[189] This lack of due

---

[186] See Human Rights in China and Human Rights Watch/Asia (joint report), "Whose Security? 'State Security' in China's New Criminal Code," *A Human Rights Watch Report*, vol. 9, no. 4, April 1997.

[187] "Studies on the Reeducation of China's National Minorities Criminals," in Lu Jialun, ed., *Ministry of Justice's Ministerial Level Topics Series* (Beijing: Legal Publishing House, 2001), p. 125. [鲁加伦, "新疆劳教逑写" in 中国少数民族罪犯改造研究 (北京:法律出版社·中国司法:部及课题丛书, 第125页]. The statistics refer to convicts in the normal criminal justice system, and not to detainees under reeducation through labor.

[188] Ibid.

[189] The instrumentalization of the judicial system for political ends remains a dominant feature of China's legal system. According to Stanley Lubman, one of the foremost legal experts on China, "The Chinese criminal process remains dominated not only by the police, but by a blatant instrumentalism that puts it at the service of

process apparently is justified by the chain of reasoning that causally associates expression of dissenting views or engagement in unapproved activities with "illegal" religious activities, ethnic separatism, and finally, terrorism.

No comprehensive statistical information on the exact number of Uighur prisoners or even the general inmate population of Xinjiang is publicly available. The Chinese authorities regard such information as state secrets and have not allowed independent monitoring of detention facilities in Xinjiang. International organizations such as the International Committee of the Red Cross have not been able to reach agreement with the Chinese government concerning access to prisons, and a planned visit by the U.N. Special Rapporteur on Torture, which included Xinjiang, was abruptly cancelled in June 2004.[190]

However, official documents relating both to prison and reeducation through labor[191] acknowledge openly that there has been a surge in the number of Uighurs detained for religious offenses since the mid-1990s. Some of these sources indicate that the number of detentions has created severe management problems in these facilities.[192]

The same documents stress that religious activities are strictly prohibited in prisons and reeducation through labor camps.[193]

---

the CCP and political leaders when they wish to use it." Stanley B. Lubman, *Bird in a Cage: Legal Reform in China after Mao* (Stanford: Stanford University Press, 1999), p. 171.

[190] Human Rights in China, "Postponement of Torture Mission 'Disappointing,'" June 16, 2004. [中国人权新闻发布, "中国人权关于中国政府再次推迟酷刑调查的声明," 2004 年 6 月 16 日].

[191] Reeducation through labor: (*laodong jiaoyu* [劳动教育]) is a system of extra-judicial detention and punishment, administratively imposed on those who are deemed to have committed minor offenses. The usual procedure is for the police acting on their own to determine a reeducation term. Sentences run from six months to three years' confinement in a camp or farm, often longer than for similar criminal offenses. A term can be extended for a fourth year if, in the prison authorities' judgment, the recipient has not been sufficiently reeducated, fails to admit guilt, or violates camp discipline.

[192] "The Course of the Work of Reeducation Through Labor in Xinjiang," Crime and Reform Studies, January 2001. ["新疆劳教工作的历程," 犯罪与改造研究, 2001 年 01 月]. For the situation in prisons, see above "Studies on the Reeducation of China's National Minorities Criminals," in Lu Jialun, ed., *Ministry of Justice's Ministerial Level Topics Series* (Beijing: Legal Publishing House, 2001).

[193] Article 2 of the Interim Provisions promulgated by the Justice Department of Xinjiang clearly stipulates that no religious activity is allowed in prisons and places of reeducation through labor: "Prisoners and persons undergoing rehabilitation through labor may not engage in any form of religious activity in prison or place of rehabilitation through labor during their term of imprisonment or incarceration. Activities such as fasting, prayer, worship or expounding the texts of Islam or Buddhism are prohibited." Such regulations breach China's own laws and regulations and basic international human rights standards. Article 42 of the U.N. Standard Minimum Rules for the Treatment of Prisoners sets forth that "So far as practicable, every prisoner shall be allowed to satisfy the needs of his religious life by attending the services provided in the institution and having in his

In mid-2001, Ren Tieling, the deputy chief of the Xinjiang Reeducation through Labor Bureau, published a detailed report discussing the characteristics of the "three categories of persons" detained in RTL camps in Xinjiang. A version of the report, redacted by removing confidential elements such as the number of detainees, was published in the Ministry of Justice journal, *Crime and Reform Studies*. The report acknowledged that, as of 2001, there had been a "sharply upward trend" in the number of people sent to RTL camps on religious or political grounds. As the numbers "increased annually," RTL camps became "jam-packed."[194]

> As we intensified our hitting power in recent years, an increasing
> number of those who joined illegal organizations, illegal publications and
> illegal religious groups...have been sent to be reeducated through labor.
> The number has increased annually and shown a sharp upward trend.[195]

According to the report, in the Kashgar RTL center, a survey of 117 prisoners showed that the majority had been sentenced because they "joined illegal organizations, took part in meetings, paid organizations fees," while some others "sheltered escaped criminals and hid their arms and ammunitions for them, or provided lodgings."[196]

The report also sheds important light on the composition of the prisoner population, and confirms the suspicion that most ethnic Uighurs picked up under the "three categories" rubric in Xinjiang are young men who have been sent there on the basis of their religious belief or activities. The article distinguishes four groups of offenders and their percentage in the reeducation through labor population:

> (a) those who joined illegal organizations and/or engaged in illegal religious
> activities make up 46 percent of the total [of the "three categories of persons"];
>
> (b) those who printed or distributed illegal periodicals for illegal propaganda
> purposes make up 27.2 percent;

---

possession the books of religious observance and instruction of his denomination"; "Standard Minimum Rules for the Treatment of Prisoners," United Nations High Commission on Human Rights, 1957, [online] http://www.unhchr.ch/html/menu3/b/h_comp34.htm.

[194] "The Course of the Work of Reeducation Through Labor in Xinjiang," *Crime and Reform Studies*, January 2001, p. 23.

[195] "Studies on the Reeducation of China's National Minorities Criminals," in Lu Jialun, ed., *Ministry of Justice's Ministerial Level Topics Series* (Beijing: Legal Publishing House, 2001).

[196] Ibid.

(c) those who sheltered criminals or unlawfully possessed guns and ammunition, provided funds to illegal organizations, or made living quarters or places for activities available, 19.3 percent.;

(d) those who illegally made explosives or illegally crossed the border, 7.1 percent.[197]

The same report relates that 85 percent of the convicts are between eighteen and thirty years old, a fact that mirrors the official focus on cracking down on incipient religious enthusiasm among the young.[198] The demographics indicate that the purpose of the operation is to discourage young Uighurs from engaging in religious activity.

For the authorities, the benefit of using RTL is that no judicial procedure is involved. Thus, the Public Security Bureau has a free hand to detain individuals for as long as four years without having to prove that they actually committed a crime.

## IX. Freedom of Religion and China's Responsibility under International Law

China's stance towards freedom of religion remains equivocal. The political ideology of the CCP has traditionally been hostile to religion, but its policy since the late 1970s has been to tolerate religious belief and expression among non-Party members so long as it does not threaten the CCP's monopoly of authority or the functions of the state.

This ambivalence is expressed in the constitution, which protects "freedom to believe in, or not believe in, any religion" and "normal" (*zhengchang* 正常) religious activities, but which also prohibits religious activities that impair public order, health, or education and proscribes "foreign domination" of religious bodies and religious affairs.[199] The freedom to express one's religion through activities is not, however, guaranteed by the constitution. This has been noted by international bodies such as the U.N. Working Group on Arbitrary Detention, which in its 2004 report reiterated its recommendation that the constitution be revised to include such a guarantee.

---

[197] "The Course of the Work of Reeducation Through Labor in Xinjiang," *Crime and Reform Studies*, January 2001, p. 23.

[198] Ibid.

[199] Constitution of the Peoples Republic of China, art. 36.

The international legal obligations that China has assumed towards freedom of religion are unequivocal, and China's policies and practices are in direct violation of these norms. The Universal Declaration of Human Rights (UDHR), an international instrument all U.N. member states accept, and which has attained the status of customary international law, guarantees persons the right to manifest their religion "either alone or in community with others and in public or private,"[200] the right to be free from discrimination based upon religion,[201] and the right to be free from unnecessary and arbitrary government regulation in exercising religious beliefs.[202]

China is a signatory to the International Covenant for Civil and Political Rights (ICCPR) and although it has not yet ratified the Covenant, it is already bound not to act in such a way as to defeat the objects and purposes of the Covenant.[203] The ICCPR protects the right of the individual to "have … a religion or belief of his choice, and [the] freedom, either individually or in community with others and in public or in private to manifest" it.[204] It not only commits signatories to ensuring freedom of religion, but also commits them not to practice discrimination on the basis of religion.[205] This obligation is violated by China's practice of subjecting Uighur Muslims, much as it does Tibetan Buddhists, to regulation of their religion in far more severe terms than that those imposed on other faiths or ethnic groups within China.

The right to educate children "in conformity with their *own* convictions"[206] is also violated by the prohibition on Uighurs teaching their religion to their own children. The Covenant does allow exceptions where it is "necessary to protect public safety, order, health, or morals or the fundamental rights and freedoms of others,"[207] but the

---

[200] Universal Declaration of Human Rights, art. 18 (1948).

[201] Ibid, art. 2.

[202] Ibid, art. 29. Article 29 states: "In the exercise of his rights and freedoms, everyone shall be subject only to such limitations as are determined by law solely for the purpose of securing due recognition and respect for the rights and freedoms of others and of meeting the just requirements of morality, public order and the general welfare in a democratic society."

[203] China signed the ICCPR on October 5, 1998, but has yet to ratify it. See Ratification of International Human Rights Treaties – China, University of Minnesota Human Rights Library, available at http://www1.umn.edu/humanrts/research/ratification-china.html (retrieved June 9, 2004). While China has not ratified the Covenant, it is still "obliged to refrain from acts which would defeat the object and purpose of the treaty" because it has signed the ICCPR and has not expressed an official intention to not become a party to it. See Vienna Convention on the Law of Treaties, art. 18; Peter Malanczuk, ed., *Akehurst's Modern Introduction to International Law* (London: Routledge, 7th ed 1997), p. 135.

[204] Ibid, art. 18(1).

[205] International Covenant on Civil and Political Rights, arts. 2 and 26 (1976).

[206] Ibid, 18(4) (emphasis added).

[207] Ibid, 18(3).

restrictions China imposes on Uighur religious practice far exceed anything that could reasonably be justified under the treaty.

The ICCPR additionally guarantees that the individual "shall not be subject to coercion which would impair his freedom to have or to adopt a religion or belief of his choice."[208] By mandating that imams include state propaganda in their messages, the Chinese government coerces religious leaders and worshipers into adopting religious beliefs that are no longer of their own choosing.[209] When the Chinese government trains and selects Uighur imams, it sets itself up as arbiter of "the correctness of what are essentially the theological decisions of religious groups," and effectively prevents groups from organizing and operating according to their own religious principles.[210]

Finally, the ICCPR recognizes the right of religious minorities "in community with the other members of their group to … profess and practice *their own* religion."[211] Significantly, this article of the ICCPR does not include any provision for limitation or exception. By retaining the right to select, certify, and review Uighur imams and to mandate their religious messages, China, rather than respecting the rights of religious minorities, actually subverts Uighur religion, to the extent that it appears to be attempting to refashion it to a state version of Islam.[212]

The Convention on the Rights of the Child (CRC), to which China is a party, protects the right of a child to freedom of religion, the right of parents to educate their children,

---

[208] Ibid, 18 (2).

[209] See Manfred Nowak, *U.N. Covenant on Civil and Political Rights: CCPR Commentary* (Strasbourg, Arlington: N.P. Engel, 1993), p. 315. ("Influencing is, in any event, impermissible when it is performed by way of coercion, threat or some other unallowed means against the will of the person concerned or without at least his implicit approval").

[210] See "Recommendations for U.S. Policy on China," U.S. Commission on International Religious Freedom, February 13, 2002, p. 8, [online] http://www.uscirf.gov/reports/13Feb02/chinaRecommendaitons.php3.

[211] ICCPR, art. 27 (emphasis added).

[212] "It is clear from the report of the Secretary-General on the historical background on art. 27 that the [Human Rights Committee] expressly sought to set down privileged treatment for minorities in order to achieve real equality. This means that members of minorities are provided with more rights than the rest of the population. … In summary, it may be stated that persons belonging to minorities are guaranteed, as against the remainder of the population, a privileged, unrestricted right to common enjoyment of their … religion. As a negative right, art. 27 obligates the States Parties to refrain from interference and to practice tolerance." Nowak, *CCPR Commentary*, pp. 500, 502. See also Eric Kolodner, "Religious Rights in China: A Comparison of International Human Rights Law and Chinese Domestic Legislation," 12 UCLA Pac. Basin L.J. 407, 412-13 (1994) ("Article 27 compels two important conclusions. First, minority religions enjoy a particularly protected status – assuming that art. 27 is more than just a redundant enunciation of the individual religious liberties protected under art. 18 and the principles of nondiscrimination in art. 26. The absence of permissible derogations further suggests this elevated status. … Second, by explicitly proclaiming the right of minorities to have and practice 'their own religion,' art. 27 prohibits governments from establishing officially recognized religious organizations while banning all others which conflict with government-sponsored belief systems").

and the right of minorities to educate their children when religious belief and practice is an integral part of their culture. Art. 14(1) provides that "States Parties shall respect the right of the child to freedom of thought, conscience and religion. The right is not derogable, but is subject to the same limits as above.[213] Article 14(2) provides that "States Parties shall respect the rights and duties of the parents...to provide direction to the child in the exercise of his or her right in a manner consistent with the evolving capacities of the child."[214] Article 30 states that: "In those States in which ethnic, religious or linguistic minorities or persons of indigenous origins exist, a child...shall not be denied the right...to enjoy his/her own culture, to profess and practice his or her own religion, or to use his or her own language.[215]

The Convention against Discrimination in Education also provides for "the liberty of parents...to ensure..." the religious and moral education of the children in conformity with their own convictions...[216]

China has assented to other international instruments that protect freedom of religion and belief. In 1991, China voted in support of the Declaration on the Elimination of All Forms of Intolerance and of Discrimination Based on Religion or Belief,[217] which reiterates the rights to freedom of religion and non-discrimination in terms more or less identical to those of the UDHR and the ICCPR. The Declaration in Article 6 elaborates on the right to religious freedom, noting that it includes the following rights:

> a) to worship or assemble in connection with a religion or belief, and to establish and maintain places for these purposes;
>
> b) to establish and maintain appropriate charitable or humanitarian institutions;
>
> c) to make, acquire, and use to an adequate extent the necessary articles and materials related to the rites or customs of a religion or belief;
>
> d) to write, issue and disseminate relevant publications in these areas;
>
> e) to teach a religion or belief in places suitable for these purposes;

---

[213] Convention on the Rights of the Child, art. 14(1).

[214] Ibid, art. 24(2).

[215] Ibid, art. 30.

[216] Convention against Discrimination in Education, art, 5(b).

[217] U.N. GA Resolution 36/55, Nov. 25, 1991. While General Assembly resolutions are not binding, they "may be evidence of customary law because it reflects the views of the states voting for it." Malanczuk, *Akehurst's Modern Introduction to International Law*, p. 54. In this case, the vote was unanimous. Additionally, a resolution entitled Elimination of All Forms of Religious Intolerance passed without a vote on December 17, 1991.

f) to solicit and receive voluntary financial and other contributions from individuals and institutions;

g) to train, appoint, elect or designate by succession appropriate leaders called for by the requirements and standards of any religion or belief;

h) to observe days of rest and to celebrate holidays and ceremonies in accordance with the precepts of one's religion or belief;

i) to establish and maintain communications with individuals and communities in matters of religion and belief at the national and international levels.

Each of these components of religious autonomy and freedom is actively denied to Uighurs living in China except where they specifically have obtained authorization from the CPP and the state apparatus. This conflicts with a widely understood notion in international law, whereby a right exists previous to state legislation and not as a privilege to be accorded at the discretion of the state. Thus to meet any standard commitment to religious freedom, the provisions must begin not with the presumption of illegality, but with a presumption that every one of these activities is protected from state interference.

# X. Recommendations

## *To the government of the People's Republic of China:*

The government should halt the persecution of Uighurs for exercising their right to practice their own religion and their right to hold their own religious beliefs. We recommend:

1. Senior government and Party officials should explicitly affirm that the independent practice of religion, peaceful dissent, and advocacy for Uighur autonomy do not constitute criminal acts.

2. Religion in Xinjiang, and the practice of Islam in particular, should not be subject to government interference or approval, save for those legal regulations necessary in a democratic society to protect national security, public security, health, order, and morals. In particular, the recruitment and training of clergy, the conduct of and attendance at religious services, the establishment and management of places of worship, the celebration of religious events and holidays, the writing and publication of religious material, and the provision of all levels of religious education, should be presumptively lawful and without need of prior approval.

3. The right of children and young adults to worship, obtain religious education, and express their religion, including through dress, should be respected. The right of parents and legal guardians to provide religious education to their children likewise should be respected.

Thorough legal reform is an urgent requirement if China is to fulfill its obligations to respect freedom of religion, association, expression, and assembly; the right of minorities to their own culture; the right of parents to educate their children; and the right of all to liberty and freedom against its arbitrary deprivation. To this end, we recommend that Chinese authorities:

1. Repeal the Xinjiang Provisional Regulations on Religion and bring national regulations on religion and freedom of association into conformity with international law and standards.
2. Amend guidelines for religious freedom, such as the 2000 Manual, to conform with China's obligations under international law. Guidelines such as those found in the Manual are problematic because they go far beyond what the regulations require, reflect the primacy of political criteria over law, and do not take into account international law.
3. Publicly disclose all laws and regulations applicable to religious practice in the Xinjiang Uighur Autonomous region.
4. Ensure that peaceful religious observance and practice is neither equated with nor incurs liability for state security offenses.
5. Amend article 36 of the constitution to explicitly protect the right to manifest one's religious beliefs without state interference.

The unjustified detention, maltreatment, and torture of Uighur religious prisoners should halt immediately, and all those imprisoned for their peaceful religious practices or religious beliefs should be freed. To this end, we recommend:

1. No person be imprisoned for the practice or expression of his or her own religious beliefs.
2. No person be imprisoned or remanded to reeducation through labor without fair trial guarantees, including a public hearing, the right to be represented or advised by counsel of choice, the right to present a defense and to invoke and rely upon constitutional and human rights, the right to a presumption of innocence, and the right to appeal to a judicial authority.

3. Prisons, labor camps, lock-ups and all other places of detention should be open to inspection; mechanisms to detect and investigate allegations of maltreatment and torture should be put in place; the use of evidence obtained by torture should be strictly outlawed; and the punishment of those who torture or maltreat detainees assured.

4. The U.N. Special Rapporteur on Torture, the U.N. Special Rapporteur on Freedom of Religion or Belief, and the U.N. Working Group on Arbitrary Detention should be invited to visit Xinjiang and, in accordance with their working methods, observe conditions and make recommendations for reform.

5. The government should make publicly available information on all persons in Xinjiang detained or imprisoned for offenses related to religion in Xinjiang, including individuals brought before the courts and the reeducation through labor committees.

### To the international community:

China has sought to justify its crackdown on any manifestation of an autonomous Uighur identity as necessary to suppress "terrorism." The international community should challenge the legitimacy of this claim and make it clear that the burden is on China to prove this link in each case. The international community should make it clear to China that its overbroad and repressive policies in Xinjiang deepen local resentment and risk further destabilizing the region, and that such policies harm the credibility and conduct of global anti-terrorism efforts.

1. Countries that conduct intelligence and criminal cooperation with China should insist that any cooperation be contingent on respect for human rights guarantees, and should urge China to distinguish between conduct that is genuinely criminal and peaceful dissent, such as expressions favoring Uighur autonomy and independent manifestations of religious belief.

2. Uighurs who flee China and request asylum should be offered protection from return to China pending resolution of their claims to asylum, and such claims should be processed and decided in accordance with international standards.

3. No country should cooperate in the return to China of Uighurs accused of crimes, including terrorism, until the proper treatment of returnees can be independently monitored and their rights to a fair trial assured. China's practice of systemic torture of state security detainees and the particularly high rates of executions in Xinjiang make such returns unsafe and likely to violate the Convention Against Torture and the U.N. Refugee Convention.

4. Countries that engage in counter-terrorism strategies, consultations, and educational programs with China should pay special attention to policies in Xinjiang with a view toward assisting China in developing policies that are respectful of human rights.

### *To international organizations and mechanisms:*

Just as China has become increasingly integrated into the world economy, it now needs to become fully integrated into the international system of human rights promotion and protection, particularly via the United Nations. The United Nations and other international mechanisms and international organizations should pay special attention to repressive policies in Xinjiang and the plight of Uighurs as an important deviation from China's international obligations.

1. The U.N. Special Rapporteur on Torture should request that Xinjiang be on the itinerary of his projected visit to China so he might examine the treatment of those accused of religious or security offenses and advise on the implementation of mechanisms to ensure that human rights obligations are fully protected in counter-terrorism strategies.

2. The U.N. High Commissioner for Human Rights should request China to report on measures it has taken to implement the 1994 recommendations of the Special Rapporteur on Religious Freedom with respect to Xinjiang as well as other parts of China.

3. The U.N. Working Group on Arbitrary Detention should write to the Chinese government raising concerns about those arrested and detained for religious practice, including those held in reeducation through labor camps, and should request an invitation to conduct a mission to Xinjiang.

4. The United Nations High Commissioner for Refugees should urge China to embark on reform of religious policy in Xinjiang to remove conditions that facilitate the persecution, and hence the flight, of religious Uighurs.

5. In advance of the Committee on the Rights of the Child's September 2005 review of China's state party report to the Committee on the steps it has taken to give effect to the rights in the Convention on the Rights of the Child, the Committee should ask China what it has done to protect the right of children in Xinjiang to manifest their religion and receive religious education.

6. The Counter-terrorism Committee of the United Nations should call on China to abide by its obligations under international human rights standards when pursuing counter-terrorism strategies, and should assist China in establishing a long-term plan for doing so.

### *To international donors and aid groups working in Xinjiang, including the World Bank and the Asian Development Bank*

1. As part of working agreements with Xinjiang authorities, require independent monitoring of discrimination against Uighurs and other ethnic minority groups in access to assistance and services.

2. Require consultation with independent NGOs on policies and regulations that affect Uighur and other ethnic communities.

3. Support the development of independent NGOs run by Uighurs and other ethnic groups in Xinjiang. Advocate for the reform of national, provincial, and local laws and regulations on religion to ensure that:

    i. individuals and groups are free to practice their religion without having to register;

    ii. freedom of religion is not limited by national security clauses;

    iii. governmental discretion in application of religious regulations is constrained by criteria that accord with international standards, clear definitions, transparent processes, and procedural protections including opportunities for affected parties to challenge alleged abuses of discretion;

    iv. no Chinese official intervenes in internal religious affairs through substantive review of ecclesiastical structures, religious appointments, or religious materials.

4. Advocate for the rights to freedom of expression, assembly, and association for Uighurs and other ethnic groups in Xinjiang.

5. As part of any health or humanitarian program in Xinjiang's prisons and detention facilities, monitor conditions and reports of abuse and raise any concerns with Chinese authorities.

6. In all humanitarian programs, distribute in Chinese, Uighur, and other local languages translations of the Universal Declaration of Human Rights, the International Covenant on Civil and Political Rights, the International Covenant on Economic, Social and Cultural Rights, the Convention Against Torture, the Convention on the Rights of the Child, and other international human rights documents.

7. Support technical assistance programs to assist the Chinese government in creating legal clinics serving Uighurs and other Xinjiang ethnic groups.

# Appendices

## *Appendix I: Xinjiang Uighur Autonomous Region Regulations on the Management of Religious Affairs (2001)*

> **Editor's note:** The following is the full text of the Xinjiang Uighur Autonomous Region Regulations on the Management of Religious Affairs, promulgated July 7, 1994, and amended July 16, 2001. The amendments were adopted by the Chairman's Committee of the Xinjiang People's Regional Congress and were appended to compilations of religious regulations circulated solely to local religious affairs bureaus for their internal use. Government websites still list the non-amended version of the regulations as current.
>
> Each 2001 amendment or partial change in an amendment is marked **(new)**.

## Xinjiang Uighur Autonomous Region Regulations on the Management of Religious Affairs (promulgated July 16, 1994; amended July 16, 2001)

### Article 1 (new)

These regulations are formulated to protect citizens' freedom of religious belief, regulate religious activities according to law, strengthen the management of religious affairs, and guide religion to adapt to a socialist society. The regulations are drawn up in accordance with the Constitution, the relevant laws and statutes, and in light of the actual conditions prevailing in the autonomous region.

### Article 2

Citizens enjoy freedom of religious belief. No organization or individual may force citizens to believe in or not believe in religion. Citizens, religious believers or non-believers may not be discriminated against.

### Article 3

The law protects the legal rights and interests of religious organizations and places of religious activities, normal religious activities and affairs of religious personnel, and normal religious activities of religious adherents. No organization or individual may violate or interfere with these rights.

**Article 4**

Religious activities must be conducted in accordance with the Constitution and the (relevant) laws and statutes. No organization or individual may restore abolished religious feudal privileges or repressive exploitative systems. Activities conducted in the name of religion that undermine the socialist system, the unification of the country, national unity and social stability, and are harmful to citizens' physical and mental health are prohibited. Religion must not be used to interfere in the country's executive, judicial, educational and marriage systems, and in the implementation of the family planning policies.

**Article 5 (new)**

Religious organizations and religious affairs must not be controlled by foreign religious forces. The principles of independence, acting on one's own and operating by oneself must be upheld. Self-Government, Self-Propagation and Self-Support must be practiced.

Foreign organizations and individuals carrying out religious activities within the Autonomous Region shall be administered pursuant to the "People's Republic of China: Regulations on the Supervision of the Religious Activities of Foreigners in China."

Religious organizations and individuals from outside the Autonomous Region must also abide by these regulations.

**Article 6**

Citizens who are believers and those who are not, as well as followers of different religions, must respect one another, refrain from interfering with one another, seek common ground while reserving differences, and live in harmony. Disputes and discord must not be sown between believers and non-believers and among followers of different religions.

**Article 7 (new)**

The religious affairs bureaus of people's governments above the county level together with the *xiang* (township) people's governments are responsible for the administration of religious affairs within their respective jurisdictions. The relevant departments of people's governments above the county level should, in accordance with their own responsibilities, work together with the religious affairs bureaus, so as to manage religious affairs successfully. The Xinjiang Production and Construction Corps should, in accordance with these regulations, assume responsibility for handling religious affairs within its jurisdiction.

**Article 8**

Under these regulations, the term clergy is defined as those citizens who profess a religion and who have been ordained for religious duties.

**Article 9**

Citizens who profess a religion must support the leadership of the Chinese Communist Party and the socialist system, love their country and abide by its laws, safeguard the unification of the motherland and national solidarity, and oppose national splittism and illegal religious activities.

**Article 10**

Clergy is recommended by the democratic management organization at the places for religious activities, agreed upon by citizen believers after discussion, and approved by the relevant religious organization and issued a certificate. The names must be reported to the religious affairs bureau of the county people's government and put on record.

**Article 11 (new)**

Religious seminaries and schools and scripture (bible) classes approved by the people's government should strengthen the training of patriotic religious personnel. No organization or individual may operate religious seminaries, schools or scripture (bible) classes without approval.

Clergy may, in accordance with the relevant provisions of the autonomous region and with approval (by the relevant authority), teach scripture students, and train young patriotic clergy. No organization or individual may secretly teach scripture students without approval.

**Article 12 (new)**

Clergy enjoy the following rights and privileges. They may:

> (1) engage in religious and church (mosque) activities according to law;
>
> (2) participate in the management of the place for religious activities where he or she belongs;
>
> (3) receive religious education, engage in religious academic research and exchange.

**Article 13 (new)**

Clergy shoulder the following responsibilities. They must:

> (1) love the country and the faith, abide by the laws and statutes of the state;
>
> (2) accept the supervision of the religious affairs bureaus of the people's government, the religious organization(s), and the democratic management organization of the places for religious activities.
>
> (3) protect the buildings, cultural objects, facilities and the environment of the places for religious activities.

**Article 14**

During their tenure, the clergy should accept routine check by the religious organization. Those who are found to be incompetent to carry out their duties or who have violated the law should be removed from their positions by the religious organizations which had originally examined and approved their credentials. The matter should be reported to the religious affairs bureau of the county-level people's government and put on record.

**Article 15 (new)**

Religious activities must not interfere with social order, production order, or work or life order.

**Article 16 (new)**

Religious activities must be carried out according to the on-the-spot principle. No organized mass religious activity which spans different localities is allowed. Clergy is not allowed to administer religious activities in different localities. Missionary work in any form by non-clergy personnel is prohibited.

**Article 17 (new)**

Pilgrimage activities are to be organized by the religious affairs bureaus of the people's government and religious organizations. No other organization or individual may organize such activities.

**Article 18**

The places for religious activities under these regulations are the mosques, churches, Daoist temples and other designated places for citizen believers to engage in religious activities, established with the approval (of the relevant authorities).

The article contains a new paragraph: No organization or individual may do missionary work outside a place for religious activities.

### Article 19

(1) All democratic management organizations of places for religious activities must petition and register with the religious affairs bureaus of people's governments above the county level. Construction of new, remodeling of old or moving places for religious activities must be approved by the religious affairs bureaus of the people's government above the county level, and then reported to and approved by the people's government at the same level.

### Article 20

The democratic management organization of a place for religious activities must apply for deeds for the land, woods, and buildings managed and used by the said place for religious activities, according to the relevant provisions of the state.

### Article 21

The relevant organization or individual that is remodeling or constructing new buildings, establishing commercial or service undertakings, holding displays or exhibitions, shooting movies or TV films on the premises administered by the place for religious activities, must obtain permission of the democratic management organization of the place for religious activities as well as the religious affairs bureaus of the people's government above the county level, and go through the required formalities according to law.

### Article 22

Places of religious activities that have been listed as protected cultural relics or that are located in scenic areas shall have their cultural relics and environments managed and protected in accordance with the provisions in relevant laws and regulations, under the guidance and supervision of relevant departments.

### Article 23 (new)

(2) Members of the democratic management organization of a place for religious activities are democratically elected from among the citizen believers and the clergy who belong to the place for religious activities, under the guidance of the local religious organization.

### Article 24 (new)

The democratic management organization of a place for religious activities may operate economic entities for the purpose of self-support. It may sell religious objects, religious art and legally published religious literature on the premises of the place for religious activities.

No organization or individual is allowed to sell illegal religious publications or illegally imported religious publications. Distribution of religious leaflets or religious publications that have not been approved by the relevant department of the people's government is prohibited everywhere.

### Article 25

Property and revenues of places of religious activities shall be managed and utilized by the democratic management team of the said places; other organizations or individuals may not appropriate or transfer them for their own use without proper compensation.

### Article 26

Religious organizations are mass organizations representing the legal rights and interests of the clergy and citizen religious believers. A religious organization must be examined and approved by the religious affairs bureau of a people's government above the county level. It must then be approved by and registered with a civil administration organ at the same level. Only then can it begin its activities. Those religious organizations that are qualified may obtain the status of legal persons.

A religious organization is under the supervision of a religious affairs bureau of a people's government. It organizes religious activities and performs religious functions according to law. No organization or individual may interfere with it.

### Article 27 (new)

Religious organizations enjoy the following rights:

> (1) protection of the rights and interests of citizen believers, the clergy and the places for religious activities, guidance and supervision of the operation of the places for religious activities;

> (2) confirmation and supervision of clergy and other personnel;

> (3) enjoyment of the ownership and the right to use their buildings and other property according to law; independently dispose of their economic income;

> (4) management of economic entities for self-support.

**Article 28 (new)**

A religious organization must perform the following duties:

> (1) abide by the laws and statutes of the state, accept control and supervision by the religious affairs bureaus and other relevant departments of people's governments at various levels;

> (2) propagate and carry out the policy of freedom of religious belief;

> (3) reflect the aspirations and demands of citizen believers;

> (4) educate citizen believers in patriotism, law-abiding and living in harmony;

> (5) engage in training activities to enhance the capabilities of the clergy;

> (6) assist the religious affairs bureaus of people's governments in successfully managing religious affairs;

> (7) guide citizen believers to participate in building socialist modernization.

**Article 29**

Religious organizations, on the basis of equality and mutual respect, and with the approval of the State Council or equivalent governing body of the autonomous regions, may conduct friendly exchanges with foreign religious organizations and clerics.

**Article 30**

The acceptance of donations by religious organizations, places for religious activities and religious personages from foreign religious organizations or individuals is regulated by the relevant statutes of the state.

**Article 31**

Those religious organizations in the autonomous region wishing to publish, reprint or issue scriptures or classics, or to publish interpretations of classics, religious doctrines, or cannons, should complete the formalities for permission in accordance with the relevant stipulations of the state and the autonomous region. No organization or individual may publish, print, reprint or issue religious publications without permission.

**Article 32 (new)**

Bringing in religious publications or other religious objects from abroad is regulated by the relevant rules of the state and the autonomous region.

Religious publications containing substance that endangers the state security of the People's Republic of China or the public interest of society may not be brought into the country.

Religious publications or other religious objects illegally carried into the country from abroad discovered by public security, frontier defense or customs must be documented and handed over to the religious affairs bureau of the local people's government for investigation and disposal.

## Article 33

Those places for religious activities or religious organizations that violate these regulations are to be handled by the religious affairs bureau of the people's government above the county level according to the degree of seriousness of the offense. Criticism and education, warning, order to make amends, cancellation of registration or confiscation of illegal earnings may be meted out respectively. Cases that are especially serious are reported to people's government above the county level, and the offender may be banned according to law.

Clergy who violate these regulations and refuse to accept education and advice are to be handled by the religious affairs bureau of the people's government above the county level. They may receive a warning, be relieved of their religious duties, or fined between 200 and 2,000 *yuan*.

## Article 34

Violations of the present regulations, infringements of the legal rights and interests of religious organizations, religious personnel and places of religious activities, must be referred by the People's Government Religious Affairs Bureau at the district level or above to the relevant department of the people's government at the same level to be investigated according to law.

## Article 35

Those who violate these regulations and engage in actions that violate security administration or foreigner entry-exit regulations are to be punished by the public security organ according to law. Those who use religion to engage in activities that endanger national security should be punished by the national security or public security organs according to law. Those who engage in activities that constitute a crime will be called to criminal account by a judicial organ according to law.

**Article 36 (new)**

Personnel of government organs, who in the course of managing religious affairs, are found to have neglected their duty, abused power, or engaged in malpractice for personal gain shall be administratively punished within his unit or by the department overseeing said unit; where the misconduct constitutes a criminal offense, the offender shall bear criminal liability.

**Article 37 (new)**

Law-enforcement officers from religious affairs bureaus of the people's government must show their credentials when performing their official duties. The relevant executive department must not punish the same violation twice for the same reason. Those who violate these regulations and are given administrative penalty must be issued a copy of the administrative penalty decision. In cases of fines and confiscations, bills printed by the finance department of the autonomous region must be issued, and the money turned over to the treasury according to stipulated procedures.

**Article 38**

The party concerned who refuses to accept the punishment, may file for review by the people's government at the same level as the organ that made the decision, or by the organ one grade superior to it. The reviewing organ must make a review decision within sixty days of receiving the petition. The party that refuses to accept the review decision may file a suit with the people's court within fifteen days of receiving the review decision. If no review petition is filed within the time limit, no suit is filed and no action is taken to discharge the obligations, the organ that made the decision may ask the people's court to enforce its decision.

**Article 39**

The people's government of the autonomous region may develop implementing measures in accordance with the above regulations.

**Article 40**

These regulations will come into force beginning October 1, 1994. The "Provisional Rules Governing the Management of Places for Religious Activities in the Xinjiang Uighur Autonomous Region" and the "Provisional Rules Governing the Administration of the Clergy in the Xinjiang Uighur Autonomous Region," adopted by the 96th session of the Standing Committee of the People's Government on August 23, 1990, are both hereby abrogated.

These regulations will come into force on the day they are published. The "Regulations on Religious Affairs of the Xinjiang Uighur Autonomous Region" shall be amended according to this amendment and republished.

### *Appendix II: Interim Provisions on Disciplinary Punishments for Party Members and Organs that Violate Political Discipline in Fighting Separatism and Safeguarding Unity (2000)*

> **Editor's note:** The following is the full text of the 2000 Interim Provisions on Disciplinary Punishments," promulgated by the Discipline Inspection Commission of the Xinjiang Uighur Autonomous Region Chinese Communist Party Committee on December 14, 2000. The 2000 Interim Provisions provide a wide range of sanctions against Party members involved in religious activities.

**Discipline Inspection Commission of the Xinjiang Uighur Autonomous Region Chinese Communist Party Committee on December 14, 2000**

**Interim Provisions for Party Disciplinary Actions Against Communist Party Members and Party Organizations Involved in Violations of Political Discipline in the Struggle Opposing National Separatism and Safeguarding the Unification of the Motherland.**

**Article 1**

In accordance with the Constitution of the Communist Party of China, Regulations of the Communist Party of China on Disciplinary Measures (proposed), as well as relevant stipulations, and in the light of the violations of political discipline committed by Communist Party members and Party organizations in the struggle opposing national separatism and safeguarding the unification of the motherland as well as in other related aspects, these interim provisions are formulated to strictly enforce the Party's political discipline, safeguard the unification of the motherland and national unity, and step up the struggle against national separatism.

**Article 2**

Persons who have been sentenced to imprisonment according to the law or have been ordered to receive reeducation through labor according to the law for planning, organizing, participating in, supporting, or conniving at national separatist activities and for of engaging in illegal activities under the cover of religion shall be expelled from the Party without exception.

## Article 3

Disciplinary action shall be taken in any one of the following circumstances against persons who participate in national separatist activities or themselves engage in illegal activities under the cover of religion.

(1) Persons who plan and organize national separatist activities or themselves engage in illegal activities under the cover of religion shall be expelled from the Party.

(2) Among persons who participate in national separatist activities and engage in illegal activities under the cover of religion, core members shall be expelled from the Party. As regards other participants, those involved in cases of a less serious nature shall be given a grave disciplinary warning or be dismissed from their posts within the Party; those involved in cases of a very serious nature shall be placed on probation within the Party or be expelled from the Party.

(3) With regard to persons who are ignorant of the facts and have participated in national separatist activities or have engaged in illegal activities under the cover of religion under duress, those who have repented and mended their ways upon criticism and education shall be given no disciplinary punishment or shall be exempt from disciplinary punishment; those who refuse to mend their ways shall be given a disciplinary warning or a grave disciplinary warning.

## Article 4

Disciplinary actions shall be taken in one of the following circumstances against persons who connive at, support, or harbor national separatist activities and illegal activities conducted under the cover of religion, as well as national separatists and other criminals engaged in illegal activities under the cover of religion:

(1) Persons who give shelter to national separatists and criminals engaged in illegal activities under the cover of religion shall be dismissed from their posts within the Party or be placed on probation within the Party; and among them, those involved in cases of a very serious nature shall be expelled from the Party.

(2) With regard to persons who provide financial and material assistance or venues for national separatist activities and illegal activities conducted under the cover of religion, and with regard to persons who provide other means to support national separatist activities and illegal activities conducted under the

cover of religion, those involved in cases of a less serious nature shall be given a disciplinary warning or a grave disciplinary warning; while those involved in cases of a very serious nature shall be expelled from the Party.

(3) Persons who fail to check or fail to report to higher authorities national separatist activities and illegal activities conducted under the cover of religion shall be given a disciplinary warning or a grave disciplinary punishment; and among them, those involved in cases of a very serious nature shall be dismissed from their posts within the party or be placed on probation within the Party.

(4) With regard to persons who connive at and harbor a situation wherein Party members, Party and government functionaries, and current teachers and students in areas and units under their jurisdiction are engaged in religious services that will interrupt the order of their work, teaching, and studies, such as religious services, scriptures studies, and Ramadan, those who have repented and mended their ways upon criticism and education shall be given no disciplinary punishment or be exempted from disciplinary punishment. Persons who refuse to mend their ways upon education shall be given a disciplinary warning; and among them, those involved in cases of a relatively serious nature shall be given a grave disciplinary warning or be dismissed from their posts within the Party, while those involved in cases of a very serious nature shall be placed on probation within the Party.

## Article 5

In the struggle of opposing national separatism and safeguarding the unification of the motherland, persons who deliberately absolve national separatists and criminals engaged in illegal activities under the cover of religion of their guilt, tip the latter off, or stall for time in order to obstruct the case-handling process shall be dismissed from their posts within the Party or be placed on probation within the Party; and among them, those involved in cases of a very serious nature shall be expelled from the Party.

## Article 6

In the struggle of opposing national separatism and safeguarding the unification of the motherland, persons who quail before dangers and run away when going into battle shall be given a grave disciplinary warning or be dismissed from their posts within the Party; and among them, those involved in cases of a very serious nature shall be placed on probation within the Party or be expelled from the Party.

## Article 7

With regard to persons who decide or participate in the printing, reproduction, compilation, publication, or issuance of propaganda materials on religious subjects in violation of relevant stipulations, and with regard to persons who organize or participate in the printing, writing, posting, and distribution of slogans, articles, books, and audio and visual products containing contents that impair the unification of the motherland and national unity, those who are held directly responsible shall be given a grave disciplinary warning or be dismissed from their posts within the Party; and among them, those involved in cases of a very serious nature shall be placed on probation within the Party or be expelled from the Party. Persons who should assume responsibility as leaders shall be given a disciplinary warning or a grave disciplinary warning; and among them, those involved in cases of a very serious nature shall be dismissed from their posts within the Party or be placed on probation within the Party.

## Article 8

Persons who stick to the stand of national separatism and openly publish articles, speeches, declarations, and statements that endanger the unification of the motherland and national unity shall be expelled from the Party. Persons who openly publish or spread remarks that will impair the unification of the motherland and national unity shall be given a disciplinary warning or a grave disciplinary warning; and among them, those involved in cases of a very serious nature shall be dismissed from their posts within the Party, be placed on probation within the Party, or be expelled from the Party. Persons who have repented and mended their ways upon education shall be dealt with leniently.

## Article 9

With regard to persons who listen to (or watch) and spread reactionary religious audio and visual products as well as reactionary religious printed materials, those involved in cases of a less serious nature shall be given a disciplinary warning or a grave disciplinary warning; those involved in cases of a relatively serious nature shall be dismissed from their posts within the party or be placed on probation within the Party; while those involved in cases of a very serious nature shall be expelled from the Party. Persons who have repented and mended their ways upon criticism and education shall be dealt with leniently.

## Article 10

With regard to persons who establish contacts with overseas (external) religious organizations and provide financial aid for exchange activities with overseas (external) religious organizations without authorization, who accept donations earmarked for

religious affairs from overseas (external) religious organizations and religious personnel without authorization, and who go on an overseas (external) pilgrimages without authorization, those involved in cases of a less serious nature shall be given a disciplinary warning or a grave disciplinary warning; those involved in cases of a relatively serious nature shall be dismissed from their posts within the Party or be placed on probation within the Party; while those involved in cases of a very serious nature shall be expelled from the Party.

## Article 11

With regard to persons who give approval to the construction of religious sites or gain such approvals by fraud in violation of relevant stipulations, those involved in cases of a less serious nature shall be given a disciplinary warning or a grave disciplinary warning; those involved in cases of a relatively serious nature shall be dismissed from their posts within the Party or be placed on probation within the Party; and among them, those involved in cases of a very serious nature shall be expelled from the Party.

## Article 12

With regard to persons who send their children and families to private schools or private classes for scripture studies, those who refuse to mend their ways upon education shall be given a disciplinary warning or a grave disciplinary warning; and among them, those involved in cases of a serious nature shall be dismissed from their posts within the Party or be placed on probation within the Party.

## Article 13

Under circumstances when leading cadres fail to stop, by oversight, the functionaries working beside them, as well as their own spouses and children, from participating in national separatist activities and illegal activities conducted under the cover of religion and that such failure has led to serious adverse influences, the leading cadres involved shall be given a disciplinary warning or a grave disciplinary warning; and among them, those involved in cases of a very serious nature shall be dismissed from their posts within the Party.

## Article 14

In the face of major events in the struggle of opposing national separatism and safeguarding the unification of the motherland, persons who fail to show a clear-cut stand or fail to take the initiative to coordinate relevant authorities in the settlement of problems, and persons whose attitude of going against the decisions and measures of Party organizations has led to adverse influences, shall be given a disciplinary warning or

a grave disciplinary warning; and among them, those involved in cases of a very serious nature shall be dismissed from their posts within the Party.

## Article 15

Under circumstances that policies and work plans of both the central authorities and the autonomous regional authorities for opposing national separatism, safeguarding the unification of the motherland and national unity, and maintaining social stability are not correctly or effectively enforced and that problems have thus arisen in areas under their jurisdiction, principal leaders who are found responsible shall be given a disciplinary warning; and among them, those involved in cases of a relatively serious nature shall be given a grave disciplinary warning or be dismissed from their posts within the Party; those involved in cases of a very serious nature shall be placed on probation or be expelled from the Party. As regards key leaders who are found responsible, those involved in cases of a relatively serious nature shall be given a disciplinary warning or a grave disciplinary warning, while those involved in cases of a very serious nature shall be dismissed from their posts within the Party.

## Article 16

In the struggle of opposing national separatism and safeguarding the unification of the motherland, under the circumstances that leaders fail to promptly discover problems in their own units or departments, such as a rampant spread of political liberalism and failure to act in unison with the central authorities, or that leaders have shut their eyes to the problems, allowed the problems to spread unchecked, and even shielded and connived with the problems instead of handling the problems seriously as soon as they are discovered, principal leaders who are found responsible shall be given a disciplinary warning or a grave disciplinary warning if they are involved in cases of a relatively serious nature, while those involved in cases of a very serious nature shall be dismissed from their posts within the Party. As regards key leaders who are found responsible, those involved in cases of a very serious nature shall be given a disciplinary warning or a grave disciplinary warning.

## Article 17

Corresponding organizational actions can be taken, when necessary and in accordance with established procedures, against persons who are given a disciplinary warning or a grave disciplinary warning because of violations of the stipulations laid out in articles 3-16 under these provisions.

**Article 18**

Persons who have a strong religious belief and are eager to organize and participate in religious activities and who have refused to mend their ways despite repeated education ought to be persuaded to withdraw from the Party or be removed from the Party. Persons who have become professional religious personnel shall be removed from the Party without exception.

**Article 19**

In the struggle of opposing national separatism and safeguarding the unification of the motherland, under circumstances that Party committees fail to correctly implement the Party's line, principles, policies, and work plans and that such failure has led to serious consequences, the Party committees that are found responsible shall be reorganized or disbanded.

**Article 20**

Corresponding political disciplinary measures can be taken against violators of the stipulations laid out above who hold political disciplinary liabilities, by reference to the party disciplinary punishments they have already been subjected to.

**Article 21**

These provisions shall be interpreted by the Discipline Inspection Commission of the Xinjiang Uighur Autonomous Regional Chinese Communist Party Committee.

**Article 22**

These provisions shall go into effect on the day of their promulgation.

### Appendix III: Regulations on the Specific Scope of State Secrets in Religious and Ethnic affairs (1995)

> **Editor's note:** The following is the full text of two regulations detailing what type of religious and ethnic information must be classified as state secrets or restricted to internal circulation. One regulation was jointly promulgated in 1995 by the State Secrets Protection Bureau and the State Council Ethnic Affairs Commission. The other regulation was promulgated at the same time by State Secrets Protection Bureau and the State Administration of Religious Affairs. The two regulations ban unauthorized disclosure of information regarding almost any national minority or religious matter or policy, even if unrelated to national security.

## Regulations on the Specific Scope of State Secrets and Classification of Religion Work

(Promulgated by the State Administration of Religious Affairs and the State Secrets Protection Bureau, October 12, 1995)

### Article 1

These regulations are enacted in accordance with the "PRC Law on the Protection of State Secrets" and the "Implementation Measures of the PRC Law on the Protection of State Secrets."

### Article 2

State secrets in the domain of religion work designate matters that affect the security and interests of the state, and that are entrusted to a limited number of people for a given period of time through a specified legal procedure.

### Article 3

Specific scope of state secrets and other secrets matters concerning religion.

I. Top secret matters

    1. measures and countermeasures taken to handle sudden public order incidents which have religious aspects;

    2. countermeasures under consideration regarding the use of religion to carry out political infiltration and engage in serious illegal criminal activities;

    3. guiding principles and strategies under consideration regarding major problems involving religious aspects with respect to foreign affairs or foreign nationals.

II. Highly confidential matters

    1. major guiding principles and strategies under consideration for analyzing the situation and development of religion;

    2. specific guiding principles and tactics for those who associate with overseas and Hong Kong, Macao, Taiwan religious organizations.

III. Secret matters

    1. important problems reflected in the implementation of relevant religious policies;

    2. internally-held lines of action towards external propaganda work.

## Article 4

The following religion work matters are not categorized as state secrets, but are matters to be managed internally, and may not be disseminated without approval from the organ:

    1. information and drafted suggestions for arrangements for important representatives of religious groups;

    2. analyses and reflections on information on religious individuals that have an important influence abroad, in Hong Kong, Macao, and Taiwan;

    3. reports and records of talks with received representatives of religious groups;

    4. opinions and recommendations of representatives of religious groups towards the country's drafted guiding principles, policies, and reflections on important policy decisions in the field of religion;

    5. analyses of developments with overseas religious organizations and their personnel;

    6. information and statistical figures not suitable for the public relating to overseas religious organizations, religious institutions, and religious activities;

    7. information relating to Party cadres and Party grassroots organizations in religious bodies;

    8. draft laws and regulations on religion;

    9. contents of meetings of organs not suitable for the public.

## Article 5

The scope of state secrets protection of ethnic work that involves state secrets matters and other secrets matters from other state organs is ascertained by the leading organ involved.

**Article 6**

The interpretation of these regulations rests with the State Administration of Religious Affairs.

**Article 7**

These regulations are effective December 1, 1995. The 1991 "Regulations on the Specific Scope of State Secrets and Classification of Religion Work" issued by the State Administration of Religious Affairs and the State Secrets Protection Bureau (State Administration of Religious Affairs promulgation No. 296 (1991) will cease to be effective at the same time.

## Regulations on the Specific Scope of State Secrets and Classification of Ethnic Work

(Promulgated by the State Ethnic Affairs Commission and the State Secrets Protection Bureau, March 17, 1995)

**Article 1**

These regulations are enacted in accordance with the "PRC Law on the Protection of State Secrets" and the "Implementation Measures of the PRC law on the Protection of State Secrets" in order to protect the security and interests of the state and foster the development of ethnic work.

**Article 2**

State secrets in the domain of ethnic work designate matters that affect the security and interests of the state, and that are entrusted to a limited number of people for a given period of time through a specified legal procedure.

**Article 3**

The specific scope of state secrets and other secrets matters in religion work is as follows:

I. Top secret matters

> 1. analyses of situations and important developments that can seriously damage ethnic relations and factors that have ethnic aspects that can endanger national unity and influence social order;

> 2. measures and countermeasures taken to handle sudden public order incidents which have ethnic aspects;

> 3. measures and countermeasures adopted against ethnic separatist movements.

II. Highly confidential matters

    1. important guiding principles, policies and measures in formulating current preliminary informal discussions of relevant ethnic work;

    2. plans and measures for handling ethnic disputes;

    3. important issues in ethnic work reflected in relevant ethnic problems and policies of ethnic minorities in Taiwan, Hong Kong, Macao, and residing overseas.

III. Secret matters

    1. important issues reflected in the implementation of relevant ethnic policies;

    2. information and measures under consideration that must be held internally on the work of ethnic identification and the establishment of ethnic autonomous areas;

    3. internally-held lines of action towards external ethnic propaganda work and ethnic foreign affairs work;

    4. analyses of important developments in ethnic languages.

**Article 4**

The following ethnic work matters are not categorized as state secrets, but are matters to be managed internally, and may not be disseminated without approval from the organ:

    1. content of organ meetings that are not suitable for the public;

    2. state organs' internal work plans, summaries, submissions, reports and relevant materials;

    3. statistical materials and formulations of guiding principles and policies in departmental work, within a fixed time and scope, that is not suitable for the public;

    4. documents, data, publications and bulletins on state organs' internal consultations.

**Article 5**

The scope of state secrets protection of ethnic work that involves state secrets matters and other secrets matters from other state organs is ascertained by the leading organ involved.

**Article 6**

The interpretation of these regulations rests with the State Ethnic Affairs Commission.

**Article 7**

These regulations are effective from the date of promulgation. The "Regulations on the Specific Scope of State Secrets and Classification of Ethnic Work," issued by the State Ethnic Affairs Commission and the State Secrets Protection Bureau on April 2, 1992 will cease to be effective at the same time.

## *Appendix IV: Manual for Urumqi Municipality Ethnic Religious Work (excerpts)*

**Editor's note:** The following document contains excerpts from the Urumqi Manual, edited by the Urumqi Ethnic Religious Work Committee (June 2000). The book is described in the afterword as a handbook "to be used to conduct education and serve cadres whose work entails ethnic religious affairs." It is structured as responses to 146 different questions, ranging from Party doctrinal topics ("What are the four fundamental principles and guiding principles on religious work set forth by Comrade Jiang Zemin?") to specific issues that religious affairs cadres have to deal with ("What qualifications must religious personnel possess?"), and government policies ("What measures has the Urumqi Municipality Committee taken in the recent years to protect social stability?").

### *Question 62: What places for religious activities should not be granted registration?*

In any of the following cases, registration should not be granted:

    1) places that do not meet any of the conditions for registration;

    2) places that superstitious sects and secret societies that have been outlawed attempt to revive in the name of religion;

    3) places of reunion such as temples, churches, and mosques that have been set up without approval by false religious figures or non-religious disciples (people who have not been baptized or ordained);

    4) places of religious activities set up in the mainland by foreign religious organizations or foreign religious clerics;

    5) places of religious activities whose management teams, finances or religious education activities are manipulated or controlled by foreign forces;

    6) the "Regulations on the Management of Places of Religious Activities" have been violated, or there have been severe violations of the law through criminal activities;

    7) the local population of believers has no need [for a place of religious activities], there are no [local] clerics, or the place is used by a few people to attract visitors or to carry out superstitious activities.

### *Question 79: What are the national regulations on publishing material affecting Islamic religion?*

The State has concrete regulations regarding the publication of material affecting Islamic religion. It is necessary to obtain the examination and approval of the Religious Affairs Bureau at the provincial level of the people's government and to report to the corresponding government level of the News Publishing Department. This kind of material can only be distributed and circulated within government-approved mosques. If the volume is high, examination and authorization by the national Religious Affairs Bureau and a permit from the News Publishing Bureau are required. Non-religious groups and individuals, without exception, are not authorized to print and publish. Those who violate the above regulations are to be dealt with according to illegal publishing activities regulations.

Any item to be published (including news and articles) related to research and appraisal of Islamic religion must uphold the Marxist viewpoint on religion, and use the yardstick of the Party's and the government's religious policies and regulations... For any sensitive question, if it discusses the implementation of religious policies or foreign policies and touches upon the questions of national minorities' religious beliefs, taboos, customs and so on, the publishing unit must report to the management department at the next higher level to seek approval. It is imperative to seek the views of the provincial level and national level Islamic Association or the Religious Affairs Bureau in a timely manner.

Commercial presses that do not have a "publishing unit" state license should never, without exception, accept commissions for any kind of publication related to Islamic religion…Distribution units should not distribute books, magazines, journals or musical material of a religious nature from non-official publishing units.

### Question No. 87: What are illegal religious activities? What are their main forms?

The category of illegal religious activity includes any religious activity that violates the country's constitution, laws and regulations or the autonomous region's management of religious affairs regulations, dispositions or rules.

The main forms of illegality are:
1) compelling people to believe;
2) compelling people to participate in religious activities;
3) privately organizing religious study schools;
4) using religion to meddle in administration, justice and education, weddings, family planning or cultural activities ;

5) without having obtained authorization, engaging in religious activities spanning different localities or organizing other religious activities;

6) beautifying, revamping or enlarging places for religious activities without having obtained authorization;

7) restoring abolished religious feudal privileges and oppressive exploitative systems;

8) printing religious propaganda material without authorization;

9) receiving foreign contributions from religious organizations and individuals without authorization;

10) going abroad to study religion or carrying out religious activities in conjunction with foreign religious organizations without authorization;

11) privately setting up a religious "spot" and conducting proselytism without registration and authorization;

12) slandering the authorities, plotting to murder patriotic religious figures, fighting against the leading authorities of religious places and organizations, premeditatedly evading supervision, and stirring up trouble;

13) engaging in religious infiltration, setting up religious organizations, conducting proselytism and so on by hostile enemy forces;

14) advocating "holy war," inciting religious fanaticism, developing religious extremist forces, spreading rumors, distorting history, advocating separatism, opposing the Party and the socialist system, sabotaging social stability or the unity of nationalities, inciting the masses to illegally rally and demonstrate, attacking the organs of the Party, government, army or public security;

15) using religion to breed separatist elements and reactionary backbone elements or to establish reactionary organizations; to carry out other activities that are harmful to the good order of society, production and life, and to criminal activities;

16) spreading evil cults.

**Question 90: What are the "four protections" that must be implemented in order to do good religious work?**

It is necessary to carry out protection of the people's interests, protection of law and order, protection of ethnic unity, and protection of national unity.

**Question 131: What measures has the Urumqi Municipality Committee taken in the recent years to protect social stability?**

For three consecutive years since 1997, under the unified arrangement of the autonomous region, Urumqi municipality's seven districts and one township, in particular Liudaowan, Bagang, Yamalike Shan, dispatched "rectification of public order" work teams; and cleaned out and struck at hardcore separatist elements, leading elements of religious extremist forces and violent terrorist criminal movements, obtaining important results and, therefore, protecting the smooth development of all activities in Urumqi municipality.

### Appendix V: Letter from the Xinjiang School of Forestry Student Office (1999)

**Editor's note:** The following is the full text of a letter from the authorities of the Xinjiang School of Forestry to a number of Uighur students' families to warn them that unless their children stopped their involvement in religious activities they would be expelled from the school. The letter refers to a policy document (Document No. 5 from the Xinjiang Uighur Autonomous Region Education Commission) that prohibits students from "praying, keeping fast and other religious activities." The Xinjiang School of Forestry is part of the Xinjiang Agricultural University in Urumqi.

#### Xinjiang School of Forestry Student Office

Family leader: How are you?

In order that your children will develop in all areas, concentrating fully on their studies so as to become able and talented people of an outstanding century, we advise you of the following:

Some students who are studying in our school, namely your children, have not been concentrating fully on their studies as they have been praying and keeping the fast and becoming involved in some religious activities, thus disobeying Document No. 5 1996 of the Autonomous Region Education Commission which says that students should not participate in religious activities (praying, keeping the fast and other religious activities) and also disobeying our school rules.

So we ask that during the holiday, you educate your children further so as to help them to complete their studies at our school successfully.

If this behavior is seen again, the students will be expelled.

Xinjiang School of Forestry Student Office

15.7.1999

[stamp of office]

### Appendix VI: Chinese official promises "devastating blows without showing any mercy" to Xinjiang separatists

**Editor's note:** The following is the text of a speech by Xinjiang Party Secretary Wang Lequan at a session of the Chinese People's Consultative Conference on January 14, 2003, as reported in an article from the official China News Agency. In his speech, Wang Lequan promises to "hit proactively" and deal "devastating blows without showing any mercy" to ethnic separatists. Wang also urges combating separatism "on the ideological front" and in the religious sphere.

Urumqi, 14 January [2003]:

Wang Lequan, member of the CCP [Chinese Communist Party] Central Committee Political Bureau and secretary of the CCP Committee of the Xinjiang Uighur Autonomous Region, said at a session of the Xinjiang Region Chinese People's Political Consultative Conference Committee held here in Urumqi that Xinjiang will always keep up the intensity of its crackdown on ethnic separatist forces and deal them devastating blows without showing any mercy.

Wang Lequan said: There is a conception at present that the current top priority for Xinjiang is to develop itself successfully and that as Xinjiang's economy develops and the people's living standard improves the issue of maintaining stability in Xinjiang can be resolved automatically. This is a very confused and very dangerous conception. Xinjiang's economic development cannot eliminate the ethnic separatist forces. Nor can it make the ethnic separatist forces give up their desire to practice splittism and obtain independence.

Wang Lequan said: Xinjiang will crack down on the ethnic separatist forces by "treating both the symptom and the root cause." We shall consistently adhere to the principle of "hitting out proactively and striking them as soon as they appear" in tackling separatists, such as the "three forces" [terrorist, separatists, and extremist forces], and deal them devastating blows without showing any mercy. In the ideological field, we shall carry on with education in patriotism and nationality solidarity; firmly refute all the fallacies of ethnic separatism that distort the history of Xinjiang, including the history of how the nationalities developed and how their religion evolved; and lay a solid ideological foundation and mass foundation for maintaining stability in Xinjiang.

Wang Lequan said: Xinjiang will continue to consolidate the patriotic united front with the religious community, give play to the positive strength of religious personalities in promoting Xinjiang's social development and stability, and steadfastly crack down on religious extremist forces. Meanwhile, it will make the people of Xinjiang more capable of resisting the separatists' infiltration under the cover of religion and firmly safeguard well the overall situation of stability and development in Xinjiang.

Source: "Wang Lequan: Xinjiang will deal devastating blows to ethnic separatist forces," China News Agency, January 14, 2003 [王乐泉：将给与民族分裂势力以毁灭性打击，中国新闻社，2003 年 1 月 14 日]

## Acknowledgements

This report was edited by Brad Adams, executive director for the Asia Division of
Human Rights Watch; Mickey Spiegel, Senior Researcher; and Joe Saunders, deputy
program director. Dinah PoKempner, general counsel for Human Rights Watch
provided legal review. Jo-Anne Prud'homme, associate for the Asia division, provided
administrative and technical assistance. Production assistance was provided by Andrea
Holley, manager of outreach and public education; Fitzroy Hepkins, mail manager;
Veronica Matushaj, photo editor; Elijah Zarwan, web editor; and Jagdish Parikh, online
communications content coordinator.

Human Rights Watch would like to thank many in the Uighur community in Xinjiang
and in several countries for their contributions to the report. Many, themselves victims
or witnesses to human rights abuses, risked danger to themselves and their families by
sharing their knowledge and experiences with us. Human Rights Watch also wishes to
thank Sidney Jones, Robert Barnett and Zama Coursen-Neff, and the staff of Human
Rights in China, for their contributions to the report.

*Human Rights Watch*
*Asia Division*

Human Rights Watch is dedicated to protecting the human rights of people around the world.

We stand with victims and activists to bring offenders to justice, to prevent discrimination, to uphold political freedom and to protect people from inhumane conduct in wartime.

We investigate and expose human rights violations and hold abusers accountable.

We challenge governments and those holding power to end abusive practices and respect international human rights law.

We enlist the public and the international community to support the cause of human rights for all.

The staff includes Kenneth Roth, executive director; Carroll Bogert, associate director; Michele Alexander, development director; Peggy Hicks, global advocacy director; Barbara Guglielmo, finance director; Lotte Leicht, Brussels office director; Steve Crawshaw, London office director; Maria Pignataro Nielsen, human resources director; Iain Levine, program director; Wilder Tayler, legal and policy director; and Joanna Weschler, United Nations representative. Jane Olson is the chair of the board. Robert L. Bernstein is the founding chair.

Its Asia division was established in 1985 to monitor and promote the observance of internationally recognized human rights in Asia. Brad Adams is executive director; Veena Siddharth is advocacy director; Saman Zia-Zarifi is deputy director; Sara Colm and Mickey Spiegel are senior researchers; Meg Davis, Meenakshi Ganguly, Ali Hasan, Charmain Mohamed, John Sifton, and Tejshree Thapa are researchers; Jo-Anne Prud'homme and Fatima Ayub are associates. Joanne Leedom-Ackerman is chairperson of the advisory committee.

Web Site Address: http://www.hrw.org
Listserv address: To subscribe to the list, send a blank e-mail message to
hrw-news-asia-subscribe@topica.email-publisher.com.

*Human Rights in China*
The mission of Human Rights in China (HRIC) is to promote universally recognized human rights and advance the institutional protection of these rights in the People's Republic of China (China). As a Chinese NGO with extensive networks inside China, HRIC contributes uniquely to human rights work in China by implementing programs

to generate institutional, systemic change in China while also engaging in critical advocacy strategies on behalf of individuals in China. We seek to enlarge the independent civil space within China by engaging a broad cross-section of citizens and activists inside and outside China.

HRIC's approach is guided and informed by four key objectives:

– Promoting a growing rights consciousness and reaffirming the dignity of the Chinese people.

– Supporting the development of civil society and empowering peaceful grassroots activism.

– Acting as a catalyst for social change towards a more open, just, and democratic China.

– Advocating effective implementation or revision of China's domestic laws and practices in compliance with international human rights obligations.

In pursuit of these objectives, HRIC engages in interrelated education, research, and international, domestic, and electronic advocacy projects.