IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DAWUT ABDUREHIM,                          )
                                          )
                                          )
            Petitioner,                   )
                                          )
    v.                                    )        Civil Action No. 05-2398 (ESH)
                                          )
GEORGE W. BUSH, *et al.*,                 )
                                          )
            Respondents.                  )
                                          )

## DECLARATION OF TERESA A. McPALMER

Pursuant to 28 U.S.C. § 1746, I, Commander Teresa A. McPalmer, Judge Advocate General's Corps, United States Navy, hereby state that to the best of my knowledge, information, and belief, the following is true, accurate and correct:

1.      I am the Legal Advisor to the Office for the Administrative Review of the Detention of Enemy Combatants at U.S. Naval Base Guantanamo Bay, Cuba (OARDEC). In that capacity I am an advisor to the Director, Combatant Status Review Tribunals.

2.      I hereby certify that the documents attached hereto constitute a true and accurate copy of the portions of the record of proceedings before the Combatant Status Review Tribunal related to petitioner Dawut Abdurehim that are suitable for public release. The portions of the record that are classified or considered law enforcement sensitive are not attached hereto or were redacted by an OARDEC staff member. This staff member also redacted information that would personally identify certain U.S. Government personnel in order to protect the personal privacy and security of those individuals.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 8 September 2006

Teresa A. McPalmer
CDR, JAGC, U. S. Navy



### Department of Defense
### Director, Combatant Status Review Tribunals

OARDEC/Ser: **7 4 8**

FOR OFFICIAL USE ONLY

**2 3 JAN 2005**

From: Director, Combatant Status Review Tribunal

Subj: **REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL FOR DETAINEE ISN # 289**

Ref: (a) Deputy Secretary of Defense Order of 7 July 2004
(b) Secretary of the Navy Order of 29 July 2004

1. I concur in the decision of the Combatant Status Review Tribunal that Detainee ISN #289 meets the criteria for designation as an Enemy Combatant, in accordance with references (a) and (b).

2. This case is now considered final and the detainee will be scheduled for an Administrative Review Board.

J. M. McGARRAH
RADM, CEC, USN

Distribution:
NSC (Mr. John Bellinger)
DoS (Ambassador Prosper)
DASD-DA
JCS (J5)
SOUTHCOM (CoS)
COMJTFGTMO
OARDEC (Fwd)
CITF Ft Belvoir

FOR OFFICIAL USE ONLY

UNCLASSIFIED

18 Jan 05

MEMORANDUM

From:  Assistant Legal Advisor
To:    Director, Combatant Status Review Tribunal
Via:   Legal Advisor ᴊᴾᴸ

Subj:  LEGAL SUFFICIENCY REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL
       FOR DETAINEE ISN #289

Ref:   (a) Deputy Secretary of Defense Order of 7 July 2004
       (b) Secretary of the Navy Implementation Directive of 29 July 2004

Encl:  (1) Appointing Order for Tribunal #12 of 29 Sept 2004
       (2) Record of Tribunal Proceedings

1. Legal sufficiency review has been completed on the subject Combatant Status Review
Tribunal in accordance with references (a) and (b). After reviewing the record of the Tribunal, I
find that:

    a. The detainee was properly notified of the Tribunal process and elected to participate
by attending the CSRT, by providing an unsworn statement to the board, responding to
the summary of evidence contained in Exhibit R-1, and by responding to additional
questions posed by the CSRT. *See* Encl. (2) at Enclosure (3).

    b. The Tribunal was properly convened and constituted by enclosure (1).

    c. The Tribunal substantially complied with all provisions of references (a) and (b).

    d. Note that some information in Exhibit R-4 was redacted. The FBI properly certified
in exhibit R-2 that the redacted information would not support a determination that the
detainee is not an enemy combatant.

    e. The detainee did not request any witnesses or any documentary evidence.

    f. The Tribunal's decision that detainee #289 is properly classified as an enemy
combatant was unanimous. However, the CSRT "urges favorable consideration for the
detainee's release," with no forcible return to China.

    g. The detainee's Personal Representative was given the opportunity to review the
record of proceedings, and declined to submit post-tribunal comments to the Tribunal.

2. The proceedings and decision of the Tribunal are legally sufficient and no corrective action is
required.

UNCLASSIFIED

UNCLASSIFIED

Subj:  LEGAL SUFFICIENCY REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL
       FOR DETAINEE ISN # 289

3.  I recommend that the decision of the Tribunal be approved and the case be considered final.

KAREN M. GIBBS
CDR, JAGC, USNR

2



**Department of Defense**
Director, Combatant Status Review Tribunals

29 Sep 04

From:  Director, Combatant Status Review Tribunals

Subj:  APPOINTMENT OF COMBATANT STATUS REVIEW TRIBUNAL #12

Ref:    (a) Convening Authority Appointment Letter of 9 July 2004

By the authority given to me in reference (a), a Combatant Status Review Tribunal
established by "Implementation of Combatant Status Review Tribunal Procedures for
Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba" dated 29 July 2004
is hereby convened. It shall hear such cases as shall be brought before it without further
action of referral or otherwise.

The following commissioned officers shall serve as members of the Tribunal:

      **MEMBERS:**

      ██████████, Colonel, U.S. Marine Corps Reserve; President

      ██████████, Lieutenant Colonel, JAGC, U.S. Army;
Member (JAG)

      ██████████, Lieutenant Colonel, U.S. Air Force; Member

J. M. McGARRAH
Rear Admiral
Civil Engineer Corps
United States Navy



**HEADQUARTERS, OARDEC FORWARD**
GUANTANAMO BAY, CUBA
APO AE 09360

06 December 2004

MEMORANDUM FOR DIRECTOR, CSRT

FROM:  OARDEC FORWARD Commander

SUBJECT:  CSRT Record of Proceedings ICO ISN# 289

1. Pursuant to Enclosure (1), paragraph (I)(5) of the *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba* dated 29 July 2004, I am forwarding the Combatant Status Review Tribunal Decision Report for the above mentioned ISN for review and action.

2. If there are any questions regarding this package, point of contact on this matter is the undersigned at DSN ▮▮▮▮▮▮.

CHARLES E. JAMISON
CAPT, USN

SECRET//NOFORN//X1

### (U) Combatant Status Review Tribunal Decision Report Cover Sheet

(U) This Document is UNCLASSIFIED Upon Removal of Enclosures (2) and (4).

(U) TRIBUNAL PANEL: ___#12___

(U) ISN#: ___289___

Ref:    (a) (U) Convening Order for Tribunal #12 of 29 September 2004 (U)
        (b) (U) CSRT Implementation Directive of 29 July 2004 (U)
        (c) (U) DEPSECDEF Memo of 7 July 2004 (U)

Encl:   (1) (U) Unclassified Summary of Basis For Tribunal Decision (U/FOUO)
       (2) (U) Classified Summary of Basis for Tribunal Decision (S/NF)
       (3) (U) Summary of Detainee/Witness Testimony (U/FOUO)
       (4) (U) Copies of Documentary Evidence Presented (S/NF)
       (5) (U) Personal Representative's Record Review (U)

1. (U) This Tribunal was convened on 19 November 2004 by references (a) and (b) to make a determination as to whether the Detainee meets the criteria to be designated as an enemy combatant, as defined in reference (c).

2. (U) On 19 November 2004 the Tribunal determined, by a preponderance of the evidence, that Detainee #289 is properly designated as an enemy combatant, as defined in reference (c).

3. (U) In particular, the Tribunal finds that this Detainee is affiliated with forces associated with al Qaida and the Taliban, which are engaged in hostilities against the United States or its coalition partners, as more fully discussed in the enclosures.

4. (U) Enclosure (1) provides an unclassified account of the basis for the Tribunal's decision. A detailed account of the evidence considered by the Tribunal and its findings of fact are contained in enclosures (1) and (2).



Colonel, U.S. Marine Corps
Tribunal President

UNCLASSIFIED//~~FOUO~~

# UNCLASSIFIED SUMMARY OF BASIS FOR TRIBUNAL DECISION

### (Enclosure (1) to Combatant Status Review Tribunal Decision Report)

TRIBUNAL PANEL:         #12

ISN #:          289

## 1. Introduction

As the Combatant Status Review Tribunal (CSRT) Decision Report indicates, the Tribunal has determined that this Detainee is properly classified as an enemy combatant because he is affiliated with forces associated with al Qaida and the Taliban that are engaged in hostilities against the United States and its coalition partners.  In reaching its conclusions, the Tribunal considered both classified and unclassified information.  The following is an account of the unclassified evidence considered by the Tribunal and other pertinent information.  Classified evidence considered by the Tribunal is discussed in Enclosure (2) to the CSRT Decision Report.

## 2. Synopsis of Proceedings

The unclassified evidence presented to the Tribunal by the Recorder indicated that the Detainee, a citizen of China, is alleged to have traveled from China to Afghanistan via Kyrgyzstan and Pakistan to receive training at a military training camp in the Tora Bora mountains.  The Detainee lived at the Uighur training camp from June to October 2001. The training camp was provided to the Uighers by the Taliban.  The East Turkistan Islamic Movement (ETIM) operated facilities in the Tora Bora region of Afghanistan in which Uighur expatriates underwent small arms training. Al Qaida and the Taliban allegedly funded these camps.  ETIM is listed on the U.S. State Department's Terrorist Exclusion list.  While at the Uighur camp, the Detainee received training on the Kalashnikov rifle, handguns, and other weapons.  Following the destruction of the training camp by the United States bombing campaign, the Detainee traveled to a village in Pakistan where he was captured.  The Detainee chose to participate in the Tribunal process.  He called no witnesses, requested no documents be produced, and made an unsworn verbal statement with the assistance of his assigned Personal Representative. The Detainee, in his verbal statement, admitted to some of the allegations in Exhibit R-1, but also claimed that he was not an enemy combatant of the United States or its allies. He said that he participated in military training at a camp in Afghanistan that Uighur fighters were allowed to use.  He claimed that the reason he sought this training was because he wanted to train to fight the Chinese government someday in the future, which is the true and only enemy of the Uighur people because they harshly oppress them in China.  He claimed no knowledge of the East Turkistan Islamic Movement and denied being a member of it. He also denied knowing anything about al Qaida or the Taliban funding of the camp.

UNCLASSIFIED//~~FOUO~~

UNCLASSIFIED//~~FOUO~~

The Tribunal President's evidentiary and witness rulings are explained below.

### 3. Evidence Considered by the Tribunal

The Tribunal considered the following evidence in reaching its conclusions:

> a. Exhibits: D-a, and R-1 through R-14.

> b. Testimony of the following persons: Unsworn statement of the Detainee.

### 4. Rulings by the Tribunal on Detainee Requests for Evidence or Witnesses

The Detainee requested no witnesses or additional evidence be produced; therefore, no rulings on these matters were required.

### 5. Discussion of Unclassified Evidence

The Tribunal considered the following unclassified evidence in making its determinations:

> a. The Recorder offered Exhibits R-1 and R-2 into evidence during the unclassified portion of the proceeding. Exhibit R-1 is the Unclassified Summary of Evidence. While this summary is helpful in that it provides a broad outline of what the Tribunal can expect to see, it is not persuasive in that it provides conclusory statements without supporting unclassified evidence. Exhibit R-2 provided no usable evidence. Accordingly, the Tribunal had to look to classified exhibits for support of the Unclassified Summary of Evidence.

> b. Essentially the only unclassified evidence the Tribunal had to consider was the Detainee's unsworn testimony. A summarized transcript of the Detainee's unsworn testimony is attached as CSRT Decision Report Enclosure (3). In sum, the Detainee admitted to some of the allegations in Exhibit R-1, but also claimed that he was not an enemy combatant of the United States or its allies. He said that he participated in military training at a camp in Afghanistan that Uighur fighters were allowed to use. He claimed that the reason he sought this training was because he wanted to train to fight the Chinese government someday in the future, which is the true and only enemy of the Uighur people because they harshly oppress them in China. He claimed no knowledge of the East Turkistan Islamic Movement and denied being a member of it. He also denied knowing anything about al Qaida or the Taliban funding of the camp.

The Tribunal also relied on certain classified evidence in reaching its decision. A discussion of the classified evidence is found in Enclosure (2) to the Combatant Status Review Tribunal Decision Report.

UNCLASSIFIED//~~FOUO~~

UNCLASSIFIED//~~FOUO~~

**6. Consultations with the CSRT Legal Advisor**

No issues arose during the course of this hearing that required consultation with the CSRT legal advisor.

**7. Conclusions of the Tribunal**

Upon careful review of all the evidence presented in this matter, the Tribunal makes the following determinations:

     a. The Detainee was mentally and physically capable of participating in the proceeding. No medical or mental health evaluation was requested or deemed necessary.

     b. The Detainee understood the Tribunal proceedings. He asked no questions regarding his rights and actively participated in the hearing.

     c. The Detainee is properly classified as an enemy combatant because he is affiliated with forces associated with al Qaida and the Taliban that are engaged in hostilities against the United States or its coalition partners.

**8. Dissenting Tribunal Member's report**

None. The Tribunal reached a unanimous decision.

Respectfully submitted,

Colonel, U.S. Marine Corps
Tribunal President

UNCLASSIFIED//~~FOUO~~

UNCLASSIFIED//FOUO

### Detainee's Unsworn Statement – ISN 289

*The Detainee was initially confused by the Detainee Election Form. He did not understand the request for documents portion. The Tribunal President explained that it meant, for example, passports or other documents the United States Government might be able to access for the Detainee.*

*The Detainee addressed each allegation in the Unclassified Summary of Evidence, with assistance from his Personal Representative.*

- 3(a)1   The Detainee is a citizen of China who traveled to Afghanistan, via Kyrgyzstan and Pakistan, to receive military training at a military training camp in the Tora Bora mountains.

  Personal Representative: Yes, I did not have any desire to get military training. I was a businessman and my goal was to go somewhere else to do my business until my country became independent. Then, I would return to my country.

  Detainee: You are saying I'm Taliban, but I'm thirty years old. In 1992 and 1993, I was in school. After that, I started my business with animal skins. In Turkistan, I wasn't involved in politics; I was just trying to do my business.

  My business wasn't good, so I decided to go to another country to do my business. When my country is independent, I will go back to my country.

  I was in school in 1989 when I heard the Russians retreated from Afghanistan, but I hadn't heard anything about Afghanistan and what was going on there. I had nothing to do with the Taliban. I have no association with the Taliban.

  You also said I was a Chinese citizen and traveled to Afghanistan through Kyrgyzstan and Pakistan. That's true. Many people travel and they can travel either by air, sea or ground. That's the only way people can travel.

  You also said I went to Afghanistan for training, but I did not. It's true that I went to Afghanistan, but before I left my country I had no desire to go to Afghanistan. My goal was to go to some other country to do my business and return to my country when it is independent.

  The reason I went to Afghanistan was because other Uighur people abroad told me there was a place in Afghanistan to train to try to fight back against the Chinese government. They said that in the future, if any fighting were to go on, it would be helpful to me to go and get the training.

UNCLASSIFIED//~~FOUO~~

The people in Turkistan are not involved in any politics. They get involved in the politics when the travel to other countries because all of the people have one goal: to try to get back our country's independence.

- **3(a)2    The Detainee lived at the Uighur training camp from June to October 2001.**

Personal Representative: Yes, this is true.

- **3(a)3    The training camp was provided to the Uighurs by the Taliban.**

Personal Representative: I did not know that this camp was provided by the Taliban. When I came to the camp, other Uighurs were there. I don't know who provided the camp to the Uighurs.

Detainee: You're saying that the Taliban provided the camp to the Uighurs. I'd like to tell you that the Afghani people and the Uighurs have had a relationship since the 1920's, 1930's, etc. The Uighurs and the Afghani people have a good relationship with each other.

It doesn't matter which government it was. They've been associated with each other for the independence of Turkistan. For example, in the 1920's and 1930's, the Afghani people went to Turkistan to get training on how to use weapons. During that time, the British were in India and in Turkistan. There was an Islamic government and they had a relationship with the Afghanis and the British. When the communists came to East Turkistan, the Uighur people went to Afghanistan and got some training.

In the Russian time, I didn't know much, but I read a story by the author Mahine (phonetic) about the Uighurs. The author says that the story has been changed. The Turkistani people's fight is only against the Chinese government.

In the Taliban's time, they just gave a place for the Uighur people. The place we stayed had trees around it. We didn't step into the other people's property. We just stayed where we were.

I just explained a little bit about the relationship between the Uighurs and the Afghan government. It doesn't matter which government it is, the Uighurs and the Afghan government has had a relationship for all those years.

If it wasn't Afghanistan, if it had been Germany or India, the Uighurs will go there. Whoever gives us a place, we will go there.

Additionally, the place given to Uighurs doesn't mean it was only given to me. I'm not the President for the Uighurs. When I got there, it was already there.

ISN# 289
Enclosure (3)
Page 2 of 9

UNCLASSIFIED//~~FOUO~~

- **3(a)4   The East Turkistan Islamic Movement (ETIM) operated facilities in the Tora Bora region of Afghanistan in which Uighur expatriates underwent small arms training. These camps were funded by Al Qaeda and the Taliban.**

Personal Representative: I don't know anything about this. I don't know anything about who was funding us, but I did participate in small arms training.

Detainee: I told my Personal Representative the name of the weapon. I'd like to explain to the [Tribunal Members].

You are calling us the Islamic Movement, but I don't think it's the Islamic Movement. You've probably seen us; we are twenty-seven to thirty in age. We didn't really understand and we didn't really study Islam either. Also, kids go to school from age seven until they graduate at eighteen or nineteen. After that, they start their business. We don't have any place to study religion in our home country. There is only one place to study that is approved by the government and it's in Urumqi (phonetic) city, and they don't really understand that much about their religion.

When I was in my country, I didn't know how to read the Koran and I had no knowledge about it. When I came to the [Uighur] camp, I started to learn how to read the Koran and how to pray and I learned all the rules. I didn't have a translated Koran. I don't think this is an Islamic Movement.

You might believe me or not. You've been here all this time. We [Uighurs] are still learning how to read the Koran here [Guantanamo Bay, Cuba].

You said it [the Uighur Camp] was funded by the Taliban or Al Qaeda, but I don't have any idea who provided financially for the camp. You're saying it's a camp, but it's not like what we see on T.V. or like your military training camp. It's just a small place. It's not a straight [level] field. It's angled in the mountains with dirt and dust all over the place.

- **3(a)5   ETIM is listed on the state departments terrorist exclusion list.**

Personal Representative: I did not know ETIM was on this list. This is the first time I've known about this. We have no relationships with terrorist people.

Detainee: It says that the Eastern Turkistan Islamic Movement is on the State Department's terrorist list, but have you ever heard of any Uighur people in Afghanistan or around the world doing any terrorist acts? Or of killing Americans, Germans or British people? Have you ever heard of anything like that?

ISN# 289
Enclosure (3)
Page 3 of 9

UNCLASSIFIED//~~FOUO~~

UNCLASSIFIED//FOUO

For example, Kyrgyz, Chechen or Uighur people. Which group have you heard of more? Have you ever heard of Uighurs before?

Also, interrogators would come to us and they would introduce themselves. They said our Turkistani group and the Uighur community was not on the terrorist list. Also, you have a list of terrorist groups with Al Qaeda, Taliban, Uzbekistan Islamic Movement and another one I forgot the name of.

They told us that we're not terrorists and now that this process has started, you're getting twenty-two people for twenty-two different types of evidence and blame. I have no associations or ties with terrorists. It is not right to call Uighur people terrorists.

We have a lot of Uighur groups all over the world and, if we fight against America or some other country, they will blame us and say we are crazy and call us things. Then, if a fight starts between us and the Chinese, we're not going to get any help from anywhere.

You are searching on the Internet for terrorist people. Us, we have two hands. We are just simple people. You have seen me and we are just simple, normal people. We're not special or different and we're not terrorists. That's why it's not right to call us terrorists.

- **3(a)6  While at the camp, the Detainee received training on the Kalashnikov rifle, handguns, and other weapons.**

Personal Representative: I had training on how to shoot the AK-47 and I had training on how to "break down" the handgun, but not how to shoot it. I don't remember being trained on any other weapons.

Detainee: I told the interrogators that I trained on how to shoot the Kalashnikov. I also told them I know how to "break down" the pistol, but I don't remember if I told the interrogators I trained on other weapons or not. It's been a while, but I don't remember. It says here that I trained on other weapons as well, but I don't remember it. I just remembered that there was a weapon that was a little longer than a Kalashnikov that they might name.

- **3(a)7  Following the destruction of the training camp by the United States bombing campaign, the Detainee traveled to a village in Pakistan where he was captured.**

Personal Representative: True. I went to a village in Pakistan and was captured.

ISN# 289
Enclosure (3)
Page 4 of 9

UNCLASSIFIED//FOUO

UNCLASSIFIED//~~FOUO~~

Detainee: That's true. That night, we were sleeping and we didn't know what was going to happen. Then we heard heavy, strong wars; the kind of war we've only heard on television.

The ground was shaking and we were scared, so we ran outside. The next morning, we counted people and we found one person dead; his body was exploded. We looked for his body and we found his fingers and thumbs. Whatever we found, we brought back and buried him there.

We couldn't stay at that place; we had to go somewhere else. We moved around and some places even had monkeys that were also screaming at us. We stayed a while, then went to Pakistan and were captured.

That is all I have about the evidence.

Tribunal President: We may have some questions for you.

Detainee: Include my statement and if there is something you do not understand, ask me and I will explain more.

## Tribunal Members Questions to Detainee

Q:    Good morning. You have provided us a good background, which we appreciate.

A:    Also, thank you.

Q:    We have a few things we'd like to clarify.

A:    If I remember, I will try to tell you.

Q:    Earlier, you mentioned a group called the Islamic Movement of Uzbekistan. Did you ever have any dealings with the Muslim people in that group?

A:    At that place [Uighur Camp], there were only Uighur people. Maybe you misunderstood me. That name was told to us by the interrogators here in Cuba.

Q:    We understand. The reason I ask is that in Kyrgyzstan, there was an attack on the United States Embassy in the recent past. Did you know anything about that when you were in Kyrgyzstan?

A:    No.

Q:    When you were in Kyrgyzstan with your business, did you have any dealings with the Uzbek Muslims?

UNCLASSIFIED//~~FOUO~~

UNCLASSIFIED//~~FOUO~~

A:     No.

Q:     Had you ever heard of the group called the East Turkistan Islamic Movement
       before coming here?

A:     It's possible I heard it on the radio.

Q:     Do the Uighur people have a group that they all belong to that calls itself a name
       close to this?

A:     No.

Q:     You don't consider yourself part of any group that has a name?

A:     No, I didn't hear of any organization name. The people are all individual people.
       They have a choice; if they want to leave, they can leave. If they want to come,
       they can come.

Q:     When you went on your travels, did you go with a group of other Uighurs or by
       yourself?

A:     With other Uighurs.

Q:     When you were in Afghanistan, did the Taliban ask you to do anything for them?

A:     No.

Q:     Did you ever have any dealings with Taliban people there?

A:     No.

Q:     You let them be, and they let you be, in the camp?

A:     We stayed in our place and we didn't know where the Taliban was.

Q:     So, even though they were in the middle of their war, with their enemy, they
       didn't ask you to fight for them?

A:     I didn't hear anything like that and I didn't see any Afghani people there.

Q:     Besides China, who do the Uighur people consider to be their enemies?

A:     How can we call any other country our enemy? We are in East Turkistan.

Q:     But, the Uighur people do consider China to be their enemy?

ISN# 289
Enclosure (3)
Page 6 of 9

UNCLASSIFIED//~~FOUO~~

UNCLASSIFIED//~~FOUO~~

A:    Yes.

Q:    While you've been at the camp [Guantanamo Bay, Cuba], has the delegation from China come to visit you?

A:    Yes. They came and talked to us.

Q:    Can you tell us briefly how that went?

A:    Yes. During that time, delegations from many countries came. We also asked other Detainees how the delegates treated them. The other Detainees said they were treated well, but it was opposite for us. There were two Uighurs and one Chinese [delegate]. They treated us really bad. I didn't talk to them that much. I said maybe one or two words. Other Uighurs did the same as well.

They asked if I wanted a drink of water. My answer was that I have enough water in my cell and I don't need a drink of water right now. The Chinese person, in Chinese, said "washing water."

They asked if I missed my family, and my answer was "yes, but what am I going to do if I miss my family?" I'm in prison. The Delegate said that if I wanted to go back to my country, he would go back and get the higher General to talk about it. The General speaks Chinese and he works at the American Embassy in China.

I refused to see the General they mentioned. The Delegate asked where I went in Afghanistan and I told him Jalalabad and then after that, I didn't say a word.

The delegates asked me if they could take my picture. I told them that America had my picture and they could give him one. I don't know if he took a picture or not.

They talked to me a second time and told me I had to talk. They said if I talked they would help me get back to my country and provide more comfort for me. They also told us that the U.S. government requested they came over because the U.S. government couldn't handle the Uighur people issues, so they were supposed to come solve our issues. They were representatives of the Communist Party in China.

They also said that I requested political asylum, but now the whole world knows we're terrorists and no country in the world will give us political asylum and that our only chance would be to go back to our country. If I refused to go back to my home country, then I'd go to military court and I would be sentenced and in prison for a long time.

UNCLASSIFIED//~~FOUO~~

They asked the other Uighur detainees if they want a drink and the other Detainees said they were fasting. The delegates acted surprised that they were fed too early in the morning.

That's the conversation I had with the Chinese delegation, but some other Uighurs had conversations with bad, dirty language. So, we were told that when we go back to the country, we'd be killed or sentenced to prison for a long time.

Q:    If you were to be released, where would you want to go and what would you want to do?

A:    The first thing, wherever I go, I'd love to get married first. Then I will look around to try to live my life and make money.

Q:    Do you have family at home?

A:    I never married.

Q:    Brothers or sisters?

A:    Yes.

Q:    Do you correspond by mail, back and forth?

A:    No. Since I've been in prison I've had no communication by mail. They don't know where I am. They think I'm still doing business somewhere.

Q:    You mentioned that the reason you left your country was for business reasons.

A:    Yes, the reason was for my business and also to live a better life.

Q:    I thought you left your country to go somewhere else to start your business. Later on, when you were talking to another member of the panel, you said you traveled with other Uighurs.

A:    When I went to Pakistan from Kyrgyzstan, I was with another Uighur.

Q:    Okay, so when you started, you were by yourself and then…

A:    We were three Uighurs together.

Q:    When you left home?

A:    Yes.

UNCLASSIFIED//~~FOUO~~

UNCLASSIFIED//~~FOUO~~

Q:     Were they business partners, or did they want to go get trained?

A:     We never heard about the training.  We were individual people doing business.

Tribunal President:  Thank you for your testimony.  Do you have any other information you would like to make known to this Tribunal today?

Detainee:  I want to say that I've been here for three years and you've probably investigated all things in my background, what I did, who I am, what involvements I've had in the past.  If not, I want you to investigate and check all of my background.  Which school I went to, who my friends were and what I did exactly in the past.  I want you to investigate all of this.

Tribunal President:  As we make our determination, we will look at all information we have available, as well as the statement we've heard from you today.

## **AUTHENTICATION**

I certify the material contained in this transcript is a true and accurate summary of the testimony given during the proceedings.

████████████████████████████

Colonel, U.S. Marine Corps
Tribunal President

UNCLASSIFIED//~~FOUO~~

## DETAINEE ELECTION FORM

|  |  |
|---|---|
| **Date:** | 17 Nov 04 |
| **Start Time:** | 10:40 |
| **End Time:** | 11:45 |

**ISN#:** ___289___

**Personal Representative:** ███████████, MAJ., USAF

**Translator Required?** YES        **Language?** _____UIGHUR_____

**CSRT Procedure Read to Detainee or Written Copy Read by Detainee?** ___YES___

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**Detainee Election:**

[X]  **Wants to Participate in Tribunal**

[ ]  **Affirmatively Declines to Participate in Tribunal**

[ ]  **Uncooperative or Unresponsive**

**Personal Representative Comments:**

Detainee will speak to each piece of evidence.
Detainee will take the oath
Detainee decline witnesses/documents

Personal Representative: ███████████████

Exhibit D-a

UNCLASSIFIED

## Combatant Status Review Board

TO: Personal Representative

FROM: OIC, CSRT (10 November 2004)

Subject: Summary of Evidence for Combatant Status Review Tribunal – ABDUREHIM, Dawut

1. Under the provisions of the Secretary of the Navy Memorandum, dated 29 July 2004, *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base Cuba*, a Tribunal has been appointed to review the detainee's designation as an enemy combatant.

2. An enemy combatant has been defined as "an individual who was part of or supporting the Taliban or al Qaida forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. This includes any person who committed a belligerent act or has directly supported hostilities in aid of enemy armed forces."

3. The United States Government has previously determined that the detainee is an enemy combatant. This determination is based on information possessed by the United States that indicates that the detainee is associated with the Taliban.

   The detainee is associated with the Taliban.

   1. The detainee is a citizen of China who traveled to Afghanistan, via Kyrgyzstan and Pakistan, to receive military training at a military training camp in the Tora Bora mountains.

   2. The detainee lived at the Uighur training camp from June to October 2001.

   3. The training camp was provided to the Uighers by the Taliban.

   4. The East Turkistan Islamic Movement (ETIM) operated facilities in the Tora Bora region of Afghanistan in which Uighur expatriates underwent small arms training. These camps were funded by bin Laden and the Taliban

   5. ETIM is listed on the state departments terrorist exclusion list.

   6. While at the camp, the detainee received training on the Kalashnikov rifle, handguns, and other weapons.

   7. Following the destruction of the training camp by the United States bombing campaign, the detainee traveled to a village in Pakistan where he was captured.

4. The detainee has the opportunity to contest his designation as an enemy combatant. The Tribunal will endeavor to arrange for the presence of any reasonably available witnesses or evidence that the detainee desires to call or introduce to prove that he is not an enemy combatant. The Tribunal President will determine the reasonable availability of evidence or witnesses.

UNCLASSIFIED

EXHIBIT R-1

*Unclassified*

## Memorandum



| | | | |
|---|---|---|---|
| To | : | Department of Defense | Date 11/10/2004 |
| | | Office of Administrative Review | |
| | | for Detained Enemy Combatants | |
| | | Capt. Charles Jamison, OIC, CSRT | |

From :   FBI GTMO
         Counterterrorism Division███████████
         Asst. Gen. Counsel ███████

Subject  REQUEST FOR REDACTION OF
         NATIONAL SECURITY INFORMATION
         ██████

      Pursuant to the Secretary of the Navy Order of 29 July 2004, Implementation of Combatant Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba, Section D, paragraph 2, the FBI requests redaction of the information herein marked[1]. The FBI makes this request on the basis that said information relates to the national security of the United States[2]. Inappropriate dissemination of said information could damage the national security of the United States and compromise ongoing FBI investigations.

  CERTIFICATION THAT REDACTED INFORMATION DOES NOT SUPPORT A
  DETERMINATION THAT THE DETAINEE IS NOT AN ENEMY COMBATANT

      The FBI certifies the aforementioned redaction contains no information that would support a determination that the detainee is not an enemy combatant.

      The following documents relative to ISN 289 have been redacted by the FBI and provided to the OARDEC:

FD-302 dated 12/09/02 (ISN 276 interview)

---

  [1]Redactions are blackened out on the OARDEC provided FBI document.

  [2]See Executive Order 12958

EXHIBIT R-2

*Unclassified*

*Unclassified*

Memorandum from ███████████ to Capt. Charles Jamison
Re:  REQUEST FOR REDACTION, 11/10/2004


        If you need additional assistance, please contact Asst.
Gen. Counsel ███████████████████████ or Intelligence Analyst (IA)
████ IA ████████████████████████████████████████████████████████

-2-

*Unclassified*

http://usembassy-australia.state.gov/hyper/2004/0521/epf505.htm

# Washington File

*EPF505 05/21/2004
Fact Sheet: Terrorist Exclusion List Authorized by USA Patriot Act
(Secretary of state, attorney general collaborate on designations) (1660)

The Terrorist Exclusion List (TEL) was created by the USA Patriot Act of 2001,
according to a State Department fact sheet released May 21 by the Office of
Counterterrorism.

The secretary of state, in consultation with the attorney general, has the
authority to identify terrorist groups that may be excluded from immigrating to
the United States or who may be asked to leave the country. This could include
any groups that have planned or carried out terrorism, have incited others to do
so, or have provided any kind of material support.

The purpose of designating terrorist groups, says the fact sheet, is to deter
financial aid to them, heighten public awareness of them, alert other
governments to U.S. concerns about them, and stigmatize and isolate them.

Ten new groups were added to the TEL on April 29.

The names of new designees are published routinely in the Federal Register.

Following is the text of the State Department fact sheet:

(begin fact sheet)

U.S. Department of State
Office of Counterterrorism
Washington, D.C.
May 21, 2004

FACT SHEET

Terrorist Exclusion List

Section 411 of the USA Patriot Act of 2001 (8 U.S.C. § 1182) authorized the
Secretary of State, in consultation with or upon the request of the Attorney
General, to designate terrorist organizations for immigration purposes. This
authority is known as the Terrorist Exclusion List (TEL) authority. A TEL
designation bolsters homeland security efforts by facilitating the U.S.

**PAGE / OF 7**

*Unclassified*

**EXHIBIT A-3**

*Unclassified*

government's ability to exclude aliens associated with entities on the TEL from entering the United States.

Designation Criteria

An organization can be placed on the TEL if the Secretary of State finds that the organization:

-- commits or incites to commit, under circumstances indicating an intention to cause death or serious bodily injury, a terrorist activity;

-- prepares or plans a terrorist activity;

-- gathers information on potential targets for terrorist activity; or

-- provides material support to further terrorist activity.

Under the statute, terrorist activity means any activity that is unlawful under U.S. law or the laws of the place where it was committed and involves: hijacking or sabotage of an aircraft, vessel, vehicle or other conveyance; hostage taking; a violent attack on an internationally protected person; assassination; or the use of any biological agent, chemical agent, nuclear weapon or device, or explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain), with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property. The definition also captures any threat, attempt, or conspiracy to do any of these activities.

Designation Process

The Secretary of State is authorized to designate groups as TEL organizations in consultation with, or upon the request of the Attorney General. Once an organization of concern is identified, or a request is received from the Attorney General to designate a particular organization, the State Department works closely with the Department of Justice and the Intelligence community to prepare a detailed administrative record, which is a compilation of information, typically including both classified and open-sources information, demonstrating that the statutory criteria for designation have been satisfied. Once completed, the administrative record is sent to the Secretary of State, who decides whether to designate the organization. Notices of designations are published in the Federal Register.

Effects of Designation

Legal Ramifications

PAGE 2 OF 7

*Unclassified*

● *Unclassified* ●

Individual aliens providing support to or associated with TEL-designated organizations may be found inadmissible to the United States, i.e., such aliens may be prevented from entering the United States or, if already in U.S. territory, may in certain circumstances be deported. Examples of activity that may render an alien inadmissible as a result of an organization's TEL designation include:

-- membership in a TEL-designated organization;

-- use of the alien's position of prominence within any country to persuade others to support an organization on the TEL list;

-- solicitation of funds or other things of value for an organization on the TEL list;

-- solicitation of any individual for membership in an organization on the TEL list; and

-- commission of an act that the alien knows, or reasonably should have known, affords material support, including a safe house, transportation, communications, funds, transfer of funds or other material for financial benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training to an organization on the TEL list.

(It should be noted that individual aliens may also found inadmissible on the basis of other types of terrorist activity unrelated to TEL-designated organizations; see 8 U.S.C. §1182(a)(3)(B).)

Other Effects

1. Deters donation or contributions to named organizations.

2. Heightens public awareness and knowledge of terrorist organizations.

3. Alerts other governments to U.S. concerns about organizations engaged in terrorist activities.

4. Stigmatizes and isolates designated terrorist organizations.

Background

Secretary of State Colin Powell, in consultation with the Attorney General, designated the following organizations, thereby placing them on the Terrorist Exclusion List (TEL). Ten groups were added to the TEL on April 29, 2004.

PAGE 3 OF 7

*Unclassified*

Unclassified

Terrorist Exclusion List Designees (alphabetical listing)

-- Afghan Support Committee (also known as [a.k.a.] Ahya ul Turas; a.k.a. Jamiat Ayat-ur-Rhas al Islamia; a.k.a. Jamiat Ihya ul Turath al Islamia; a.k.a. Lajnat el Masa Eldatul Afghania)

-- Al Taqwa Trade, Property and Industry Company Ltd. (formerly known as [f.k.a.] Al Taqwa Trade, Property and Industry; f.k.a. Al Taqwa Trade, Property and Industry Establishment; f.k.a. Himmat Establishment; a.k.a. Waldenberg, AG)

-- Al-Hamati Sweets Bakeries

-- Al-Ittihad al-Islami (AIAI)

-- Al-Ma unah

-- Al-Nur Honey Center

-- Al-Rashid Trust

-- Al-Shifa Honey Press for Industry and Commerce

-- Al-Wafa al-Igatha al-Islamia (a.k.a. Wafa Humanitarian Organization; a.k.a. Al Wafa; a.k.a. Al Wafa Organization)

-- Alex Boncayao Brigade (ABB)

-- Anarchist Faction for Overthrow

-- Army for the Liberation of Rwanda (ALIR) (a.k.a. Interahamwe, Former Armed Forces (EX-FAR))

-- Asbat al-Ansar

-- Babbar Khalsa International

-- Bank Al Taqwa Ltd. (a.k.a. Al Taqwa Bank; a.k.a. Bank Al Taqwa)

-- Black Star

-- Communist Party of Nepal (Maoist) (a.k.a. CPN(M); a.k.a. the United Revolutionary Peoples Council, a.k.a. the People s Liberation Army of Nepal)

Unclassified

Unclassified

-- Continuity Irish Republican Army (CIRA) (a.k.a. Continuity Army Council)

-- Darkazanli Company

-- Dhamat Houmet Daawa Salafia (a.k.a. Group Protectors of Salafist Preaching; a.k.a. Houmat Ed Daawa Es Salifiya; a.k.a. Katibat El Ahoual; a.k.a. Protectors of the Salafist Predication; a.k.a. El-Ahoual Battalion; a.k.a. Katibat El Ahouel; a.k.a. Houmate Ed-Daawa Es-Salafia; a.k.a. the Horror Squadron; a.k.a. Djamaat Houmat Eddawa Essalafia; a.k.a. Djamaatt Houmat Ed Daawa Es Salafiya; a.k.a. Salafist Call Protectors; a.k.a. Djamaat Houmat Ed Daawa Es Salafiya; a.k.a. Houmate el Da awaa es-Salafiyya; a.k.a. Protectors of the Salafist Call; a.k.a. Houmat ed-Daaoua es-Salafia; a.k.a. Group of Supporters of the Salafiste Trend; a.k.a. Group of Supporters of the Salafist Trend)

-- Eastern Turkistan Islamic Movement (a.k.a. Eastern Turkistan Islamic Party; a.k.a. ETIM; a.k.a. ETIP)

-- First of October Antifascist Resistance Group (GRAPO) (a.k.a. Grupo de Resistencia Anti-Fascista Premero De Octubre)

-- Harakat ul Jihad i Islami (HUJI)

-- International Sikh Youth Federation

-- Islamic Army of Aden

-- Islamic Renewal and Reform Organization

-- Jamiat al-Ta awun al-Islamiyya

-- Jamiat ul-Mujahideen (JUM)

-- Japanese Red Army (JRA)

-- Jaysh-e-Mohammed

-- Jayshullah

-- Jerusalem Warriors

-- Lashkar-e-Tayyiba (LET) (a.k.a. Army of the Righteous)

-- Libyan Islamic Fighting Group

Unclassified

*Unclassified*

-- Loyalist Volunteer Force (LVF)

-- Makhtab al-Khidmat

-- Moroccan Islamic Combatant Group (a.k.a. GICM; a.k.a. Groupe Islamique Combattant Marocain)

-- Nada Management Organization (f.k.a. Al Taqwa Management Organization SA)

-- New People's Army (NPA)

-- Orange Volunteers (OV)

-- People Against Gangsterism and Drugs (PAGAD)

-- Red Brigades-Combatant Communist Party (BR-PCC)

-- Red Hand Defenders (RHD)

-- Revival of Islamic Heritage Society (Pakistan and Afghanistan offices -- Kuwait office not designated) (a.k.a. Jamia Ihya ul Turath; a.k.a. Jamiat Ihia Al-Turath Al-Islamiya; a.k.a. Revival of Islamic Society Heritage on the African Continent)

-- Revolutionary Proletarian Nucleus

-- Revolutionary United Front (RUF)

-- Salafist Group for Call and Combat (GSPC)

-- The Allied Democratic Forces (ADF)

-- The Islamic International Brigade (a.k.a. International Battalion, a.k.a. Islamic Peacekeeping International Brigade, a.k.a. Peacekeeping Battalion, a.k.a. The International Brigade, a.k.a. The Islamic Peacekeeping Army, a.k.a. The Islamic Peacekeeping Brigade)

-- The Lord's Resistance Army (LRA)

-- The Pentagon Gang

-- The Riyadus-Salikhin Reconnaissance and Sabotage Battalion of Chechen Martyrs (a.k.a. Riyadus-Salikhin Reconnaissance and Sabotage Battalion, a.k.a. Riyadh-as-Saliheen, a.k.a. the Sabotage and Military Surveillance Group of the

*Unclassified*

 *Unclassified*

Riyadh al-Salihin Martyrs, a.k.a. Riyadus-Salikhin Reconnaissance and Sabotage Battalion of Shahids (Martyrs))

-- The Special Purpose Islamic Regiment (a.k.a. the Islamic Special Purpose Regiment, a.k.a. the al-Jihad-Fisi-Sabililah Special Islamic Regiment, a.k.a. Islamic Regiment of Special Meaning)

-- Tunisian Combat Group (a.k.a. GCT, a.k.a. Groupe Combattant Tunisien, a.k.a. Jama a Combattante Tunisien, a.k.a. JCT; a.k.a. Tunisian Combatant Group)

-- Turkish Hizballah

-- Ulster Defense Association (a.k.a. Ulster Freedom Fighters)

-- Ummah Tameer E-Nau (UTN) (a.k.a. Foundation for Construction; a.k.a. Nation Building; a.k.a. Reconstruction Foundation; a.k.a. Reconstruction of the Islamic Community; a.k.a. Reconstruction of the Muslim Ummah; a.k.a. Ummah Tameer I-Nau; a.k.a. Ummah Tameer E-Nau; a.k.a. Ummah Tameer-I-Pau)

-- Youssef M. Nada & Co. Gesellschaft M.B.H.

(end fact sheet)

(Distributed by the Bureau of International Information Programs, U.S. Department of State. Web site: http://usinfo.state.gov)

*Unclassified*

UNCLASSIFIED//~~FOUO~~

## Personal Representative Review of the Record of Proceedings

I acknowledge that on 24 November 2004 I was provided the opportunity to review the record of proceedings for the Combatant Status Review Tribunal involving ISN #289.

✓ I have no comments.

___ My comments are attached.

███████████, Major, USAF
_____
Name

█████████████████████
█████████████
Signature

24 Nov 04
_____
Date

ISN #289
Enclosure (5)

UNCLASSIFIED//~~FOUO~~