FILED WITH THE
COURT SECURITY OFFICER
CSO: E HOGARTM
DATE: 2-13-2007

No·___

_____

IN THE SUPREME COURT OF THE UNITED STATES

_____

In re Petitioner Ali,

*Petitioner.*

_____

## PETITION FOR ORIGINAL
## WRIT OF HABEAS CORPUS

_____

Angela C. Vigil
 *Counsel of Record*
Baker & McKenzie LLP
1111 Brickell Ave, Suite 1700
Miami, FL 33131
(305) 789-8900

George M. Clarke III
Baker & McKenzie LLP
815 Connecticut Ave., N.W., Suite 900
Washington, DC 20006
(202) 452-7068

*Counsel for Petitioner*

February 12, 2007

## QUESTIONS PRESENTED

1. Whether the Court's habeas jurisdiction extends to this case.

2. Whether the Court should direct the District Court to lift its stay of Petitioner's habeas action, and proceed to the merits, in view of the prolonged inaction of the Court of Appeals in resolving purported jurisdictional issues raised by the government.

3. Whether the definition of "enemy combatant" used by the plurality in *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), should govern the District Court's determination of the lawfulness of Petitioner's imprisonment.

## PARTIES TO THE PROCEEDING

Petitioner here and in the United States District Court for the District of Columbia is Ali, Internment Serial Number ("ISN") 250, also known as Anvar Hassan. Respondents here and in the District Court, or their successors, are George W. Bush, President; Robert M. Gates, Secretary of Defense; Rear Admiral Harry B. Harris, Commander, Joint Task Force-GTMO; and Colonel Wade F. Davis (United States Army), Commander, Joint Detention Operations Group.

## TABLE OF CONTENTS

Opinions Below ................................................................................................................. 1

Jurisdiction ....................................................................................................................... 1

Constitutional And Statutory Provisions .................................................................... 1

Statement Of The Case................................................................................................... 2

Summary Of Argument ................................................................................................ 11

Argument ........................................................................................................................ 12

I.    Habeas Review "Must Be Speedy If It Is To Be Effective." ................................ 12

II.   This Court May Exercise Its Habeas Jurisdiction To Break The
      Logjam In The Courts Below.............................................................................. 13

      A.   The Court's Power Of Direct Habeas Review Extends To This
           Case.............................................................................................................. 13

      B.   Habeas Review Is Logjammed In The Courts Below. ................................ 14

      C.   This Court Has Jurisdiction To Break The Logjam. .................................. 15

III.  The Definition Of "Enemy Combatant" Used In *Hamdi* Should Govern
      The District Court's Determination Of The Lawfulness Of Petitioner's
      Imprisonment. ...................................................................................................... 18

Conclusion........................................................................................................................ 23

## JURISDICTION

This Court's jurisdiction is invoked under 28 U.S.C. 1651(a), 2241(a), and 2242, and Article III of the U.S. Constitution.

## CONSTITUTIONAL AND STATUTORY PROVISIONS

U.S. Const. art. I, § 9, cl. 2 provides:

The privilege of the writ of habeas corpus shall not be suspended, unless when in cases of rebellion or invasion the public safety may require it.

U.S. Const. art. I, § 9, cl. 3 provides:

"No bill of attainder or ex post facto Law shall be passed."

Section 2241 of Title 28, United States Code, as amended by the Military Commissions Act of 2006, Pub. L. No. 109-366, § 7, 120 Stat. 2600, 2636 (2006), is reproduced at Tab 9 of the Appendix.

Section 1005(e) of the Detainee Treatment Act of 2005, Pub. L. No. 109-148, §1005(e), 119 Stat. 2680 (2005), is reproduced at Tab 10 of the Appendix.

1

## STATEMENT OF THE CASE

Petitioner Ali is a Chinese Uyghur charged with no offense who has been in-carcerated at Guantanamo since February 2002.[1] After a Combatant Status Review Tribunal ("CSRT") determined in November 2004 that Ali was *not* properly classi-fied as an "enemy combatant,"[2] the Assistant Secretary of Defense for Detainee Af-fairs ordered the military authorities to try again. In January 2005, a CSRT deter-mined that Ali *was* properly classified as an "enemy combatant." Ali has just en-tered his sixth year of incarceration at Guantanamo.

In December 2005, upon retaining counsel, Ali filed a habeas petition in the United States District Court for the District of Columbia. In March 2006, the Dis-trict Court stayed Ali's case while the Court of Appeals for the District of Columbia Circuit considers in two pending appeals whether Guantanamo prisoners have any rights they may enforce through habeas. Those appeals were filed in March 2005, but the Court of Appeals still has not issued its decision.

The five years' incarceration that Petitioner Ali and hundreds of other Guan-tanamo prisoners have been forced to suffer without a judicial hearing makes a mockery of habeas as "an effective and speedy instrument by which judicial inquiry

---

[1] Uyghurs are a Turkic Muslim ethnic minority that has been, and continues to be, brutally oppressed by the Chinese government. *See* U.S. Dep't of State, Country Reports on Human Rights Practices, China – 2005 (March 8, 2006), *available at* http://www.state.gov/g/drl/rls/2005/61605.htm.

[2] The government established CSRTs, following this Court's decision in *Hamdi* v. *Rumsfeld*, 542 U.S. 507 (2004), and *Rasul* v. *Bush*, 542 U.S. 466, 484 (2004), to de-termine whether the prisoners held at Guantanamo were properly classified as "en-emy combatants." Wolfowitz Memo ¶g(12), App. Tab 13.

may be had into the legality of the detention of a person." *Carafas* v. *LaVallee*, 391 U.S. 234, 238 (1968). Ali respectfully asks the Court to direct the District Court to lift its stay of his case and proceed to the merits of his petition.

1. Five years ago, the first prisoners, including Petitioner Ali, arrived at Guantanamo, and the first habeas petitions were filed on their behalf in federal court. Since then, hundreds of other prisoners have arrived at Guantanamo and filed habeas petitions. To date, however, not a single Guantanamo prisoner has had an individualized hearing on the merits of his habeas petition. The cases have been stayed since January 2005, notwithstanding this Court's directive, in one of the earliest habeas cases, that "the District Court . . . consider . . . *the merits* of petitioners' claims." *Rasul* v. *Bush*, 542 U.S. 466, 484 (2004). Meanwhile the prisoners are forced to endure conditions that are not permitted for prisoners of war under the Geneva Conventions or Army regulations, for convicted criminals in federal prisons, or for caged animals under Humane Society guidelines.

"The primary purpose of a habeas corpus proceeding is to make certain that a man is not unjustly imprisoned." *Price* v. *Johnston*, 334 U.S. 266, 291 (1948). But habeas review "must be speedy if it is to be effective." *Stack* v. *Boyle*, 342 U.S. 1, 4 (1952). Nevertheless, all of the Guantanamo cases, including Petitioner's, have been stayed, some since January 2005, while the Court of Appeals for the District of Columbia Circuit considers, in two consolidated appeals, whether the prisoners have any rights they may enforce through habeas. Both of those appeals were filed in March 2005, but the stay has continued in force as intervening events have pro-

3

duced delay after delay in their resolution. Nearly three months after the latest round of briefing was completed in those appeals (on the effect of the Military Commissions Act of 2006), the Court of Appeals has yet to issue its decision. If winning is not losing, the government is winning simply by stalling the litigation.

2. Although this case was filed in December 2005, its procedural history began in February 2002, when the first habeas petitions were filed on behalf of Guantanamo prisoners. The government contested the jurisdiction of the federal courts to entertain those petitions. It was not until June 2004 – nearly two-and-one-half-years after the first petitions were filed – that this Court held that the district courts have habeas jurisdiction "to determine the legality of the Executive's potentially indefinite detention of individuals [at Guantanamo] who claim to be wholly innocent of wrongdoing." *Rasul* v. *Bush*, 542 U.S. 466, 485 (2004). Accordingly, observing that "Petitioners' allegations . . . unquestionably describe 'custody in violation of the Constitution or laws or treaties of the United States,'" *id.* at 483 n.15, the Court remanded the cases "for the District Court to consider in the first instance the merits of petitioners' claims," *id.* at 485.

Encouraged by *Rasul*, more Guantanamo prisoners filed habeas petitions. The government moved to dismiss the petitions on the ground that the prisoners have no rights they could enforce through habeas. Two judges of the District Court issued conflicting decisions on the government's motion. On January 19, 2005, District Judge Richard Leon granted the government's motion to dismiss the cases before him, holding that the Guantanamo prisoners had no enforceable rights. *Khalid*

4

*v. Bush*, 355 F. Supp. 2d 311 (D.D.C. 2005). On January 30, 2005, District Judge Joyce Hens Green held that the prisoners have enforceable Due Process and Geneva Conventions rights and denied the government's motion to dismiss, *In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443 (D.D.C. 2005).[3]

On January 31, 2005, Judge Green allowed the government an interlocutory appeal under 28 U.S.C. § 1292(b) and stayed her decision pending appeal. On March 2, 2005, the *Khalid* petitioners appealed Judge Leon's decision, *Boumediene v. Bush*, Nos. 05-5062, 05-5063 (D.C. Cir.). On March 7, 2005, the government appealed Judge Green's decision, *Al Odah v. United States*, Nos. 05-5064 *et al.* (D.C. Cir.). On September 8, 2005, the D.C. Circuit heard argument.[4]

3. Petitioner Ali, also known as Anwar Hassan, is a 32-year-old native Uyghur who has been imprisoned at Guantanamo Bay Naval Station, Cuba, since February 2002. BN 80.[5] On December 14, 2005, Ali and Thabid, another Chinese Uyghur imprisoned at Guantanamo, filed a habeas petition in the United States District Court for the District of Columbia. App. Tab 3.

---

[3]   Judge Green relied, in part, on Judge James Robertson's decision of November 8, 2004, in *Hamdan* v. *Rumsfeld*, 344 F. Supp. 2d 152 (D.D.C. 2004), invalidating military commissions established by the President to try Guantanamo prisoners charged with purported war crimes; in that decision, Judge Robertson held that Guantanamo prisoners have enforceable Geneva Conventions rights.

[4]   On July 15, 2005, the Court of Appeals reversed Judge Robertson's *Hamdan* decision, *Hamdan* v. *Rumsfeld*, 415 F.3d 33 (D.C. Cir. 2005), and, on July 26, 2005, the court ordered the parties to brief the effect of the Court of Appeals decision on the *Boumediene* and *Al Odah* Appeals in advance of oral argument.

[5]   "BN" refers to the Bates numbered pages of Ali's proceedings before the Combatant Status Review Tribunal ("CSRT Record"). App. Tab 4B.

According to interrogation records, Petitioner had settled in a small commu-
nity of Uyghur expatriates in Afghanistan in 2001; had fled to Pakistan in Decem-
ber 2001, after the U.S. bombing of Afghanistan; and was captured ███████
████ in December 2001, transferred ████████████ to U.S. control ████
████ in January 2002; and brought to Guantanamo in February 2002, where he
has remained since. See, e.g., BN 15, 79-80, 83, 86, 92, 107.

After being brought to Guantanamo, Petitioner was subjected to at ███████
interrogations. See BN 36-35, 36-42, 43-44, 45-47, 48-51, 52-53. █████████
████████████████████████████████████████████████
████████████████████████████████████████ BN 36.

On the basis of these interrogations, interrogators concluded, in reports dated De-
cember 6, 2002 and April 26, 2003, that Petitioner was in Afghanistan "to train and
learn to fight for the Uyghur cause against Chinese oppression and was not fighting
for the Taliban or Al Qaida," and that Petitioner "does not represent a threat to the
United States nor its interests." BN 82-83; see BN 66. ██████████████████
██████

> All efforts should be made to expedite the release of [Petitioner] and
> grant him political asylum in a country not under Chinese rule in or-
> der to avoid being returned to China where he is certain he will face
> torture and execution for being an ethnic Uyghur, who lived in Paki-
> stan and Afghanistan.

BN 83. On November 16, 2004, the CSRT (Panel 18) determined that Ali was "not
properly classified as an enemy combatant." BN 14. CSRTs also determined that
five other Uyghurs were not properly classified as enemy combatants.

6

For purposes of CSRT review, an "enemy combatant" is "an individual who was part of or supporting Taliban or al Qaeda forces, or associated forces that are engaged in hostilities against the United States or its coalition partners." Order for the Secretary of the Navy, prepared by Deputy Secretary of Defense Paul Wolfowitz, dated July 7, 2004, ¶ a ("Wolfowitz Memo"). App. Tab 13. Under this definition, an individual may be classified as an "enemy combatant" even if the individual never took up arms against the United States – a definition far broader than that proffered by the government and relied on by the plurality in *Hamdi*, 542 U.S. at 516 (defining "enemy combatant" as "an individual who . . . was 'part of or supporting forces hostile to the United States or coalition partners' in Afghanistan *and* who 'engaged in an armed conflict against the United States'") (emphasis added).

Declaring that the CSRT's determinations as to Petitioner and the five other Uyghurs were in error, Deputy Assistant Secretary of Defense for Detainee Affairs Matthew Waxman directed that their classifications be reconsidered. (BN 101-102, 107.) In asserting the supposed error, Mr. Waxman noted that "16 other Uighurs with identical circumstances were determined to be ECs." (BN 102.) In response – and, Petitioner submits, contrary to CSRT procedures for non-enemy combatant designations (see, *e.g.*, Wolfowitz Memo at 3) – the authorities undertook an "inculplery search." (BN 85.) On January 18, 2005, the military officer charged with conducting that search, ███████████████ submitted the results of his search (BN 85-86). On January 21, 2005, a new CSRT (Panel 32) was convened to

7

reassess Petitioner's non-enemy combatant status (BN 8) and sometime thereafter

redesignated Petitioner as an "enemy combatant" (BN 10).

In an email chain culminating in a message to the Chair of CSRT Panel 32,

included as Exhibit R-18 of the CSRT Record, the following text appeared:

"Two points to consider in determining [Petitioner's] status:

* 16 of 22 Uighers have been classified as EC and the same criteria
  applied (Per SPECIAL Uigher Chart) to them as well. Inconsisten-
  cies will not cast a favorable light on the CSRT process or the work
  done by OARDEC. This does not justify making a change in and of
  itself, but is a filter by which to look at the overall Uigher transac-
  tion since they are all considered the same notwithstanding a spe-
  cific act.[6]

* By properly classifying them as EC, then there is an opportunity to
  (1) further exploit them here in GTMO and (2) when they are trans-
  ferred to a third country, it will be controlled transfer in status. The
  consensus is that all Uighers will be transferred to a third country
  as soon as the plan is worked out."

BN 86 (emphasis added). The Legal Advisor who reviewed the CSRT Record in Peti-

tioner's case described the first of the quoted paragraphs as "troubling" but stated

that he found "no indication that the Tribunal adopted this inappropriate 'one size

fits all' policy." BN 7.

4. Two weeks after Ali filed his habeas petition in the District Court, the

President signed into law the Detainee Treatment Act of 2005 ("DTA"), Pub. L. No.

109-148, 119 Stat. 2739 (2005). The government thereupon suggested that DTA

---

[6] The five others Uyghurs whose non-enemy combatant determinations were chal-
lenged by Secretary Waxman were all released to Albania as non-enemy combat-
ants in May 2006 on the eve of oral argument in their cases in the Court of Appeals.
See *Mamet* v. *Bush*, Docket No. 05-1886 (D.D.C.) (3 prisoners); *Qassim v. Bush*, Civ.
A. No. 05-497 (D.D.C.) (2 prisoners).

§ 1005(e) deprived the Court of Appeals of jurisdiction over the pending appeals. The government's suggestion prompted two rounds of supplemental briefing and a second oral argument.

On March 31, 2006, the District Court stayed Ali's action pending resolution of the jurisdictional issue by the Court of Appeals. The Court of Appeals, in turn, stayed its hand pending this Court's resolution of the DTA jurisdictional issue in *Hamdan* v. *Rumsfeld*. In June 2006 – nearly four-and-one-half years after the first habeas petitions were filed by Guantanamo prisoners – this Court resolved that issue in favor of pre-DTA jurisdiction in cases, like Ali's, that were pending when the DTA was enacted. 126 S. Ct. 2749, 2764-69 (2006). The Court of Appeals then ordered further briefing on the effect of *Hamdan* on the *Boumediene* and *Al Odah* appeals.

Congress also responded to *Hamdan*. On October 17, 2006, the President signed into law the Military Commissions Act of 2006 ("MCA"), Pub. L. No. 109-366, 120 Stat. 2600 (2006). The MCA raised new questions about the jurisdiction of the federal courts to entertain habeas petitions by the Guantanamo prisoners, prompting yet another round of briefing in the Court of Appeals. Supplemental briefing on the effect of the MCA on the court's jurisdiction was completed on November 20, 2006, but nearly three months later, the Court of Appeals has yet to issue its decision in the appeals.

Notwithstanding its stay, the District Court on August 18, 2006 ordered the government to file a factual return for Ali, and on October 17, 2006, the government

9

filed the return. On November 22, 2006, Ali filed a motion to lift the stay and for summary judgment based on the facts in the government's return. On December 6, 2006, however, the District Court denied Ali's motion to lift the stay, pending the Court of Appeals resolution of the jurisdictional issues raised by the DTA and the MCA. The District Court also denied his summary judgment motion without prejudice. Thus, five years after the first habeas petitions were filed on behalf of Guantanamo prisoners in February 2002, not one prisoner – including Ali – has had an individualized hearing on the merits of his petition.

Pending its decision in *Boumediene* and *Al Odah*, the Court of Appeals also has held in abeyance petitions seeking relief under the purported habeas substitute provided in the DTA – *Parhat* v. *Gates*, No. 06-1397 (D.C. Cir. filed Dec. 4, 2006), involving other Uyghur detainees with identical circumstances to those of Petitioner, App. Tab 6; *Bismullah* v. *Rumsfeld*, No. 06-1197 (D.C. Cir. filed June 9, 2006), App. Tab 5; *Paracha* v. *Gates*, No. 06-1038 (D.C. Cir. filed Jan. 24, 2006), App. Tab 7; and *Al Sanani* v. *Bumgarner*, No. 07-5039 (D.C. Cir.), App. Tab 8. Counsel in *Boumediene* and *Al Odah* recently filed a motion with the Court of Appeals asking the court to expedite the issuance of its decision and to lift the stay.

5. Meanwhile, Petitioner Ali is being held in isolation in Camp 6, a 'supermax" prison, at least 22 hours a day. Clarke Decl., App. Tab 12 at 9. He never sees direct sunlight and has no access to fresh air. *Id.* ¶18. During his 2 hours per day of "recreational time" (which, on alternating days, is in the middle of the night), Ali is placed in a cage where he can sometimes see other prisoners but is punished if he

tries to touch or greet them. *Id.* ¶10. He is compelled to complain to get clean clothes. *Id.* ¶12. He is denied privacy when he uses the toilet; even female guards can see him. *Id.* ¶13. His food and drinks are always cold. *Id.* ¶14. He eats every meal alone. *Id.* ¶15. Like all Guantanamo prisoners, he is not allowed any visitors other than occasional trips by counsel and the Red Cross, and he is not allowed to make phone calls. *Id.* ¶¶16-17. As this Court recently affirmed, even convicted murderers cannot be made to endure conditions like these without first providing them the benefit of due process. *Wilkinson* v. *Austin*, 545 U.S. 209, 224 (2005).[7]

## SUMMARY OF ARGUMENT

Having fled ethnic and religious persecution by the Chinese authorities, Petitioner Ali has been imprisoned for five years – without, he asserts, having been afforded due process of law or other fundamental rights – by a government that promises justice but has delivered him into a penal hell "just as bad as China." (Clarke

---

[7]    The prolonged detention and isolation of the prisoners, with no end in sight, has left many in complete despair. The observations contained in paragraphs 30 through 42 of the declaration of Sabin Willett attached to the motion to expedite in *Al-Odah* (App. Tab 16), describe the declining mental and emotional states of the prisoners generally. Many have given up hope of ever being released; most have abandoned their faith that the American legal system will ever bring them justice. The conditions in which they are held would not be permitted for prisoners of war under the Geneva Conventions or Army regulations, or for convicted criminals in federal prisons.

Multiple studies have shown that prolonged isolation in prison leads to very high frequency of severe psychological and emotional disorders including insomnia, confusion, hallucinations, anxiety, depression, self mutilation, and insanity. See, *e.g.*, Peter S. Smith, "The Effects of Solitary Confinement on Prison Inmates," 34 Crime & Just. 441, 452 (Spring, 2006). Indeed, the Court has held that prolonged solitary confinement can amount to cruel and unusual punishment under the Eighth Amendment of the Constitution. See *Robinson* v. *California*, 370 U.S. 660, 675 (1962); *In re Medley*, 134 U.S. 160, 167 (1890).

11

Decl. (App. Tab 12) ¶19.) Paralyzed by the stays imposed pending the Court of Appeals' decision in *Boumediene* and *Al Odah*, the lower courts are unable to provide habeas review that "must be speedy if it is to be effective." *Stack v. Boyle*, 342 U.S. 1, 4 (1952). This Court has the authority to redress that injustice, and the Court should exercise that authority to do so.

ARGUMENT

I.    HABEAS REVIEW "MUST BE SPEEDY IF IT IS TO BE EFFECTIVE."

"The writ of habeas corpus is the fundamental instrument for safeguarding individual freedom against arbitrary and lawless [government] action." *Harris v. Nelson*, 394 U.S. 286, 290-91 (1969). As the Court stated:

> The scope and flexibility of the writ – its capacity to reach all manner of illegal detention – its ability to cut through barriers of form and procedural mazes – have always been emphasized and jealously guarded by courts and lawmakers. The very nature of the writ demands that it be administered with the initiative and flexibility essential to insure that miscarriages of justices within its reach are surfaced and corrected.

*Id.* at 291. "Since habeas is an extraordinary remedy whose operation is to a large extent uninhibited by traditional rules of finality and federalism, its use has been limited to cases of special urgency, leaving more conventional remedies for cases in which the restraints on liberty are neither severe nor immediate." *Hensley v. Mun. Court*, 411 U.S. 345, 351 (1973). See also *Peyton v. Rowe*, 391 U.S. 54, 58-60 (1968).

Precisely because the use of habeas is "limited to cases of special urgency," *Hensley*, 411 U.S. at 351, and because "a principal aim of the writ is to provide for swift judicial review of alleged unlawful restraints on liberty," *Peyton*, 391 U.S. at 63, see also *Harris*, 394 U.S. at 291 ("the office of the writ is 'to provide a prompt

12

and efficacious remedy for whatever society deems to be intolerable restraints'"), the Court has emphasized time and again the writ's demand for "speed, flexibility, and simplicity," *Hensley*, 411 U.S. at 350. Especially pertinent here, the Court has made plain that "a habeas corpus proceeding must not be allowed to founder in a 'procedural morass.'" *Harris*, 394 U.S. at 291-92 (quoting *Price* v. *Johnston*, 334 U.S. 266, 269 (1948)).[8]

## II. THIS COURT MAY EXERCISE ITS HABEAS JURISDICTION TO BREAK THE LOGJAM IN THE COURTS BELOW.

### A. The Court's Power Of Direct Habeas Review Extends To This Case.

This Court's appellate jurisdiction is sufficiently broad to remedy the injustice that has befallen Petitioner. "[T]hat this court is authorized to exercise appellate jurisdiction by habeas corpus directly is a position sustained by abundant authority." *Ex parte Siebold*, 100 U.S. 371, 374 (1880). This Court's habeas or habeas-equivalent jurisdiction stems from its appellate jurisdiction over actions originally brought in the District Court (such as the habeas action filed by Petitioner) or the Court of Appeals (such as DTA review actions). See generally U.S. Const. art III, § 2, cl. 2; 28 U.S.C. §§ 1254 and 2241; *Siebold*, 100 U.S. at 374-375 ("[h]aving this general power to issue the writ, the court . . . may issue it in the exercise of appellate jurisdiction where it has such jurisdiction").

---

[8] See also *Hoeun Yong* v. *INS*, 208 F.3d 1116, 1120 (9th Cir. 2000) ("The writ of habeas corpus, challenging illegality of detention, is reduced to a sham if trial courts do not act within a reasonable time." (citations omitted)); *Johnson* v. *Rogers*, 917 F.2d 1283, 1284 (10th Cir. 1990) ("If a fourteen-month delay . . . were routinely permissible, the function of the Great Writ would be eviscerated.").

The District Court and the Court of Appeals have "allowed [this case] to founder in a procedural morass." *Harris*, 394 U.S. at 292. All the while Petitioner continues, year after year, to be unlawfully imprisoned at Guantanamo Bay. One or both of the lower courts must have jurisdiction over Petitioner's action – either the District Court under habeas, or the Court of Appeals under the DTA (but only if its review mechanism affords the *same* relief as habeas, see *Swain v. Pressley*, 430 U.S. 372, 381 (1977) (habeas substitute must be "neither inadequate nor ineffective to test the legality" of the detention)). This Court therefore has appellate jurisdiction over this matter. Because this Court has appellate jurisdiction; because each lower court has failed to act; and because the exceptional circumstances of this case warrant it (see Rule 20.4(a)), this Court should direct the District Court to "relieve the prisoner from the unlawful restraint" that the paralysis of the lower courts force him to endure. *Ex parte Yerger*, 75 U.S. 85, 103 (1869).

B. Habeas Review Is Logjammed In The Courts Below.

In response to his habeas petition, the District Court on August 18, 2006 ordered the government to provide factual returns explaining the basis for Petitioner's continued detention. Petitioner contends that those returns demonstrate, as the CSRT originally determined, that Petitioner "does not represent a threat to the United States or its interests" and was not properly classified as an "enemy combatant." (BN 82.) On the basis of the evidence supporting that determination – substantially the same evidence on which the second CSRT determined that Petitioner was properly classified as an "enemy combatant" – Petitioner on November 22, 2006 moved for a summary judgment that he is not properly classified as "an

enemy combatant." The District Court, however, denied Petitioner's motion (without prejudice) based on the pendency of *Boumediene* and *Al Odah.* (App. Tab 2.) The continuing inaction by the Court of Appeals to decide those appeals has rendered the stay entered by the District Court a sentence of extended imprisonment.

    C. This Court Has Jurisdiction To Break The Logjam.

The government argues in the courts below that the MCA provision codified as 28 U.S.C. §2241(e)(1) abolishes habeas review for prisoners held at Guantanamo and remits them to the review in the Court of Appeals provided by the DTA. At the same time, the government insists that the MCA and the DTA do not suspend the Great Writ. The government's implicit claim that those statutes provide an adequate substitute for habeas (which is belied by the events that led to Petitioner Ali's reclassification as an enemy combatant), and thus do not suspend the writ, is incorrect, cf. *In re Guantanamo Cases* (CSRTs violated due process rights of prisoners); but in making that claim, the government effectively concedes that habeas or habeas-equivalent review exists *somewhere* below.

This Court held in *Rasul* that Petitioner and other men imprisoned at Guantanamo Bay have the right to habeas corpus. *Rasul,* 542 U.S. at 466. In addition to finding that they have that right under the 28 U.S.C. §2241, *Rasul* confirmed that they were entitled to the writ under the common law, and would have been entitled to the writ as of 1789 when the Constitution was adopted. *Id.* at 479-82. "[A]t the absolute minimum, the Suspension Clause protects the writ as it existed in 1789." *INS* v. *St. Cyr,* 533 U.S. 289, 301 (2001) (internal quotations omitted). Accordingly, Petitioner's right to the writ as of 1789 is protected by the Suspension Clause.

The Suspension Clause is a plain, direct, and explicit limit imposed by Article I of the Constitution on the power of Congress. It does not need to give particular individuals a "right," although it may well do so. The Clause provides, rather, that Congress may not suspend access to the writ of habeas corpus except in cases of "rebellion" or "invasion." If those circumstances do not exist, which they do not here, Congress cannot suspend the writ, and the courts cannot allow the suspension to stand. See *United States* v. *Klein*, 80 U.S. 128, 147 (1872) (holding statute stripping the Court of jurisdiction violative of separation of powers).

Reading the MCA as a prohibition against habeas or habeas-equivalent relief for Guantanamo prisoners also would render it a violation of the Constitution's prohibition against bills of attainder. U.S. Const. art I, § 9, cl. 3. A "deprivation of any rights, civil or political," including "the privilege of appearing in courts" focused on a specified group is an impermissible bill of attainder. *Cummings* v. *Missouri*, 71 U.S. 277, 320 (1866); *United States* v. *Brown*, 381 U.S. 437, 448 (1965). The requirement that a bill of attainder impose a punishment is met by the MCA's denial of access to the courts. *Cummings*, 71 U.S. at 720. It also meets the three-pronged "punishment" test described in *Foretich* v. *United States*, 351 F.3d 1198, 1218 (D.C. Cir. 2003), because it: (i) meets the historical definition of punishment (denial of access to courts); (ii) furthers no non-punitive legislative purposes; and (iii) evinces the congressional intent to punish the specified class. The requirement that the punishment apply only to that specified class also is met because the MCA jurisdiction-

16

stripping provision applies only to alien enemy combatants; such individuals are "easily ascertainable members of a group." *Id.* at 1217.

Even if the MCA stripped this Court's habeas powers, it is well established that every federal court "retains jurisdiction to review [any] underlying jurisdictional fact at issue" in determining whether those courts have jurisdiction. *Jobson v. Ashcroft*, 326 F.3d 367, 371 (2d Cir. 2003) (citing *Sui* v. *I.N.S.*, 250 F.3d 105, 110 (2d Cir. 2001)). In this instance, the jurisdictional fact at issue is whether petitioner is "properly detained as an enemy combatant" by the United States. 28 U.S.C. §2241(e)(1). In order for this Court to determine whether it has jurisdiction, the District Court must determine whether Petitioner is properly detained as an "enemy combatant." "Thus, the jurisdictional inquiry merges with the question on the merits of the case" requiring this court to evaluate both of these questions, simultaneously, rather than avoid them both. *Jobson*, 326 F.3d at 371.

In the case of a similar jurisdiction-limiting provision, the Courts of Appeals that have considered the issue have unanimously found that a statute that specifically divests a court of jurisdiction does not prevent a court from first evaluating whether that provision applies based on the necessary jurisdictional facts. *Drakes* v. *Zimski*, 240 F.3d 246, 247 (3d Cir. 2001) (and cases collected therein). In *Drakes*, the Third Circuit found that the jurisdiction-stripping provision of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") did not prevent the court from first identifying whether the court had jurisdiction because the questions of jurisdiction and merits were inextricably intertwined.

17

In *Drakes*, the jurisdiction-limiting provision of the IIRIRA was similar to the one facing the Court here:

> [N]o court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed a criminal offense covered in 8 U.S.C. §1182(a)(2).

240 F.3d at 247 (internal citations omitted). This court faces the jurisdiction-limiting provision under the MCA:

> No court, justice or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant. . . .

28 U.S.C. §2241(e)(1).

In *Drakes*, in order to determine whether the IIRIRA provision prevented the court from considering the petitioner's claim, the court recognized it first had to determine whether it "had jurisdiction to determine [its] jurisdiction under §1252(a)(2)(C)." 240 F.3d at 247. This was despite the fact that the Board of Immigration Appeals had "ordered Drakes deported" and thus itself, obviously, concluded that he *had* committed the requisite criminal offense under 8 U.S.C. §1252(a)(2)(C) and was properly deported. The analysis here is the same. This Court cannot be blocked by the MCA's attempted jurisdiction-stripping provision without determining whether the provisions of the MCA apply to Petitioner in the first place.

III.    THE DEFINITION OF "ENEMY COMBATANT" USED IN *HAMDI* SHOULD GOVERN THE DISTRICT COURT'S DETERMINATION OF THE LAWFULNESS OF PETITIONER'S IMPRISONMENT.

Pursuant to 28 U.S.C. §2241(b), this Court should transfer Petitioner's application to the District Court for an immediate and expedited hearing and determina-

tion as to whether Petitioner is an "enemy combatant" under the standard set forth by this Court in *Ex parte Quirin*, 317 U.S. 1, 37 (1942) and *Hamdi*, 542 U.S. at 516.

At least six decades of United States and international law define an enemy combatant or "enemy belligerent" as a person who engaged in or intended to engage in hostile acts against the detaining power. As this Court has instructed:

> [Persons] who associate themselves with the military arm of the enemy government [presumably including a terrorist organization], *and* with its aid, guidance and direction [engage in] *hostile acts*, are enemy belligerents within the meaning of the Hague Convention and the law of war.

*Quirin*, 317 U.S. at 37 (emphasis added). Even very recently, a plurality of the Court has applied this definition in the context of the current war on terror, finding that "one who takes up arms against the United States" is an enemy combatant. *Hamdi*, 542 U.S. at 516 (a case in which the United States itself argued that Hamdi had "engaged in an armed conflict against the United States"). The Fourth Circuit adopted these definitions in the context of the "war on terror" in its recent opinion in *Padilla* v. *Hanft*, 423 F.3d 386 (4th Cir. 2005), holding that because "Padilla associated with the military arm of the enemy, and with its aid, guidance and direction entered this country bent on committing hostile acts on American soil" he "falls within *Quirin's* definition of enemy belligerent." 423 F.3d at 392 (emphasis added); see also *In re Territo*, 156 F.2d 142, 145 (9th Cir. 1946) (explaining that "[t]hose who have written texts upon the subject of prisoners of war agree that all persons who are active in opposing an army in war may be captured") (emphasis added, internal citations omitted).

19

Never has the term enemy combatant been applied by a United States court to a person, such as Petitioner Ali, who has committed no hostile act and as to whom no evidence indicates any hostile intent. In the words of the Congressional Research Service:

> We are unaware of any U.S. precedent confirming the constitutional power of the President to detain indefinitely a person accused of being an unlawful combatant due to mere membership in or association with a group that does not qualify as a legitimate belligerent, with or without the authorization of Congress.

CRS Report for Congress, Detention of American Citizens as Enemy Combatants (Updated March 31, 2005) at 11 (emphasis added).

The principles of international law similarly require active hostility in order to be classified as an enemy combatant. As early as the 1700s it was well established that "as long as [persons in occupied territory] refrain from all violence, and do not show an intention to use force" they are not appropriately considered enemy combatants. Wolff, *Jus Gentium Methodo Scientifica Pertractum* (Translation of the Edition of 1764 by Joseph H. Drake, Carnegie Endowment 1934) at 409-410; *see also* de Vattel, *Law of Nations of the Principles of Natural Law* (Translation of the Edition of 1758 by Charles G. Fenwick, Carnegie Institution 1916) at 283 (explaining that "[p]rovided the inhabitants [of an occupied country] refrain from acts of hostility, they live in safety as if they were on friendly terms with the enemy"). "The custom of civilized nations . . . has therefore exempted . . . private individuals engaged in the ordinary civil pursuits of life, from the direct effect of military operations, *unless actually taken in arms, or guilty of some misconduct* in violation of the

20

usages of war by which they forfeit their immunity." Wheaton, *Elements of International Law* 3d Ed. (Philadelphia 1846) at 394-395 (emphasis added).

While the laws of war allow a belligerent force to capture and detain "secret participants in hostilities, such as banditti, guerillas, spies, &c" (Opinion of James Speed, 11 Op. Atty Gen. 297 (July 1865) at 6 such enemies must be "[s]ecret, but active participants" (*id.* at 3-4). There is no evidence that Petitioner Ali ever was an active participant in hostilities against this country. As the United States military itself concluded "[Petitioner Ali] was in Afghanistan to train and learn to fight for the Uyghur cause against the Chinese oppression and was not fighting for the Taliban or Al Qaida." (BN 82-83.) "[Petitioner Ali] does not represent a threat to the United States or its interests." (BN 82.) Not a scintilla of evidence shows that Petitioner Ali acted or intended to act with hostility towards the United States or its coalition partners.[9]

Consistent with United States and international law, even the MCA contains a definition of enemy combatant which requires a hostile act or material support of a hostile act:

> A person who has engaged in hostilities or who has purposefully and materially supported hostilities against the United States or its cobelligerents who is not a lawful enemy combatant (including a person who is part of the Taliban, al Qaeda, or associated forces).

---

[9]   To the contrary, even after being whisked away to indefinite detention in Guantanamo Bay, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮commented that "[Petitioner Ali] ha[s] not developed any animosity towards the U.S. or Americans in general, and ha[s] great admiration for such a wonderfully democratic society, where human rights are protected and people are allowed to live their lives peacefully, with no threat of mistreatment. . . ." (BN 81.)

10 U.S.C. §948a(1)(i). In addition to this definition, the MCA contains the list of crimes for which an enemy combatant can be charged and tried under that Act. 10 U.S.C. §950v ("[c]rimes triable by military commissions"). Petitioner Ali maintains that his conduct fails to satisfy the criminal elements of any of these chargeable crimes.[10]

Ironically, one of the crimes listed in the MCA, "attacking civilians" actually defines a "civilian" for purposes of the Act's prosecution provisions as a person "*not taking active part in hostilities.*" 10 U.S.C. §950v(b)(2) (emphasis added). This definition is consistent with international law; ironically, however, while Petitioner Ali is being detained as an enemy combatant, one who attacked *him* on the battlefield could be prosecuted for attacking a civilian. Said differently, Petitioner Ali is specifically defined as a civilian, and not as a combatant, under the MCA itself.

Based on the treatment of Petitioner Ali, the government's position appears to be that it may detain anyone, *indefinitely,* based solely on unsupported (and denied) allegations of "associations," all where there is no evidence that the person ever committed an act of hostility towards the United States or ever intended to commit such an act.[11] If the promise of the Great Writ and the laws of this country stand for anything, it is that such a proposition cannot be correct.

---

[10] Even the broadest crime, "providing material support for terrorism," requires that a person provide "material support or resources" to an organization that he or she knows is engaged in terrorism against the United States. 10 U.S.C. §950v(b)(25). Neither CSRT Tribunal found that Petitioner Ali provided material support for terrorism and there is no evidence in the CSRT Record that he did.

[11] This Court has already instructed that United States citizenship is no insulation to being held as an enemy combatant. *Hamdi v. Rumsfeld,* 542 U.S. 507, 516 (2004).

22

CONCLUSION

The petition should be granted.

Respectfully submitted,

*Angela C. Vigil*
Angela C. Vigil
*Counsel of Record*
Baker & McKenzie LLP
1111 Brickell Ave, Suite 1700
Miami, FL 33131
(305) 789-8900

George M. Clarke III
Baker & McKenzie LLP
815 Connecticut Ave., N.W., Suite 900
Washington, DC 20006
(202) 452-7068[12]

*Counsel for Petitioner*

Dated: February 12, 2007

---

[12] Edwin S. Matthews, an attorney in the New York office of Baker & McKenzie LLP and a member of the bar of this Court, assisted in the preparation of the un-classified portions of this Petition.