No. 07-_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

**BAHTIYAR MAHNUT, ABDUL NASSAR, THABID,**
and **ARKIN AMAHUD** as Next Friend of Bahtiyar Mahnut,

PRISONERS, Guantanamo Bay Naval Station, Guantanamo Bay, Cuba,

*Petitioners/Plaintiffs,*

v.

**ROBERT M. GATES,**
SECRETARY OF DEFENSE OF THE UNITED STATES OF AMERICA,

*Respondent/Defendant.*

**PETITION FOR IMMEDIATE RELEASE AND OTHER RELIEF
UNDER DETAINEE TREATMENT ACT OF 2005**

**BINGHAM McCUTCHEN LLP**
P. Sabin Willett
Susan Baker Manning
2020 K STREET, N.W.
WASHINGTON, D.C.  20006
Telephone:   (202) 373-6000
Facsimile:    (202) 373-6001
*Attorneys for Petitioner Abdul Nassar*

**ELIZABETH P. GILSON,
    ATTORNEY AT LAW**
383 Orange Street
New Haven, Connecticut  06511
Telephone:  (203) 777-4050
Facsimile:  (203) 787-3259
*Attorney for Petitioners Bahtiyar Mahnut
and Arkin Amahud*

**BAKER & MCKENZIE LLP**
George M. Clarke III
Angela C. Vigil
815 Connecticut Avenue, N.W.
Washington, D.C. 20006
Telephone (202) 452-7000
Facsimile: (202) 452-7074
*Attorneys for Petitioner Thabid*

## TABLE OF CONTENTS

                                                                              Page

I.    PRELIMINARY STATEMENT ................................................................2

II.   INTRODUCTION ................................................................................2

III.  JURISDICTION ..................................................................................5

IV.   PARTIES ............................................................................................6

V.    STATEMENT OF FACTS ....................................................................7

      A.   The 9/11 Murders and the Afghanistan War ..............................7

           1.   The Authorization for Use of Military Force .......................7

           2.   The Afghanistan War................................................................7

           3.   The President's November 13, 2001 Executive Order .........9

      B.   The Petitioners............................................................................10

           1.   The Oppression of the Uighur People in China...............10

           2.   Petitioners' Flight from China to Afghanistan .................11

           3.   The Uighur Village in Afghanistan ...................................12

           4.   Flight From Afghanistan and Arrest By Pakistani Bounty Hunters.........13

      C.   Guantanamo Bay .......................................................................15

           1.   The Interrogation Prison....................................................15

           2.   The Uighurs at Guantanamo ..............................................16

           3.   China's Effort to Exploit the "Global War on Terror" to Quell
                Political Dissent Among the Uighur Population ......................20

           4.   China Acquiesces in U.S. War Plans in Exchange for "Terrorism"
                Charges Against the Uighurs...............................................21

           5.   Harsh Interrogations at Guantanamo by Communist Chinese
                Interrogators.......................................................................24

           6.   The Twin Dangers of Rendition and Indefinite Detention ......................27

      D.   The CSRT Process......................................................................30

           1.   The Government's Admission that CSRTs were not a Substitute
                for Habeas Review...............................................................31

           2.   The Enemy Combatant Definition......................................32

           3.   The Pre-Hearing Phase:  The Role of the Recorder ................................32

           4.   The Personal Representative Was Structurally Incapable Of
                Rendering Effective Assistance To A Prisoner ......................35

           5.   The CSRT Hearing Was Designed To Rubber Stamp Prior "Enemy
                Combatant" Determinations.................................................36

           6.   The Evidence Relied Upon By The Tribunal Was Unavailable To
                The Prisoner and Inherently Unreliable..............................36

           7.   The CSRT Improperly Presumed Petitioners' Guilt................................39

TABLE OF CONTENTS
(continued)

Page

E.    Petitioners' CSRTs Erroneously Classified Petitioners as "Enemy
Combatants." ..................................................................................................39

VI.    CAUSES OF ACTION....................................................................................44

A.    Count I Relief Under Section 1005(e)(2)(C)(i) of the Detainee Treatment
Act (Failure Appropriately to Apply "Enemy Combatant" Definition)..............44

1.    There was no reliable evidence, in the case of any Petitioner, of
"affiliation." .............................................................................................45

2.    There was no reliable evidence that any Petitioner engaged in
hostile military activity .............................................................................46

B.    Count II Relief Under Section 1005(e)(2)(C)(i) of the Detainee Treatment
Act (Failure of Recorder to Apprise Panels of Evidence Dispositive of
Non-Combatant Status) ....................................................................................46

C.    Count III Relief Under Section 1005(e)(2)(C)(i) of the Detainee Treatment
Act (Failure to Apply Standards Uniformly)........................................................49

D.    Count IV Relief Under Section 1005(e)(2)(C)(i) of the Detainee Treatment
Act (Failure of the Tribunal Panels to Adhere to Standards) ...............................49

E.    Count V Relief Under Section 1005(e)(2)(C)(ii) of the Detainee Treatment
Act (Failure to Apply Standards in Conformity with the Constitution and
Laws of the United States).................................................................................50

1.    The Decision-Maker was Not Neutral.........................................................52

2.    Petitioners had No Notice of What Charge or Allegation to Meet...........54

3.    Petitioners Were Denied a Meaningful Opportunity to Contest the
Charges Against Them .............................................................................55

VII.    LEAVE TO AMEND .........................................................................................57

VIII.    PRELIMINARY INJUNCTION AGAINST TRANSFER OF PETITIONERS.............57

IX.    PRAYER FOR RELIEF .....................................................................................59

DCDOCS/677423.2/0999997-0000928762

## I.    PRELIMINARY STATEMENT

1.    In late August, 2002, as an international crisis swirled around Saddam Hussein's regime in Iraq, two senior ministers raced to Beijing. One, Iraqi Foreign Minister Naji Sabri, would urge the People's Republic of China to oppose a U.S.-led invasion. The other, U.S. Deputy Secretary of State Richard Armitage, sought Chinese support for U.S. war plans. Chinese diplomats skillfully played one against the other, but Mr. Armitage gained the advantage. Chinese President Jiang Zemin assured President Bush two months later in Crawford, Texas that the Chinese would acquiesce in American war plans. For this acquiescence, China demanded concessions. The list included Taiwan, trade regulations, and one additional demand.

2.    Twenty-two Uighurs—political dissidents and opponents of Communism—had been swept up by mistake in the U.S. "war on terror" and were then being held at the United States Naval Station at Guantanamo Bay, Cuba ("Guantanamo"). China wanted them branded by the U.S. as "terrorists."

3.    In the crisis atmosphere of the time, the interests of a few dozen refugees paled beside the urgency of the Administration's war plans. On August 26, 2002, in a conference room in Beijing, Mr. Armitage gave the point.

4.    The Iraq deal sealed the fate of the five Petitioners here. More than four years have passed. Long-discarded pawns in a diplomatic match between superpowers, Petitioners today remain illegally imprisoned at Guantanamo.

## II.    INTRODUCTION

5.    This Petition for Release and Other Relief under the Detainee Treatment Act of 2005 ("DTA"), and, in the Alternative, for Writ of Habeas Corpus is submitted on behalf of Petitioners Bahtiyar Mahnut (a.k.a. Sad'r) ), Abdul Nassar (a.k.a. Abdul Helil Mamut), and Thabid (a.k.a. Dawut Abdurehim) (collectively, "Petitioners"). Petitioners are Uighur (pronounced "Wee-ghur") refugees who will shortly embark on their sixth year of unlawful imprisonment by Respondent. They are held in cages at Guantanamo.

6.      Petitioners are not, nor have they ever been "enemy combatants." They have never been members, supporters or sympathizers of the Taliban, Al Qaeda or any other terrorist organization. Petitioners never participated in military activity of any kind against the United States or any Coalition partner.

7.      The Uighurs are a Muslim ethnic minority from far western China. Overrun by Mao Tse Tung in 1949, their homeland, which they refer to as "East Turkistan," has been under the sometimes-brutal domination of Communist China ever since. Each Petitioner fled communist oppression in or before 2001. At the time, each Petitioner venerated the United States as the world's bulwark against communist tyranny.

8.      Petitioners are six of eighteen Uighurs currently or formerly imprisoned at Guantanamo whose circumstances were—*as Respondent has conceded*—the same in every material way. Panels determined that five of the eighteen were not enemy combatants. A sixth was determined to be a noncombatant until Washington ordered the result changed. *In every particular, Petitioners were situated precisely the same as those whom the Combatant Status Review Tribunals ("CSRTs") determined were not enemy combatants.*

9.      While maintaining *at home* that the Petitioners' are "enemy combatants," Respondent has for more then three years been peddling the Petitioners *abroad* to dozens of countries as innocents who are appropriate for resettlement. Their imprisonment continues not because there is any lawful basis for it, but because Respondent, by bringing them to Guantanamo, has so destroyed their reputation that no other country will take them, and the United States, for reasons of public relations, will not take them itself.

10.     Every Guantanamo prisoner, including every Petitioner here, was repeatedly assured by Respondent in 2004, prior to his CSRT, that the CSRT was *not* a substitute for habeas corpus, and that his right to habeas review in the U.S. Courts would proceed independently. Every prisoner was entitled to, and did rely on that instruction. It also appears categorically that the military itself relied on that clear distinction, for it never attempted to duplicate a fair process or an objective investigation into truth, or any other aspect of the traditional habeas proceeding.

DCDOCS/677423.2/0999997-0000928762

11.     After five years in U.S. custody, Petitioners are living experiments as to the consequences of indefinite imprisonment on a human being. Half a world away from their home, they do not know the language or customs of their captors, have been denied contact with family, friends, and the outside world, and have been subjected to cruel, inhumane, and degrading treatment. Most show symptoms of desolation and clinical depression, and exhibit fear, paranoia and hopelessness.

12.     In light of these symptoms, it might be expected that Respondent would improve the conditions of imprisonment. He has not. Instead, Respondent has moved Petitioners into a newly constructed prison called Camp VI.

13.     In Camp VI, each Petitioner is imprisoned alone in a cell. Each cell contains a bed, toilet, sink, and metal mirror. No cell admits any natural light or air. There are no windows or openings in the walls, floor, or ceiling, except strips of glass approximately four inches wide by twenty four inches high. The glass gives a view of the an interior corridor where MPs are stationed, and of a clock. Petitioners have no television, no access to magazines or books, and no way to communicate with the outside world. They have no family visits. They are imprisoned alone, they eat alone, and they pray alone. They are provided with two hours of recreation time, often in the middle of the night. "Recreation" is limited to a concrete box fifteen meters by four meters, and two stories high. This box is divided into cages, each three by four meters. Petitioners are permitted to spend two hours in these small cages alone. At night they often sleep instead. A Petitioner never touches another living being, and he is prohibited from doing so. The only human touch he is afforded or allowed is the grip of rubber gloves which push and pull him to his cage and back, and hold him while he is unshackled and shackled before and after he leaves.

14.     Camp VI is like no prison within United States. Some of the conditions in Camp VI bear some semblance to those in super maximum ("supermax") facilities—except that Camp VI is much more severe. Supermax facilities are the highest security prisons and subject prisoners to the harshest conditions within the United States. Prisoners spend hours alone in a

small cell, devoid of human contact. They can not converse, cannot hear, and cannot touch other human beings. They are absolutely alone, in the most real sense. Long-term studies suggest that these prisons drive prisoners insane. *See* Jeffrey Klugar, *Are Prisons Driving Prisoners Mad*, TIME, Jan. 26, 2007 (noting that this type of imprisonment has been compared to "touchless torture"). Conditions in Camp VI are substantially worse. Detainees are in smaller cells, they are provided with no reading material and no television, and they are provided with no visiting rights. They are suffering as a result.

15.    These are extreme cases. The case for Petitioners' imprisonment is so contrived, so false, so shameless, so contemptible, so utterly without legal, moral or intellectual basis, so empty of integrity, so cynical an instance of *realpolitik*, that under any standard of review—even the crabbed provisions of the Detainee Treatment Act—these cases cry out for immediate relief.

16.    These cases have become a profound stain on the Judicial Branch itself. The imprisonment simply must be brought to an end.

## III.    JURISDICTION

17.    Petitioners bring this action under the Detainee Treatment Act of 2005, Pub. L. No. 109-148, §§ 1001-1006, 119 Stat. 2680, 2739-45 (Dec. 30, 2005) ("DTA"). Petitioners invoke this Court's jurisdiction under § 1005(e)(2)(A) of the DTA, granting this Court original jurisdiction over DTA claims. Because they seek declaratory relief, Petitioners also rely on 28 U.S.C. § 2201.

18.    Petitioners bring their alternative habeas corpus action under 28 U.S.C. §§ 2241 and 2242. Petitioners further invoke this Court's original jurisdiction under 28 U.S.C. §§ 1331, 1350, 1651, 2201, and 2202; 5 U.S.C. § 701 *et seq.*; and Articles I and II of the Constitution of the United States, and the Fifth, Sixth, and Eighth Amendments thereto.

19.    This Court is further empowered to declare the rights and other legal relations of the parties herein by 28 U.S.C. § 2201, and to effectuate and enforce declaratory relief by all necessary and proper means by 28 U.S.C. § 2202, as this case involves an actual controversy within the Court's jurisdiction, and to issue all writs necessary or appropriate in aid of its

DCDOCS/677423.2/0999997-0000928762

jurisdiction by 28 U.S.C. § 1651.

## IV.    PARTIES

20.     Petitioners Thabid (a.k.a. Dawut Abdurehim), Abdul Nassar (a.k.a. Abdul Helil Mamut), and Bahtiyar Mahnut (a.k.a. Sad'r) are Uighur refugees from the People's Republic of China currently imprisoned at Guantanamo under Respondent's custody and control. Petitioners' jailers refer to them, and to all other inmates at Guantanamo, by a number, not a name. Thabid's ISN is 289. Abdul Nassar's ISN is 278. Mr. Mahnut's ISN is 277. On information and belief, Respondent convened a CSRT as to each Petitioner, and each Petitioner was classified as an "enemy combatant."[1]

21.     Arkin Amahud is a Uighur refugee who is currently incarcerated at Guantanamo. He is Petitioner Mahnut's older brother. Unlike his brother, Mr. Amahud was not arrested with the group of 18 Uighurs in Pakistan. Mr. Amahud, who had traveled to Afghanistan to search for his younger brother, was arrested in northern Afghanistan by an Afghan warlord, and later turned over to U.S. forces. Mr. Amahud. Because Petitioner Mahnut has been denied access to legal counsel and to the courts of the United States, Mr. Amahud acts as his Next Friend.

22.     Robert M. Gates is Secretary of Defense of the United States of America. Secretary Gates has been charged by the President of the United States with maintaining custody and control over Petitioners, and is responsible therefor. Respondent is responsible for activities undertaken by or under the supervision of officers, agents or employees acting on his behalf, or of agents or employees of private contractors with whom any agency under Respondent's authority or supervision has contracted for the provision of services. Specifically, Respondent,

---

[1] Respondent represented to the district court in *Kiyemba v. Bush* that each Petitioner therein, including Abdul Nassar, is an "enemy combatant." *See, e.g.*, Respondents' Opposition to Petitioner's Motion for Leave to File Surreply at 3, *Kiyemba v. Bush*, No. 05-1509 RMU (D.D.C. filed Nov. 11, 2005). Respondent has never provided a fact return setting forth the basis of his continued incarceration of Abdul Nasser. As to Petitioner Abdul Nasser, the information available to counsel is, therefore, limited. Although Respondent was required by the district court to provide a factual returns for Petitioner Thabid and a partial factual return for Petitioner Mahnut, these returns provide little information, no concrete evidence, and absolutely no substantive rationale for their imprisonment of over five years.

through his delegated authority, is responsible for the conduct of the CSRT that was convened with respect to each Petitioner. All references to "Respondent" include Secretary Gates, his immediate predecessor former-Secretary of Defense Donald H. Rumsfeld, and those acting under his or Mr. Rumsfeld's direction or supervision, or the direction or supervision of any officer, agent, employee or private contractor acting on his or Mr. Rumsfeld's behalf or under his or Mr. Rumsfeld's authority. Respondent Gates is a proper party to this proceeding pursuant to section 1005(e)(4) of the DTA. He is sued in his official capacity.

## V.    STATEMENT OF FACTS

### A.    The 9/11 Murders and the Afghanistan War

#### 1.    The Authorization for Use of Military Force

23.    On September 11, 2001, nineteen terrorist aliens, none of them Uighurs, hijacked aircraft and carried out the savage murders in New York, Virginia, and Pennsylvania that became infamous as "9/11." The United States quickly determined that the Al Qaeda terrorist organization was responsible for the 9/11 murders, and that this group had been given sanctuary in Afghanistan by its government, the extremist Islamist group known as the Taliban.

24.    Seven days later, Congress authorized the President "to use all necessary and appropriate force against those nations, organizations, or persons" that "planned, authorized, committed or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons." Authorization for Use of Military Force ("AUMF"), P.L. 107-40, 115 Stat. 224 (Sept. 18, 2001). Congress did not then or later authorize the President to use military or other force against any Uighur or group of Uighurs.

25.    Neither the President nor any unit of the United States government has ever determined that any Uighur person or group planned, authorized, committed or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons.

#### 2.    The Afghanistan War

26.    On October 7, 2001, American and British forces began bombing Taliban and Al Qaeda strongholds in Afghanistan. U.S. ground forces entered Afghanistan on October 18, 2001,

in cooperation with Afghan factions hostile to the governing Taliban, loosely known as the "Northern Alliance." The U.S. bombed and provided close air support, while Afghan forces took the lead in most (although not all) ground combat operations. This approach meant that in most cases, it was not U.S. or British forces that captured enemy prisoners of war.

27.    Mazar-e-Sharif fell to Northern Alliance forces on November 9, 2001. Kabul and Konduz followed. The Taliban was overthrown on December 9, 2001, when its forces surrendered Kandahar and Taliban Supreme leader Mullah Omar fled the city. Kenneth Katzman, *Afghanistan: Post-War Governance, Security, and U.S. Policy, Congressional Research Service Report for Congress* RL30588, CRS-10 (Aug. 23, 2006).

28.    On December 22, 2001, an interim government headed by Hamid Karzai and endorsed by the United States and the United Nations was formed. On or about January 29, 2002, the State Department determined that the Taliban had relinquished its control over all territories in Afghanistan. *Id.* at CRS-53.

29.    Afghans ratified a new constitution in January 2004, held a national presidential election in November 2004, and elected a parliament in November 2005. *Id.* at CRS-13.

30.    The United States long ago acknowledged the successful conclusion of the international armed conflict in Afghanistan authorized by the AUMF. On May 1, 2003, then-Secretary of Defense Donald H. Rumsfeld said: "[I]n regard to Afghanistan, [President] Bush, U.S. Central Command Chief Tommy Franks, and Afghan President Hamid Karzai 'have concluded we're at a point where we clearly have moved from major combat activity to a period of stability and stabilization and reconstruction activities.'" *Rumsfeld: Major Combat Over in Afghanistan*, CNN, May 1, 2003, *available at* http://www.cnn.com/2003/WORLD/asiapcf/central/05/01/afghan.combat/.

31.    On September 28, 2006, NATO took full control of all military operations in Afghanistan.

32.    While it remains a dangerous and unstable place whose government, aided by NATO forces, continues to be subject to terrorist and insurgent attack, the Islamic Republic of

DCDOCS/677423.2/0999997-0000928762

Afghanistan is today a sovereign nation. It is not the nation that gave harbor to the 9/11 murderers. The new nation is an ally of the United States. Its President has been welcomed to the White House. Thus the international armed conflict that Congress authorized on September 18, 2001—between the United States and the "nations . . . [that] planned, authorized, committed or aided the terrorist attacks that occurred on September 11, 2001"—is long past.

33.      One of the crowning ironies of Guantanamo is this: prisoners remain imprisoned there on the theory that once they had some Taliban connection in Afghanistan, while Afghanistan, a U.S. ally, has itself reintegrated tens of thousands of actual Taliban soldiers into society. The new Afghanistan government "disarmed 63,380 ex-combatants, demobilized 62,044 and provided reintegration programs for 55,804." Co-Chairs' Summary: The Second Tokyo Conference on Consolidation of Peace in Afghanistan (DDR/DIAG)(July 5, 2006), *available at* http://www.mofa.go.jp/region/middle_e/afghanistan/summary0607.html. The Afghanistan New Beginnings Program ("ANBP"), made its goal from the start "to disarm tens of thousands [of] officers/soldiers and provide them with education, training, and/or job opportunities suited to their particular needs, interests, and skills." DDR Programme Summary, *available at* http://www.undpanbp.org/Overview/programme/summary.htm. The ANBP has provided vocational training and work to over half of the estimated 100,000 former members of the Afghan Military Forces under the Taliban. DDR Fact Sheet, *available at* http://www.undpanbp.org/Overview/factsheet.htm.

### 3.      The President's November 13, 2001 Executive Order

34.      On November 13, 2001, while international armed conflict was active in Afghanistan, President Bush issued an Executive Order authorizing Respondent to detain indefinitely "any individual who is not a United States citizen with respect to whom [the President] determine[s] from time to time in writing" that:

> there is reason to believe that such individual, at the relevant times,
>
> (i) is or was a member of the organization known as al Qaida;
>
> (ii) has engaged in, aided or abetted, or conspired to commit, acts

DCDOCS/677423.2/0999997-0000928762

of international terrorism, or acts in preparation therefore, that have caused, threaten to cause, or have as their aim to cause, injury to or adverse effects on the United States, its citizens, national security, foreign policy, or economy; or

(iii) has knowingly harbored one or more individuals described in subparagraphs (i) and (ii)

Executive Order, Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism, 66 Fed. Reg. 57,833 (Nov. 13, 2001) ("Executive Order").

35.    The President has never certified or determined in any manner, nor could so certify based on the undisputed facts, that any Petitioner is subject to the Executive Order.

**B.    The Petitioners**

**1.    The Oppression of the Uighur People in China**

36.    Petitioners are natives of the Xinjiang Uyghur Autonomous Region, a far-western province of the People's Republic of China known to its native Uighur population as "East Turkistan." Uighurs from this region are subject to severe political and religious persecution by the communist government. The oppression of the Uighur people, and the state-sponsored mass-migration of millions of ethnic Han Chinese into the Uighur homeland, has led to ethnic tensions and a Uighur nationalist movement. U.S. Dep't of State, *Country Reports on Human Rights Practices—2004—China* (2005), *available at* http://www.state.gov/g/drl/rls/hrrpt/ 2004/41640.htm.

37.    In 1997, China redoubled its efforts against advocates for separatism. *Id.* at 36. "Because the Government authorities in Xinjiang regularly grouped together those involved in 'ethnic separatism, illegal religious activities, and violent terrorism,' it was often unclear whether particular raids, detentions, or judicial punishments targeted those peacefully seeking to express their political or religious views or those engaged in violence." *Id.* China "continues to brutally suppress any peaceful political, religious, and cultural activities of Uighurs, and enforce a birth control policy that compels minority Uighur women to undergo forced abortions and sterilizations." Amnesty International, China Report 2005, *available at* http://web.amnesty.org/report2005/chn-summary-eng.

DCDOCS/677423.2/0999997-0000928762

38.     The United States has long condemned China's record of human rights abuses

generally, and its oppression of the Uighurs particularly.  According to the State Department, in

China during 2004 "[f]ormer detainees reported credibly that officials used electric shocks,

prolonged periods of solitary confinement, incommunicado detention, beatings, shackles, and

other forms of abuse. . . .  Deaths in custody due to police use of torture to coerce confessions

from criminal suspects continued to occur."  U.S. Dep't of State, *Country Reports on Human

Rights Practices—2004—China*, § 1(c) (2005), *available at* http://www.state.gov/g/drl/rls/

hrrpt/2004/41640.htm.

39.     9/11 gave Beijing a new card.  Soon afterwards, it exploited the "war on terror" as

a pretext for cracking down harshly on Uighur political dissent.  *See* Joshua Kurlantzik,

"Unnecessary Evil: China's Muslims aren't terrorists. So why did the Bush administration give

Beijing the green light to oppress them?" Washington Monthly (Dec. 1, 2002) ("More than 3,000

Uighurs reportedly have been secretly jailed since 9/11, and many have been executed for no

given reason.  Xinjiang province . . . remains the only place in China where people are routinely

put to death for purely political disagreement.").  According to the State Department:

> The [Chinese] Government used the international war on terror as
> a justification for cracking down harshly on suspected Uighur
> separatists expressing peaceful political dissent and on independent
> Muslim religious leaders. . . .  Uighurs were executed and
> sentenced to long prison terms during the year on charges of
> separatism . . . on October 2003, Uighur Shaheer Ali was executed
> after being convicted of terrorism. He had been repatriated forcibly
> from Nepal in 2002, where he had been interviewed by the
> UNHCR and granted refugee status.

U.S. Dep't of State, *Country Reports on Human Rights Practices—2004—China* (2005) at

Introduction and § 5, subsection on National Racial/Ethnic Minorities, *available at*

http://www.state.gov/g/drl/rls/hrrpt/2004/41640.htm.

### 2.     Petitioners' Flight from China to Afghanistan

40.     Petitioner Bahtiyar Mahnut  (a.k.a Sad'r) (ISN 277), 30, is from Ghulja, a city

astride the Lli River in western Xinjiang, near the border with Kazakhstan.  In Ghulja, he ran a

small business selling clothing.  *See* Summary of Admin. Rev. Board's Proceedings for ISN 277,

20303, 20312, *available at*

http://www.dod.mil/pubs/foi/detainees/csrt/ARB_Transcript_Set_6_20255-20496.pdf. He left

the city amid increasing political oppression of the Uighurs by the Chinese. *Id.* at 20311. He did

not want to "waste his youth" in such a climate, and hoped to travel to a country like the United

States or Canada. *Id.* Mr. Mahnut decided to travel first to Pakistan, and eventually to

Afghanistan, where he heard that there were Uighurs living in a small village in. *Id.*

      41.    Petitioner Thabid (a.k.a. Dawut Abdurehim) (ISN 289), 30, left Ghulja with two

other Uighurs to start a business "and also to live a better life." FOIA CSRT 1621. Thabid had

attended school for some time, and owned a business selling animal skins. *Id.* at 1614. His goal

was to travel abroad with his business and return to China when the Uighurs gained their

independence. *Id.* He began this journey by traveling to Kyrgyzstan with two other Uighurs. *Id.*

at 1621. During his travels, Thabid heard about Uighurs who were living in Afghanistan. *Id.* at

1614. In early summer he and his business partners traveled into Afghanistan to join the Uighurs

there. He lived in the Uighur village from June until October when it was bombed. *Id.* at 1615.

      42.    Petitioner Abdul Nassar (a.k.a. Abdul Helil Mamut) (ISN 278), 29, is from

Kashgar, an ancient city built along what was once the silk road in western Xinjiang. Abdul

Nassar left China to secure an education in Pakistan. FOIA CSRT 3107. He studied for three

years at Lahore Institute, a technical school. *Id.* at 3108 However, Abdul. Nassar grew

frustrated with his progress. *Id.* "It was really hard and I had to study really hard. I had to

memorize all kinds of things because I did not have a basic education in the past." *Id.* at 3108.

When Abdul Nassar heard about Uighurs who were living in Afghanistan, he traveled there to

"try to help [his] country and [his] people." *Id.*

      **3.**    **The Uighur Village in Afghanistan**

      43.    In 2001, a Uighur expatriate village—which the military would later label a

"training camp"—was located in the White Mountains of Afghanistan near Jalalabad and the

Pakistan border.

      44.    There were no Afghans or Arabs in the village. The village itself was no more

DCDOCS/677423.2/0999997-0000928762

than a handful of houses bisected by dirt tracks. Each Petitioner, as well as five Uighurs who would later be determined non-combatants, lived at this village in October, 2001. In return for food and shelter, the Uighur men did odd construction jobs and manual labor. They helped build houses and a mosque.

45.    In the village there was a single AK-47 Kalashnikov rifle and a pistol. Sixteen of the eighteen Uighurs (including all Petitioners, and all five of the Uighurs later determined to be noncombatants) freely admitted that they were shown the Kalashnikov, and how to assemble and disassemble the weapon. Some engaged in target practice. *See, e.g.,* FOIA CSRT 001365 (Akhtar Qassim, later determined *not* to be an enemy combatant, shot 3 or 4 bullets).

46.    This was not military activity. Persons legally may do exactly the same thing at gun clubs and rifle ranges all over the United States. It was particularly unremarkable in a country like Afghanistan where Kalashnikovs outnumber adult males.

### 4.    Flight From Afghanistan and Arrest By Pakistani Bounty Hunters

47.    In mid-October 2001, the village was bombed. In the chaos and confusion, eighteen unarmed Uighur men fled together to the mountains. Among them were the Petitioners, as well as five Uighurs later determined to be non-combatants.

48.    The Uighurs never fought against the United States or coalition forces, nor supported forces hostile to or engaged in armed conflict with the United States. Near starvation, they crossed into Pakistan, where they were taken in by local villagers who fed them and gave them shelter.

49.    This was not an act of hospitality. In late 2001, the U.S. distributed leaflets throughout northeastern Afghanistan and western Pakistan, promising substantial bounties for "terrorists." Leaflets were "dropping like snowflakes in December in Chicago," according to Secretary of Defense Rumsfeld. Remarks at a Department of Defense News Briefing, Nov. 19, 2001, *available at* http://www.washingtonpost.com/wp-srv/nation/specials/attacked/transcripts/ rumsfeldtext_111901.html. One leaflet said:

Get wealth and power beyond your dreams. Help the Anti-Taliban

> Forces rid Afghanistan of murderers and terrorists. You can
> receive millions of dollars for helping the Anti-Taliban Force catch
> Al-Qaida and Taliban murderers. This is enough money to take
> care of your family, your village, your tribe for the rest of your life.
> Pay for livestock and doctors and school books and housing for all
> your people.

*Available at* http://www.psywarrior.com/afghanleaf40.html. *See also* Mark Denbeaux *et al.*, *The*

*Guantanamo Detainees: the Government's Story* at 2-3 (2006), *available at*

http://law.shu.edu/news/guantanamo_report_final_2_08_06.pdf ("Denbeaux I") (up to 86% of

Guantanamo detainees may have been handed over to the United States in return for a bounty);

*Guantanamo detainees say Arabs, Muslims sold for U.S. bounties*, USA TODAY, May 31, 2005

(reporting that certain Guantanamo detainees testified to CSRT that they had been sold to

American forces for bounties ranging from $3,000 to $25,000).

50.    Locals were quick to oblige, and hundreds of "terrorists" were turned in for cash.

Victims of this commerce often were foreigners without friends or tribal ties, or those against

whom there was an inter-tribal grudge.

51.    The Uighurs were easy prey. In approximately December, 2001, Pakistani

villagers lured the Uighurs to a mosque, where they were surrounded and arrested by Pakistani

security forces. *See, e.g.,* FOIA CSRT 01236. The Pakistanis turned the eighteen Uighurs over

to the U.S. military. On information and belief, they were rewarded with substantial bounties.

Petitioners learned in Kandahar that the United States paid a $5,000 bounty for each Petitioner.

*See generally* FOIA CSRT 001220.

52.    Beginning in approximately January 2002, all eighteen Uighurs, including

Petitioners here, were held at the U.S. military base at Kandahar, Afghanistan. Conditions were

primitive; treatment severe. The Uighurs were repeatedly interrogated by United States military

and government personnel, and sometimes beaten. The United States gave none of the Uighurs,

including Petitioners, any hearing or other lawful process upon their initial detention, prior to

their transfer to the U.S. military facility at Kandahar, Afghanistan, or prior to their transfer to

Guantanamo.

53.    Before the Kandahar imprisonment had ended, U.S. forces had realized that a

mistake had been made. Adel Abdul Hakim, for example, was told that he had been taken prisoner by mistake. *Qassim et al v. Bush*, no. 00497 JR, Decl. of Sabin Willett, Doc. 24-1 at 3 (D.D.C. filed July 22, 2005).

## C.    Guantanamo Bay

### 1.    The Interrogation Prison

54.    Soon after the Afghanistan war began, the United States began receiving aliens, captured principally in Afghanistan and Pakistan, but also in places around the globe, including Bosnia, Gambia, and Thailand. These captures have been widely misrepresented as "battlefield" captures made during the nation's armed conflict in Afghanistan. For example, on March 21, 2002, the General Counsel of the Department of Defense said that the Guantanamo detainees were "captured on the battlefield seeking to harm U.S. soldiers or [our] allies." DOD News Briefing on Military Commissions (March 21, 2002), http://www.defenselink.mil/transcripts/ Transcript.aspx?TranscriptID=3367.

55.    The core proposition of battlefield capture was important to Respondent. It provided, from the beginning, the argument that exigency governed the status determination, and that "status" was a military question as to which substantial deference should be granted to the Defense Department.

56.    The proposition was, from the beginning, almost entirely false. Just as the Uighurs were captured far from any battlefield, CSRT records (the military's charges, without regard to the contentions of the prisoners), show that only five percent of the Guantanamo prisoners are even *alleged* to have been taken on a battlefield. *See* Denbeaux I, *supra*, at 2. Up to eighty-six percent of the men in Guantanamo may have been sold to U.S. forces for a bounty by either Pakistan or the Northern Alliance. *Id*. at 3. The military does not accuse the majority of the Guantanamo population of having participated in a single hostile act against anyone. *Id*. at 2.

57.    These captures had nothing to do with the detention of enemy combatants during armed conflict. Rather, the idea was that by capturing a large number of potential sources of

intelligence, isolating them, and interrogating them harshly,[2] interrogators would discover "pieces" of the "information mosaic." These pieces then could be reassembled to counter terrorism. *See generally* Joseph Margulies, *Guantanamo and the Abuse of Presidential Power* (Simon & Schuster 2006); *but see Hamdi v. Rumsfeld*, 542 U.S. 507, 521 (2004) (indefinite detention for purposes of interrogation is unlawful). Because the object was intelligence, not the capture of combatants, captures were not limited to Taliban soldiers or members of Al Qaeda. The military seized anyone they perceived might be a source of intelligence value.[3] In 2002, no one worried about what to do with the prisoners later.

58.    Respondent began transporting captured prisoners to Guantanamo in January 2002. Respondent denied them prisoner-of-war status. Respondent has contended that they classified them as "enemy combatants," although they have never produced any evidence that any such "classification" occurred prior to the 2004 CSRTs. Generally Respondent uses the euphemism, "detainees," to describe the prisoners. There is no record evidence of an official process, determination, or classification having taken place for any Petitioner prior to August 2004.

## 2.    The Uighurs at Guantanamo

59.    Respondent transferred the Uighurs to Guantanamo in approximately June, 2002, and have imprisoned each Petitioner there ever since.

60.    At Guantanamo, Petitioners are completely cut off from the world. Respondent

---

[2]  As of February 2006, ninety-eight prisoners had died in U.S. custody since 9/11, and thirty-four of those deaths were being investigated by the military as suspected or confirmed homicides. Human Rights First, "Command's Responsibility: Deaths in U.S. Custody in Iraq and Afghanistan," Feb. 22, 2006, *available at* http://www.humanrightsfirst.info/pdf/06221-etn-hrf-dic-rep-web.pdf.

[3]  Intelligence gathering in Afghanistan was prone to error. As one intelligence officer described it, Afghanistan "has a level of complexity that is almost unfathomable." *See* Daniel Bergner, *Where the Enemy is Everywhere and Nowhere*, N.Y. TIMES, July 20, 2003 (Magazine). As a result, "we haven't managed in the least to understand the country." *Id.* Another intelligence officer observed: "We thought the detainees were all masterminds. It wasn't the case. Most of them were just dirt farmers in Afghanistan." Jane Mayer, *The Experiment*, THE NEW YORKER, July 11 & 18, 2005.

DCDOCS/677423.2/0999997-0000928762

barred the release of any and all information about the prisoners. They refused to disclose the prisoners' names for four years—until April 2006, when ordered to do so by a federal court—effectively "disappearing" them.

61.     Petitioners and other prisoners have been denied access to their families, friends, counsel, and organizations. Prisoners are not allowed personal visits. They have no access to telephones. They are not allowed newspapers, magazines or other reading material, except for the Koran and a limited range of books pre-approved by the military to which the military controls access as a disciplinary tool. The prisoners may send and receive mail only to and from lawyers, subject to extreme limitations, including page limits, heavy-handed censorship, and extraordinary delays in receipt and delivery.

62.     Many of the Petitioners today demonstrate paranoia, anger, depression, profound sadness, listlessness, hopelessness, and despair. Some have refused visits from counsel, having rationally concluded, after five years, that the American justice system is a sham. Delays in habeas corpus proceedings are deeply destructive of the Petitioners' ability to trust an attorney and effectively present a case.

63.     The conditions of Petitioners' confinement continue to worsen with time. In December 2006 the government arbitrarily moved each Petitioner into a newly constructed facility the government calls Camp VI. The conditions in Camp VI are some of the worst that Petitioners have had to endure.

64.     Camp VI is an imposing physical concrete structure. It has no windows, and is surrounded by multiple fences, cleared areas, and checkpoints guarded by MPs. In Camp VI Petitioners are completely isolated in small six foot by six foot cells. The cell walls, ceiling, and floor are solid metal. The air conditioning is run throughout the day to keep these cells uncomfortably cold. The metal floors and walls conduct what little heat Petitioners may emit, and are cold to the touch.

65.     Each cell is barren, except for a bed, toilet, sink, and metal mirror. There is no natural light or air. Some prisoners have complained that they are painfully cold in their cells.

- 17 -

There are no windows or opening in the walls, floor, or ceiling, except strips of glass approximately four inches wide by twenty four inches high. The glass gives a view of the interior corridor where MPs are stationed, and of a clock.

66. Throughout the day and night the loud churning of the HVAC system and the banging of doors in the facility echo through metal corridors and cells. Petitioners have extreme difficulty sleeping, and are often awakened (purposely) by the guards in the middle of the night. Prisoners are constantly watched by MPs, as they sleep, as they eat, and as defecate.

67. Petitioners have no television, no access to magazines or books, and no way to communicate with the outside world. They have no family visits. They are imprisoned alone, they eat alone, and they pray alone. They sometimes attempt to communicate basic messages with one another by crouching at the door and yelling through a small gap between the floor and the door. A cry can be heard in the halls at times, "Are you all right?" Generally there is silence.

68. Petitioners have little room to move about in cells not much larger than a closet. They are provided with two hours of "recreation" time, often in the middle of the night. "Recreation" is limited to a concrete box fifteen meters by four meters, and two stories high. This box is divided into cages, each three by four meters. Petitioners are permitted to spend two hours in these small cages alone. At night they often sleep instead. Participating in "recreation" involves standing within the caged area and sometimes kicking a soccer ball against the fence.

69. A Petitioner never touches another living being, and is prohibited from doing so. The only human touch he is afforded or allowed is the grip of rubber gloves which push and pull him to the cage and back, and hold him while he is unshackled and shackled before and after he leaves. Petitioners never see, smell, or touch plants, soil, the sea, or any creatures except insects. Each of the Uighur men has expressed an urgent desire for sunlight and fresh air.

70. There are no similar prisons in the United States. Camp VI is generally modeled after a facility in Lenawee County, Michigan, called a super maximum or "supermax" facility. The United States employs supermax prisons to isolate and punish its most violent and dangerous offenders. Altogether, supermax facilities hold around one percent of all prisoners.

*See* Jeffery Klugar, *Are Prisons Driving Prisoners Mad?* Time, Jan. 26, 2007. It is widely

reported that these prisons drive their prisoners insane. *Id.* (noting that the isolation in these

prisons is a type of "touchless torture").[4]

71.     Camp VI may have been modeled on a supermax prison, but its conditions are far

worse. The cells in Camp VI are six foot by six foot, about half the size of a supermax cell that

typically measures a depth of fourteen feet. While prisoners in supermax facilities have access to

television and books, the Uighur men here have not been provided with reading material in their

own language in four years and have no access to television. Most importantly, supermax

prisoners have access to visits with family and friends.

72.     In the six years that the Uighurs have been imprisoned, Respondent has kept them

in total isolation. No friends. No family. They have not touched a loved one in six years, and

they have not touched another human being in months. Uighur prisoner Abdusemet described

Camp VI as "the dungeon above the ground" and noted that it reminded him of a Nazi

concentration camp, "a place where, when they take you in, you never come out." Jan. 20, 2007

Decl. of Sabin Willet, *Parhat v. Gates*, no. 06-1367 (D.C. Cir. filed Dec. 4, 2006).

73.     As a result of these conditions, prisoners within Camp VI are reportedly

becoming psychotic. *See* Suleiman al-Khalidi, *Guantanamo Conditions Said Worse*, Reuters,

Jan. 26, 2007. Their days are now filled with infinite tedium and loneliness. *See* Ben Fox, *Life*

*Harsher in New Guantanamo Unit*, Wash. Post, Feb. 3, 2007. It is also reported that beatings

of the prisoners has increased, one report suggesting that an entire can of mace was sprayed in a

prisoner's face. *Id.*

74.     The Uighur prisoners within Camp VI are suffering similar consequences. All

have reported grave unhappiness. Uighur prisoner Abdusemet reported hearing voices

sometimes. "There is no one to talk to all day in my cell and I hear voices." Uighur prisoner

---

[4] The supermax facilities also raise serious constitutional questions. Currently, at least seven states are
facing charges that their supermax facilities are a form of cruel and unusual punishment.

Hammad Memet has taken to starving himself to death. *See* Jan. 20, 2007 Decl. of Sabin Willet,

*Parhat v. Gates*, no. 06-1367 (D.C. Cir. filed Dec. 4, 2006). Many feel dead already. One

Uighur has asked that counsel tell his wife that he is dead, and she should remarry. *Id.*

> ### 3.    China's Effort to Exploit the "Global War on Terror" to Quell Political Dissent Among the Uighur Population

75.    Soon after 9/11, China began exploiting the U.S.-led "war on terror" by asserting

that Uighur political dissidents were "terrorists."

76.    In October, 2001, a Chinese Foreign Ministry spokesman declared that, as "a

victim of international terrorism," China hoped that "efforts to fight against East Turkistan

terrorist forces should become a part of the international efforts and should also win support and

understanding." *See* Human Rights Watch Report, *Devastating Blows, Religious Suppression of*

*Uighurs in Xinjiang: II, available at* http://hrw.org/reports/2005/china0405/4.htm. The Chinese

government initiated an active diplomatic and propaganda campaign against "East Turkistan

terrorist forces." In particular it urged that there existed a terrorist organization known as the

"East Turkistan Islamic Movement" ("ETIM"), and that Uighur political dissidents were

members of ETIM. This label was to be applied by the Chinese indiscriminately to any Uighur

suspected of political dissidence. Chinese authorities did not distinguish between peaceful

political activists, peaceful separatists, and those advocating or using violence. *Id.*

77.    On November 12, 2001, China told the U.N. Security Council that anti-state

Uighur groups had links with the Taliban in Afghanistan and claimed that they were supported

from abroad by radical Islamist organizations. *Id.*

78.    Chinese officials charged that Uighurs carried out "terrorist operations" by using

"literary means" and "arts and literature" to "distort historical facts." Uighurs were accused of

"taking advantage of art and literature to tout the products of opposition to the people and to the

masses and of advocating ethnic splittist thinking." *Id.*

79.    The United States did *not* believe, however, that ETIM was a terrorist group. On

December 6, 2001 (about the time Petitioners came into U.S. custody), U.S. State Department

Coordinator for Counter-terrorism Francis X. Taylor said, following talks in Beijing, that "the

U.S. has not designated or considers the East Turkistan organization as a terrorist organization."

September 11, 2001: Attack on America: Press Conf. of Ambassador Francis X. Taylor, Beijing,

China (Dec. 6, 2001), http://www.yale.edu/lawweb/avalon/sept_11/taylor_003.htm.  The State

Department prepared a list of terrorist organizations.  *ETIM was not on it.*  U.S. Dept. of State

2001 Report on Foreign Terrorists, *available at* http://www.state.gov/s/ct/rls/rpt/fto/

2001/5258.htm.

      80.     State Department officials continued to negotiate with China concerning

legitimate U.S. needs for international cooperation in connection with terrorism.  Among other

things, at about the time the Petitioners reached the U.S. military base at Kandahar, the U.S. was

seeking Chinese permission to open an FBI office in Beijing.

      81.     Within China, exploitation of the so-called "global war on terror" to crush

political dissidents continued.  In February 2002, the Xinjiang Party Secretary instructed the

local authorities to crack down on Uighur "separatist techniques" and detailed the "forms of

infiltration and sabotage *carried out in the ideological sphere* by ethnic separatist forces."

Human Rights Watch Report, *available at* http://hrw.org/reports/2005/china0405/4.htm

(emphasis added).

### 4. China Acquiesces in U.S. War Plans in Exchange for "Terrorism" Charges Against the Uighurs

      82.     In the summer of 2002, the United States was developing war plans for a potential

invasion of Iraq.  President Bush had approved $700 million in military "preparation"

expenditures, including the upgrading of Persian Gulf airfields and munitions storage facilities.

Bob Woodward, *Plan of Attack* 137 (Simon and Schuster 2004).  Covert CIA teams had entered

Northern Iraq.  *Id.* at 109.  The Administration's focus on the Iraq question was intense: late that

summer, administration representatives linked the Iraqi regime to Al Qaeda and spoke of a

gathering nuclear threat.  On August 26, Vice President Cheney said that Saddam Hussein would

"soon" acquire nuclear weapons.  *See* White House News Brief (Aug. 26, 2002), Vice President

DCDOCS/677423.2/0999997-0000928762

Speaks at VFW 103rd National Convention, *available at* http://www.whitehouse.gov/
news/releases/2002/08/20020826.html. On August 10, the President said of Iraq, "we're in the
process of consulting not only with Congress . . . but with our friends and allies." White House
News Brief (Aug, 10, 2002), *available at* http://www.whitehouse.gov/news/releases/2002/08/
20020810-3.htm.

83.     At the time, the U.S. urgently was seeking U.N. consensus for military action, as
opposed to continued use of sanctions against the Iraqi regime. Over the next several months
(before it became clear in 2003 that such consensus could not be developed, and the U.S., and
certain allies, would determine to pursue an invasion in their own right), it was a U.S. priority to
develop consensus among major world powers. Crucial among these nations was Communist
China. Its position on the U.N. security council, its immense diplomatic and commercial power,
and its influence in the Arab world were all profoundly important. The Chinese position on a
potential invasion of Iraq was seen in diplomatic circles as a key issue.

84.     Accordingly, in late August, representatives of U.S. and Iraqi foreign ministries
hurried to Beijing to solicit Chinese support for their respective diplomatic positions. On August
24, 2002, Iraqi Foreign Minister Naji Sabri left Baghdad for his first-ever high-level meeting
with Beijing. People's Daily (English Version) (Aug. 25, 2002), *available at*
http://english.people.com.cn/200208/25/ eng20020825_102043.shtml. Sabri did not meet with
senior officials until August 27, however. U.S. Deputy Secretary of State Richard Armitage beat
him to the punch, meeting with senior Chinese officials on August 26. Transcript of Deputy
Secretary of State Richard Armitage Press Conference—Conclusion of China Visit (Aug. 26,
2002) *available at* http://lists.state.gov/SCRIPTS/WA-USIAINFO.EXE?A2=ind0208d&L=us-
china&H=1&O= D&P=75.

85.     The Uighurs—and specifically the Uighurs in Guantanamo—became a diplomatic
chip in this high-stakes game, a *quid pro quo* for Chinese acquiescence in the Administration's
Iraq policy. Speaking to the press in Beijing immediately after his meeting on August 26, Mr.
Armitage advised that the groundwork had been laid for an October 2002 summit between

- 22 -

Presidents Bush and Jiang Zemin.  He acknowledged that talks had focused on Iraq:

> QUESTION: Could you brief us a little bit more about what kind of talks you had on Iraq?  Especially, have you touched upon the possibility of a U.S. attack on Iraq?

> ARMITAGE: I discussed the fact that Iraq left untended, we felt, was a threat to us and to Iraq's neighbors.  I discussed some of our President's comments, to the effect that he has all options before him and he's made no decisions.  I discussed, with our Chinese friends, the fact that we will consult with them as we move forward, and that no final decisions have been made now.  Finally, we discussed sort of the theory of having U.N. Security Council Resolutions existent, and the specter of a nation basically thumbing their nose at the United Nations Security Council, and what this augured for the body.

The next question and answer was telling.

> QUESTION: You mentioned the ETIM, and discussed putting it on the terrorist list.  Does this mean that the U.S. considers the ETIM to be a terrorist organization, and would support putting it on a list of terrorist organizations?

> ARMITAGE: We did.

Transcript of Deputy Secretary of State Richard Armitage Press Conference—Conclusion of

China Visit (Aug. 26, 2002), *available at* http://lists.state.gov/SCRIPTS/WA-USIAINFO.EXE?

A2=ind0208d&L=us-china&H=1&O=D&P=75.

86.     Several weeks later, ETIM was added to the official State Department list of

"terrorist organizations."  This was purely a political accommodation to the Chinese, having

nothing to do either with the facts, the Petitioners, or the AUMF, but granted solely to secure

Chinese acquiescence in U.S.'s Iraq war plans.[5]

87.     Not revealed in Mr. Armitage's remarks was an extraordinary fact.  Not only had

the U.S. agreed to reverse itself and declare "ETIM" a "terrorist organization," it had granted the

Chinese permission to interrogate the Uighurs at Guantanamo Bay.  Only weeks later, in

---

[5] Curiously, ETIM was *not* designated as a "terrorist organization" for U.S. immigration purposes. Following August, 2002, the Uighurs continued to be a favored group as to applications for political asylum in the United States.

DCDOCS/677423.2/0999997-0000928762

September 2002, Chinese agents interrogated Petitioners at Guantanamo. Amnesty International, *People's Republic of China: Uighurs Fleeing Persecution as China Wages its "War on Terror"* 33-34 (2004); see FOIA 00174 (unclassified return from Sabir Osman); *Qassim et al v. Bush, no.* 00497 JR, Decl. of Sabin Willett, Doc. 24-1 at 2 (D.D.C. filed July 22, 2005).

88.    One month later, President Bush welcomed Chinese President Jiang in Crawford, Texas, for talks that focused on China's position on a potential invasion of Iraq.[6]

89.    This astonishing episode in U.S. diplomatic history—the United States welcoming agents of a communist government to its secure military facility at Guantanamo, granting them prisoner access that it has strenuously denied U.S. courts, Congressmen, the United Nations, and the Press, and branding as "terrorist" an "organization" it had previously determined *not* to be a terrorist organization—points up the urgency, at the time, of the Iraq issue. This was a naked political deal to help secure China's tacit acquiescence in the Iraq invasion being planned in 2002.

### 5.    Harsh Interrogations at Guantanamo by Communist Chinese Interrogators

90.    When the two presidents met, Chinese agents had already been to Guantanamo Bay to interrogate the Uighurs. Amnesty International later reported, "It is alleged that during (the delegation's visit), the detainees were subjected to intimidation and threats and to stress and duress techniques such as environmental manipulation, forced sitting for many hours and sleep deprivation." *Id.* Citing "credible" reports, Amnesty International said some of the interrogation

---

[6] Commenting immediately after the meeting, a senior administration official said, "The question is . . . was there common ground between the two Presidents on Iraq. Did the President come away thinking that he had President Jiang's support. The two Presidents did, indeed, discuss Iraq fairly thoroughly. I think that you know our position very well and I think President Jiang Zemin has also made it very clear that Iraq should implement all previous Security Council resolutions. I'm not going to go much beyond that, *but to say that I think we have common ground to work*." White House News Release, *President Bush Chinese President Jiang Zemin Discuss Iraq, North Korea,* (Oct. 25, 2002), (emphasis added), *available at* http://www.whitehouse.gov/news/releases/2002/10/20021025.html.

DCDOCS/677423.2/0999997-0000928762

techniques were "alleged to have been on the instruction of the Chinese delegation." *Id.*

91.    Petitioners Bahtiyar Mahnut and Thabid were interrogated, abused and threatened by Chinese representatives. Several Uighurs later described these incidents to the CSRTs. For example, Thabid was told that he would be killed or imprisoned by the Chinese. FOIA CSRT at 1621. Another Uighur named Abdusemet described how he was forcibly interrogated, threatened, and deprived of sleep and food by the Chinese delegation in Guantanamo. FOIA CSRT 2916. He stated that an American who identified himself as a White House representative specifically threatened to send Abdusemet to China if he did not cooperate with interrogators. *Id.* Huzaifa Parhat told his CSRT panel how the Chinese threatened to jail him for "three or four years." *Id.* at 1515. The Chinese also threatened Sabir Osman with years of jail time. *Id.* at 174. As Mr. Osman described the scene to his CSRT panel, the Chinese made it clear that the Uighurs "had better answer whatever the interrogators ask. It was their last chance. . . . They had me believe the allegations that the U.S. would send us back to China." *Id.* at 175. A Chinese interrogator told Adel Abdul Hakim (later determined to be a noncombatant) that he was "lucky" to be in Guantanamo; if they took him back to a Chinese jail, he would be "finished." On information and belief, several Uighurs were told that they would be killed in China. Despite these threats, most of the Uighurs refused to cooperate with Chinese interrogators. As punishment, the Americans put all but two of them in solitary confinement.

92.    These coercive and abusive interrogations took place while Petitioners were in Respondent's custody, under Respondent's complete control, and with Respondent's cooperation and complicity. Petitioners' constitutional, statutory, and international rights to dignity and freedom from torture and from cruel, inhumane and degrading treatment and punishment were violated. *See, e.g.,* U.N. Econ. & Soc. Council, Comm. On Human Rights, Report: Deprivation of Liberty at Guantanamo Bay, 52, U.N. Doc. E/CN.4/2006/120 (Feb. 15, 2006).

93.    In December 2002, a spokesman for the Chinese Foreign Ministry demanded that any Uighurs captured in Afghanistan be returned to China "to face charges of terrorism." Human Rights Watch, *Afghanistan: Return of Foreign Fighters and Torture Concerns*, HRW

Backgrounder (Dec. 2001), *available at* http://www.hrw.org/backgrounder/asia/afghanistan/ afforeign1220.htm.  Each and every Petitioner, like all the Uighurs in Guantanamo, has a reasonable fear of persecution if returned to China.

94.    By the spring of 2003, however, the Iraq invasion was underway, China was on the sidelines, and Chinese allegations about the Uighurs had been discredited within U.S. intelligence circles, and particularly so among military intelligence personnel at Guantanamo.  In 2003, Petitioner Abdul Nassar was told that his "case was closed."  His interrogator told him, "You are innocent."  She also told him that he was awaiting release, and would be transferred to a different part of the camp.[7]  In April, 2003, Uighur prisoner Abdusemet was advised by military interrogators, "Congratulations, your interrogation is complete, you are innocent, you will be leaving soon."[8]  In late April 2003, Uighur prisoner Hammad Memet was interrogated for six hours.  At the end of the session, an interrogator told him, "Congratulations.  You are innocent.  I am closing the file on you."  She also told Mr. Memet that he would be moved to a different part of the camp.  "You are knocking on the door; you are close to getting out."

95.    At about this time, the State Department commenced active efforts to persuade a foreign country to take the Uighurs.  Between 2003 and August 2005, the United States approached at least 25 countries.  *See* National Public Radio, Morning Edition, "Chinese detainees at Guantanamo get hearing" (Aug. 25, 2005) (interview with Pierre-Richard Prosper, U.S. ambassador-at-large for war crimes).  On information and belief, each such country was assured that the Petitioners were not enemy combatants and represented no security threat to that

---

[7] The source for each of the allegations in this paragraph is the identified prisoner.  The statements made by interrogators were recounted by the prisoner and are set forth in attorney notes of client meetings that took place August 29-30, 2006 at Guantanamo.  All facts learned from interviews with prisoners have been declassified under the applicable protective order.

[8] Three years later, in May or June 2006, another interrogator told Abdusemet that he had been "cleared," and soon would be granted asylum.  "Why then did you say in 2004 that I was an enemy combatant?" Abdusemet asked.  The interrogator shrugged, and said, "Oops."

DCDOCS/677423.2/0999997-0000928762

country.

96.    No country agreed to take Petitioners.

97.    Two factors were paramount in the unwillingness of foreign allies to grant refugee status.  First, since early 2002, the United States had waged a massive international public relations campaign, falsely claiming that all Guantanamo prisoners were "the worst of the worst," "vicious killers," "terrorists," and the like.  This relentless campaign, although false, successfully persuaded both domestic and foreign communities that anyone at Guantanamo was dangerous.  Second, the People's Republic of China wields enormous power in the world, and foreign nations were unwilling to help the United States solve the Uighur problem at the price of souring their relations with the Chinese.

### 6.    The Twin Dangers of Rendition and Indefinite Detention

98.    The United States has known and stated publicly for many years that the Uighurs are not enemy soldiers of any description, and not criminals.

- In May, 2004, State Department spokesman Richard Boucher reiterated that the U.S. had no interest in continuing to detain the Uighurs.  U.S. State Dep't Daily Press Briefing (May 13, 2004), *available at* http://www.state.gov/r/pa/prs/dpb/2004/32455.htm.

- "The Uighurs are a difficult problem," Secretary of State Colin Powell said in an August 12, 2004 briefing, "and we are trying to resolve all issues with respect to all detainees at Guantánamo.  The Uighurs are not going back to China." U.S. State Dep't, *Roundtable with Japanese Journalist* (Aug. 12, 2004), *available at* http://www.state.gov/secretary/former/powell/remarks/37356.htm.

- In early November, 2004, military officials told the New York Times that "at least half of the Uighurs here are eligible for release."  Neil A. Lewis, *Freedom for Chinese Hinges on Finding a New Homeland*, N.Y. TIMES, Nov. 8, 2004, at A17.

- "The Pentagon determined last year that half of the two dozen Uighur Chinese captured in the war on terrorism have no intelligence value and should be

DCDOCS/677423.2/0999997-0000928762

released. The U.S. has so far resisted Beijing's demands for repatriation out of concern that they may be tortured once back in China." Demitri Sevastopulo, *Uighurs face return from Guantanamo*, FINANCIAL TIMES, Mar. 16, 2005.

- "I think it has been reported we have Uighurs from China that we have not returned to China, even though, you know, *some of those have been deemed, even before these [CSRT] hearings, to be non-enemy combatants* because of concerns and issues about returning them to their country." Navy Secretary Gordon England, *U.S. Dep't of Defense News Transcript—Defense Department Special Briefing on Combatant Status Review Tribunals* at 3 (Mar. 29, 2005) (emphasis added), *available at* http://www.defenselink.mil/transcripts/2005/tr20050329-2382.html.

- "[T]he military has determined that about 15 of [the Uighurs at Guantanamo] are not 'enemy combatants.' . . . The Pentagon has, consequently, cleared them for release. The trouble is that the State Department has been unable to find other countries willing to take them." Editorial, *Detention Dilemma*, WASH. POST May 3, 2005.

- "Navy Secretary Gordon England confirmed in March that Guantanamo captives include Chinese Muslims—reportedly about two dozen—who are no longer classified as 'enemy combatants,' the Bush administration term for terrorism suspects." Carol Rosenberg, *Closing Terror Prison Tricky for U.S.*, MIAMI HERALD, June 12, 2005, at 1A.

- "The U.S. is holding about 550 detainees at Guantanamo, including about a dozen Uighur Chinese whom the U.S. has determined are no longer 'enemy combatants.' The U.S. does not want to repatriate the Uighurs ethnic Muslims from China's Xinjiang province out of fear that they could be tortured in China. But the Bush administration is having trouble persuading other countries to take the Uighurs." Demitri Sevastopulo, *Cheney Backs Guantanamo Prison Amid*

*Growing Unease*, FINANCIAL TIMES, June 13, 2005, at 6.

- "The repatriation of nearly two dozen ethnic Uighurs from China detained at
  Guantanamo Bay has been held up because of State Department concerns that the
  Uighurs might be tortured or killed after being turned over to Chinese custody."
  Mark Mazzetti & John Hendren, *U.S. Quietly Exploring Alternatives to
  Guantanamo Bay*, L.A. TIMES, June 15, 2005.

- National Public Radio, Morning Edition, "Chinese Detainees at Guantanamo Get
  Hearing" (Aug. 25, 2005):

  Jackie Northam: "More than a year ago, the Pentagon determined
  that [Abu Bakker Qassim and Adel Abdul Hakim] are not enemy
  combatants. . . . But Pierre-Richard Prosper, the U.S.
  Ambassador-at-Large for War Crimes, says the two men face
  persecution and perhaps torture if they're sent home to China."

  Amb. Prosper: "When we made a decision that we wanted to
  release these Uighurs, we also decided we were not prepared to
  send them back to China. So as a result we had to find a third
  country for resettlement."

  Northam: "Prosper says the U.S. government has been actively
  trying to find a country that will take Qassim and Hakim, as well
  as more than a dozen other Uighurs being held in Guantanamo,
  with no luck."

99.    The only reason Respondent continues to imprison Petitioners is because they

cannot be returned to China, and the U.S. government cannot find another country willing to take

them.[9]

---

[9] On March 26, 2005, the government certified the CSRT conclusion that five of the Uighurs were *not*
enemy combatants. Two of them had filed a habeas petition, *Qassim v. Bush*, but the Government did not
advise the district court, and indeed, in papers filed on March 29, 2005, misled that court into thinking
that they were enemy combatants. *See Qassim v. Bush*, 382 F. Supp. 2d 126 (D.D.C. 2005). On May 5,
2006—one business day before this Court was scheduled to hear oral argument on the lawfulness of
Respondent's continued imprisonment of innocent men—Respondent hastily flew the five non-enemy
combatant Uighurs to Albania and moved to dismiss their habeas cases. The "Albania Five" currently
live in a United Nations refugee center surrounded by razor wire, and monitored by armed guards. The
men have few prospects in Albania.

DCDOCS/677423.2/0999997-0000928762

### D.    The CSRT Process

100.    On June 28, 2004, the Supreme Court determined that Guantanamo prisoners have the right to challenge the legality of their detention in federal court. *Rasul v. Bush*, 542 U.S. 466 (2004).

101.    The Government hastily created the CSRTs.  On July 7, 2004, Deputy Secretary of Defense Paul Wolfowitz issued an "Order Establishing Combatant Status Review Tribunal." *See* Exhibit 1, Paul Wolfowitz, Deputy Secretary of Defense, *Order Establishing Combatant Status Review Tribunal* (July 7, 2004).  The Wolfowitz Order set forth provisions governing the standards and procedures to be used by the CSRTs in reviewing the previous determination that a prisoner—or "detainee" in the Defense Department's formulation—was an "enemy combatant." On July 29, 2004, Navy Secretary Gordon R. England issued an implementing memorandum containing standards and procedures for the "Combatant Status Review Tribunal Process" (hereinafter "CSRT Procedures").  *See* Exhibit 2, Gordon England, Secretary of Navy, *Memorandum re Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba* (July 29, 2004).

102.    Commencing in August, Respondent processed 558 CSRTs at a dizzying pace of more than one hundred per month—or more than three per day. Mark Denbeaux et al, *No-Hearing Hearings: CSRT, the Modern Habeas Corpus?* 11-12 (2006) *available at* http://law.shu.edu/news/final_no_hearing_hearings_report.pdf ("Denbeaux II").

103.    The CSRT Procedures establish a "non-adversarial proceeding," purportedly "to determine whether each detainee" at Guantanamo "meets the criteria to be designated as an enemy combatant."  CSRT Procedures, Encl. 1(B).  But CSRTs were never intended to determine status.  They were created to lend the appearance of legitimacy to the *de facto* imprisonments that already existed.  In the overwhelming majority of cases, the CSRT worked as intended.  In numerous cases where the CSRT did not reach the predetermined enemy combatant result, Respondent put intense pressure on the panel to reverse its finding, convened another CSRT to declare the prisoner in question to be an enemy combatant, or simply ignored the result

by continuing the imprisonment anyway. *See infra* ¶¶ 135-36.

104.    The Government's public-relations need to stage CSRTs in order to create the impression of "enemy combatant" status created a special problem as to the group of eighteen Uighurs, all of whom, on information and belief, previously had already been cleared of "enemy combatant" status. The United States had not yet persuaded a country to take them.

105.    Accordingly, during the Uighur CSRT hearings, military panels made use of previously discredited Chinese allegations as a pretext for Petitioners' continued imprisonment. For example, in addition to dubbing the Uighur village a "training camp," the military rehashed the discredited Chinese allegations that ETIM existed, that the organization was in turn somehow associated with either the Taliban or Al Qaeda, and that Petitioners were associated with it. Each and every one of the Uighurs denied any knowledge of or involvement in any such group. Not a shred of unclassified evidence was presented in any CSRT to support the determination (i) that ETIM exists at all, (ii) that ETIM was involved in terrorist or military attacks against the United States, (iii) that ETIM was associated with Taliban or Al Qaeda, or (iv) that any Petitioner was affiliated with ETIM. On information and belief, so such evidence exists in the classified record.

**1.    The Government's Admission that CSRTs were not a Substitute for Habeas Review**

106.    Before each CSRT was convened, the prisoner was advised that his status review was not a substitute for his habeas rights. The following notice was read to each Petitioner:

> The U.S. Government will give you an opportunity to contest your status as an enemy combatant. Your case will go before a Combatant Status Review Tribunal, composed of military officers.
>
> &ast; &ast; &ast;
>
> *As a matter separate from these Tribunals, United States courts have jurisdiction to consider petitions brought by enemy combatants held at this facility that challenge the legality of their detention. You will be notified in the near future what procedures are available to challenge your detention in the U.S. courts.*

Gordon England, Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba (July 29, 2004), *available at*

DCDOCS/677423.2/0999997-0000928762

http://defenselink.mil.news/Jul2004/d20040730comb.pdf (emphasis added). Each Guantanamo prisoner was entitled to, and did rely on this notice, which conclusively binds Respondent from asserting that the CSRTs were a substitute for habeas corpus review.

### 2.    The Enemy Combatant Definition

107.    The CSRT Procedures defined an "enemy combatant" as:

> an individual who was part of or supporting the Taliban or al Qaida forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. This includes any person who has committed a belligerent act or has directly supported hostilities in aid of enemy armed forces.

CSRT Procedures, Encl. 1(B).

108.    This definition was to be applied in accordance with Respondent's lawful powers under the law of war, under which one cannot be an enemy combatant without actual participation in military activity. In *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), the Supreme Court accepted the government's definition of "enemy combatant" as "an individual who, [the government] alleges, was part of or supporting forces hostile to the United States or coalition partners in Afghanistan *and* who engaged in an armed conflict against the United States there." 542 U.S. at 516 (emphasis added) (internal quotations omitted).

### 3.    The Pre-Hearing Phase: The Role of the Recorder

109.    The CSRT Procedures mandated a non-adversarial proceeding. They prohibited the prisoner from obtaining aid of counsel, prevented the prisoner from seeing the classified evidence against him, and blocked meaningful access to witnesses and evidence.

110.    The Recorder acted simultaneously as investigator, prosecutor and clerk. The Recorder was a commissioned officer tasked with: (i) "obtain[ing] and examin[ing]" reasonably available information in the possession of the United States government "bearing on" the prisoner's status ("Government Information"); (ii) preparing an unclassified summary of evidence for the prisoner's review; (iii) presenting evidence to the Tribunal; and (iv) compiling the record of the hearing. *See generally* CSRT Procedures, Encl. 2. The Recorder was the source of all evidence presented to the Tribunal. *Id.*, Encl. 2(C)(1), 1(E)(3).

- 32 -

111.    The Recorder was not an independent or disinterested party. He served under Respondent and others in the chain of military command who previously and publicly had asserted that all prisoners presented for CSRTs were enemy combatants. *See, e.g.*, DoD News Briefing—Gen. Richard B. Myers, Chairman, Joint Chiefs of Staff (Jan. 11, 2002), *available at* http://www.defenselink.mil/transcripts/2002/t01282002_t0128asd.html (prisoners are "the worst of the worst"); *Rumsfeld: Captives Will Not be POWs*, USA TODAY, Jan. 28, 2002, at A1 (quoting Secretary Rumsfeld: "[The prisoners are] among the most dangerous, best-trained vicious killers on the face of the Earth."); DoD News Briefing—Secretary Rumsfeld and Gen. Myers (Jan. 28, 2002) ("These are people that would gnaw through hydraulic lines in the back of a C-17 to bring it down, so these are very, very dangerous people, and that's how they're being treated.") *available at* http://www.defenselink.mil/transcripts/2002/t01112002_t0111sd.html; DoD News Briefing—ASD PA Clarke and Rear Adm. Stufflebeem (Jan. 28, 2002) *available at* http://www.defenselink.mil/transcripts/2002/t01282002_t0128asd.html (Rear Admiral John D. Stufflebeem, Joint Staff: "These are the worst of the worst, and if let out on the street, they will go back to the proclivity of trying to kill Americans and others. So that is well established.").[10] The CSRT Procedures explicitly state: "Each detainee . . . has previously been determined . . . to be an enemy combatant through multiple levels of review by military officers and officials of the Department of Defense." *Id.* at Encl. 1(B). The Recorder thus had a powerful interest in avoiding contradiction of the alleged previous determination, and in supporting his superiors' public statements. The Personal Representative, Tribunal members, and Legal Advisor were all similarly biased.

112.    After gathering and examining the Government Information, the Recorder was to

---

[10] This shrill rhetoric has continued unabated ever since. The President, Vice President and numerous other administration officials have repeated the claim that the detainees are "terrorists" and the "worst of the worst." In 2006, when three Guantanamo prisoners took their own lives in despair, the suicides were described Admiral Harris as "an act of asymmetric warfare against us." Josh White, *Three Detainees Commit Suicide at Guantanamo*, WASH. POST, June 11, 2006, at A1.

DCDOCS/677423.2/0999997-0000928762

ensure the proper handling of classified information, which could not be shared with the prisoner. On information and belief, all the evidence against the prisoner was considered classified, *even information obtained from the prisoner himself in interrogation*. The Recorder drafted an "unclassified summary of the relevant evidence" from the Government Information, which was the only source of information provided to the prisoner about the charges against him. *Id.* at Encl. 2(C)(2).

113.    On information and belief, each unclassified summary of evidence recited the statement in the CSRT Procedures: "The United States Government has previously determined that the detainee is an enemy combatant. This determination is based on information possessed by the United States[.]" *See generally* Denbeaux I, *supra*, at 6. *See also, Thabid v. Bush*, no. 05-02398 ESH, Respondent's Factual Return for Hassan Anvar (Ali) (Docket No. 27) (hereinafter, "Hassan Anvar (Ali Mohammad) Fact Return"), Unclassified Summary of Evidence for Combatant Status Review Tribunal—Anvar, Hassan (Nov. 2, 2004). On information and belief, each unclassified summary of evidence had four numbered paragraphs. Paragraphs 1, 2 and 4 were identical in each unclassified summary of evidence. The first stated that the CSRT has been convened pursuant to the CSRT Procedures promulgated by Secretary England. The second recited the enemy combatant definition. The fourth asserted that "[t]he detainee has the opportunity to contest his designation as an enemy combatant." *Id, see also, e.g.*, Hassan Anvar (Ali Mohammad) Fact Return at Unclassified Summary of Evidence for Combatant Status Review Tribunal—Anvar, Hassan (Nov. 2, 2004).

114.    The third paragraph was drafted by the Recorder, and purported to summarize the classified evidence that the prisoner is an enemy combatant. For each of the Petitioners, this paragraph was, on information and belief, nothing more than a series of allegations. It included no references or citations to actual evidence, the source(s) of any actual evidence, or to any witness(es) who may have offered a statement against the Petitioner.

### 4. The Personal Representative Was Structurally Incapable Of Rendering Effective Assistance To A Prisoner.

115.   The CSRT Procedures specifically prohibit the prisoner from receiving legal representation or assistance. Encl. 1(F)(5). The prisoner instead was allowed only the service of a "Personal Representative."

116.   The Personal Representative was a commissioned officer assigned to the prisoner who could not be a lawyer. *Id.* at Encl. 1(F)(5), (C)(3). He or she was responsible for "assist[ing] the detainee in reviewing all relevant unclassified information, in preparing and presenting information, and in questioning witnesses at the CSRT." *Id.* at Encl. 1(C)(3). The Personal Representative was specifically forbidden from serving as the prisoner's "advocate," and the prisoner's discussions with the Personal Representative are not privileged or confidential. *Id.* at Encl. 3(D).

117.   Personal Representatives spent almost no time preparing with the Petitioners. The Government has asserted that only five persons served as Personal Representatives in connection with 558 CSRTs conducted over approximately six months. Denbeaux II at 11 n. 8.

118.   As a uniformed officer, the Personal Representative was indistinguishable to the Petitioners from the guards and interrogators. The distinction was further blurred by the Personal Representative's scripted introduction. During the first meeting with the prisoner, the Personal Representative informed the prisoner that s/he was neither a lawyer nor an advocate for the prisoner and that "[n]one of the information [provided by the detainee to the Personal Representative] shall be held in confidence." *Id.* at Encl. 3(D). To prisoners cut off from the world, having spent months or years in interrogations, the Personal Representative's statement powerfully warned Petitioners not to work with a Personal Representative to challenge their detentions.

119.   Personal Representatives proved unhelpful and sometime adversarial. For example, contained in the records for prisoner ISN 473 is the following exchange:

> Detainee: My personal representative is supposed to be with me,
> Not against me. Now he is talking like he is an interrogator. How
> can he be my attorney? I said all of these allegations were

fabricated and I told you I had nothing to do with them. It's up to the Record or Report to response or provide the proof. I'm afraid to say anything that you might use against me. As you know, there is no attorney here today and I don't know anything about the law.

Denbeaux II, at 16-17.

### 5.    The CSRT Hearing Was Designed To Rubber Stamp Prior "Enemy Combatant" Determinations.

120.    The Tribunal was authorized to: (i) determine "[in] the perception of a layperson, not a medical or mental health professional," the prisoner's mental and physical capacity to participate in the hearing; (ii) order the attendance of "reasonably available" witnesses; (iii) request, through the Recorder, production of "reasonably available" evidence; (iv) "[r]equire each witness (other than the detainee) to testify under oath;" and (v) determine whether the prisoner is an enemy combatant. *Id.* at Encl. 1(B) & 1(E).

121.    The Recorder presented to the Tribunal "such evidence in the Government Information as may be sufficient to support the detainee's classification as an enemy combatant" (the "Government Evidence"). *Id.* at Encl. 1(H)(4), *see also id.* at Encl. 2(B)(1) ("[T]he Recorder *has a duty* to present . . . evidence . . . sufficient to support the detainee's classification as an enemy combatant") (emphasis added). In addition, "[i]n the event that the Government Information contains evidence to suggest that the detainee should not be designated as an enemy combatant, *the Recorder shall also provide* such evidence to the Tribunal." *Id.* (emphasis added).

122.    Because the prisoner was not allowed to see the Government Information, he was unable to ensure that exculpatory information was provided to the Tribunal.

123.    At the CSRT hearings themselves, the Recorder could call witnesses to testify before the Tribunal. *Petitioners are aware of no CSRT in which a Recorder ever called a witness, or in which there was testimony of any U.S. personnel concerning any Guantanamo prisoner. See* Denbeaux II.

### 6.    The Evidence Relied Upon By The Tribunal Was Unavailable To The Prisoner and Inherently Unreliable.

124.    For each CSRT, all of the government's evidence was secret. Petitioners never

saw or could respond to any of it.

125.    In the case of Petitioners, this evidence, if it existed at all, on information and belief consisted solely of false, hearsay statements provided to the U.S. by Chinese agents, and on information and belief long ago discredited by U.S. military intelligence.

126.    Because the Uighur language is obscure, translation problems further hampered the CSRTs. In Uighur, for example, the verb "koresh" can mean either "oppose," in the intellectual or political sense, or "fight," in the physical sense. Petitioners' accounts of their ideological struggle with, and opposition to China frequently was mistranslated as "fighting China." As with the English verb, "fight," it is a question of context. Boxers may "fight" in the ring; a Congressman may "fight" against a bill proposed by another Congressman; a drug may "fight" the spread of disease. Suffice to say that all context was lost on the CSRT panels.

127.    On information and belief, the Tribunal panels may also have considered statements made by Petitioners during harsh interrogations by Chinese interrogators. Not only were such statements inherently unreliable, they also effectively forced the prisoner to testify against himself, in contradiction of the rule set forth in the CSRT Procedures that the prisoner cannot be compelled to testify. *Id.* at Encl. 1(F)(4).

128.    Because he was unaware of the nature of the false hearsay provided by the Chinese, and had no access to witnesses outside the prison population, Petitioners' right to call witnesses on his behalf also was devoid of meaning.[11]

129.    Except for other Uighurs, there were no witnesses in the Guantanamo population with material evidence concerning the Petitioners' status. There were, however, numerous

---

[11] Petitioner Mahnut's request for 17 Uighur witnesses was rejected. *See* Decl. of Joseph Imburgia, *Mahnut v. Bush*, no. 05-1704 (filed Dec. 30, 2005) (Docket No. 17) . Memorandum from Asst. Legal Advisor to Director, CSRT. In a rare example of dissent, Mahnut's Personal Representative pointedly objected and noted that Mahnut had been deprived of due process. *Id.* at 2. The Legal Advisor found this objection meritless. *Id.* 2-3. Similarly, Ahmet Adel (ISN 260), requested the seventeen other Uighurs as witnesses at his CSRT. FOIA CSRT 1232. The Tribunal President refused, and allowed him to call only one witnesses even though all seventeen men were undoubtedly reasonably available. *Id.*

witnesses among U.S. military intelligence and State Department personnel either physically present at Guantanamo or present in Washington who, on information and belief, had substantial evidence demonstrating their non-combatant status. However, the Petitioners had no way to call these witnesses.

130.    Not only was the prisoner deprived of an opportunity to consider and respond to the evidence, the *panel* was as well. First, the panel would learn nothing that was not presented to it by the Recorder. Second, even as to the status evidence, the procedures deprived the panel of an opportunity to explore the allegations with the prisoner.

131.    With no knowledge of what the evidence was, the prisoner could only give a statement, attempting to deny that he was a soldier or a terrorist. Following the prisoner's statement, the Recorder and the Tribunal were permitted to question the prisoner. Yet it was impossible for the Tribunal members effectively to question the prisoner because at the time the prisoner gave his statement and was questioned, *the Tribunal itself had seen none of the evidence.* The Recorder had offered no evidence in the unclassified session, and the Tribunal had not yet seen the classified record. *See, e.g.*, FOIA CSRT 3158 (Tribunal told Uighur prisoner Hammad Memet (ISN 328) that they did not have access to exculpatory evidence in his medical files); *Id.* at 1355 (in response to a question by Uighur prisoner Abu Bakker Qassim (ISN 283) seeking clarification of the allegations in the unclassified summary of evidence, the Tribunal President admitted, "I don't honestly know, this is the only information we have about you at the moment."); *Id.* at 3106 (when Petitioner Abdul Nasser noted that the answer to a question asked by the Tribunal was in his file, the Tribunal admitted that they had not seen his file). The panel, like each Petitioner, was deprived of information that would have permitted it to ask meaningful questions of the Petitioner, and that would in turn have permitted the Petitioner to respond.

132.    Only *after* the prisoner was excused from the hearing did the Tribunal review classified material. *Id.* at Encl. 8. The Personal Representative "may," but was not required to, "comment upon classified information submitted by the Recorder" in these closed sessions. *Id.*

- 38 -

at Encl. 3(C)(5). Such comments, if made, were made without input from the prisoner, with whom the Personal Representative was not permitted to discuss classified information.

### 7.    The CSRT Improperly Presumed Petitioners' Guilt.

133.    The CSRT Procedures establish a *de facto* presumption of guilt: "There is a rebuttable presumption that the Government Evidence . . . submitted by the Recorder to support a determination that the detainee is an enemy combatant, is genuine and accurate." *Id.* at Encl. 1(G)(11). This presumption applied only to evidence submitted by the government that supported an "enemy combatant" determination. *Id.* It did not apply, even as to evidence collected by the Recorder from the very same source, to evidence that might "suggest that the detainee should not be designated as an enemy combatant." *Id.* at Encl. 2(B)(1).

### E.    Petitioners' CSRTs Erroneously Classified Petitioners as "Enemy Combatants."

134.    In August, 2004, the military began conducting CSRTs at a breakneck pace. At the height of the process, more than fifty a week were conducted. Denbeaux II, *supra*, at 12.

135.    For each of the Petitioners, the CSRT proceeded in essentially the same way. Shortly before the hearing, each Petitioner was advised that the status review was separate and apart from habeas—*i.e.,* he had a right to proceed in the U.S. courts. That advice and assurance is binding on the Government as to all Petitioners.

136.    Shortly before the proceedings, each Petitioner met for the first time his "personal representative." On information and belief the entire process of preparing lasted no more than an hour. The personal representative was a uniformed military officer. He began by advising the Petitioner that he was not a lawyer and would not preserve confidences. Denbeaux II, *supra*, at 14-15.

137.    For each Petitioner, an interrogation file was physically present at Guantanamo Bay. On information and belief, each such file documented multiple occasions, including occasions in Kandahar and Guantanamo in which interrogators had concluded that the Petitioner was "innocent" and would soon be released. As of July, 2004, the State Department had already

DCDOCS/677423.2/0999997-0000928762

undertaken substantial efforts to locate a country to accept each Petitioner, and on information and belief had made representations to such countries that each Petitioner inconsistent with an "enemy combatant" determination. All of this evidence was readily available from the State Department. Public information also showed that in December, 2001, the U.S. had stated that "ETIM" was not a terrorist organization, and that the August, 2002 agreement to deem "ETIM" as a "terrorist organization" was a political accommodation made to the Chinese to procure acquiescence in U.S. Iraq policy.

138.    The Personal Representative supplied none of this information to any Petitioner. On information and belief, the Recorder obtained none of this information, and supplied none of it to the tribunal panels.

139.    The human geography of the small trailer in which the tribunals met powerfully communicated to each Petitioner that the Personal Representative was his antagonist. The prisoner sat in a plastic chair along one of the long walls of the trailer. He was handcuffed and leg-shackled. To his right was a table. The three tribunal panelists sat there. Facing the prisoner, at a distance of about three feet, was a second table. On the table was tape recording equipment. Behind the second table and facing the prisoner sat the Recorder. Next to the Recorder, literally at his right hand, *also* uniformed, *also* facing the Petitioner, sat the Personal Representative. His uniform made him indistinguishable from the Recorder.[12]

140.    In no unclassified portion of any CSRT of any Petitioner did Respondent offer or disclose *a single piece of evidence*. No witness was called by the government. Allegations—discussed below—were made, and the Petitioner was invited to respond, but there was no evidence offered, and none to which any Petitioner could respond.

141.    There was no evidence, as to any Petitioner, of the existence of "ETIM" or the

---

[12]    In many cases, confused prisoners thought the entire process was simply a continuation of their interrogations. Denbeaux II, *supra*, at 16.

DCDOCS/677423.2/0999997-0000928762

Petitioner's role in it.

142.    As to each of the 18 Uighurs, the unclassified allegations were substantially the same. The President of one panel wrote: "They are all considered the same notwithstanding a specific act." *See* Hassan Anvar (Ali Mohammad) Fact Return, Memorandum from Legal Advisor to Director, CSRT. There were no substantial differences between the CSRT records for the non-enemy combatants and the Petitioners.

143.    Following the hearings, twelve of the men (including Petitioners Thabid, Abdul Nassar, and Bahtiyar Mahnut) were classified as enemy combatants. Five were determined not to be enemy combatants.

144.    Uighur prisoner Ali Mohammad (ISN 250), however, was deemed to be a noncombatant until the panel was effectively ordered by Washington to change its decision. On November 16, 2004, a CSRT determined that Mr. Mohammad "was not properly designated as an enemy combatant." *See Thabid v. Bush*, 05-02398 ESH, Respondent's Factual Return for Ali Mohammad (Docket No. 27), Feb. 8, 2005 Memorandum from Legal Advisor to Director, CSRT. The President of that Tribunal wrote: "Inconsistencies will not cast a favorable light on the CSRT process or the work done by OARDEC. This does not justify making a change in and of itself, but is a filter by which to look at the overall Uighur transaction since they are all considered the same notwithstanding a specific act." *Id.* at 2.

145.    Mr. Mohammad's exoneration was not an acceptable outcome. Respondent ordered a panel to reconvene and obtain an acceptable result. "CSRT intelligence personnel conducted another search of the Government Information for evidence." *Id.* A second CSRT was convened to consider the "new" evidence. It concluded that Mr. Mohammad was an "enemy combatant." *See Thabid v. Bush*, 05-02398 ESH, Respondent's Factual Return for Ali Mohammad (supra).[13] On information and belief, the CSRT panels that determined that

---

[13] For another prisoner, Abdullah Mohammad Khan of Uzbekistan (ISN 556), Respondent had to send the case back *twice* before the panel entered an enemy combatant determination. Denbeaux II, *supra*, at

(Footnote Continued on Next Page.)

Petitioners are "enemy combatants"—like the CSRT panel that reversed the earlier finding and classified Mr. Mohammad to be an enemy combatant—succumbed to severe institutional pressure to classify Petitioners as enemy combatants regardless of the facts.

146.    The CSRT results are summarized below.  Each Petitioner here was eventually classified as an enemy combatant, and is noted with an asterisk below.

| Name | ISN | CSRT determination | Notes |
|---|---|---|---|
| Abdul Razakah | 219 | EC | Respondent refused to make return |
| Ali Mohammad (Hassan Anvar) | 250 | 1st CSRT – NEC 2d CSRT – EC | Fact return available. *See Thabid v. Bush*, no. 05-2398 ESH (D.D.C. Docket No. 27). |
| Ahmat Adel | 260 | NEC | Sent to Albania (May 2006) |
| Abdusabour | 275 | EC | Respondent refused to make return |
| Ahktar Qassim | 276 | NEC | Sent to Albania (May 2006) |
| Bahtiyar Mahnut * (Sad'r) | 277 | EC | Partial (unclassified) fact return available. *See Kabir v. Bush*, no. 05-1704 JR (D.D.C. Docket No. 9). |
| Abdul Nasser * (Abdul Helil Mamut) | 278 | EC | Respondent refused to make return |
| Ayoub Haji Mamet | 279 | NEC | Sent to Albania (May 2006) |
| Khalid Ali | 280 | EC | Respondent refused to make return |
| Abdul Ghappar (Abdul Rahman) | 281 | EC | Respondent refused to make return |
| Sabir Osman | 282 | EC | Respondent refused to make return |
| Abu Bakker Qassim | 283 | NEC | Sent to Albania (May 2006) |
| Jalal Jalaldin | 285 | EC | Respondent refused to make return |
| Thabid * (Dawut Abdurehim) | 289 | EC | Fact return available. *See Thabid v. Bush*, no. 05-2398 ESH (D.D.C. Docket No. 28). |
| Adel Abdul Hakim | 293 | NEC | Sent to Albania (May 2006) |
| Abdusemet | 295 | EC | Respondent refused to make return |
| Huzaifa Parhat | 320 | EC | Respondent refused to make return |
| Hammad Memet | 328 | EC | Respondent refused to make return |

147.    The government has disclosed CSRT records for only three of the eighteen men, and for none of the Petitioners.  The few relevant documents that are publicly available show that the military viewed the men as identically situated.  Although some of the details vary, for each

_____

(Footnote Continued from Previous Page.)

38.

DCDOCS/677423.2/0999997-0000928762

of the eighteen men, the unclassified summary of evidence alleged that the prisoner did six basic things:

- traveled to Afghanistan from China, often passing through Kyrgyzstan and/or Pakistan;

- stayed in a Uighur village—styled a "training camp"—in Afghanistan;

- learned to shoot an AK-47 while there;

- fled Afghanistan after it was bombed by the U.S.;

- crossed into Pakistan; and

- was arrested with the group of Uighurs.

*See, e.g.*, FOIA CSRT 3102-09 (Petitioner Abdul Nassar), *Id.* at 2469-85 (Petitioner Mahnut), *Id.* at 1614-22 (Petitioner Thabid), *Id.* at 1920-35 (Abdul Razakah, ISN 219), *Id.* at 2844-55 (Abdul Ghappar, ISN 281), *Id.* at 1623-30 (Abdusabour, ISN 275), *Id.* at 2909-21 (Abdusemet, ISN 295), 3151-59 (Hammad Memet, ISN 328), *Id.* at 1505-16 (Huzaifa Parhat, ISN 320), *Id.* at 1631-44 (Jalal Jalaldin ISN 285), *Id.* at 00161-77 (Sabir Osman, ISN 282). *Id.* at.[14]

148.    Other government documents confirm that the military viewed the eighteen Uighurs as identically situated, and that presence in the "training camp" was key evidence against each of them. For example, an October 30, 2004, military memorandum to the Joint Staff, Office of Detainee Affairs described each of the Uighur prisoners at Guantanamo. As to every one of the eighteen who had been arrested together in Pakistan, the memo author stated, "[The detainee] is suspected as being a probable member of the East Turkistan Islamic Movement (ETIM). He is suspected of having received training in an ETIM training camp in Afghanistan." *See Hassan Anvar (Ali) Fact Return*, Document R-26, at 2-7. This document was

---

[14] Most of the other allegations are either totally lacking in foundation, or non sequiturs. For example, the government contended that Uighur prisoner Abdusemet is associated with Al Qaeda in part because he allegedly "stayed in a Uighur guesthouse in Jalalabad." FOIA CSRT 2912. "Stopping at such facilities is common for all people traveling in the area. In the region, the term guest house refers simply to a form of travel accommodation." Denbeaux I, *supra*, at 20.

DCDOCS/677423.2/0999997-0000928762

drafted after August, 2002, when the United States had agreed with the Chinese to identify

"ETIM" as a "terrorist organization." On information and belief, all allegations made in this

regard were hearsay provided by the Chinese communists. The allegations were false.

149.    In some, but not all, of the Uighurs' unclassified summaries of evidence, the

military further asserted that the "training camp" had been provided to the Uighurs by the

Taliban.[15]

150.    Each of the five determined non-combatants stayed at the same Uighur village. In

none of their cases was this evidence sufficient for an "enemy combatant" determination.

151.    The CSRT panel that initially exonerated Mr. Anvar noted the limited value of

this document. "The Tribunal found this document... not persuasive in supporting classification

of Detainee as an enemy combatant. . . The Tribunal found the Detainee's denial of involvement

with the Taliban, al Qaida, or ETIM . . . to be sincere and genuine." *See Thabid v. Bush*, 05-

02398 ESH, Respondent's Factual Return for Ali Mohammad (supra) at 2.

## VI.    CAUSES OF ACTION

### A.    Count I
**Relief Under Section 1005(e)(2)(C)(i) of the Detainee Treatment Act
(Failure Appropriately to Apply "Enemy Combatant" Definition)**

152.    Petitioners incorporate by reference all preceding paragraphs as if set forth fully

herein.

153.    Section 1005(e)(2)(C)(i) of the DTA provides for review of whether the CSRT

determination:

> was consistent with the standards and procedures specified by the
> Secretary of Defense for Combatant Status Review Tribunals
> (including the requirement that the conclusion of the Tribunal be
> supported by a preponderance of the evidence and allowing a
> rebuttable presumption in favor of the Government's evidence).

---

[15]  Based on the available documents, it appears that the unclassified summaries of evidence for
Petitioner Abdul Nassar, and Uighur prisoners Hammad Memet, and Jalal Jalaldin do not include any
reference to the ETIM, the Taliban or Al Qaeda. *See* FOIA CSRT 3102-09 (Abdul Nassar), 3151-59
(Hammad Memet) and 1631-44 (Jalal Jalaldin).

154.    Each Petitioner's CSRT was inconsistent with the standards and procedures specified by the Secretary of Defense, because none appropriately applied the definition of "Enemy Combatant."

155.    The CSRT Procedures defined an "enemy combatant" as:

> an individual who was part of or supporting the Taliban or al Qaida forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. This includes any person who has committed a belligerent act or has directly supported hostilities in aid of enemy armed forces.

CSRT Procedures, Encl. 1(B).

156.    Respondent lacked authority to imprison civilians seized outside of military operations who were not "carrying a weapon against American troops on a foreign battlefield." *Hamdi*, 542 U.S. at 522 n.1. In applying the definition, and determining that a prisoner was an "Enemy Combatant," each CSRT was obliged to make two findings, each by a preponderance of evidence. First, it had to find affiliation with a group engaged in warfare with the United States or its coalition partners. Second, it had to find that the prisoner actually engaged in military activity.

157.    ETIM was not a terrorist organization when Petitioners were seized. Deputy Secretary of State Richard L. Armitage announced the addition of ETIM to the list of foreign terrorist organization on August 26, 2002. Karen DeYoung, *U.N and China Ask U.N. to List Separatists as Terror Group,* WASH. POST Sept. 11, 2002, at A13. This designation was a quid pro quo for China's acquiesce and support for the U.S. invasion of Iraq. *See infra* ¶¶ 75-77. Colin Powell designated ETIM as a terrorist organization on the immigration Terrorist Exclusion List ("TEL") on April 29, 2004. U.S. Department of State Additions to Terror List (April 29, 2004) *available* at http://www.state.gov/r/pa/prs/ps/2004/31943.htm.

### 1.    There was no reliable evidence, in the case of any Petitioner, of "affiliation."

158.    Respondent asserted that certain Petitioners were affiliated with ETIM, the so-called organization that the United States agreed, in political negotiations with the Chinese in

August, 2002, almost a year after the Petitioners' capture, to deem a "terrorist organization."

159.    The unclassified record for each Petitioner contained no evidence that (i) ETIM exists, (ii) ETIM was affiliated in any way with Al Qaeda, the Taliban, or the 9/11 murders, or (iii) the Petitioner was affiliated with ETIM.  On information and belief, the classified record contained no reliable evidence of any of these points.

160.    The unclassified record contains no evidence that any Petitioner was affiliated with Al Qaeda or the Taliban.

161.    On information and belief, the classified record contained no reliable evidence as to any Petitioner that (i) ETIM exists, (ii) ETIM was affiliated in any way with Al Qaeda, the Taliban, or the 9/11 murders, or (iii) the Petitioner was affiliated with ETIM, (iv) Petitioner was affiliated with Al Qaeda, or (v) Petitioner was affiliated with the Taliban.

> **2.    There was no reliable evidence that any Petitioner engaged in hostile military activity.**

162.    There was no evidence, in the case of any Petitioner, of actual participation in armed conflict or other military activity.[16]

163.    In determining that each Petitioner was an Enemy Combatant, the CSR Tribunal acted inconsistently with the implementing definition.

> **B.    Count II**
> **Relief Under Section 1005(e)(2)(C)(i) of the Detainee Treatment Act**
> **(Failure of Recorder to Apprise Panels of Evidence Dispositive of Non-Combatant Status)**

164.    Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

---

[16]  Of the eighteen Uighurs, at least six—including all Petitioners—were not accused of committing *any* hostile act.  On information and belief, the Government does not accuse over half of the detainees at Guantanamo Bay of any hostile act.  *See* Denbeaux I at 6-7.  The Government's characterization of what constitutes a "hostile act" is also deeply flawed.  For example, the only allegation purportedly supporting the Government's contention that Abdusemet committed a "hostile act" is that, "[t]he Detainee was in Toro Bora for approximately three months during the U.S. bombing campaign."  *See* FOIA CSRT 2913. *See infra* ¶¶ 190.  *See also generally* Denbeaux I at 11-13.

DCDOCS/677423.2/0999997-0000928762

165.   Each Petitioner's CSRT was inconsistent with the standards and procedures specified by the Secretary of Defense.

166.   On information and belief, the Recorder in each Petitioner's CSRT failed to make a reasonably diligent and thorough search for documents and information, including but not limited to each Petitioner's own interrogation file, which contained dispositive evidence that Petitioner was not an enemy combatant.

167.   The files of Petitioners' own interrogations conducted in both Kandahar and Guantanamo prior to mid-2003 showed that interrogators had concluded that they were innocent of involvement in military or criminal activity.  Much of the relevant exculpatory documents and information was, on information and belief, physically present at the Guantanamo base.  The Recorder failed to present this evidence to the panel.  In addition, the Recorder failed to obtain and present to the panel documents and information related to each Petitioner's reasons for leaving China, and the plight of the Uighur people in China; each Petitioner's actions while in Afghanistan and Pakistan; the nature of the Uighur village in Afghanistan; the activities that took place in the Uighur village in Afghanistan; individuals present in the Uighur village in Afghanistan; Chinese political pressure to identify "ETIM" as a terrorist organization in exchange for support of the Iraq invasion; the bombing of the Uighur village by U.S. forces; each Petitioner's actions while a refugee after the bombing of the Uighur village, and their flight from Afghanistan to Pakistan; the circumstances of Petitioners' arrest, and in particular the substantial bounty paid by the U.S. for each Petitioner; Petitioners' substantial and well founded fear of harm, torture or death if returned to China; the circumstances of Petitioners' incarceration by both Pakistani authorities and the U.S. military prior to their transportation to Guantanamo; the circumstances of Petitioners' interrogations, both in Afghanistan and Guantanamo; and the circumstances under which one or more Petitioners, like numerous other Uighurs, were informed by U.S. military authorities that they were "innocent."

168.   Such relevant exculpatory documents and information were "reasonably available" within the meaning of the CSRT Procedures in that they were publicly available from

State Department reports, and on information and believe privately available from the State Department and U.S. military intelligence.

169.    The Recorder was obliged to "obtain and examine" reasonably available information in the possession of the United States government "bearing on" the prisoner's status ("Government Information") and to present such evidence to the tribunal. CSRT Procedures, Encl. 2. In addition, "[i]n the event that the Government Information contains evidence to suggest that the detainee should not be designated as an enemy combatant, *the Recorder shall also provide* such evidence to the Tribunal." *See also id.* at Encl. 2(B)(1) (emphasis added).

170.    For each of the Petitioners, the Recorder failed to gather and examine the Government Information as defined in Enclosure 1, Part E(3), inconsistent with his duties as defined in Enclosure 2, Part C(1) of standards and procedures specified by the Secretary; failed to present information "suggest[ing] that the detainee should not be classified as an enemy combatant," inconsistent with Enclosure 2, Part B(1) of the standards and procedures specified by the Secretary, and failed to present the Government Evidence in a manner permitting the Tribunal to fulfill its duty under Enclosure 1, Part G(7) of the standards and procedures specified by the Secretary.

171.    According to the Unclassified record of each of the Petitioner's CSRTs, and, on information and belief, the classified record, the Recorder in each CSRT failed to present to the panel overwhelming and easily-available evidence demonstrating that the Petitioner was not an enemy combatant, including (i) evidence available in Guantanamo interrogation files physically present at the base demonstrating the conclusion of military interrogators that the Petitioner was not an enemy combatant, (ii) evidence easily obtained from the State Department demonstrating the government's representations to numerous foreign governments that that the Petitioner was a suitable candidate for asylum in such countries, and (iii) voluminous publicly available information, and, on information and belief, information in the interrogation files about the unreliability of information obtained from Chinese agents in 2002.

C.    **Count III**
**Relief Under Section 1005(e)(2)(C)(i) of the Detainee Treatment Act**
**(Failure to Apply Standards Uniformly)**

172.    Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

173.    Each Petitioner's CSRT was inconsistent with the standards and procedures specified by the Secretary of Defense, because the CSRT panels failed to apply the standards uniformly and consistently.

174.    Eighteen Uighur prisoners presented cases to the panels that were, as Respondent has conceded, in all material respects the same.

175.    The panels determined that five of the Uighur prisoners were noncombatants.

176.    Thirteen of the Uighur prisoners were determined to be combatants.

177.    One of the thirteen, Ali Mohammad, (ISN 289), was first determined, correctly, to be a noncombatant. The determination was then changed under the direction of unnamed persons within the Department of Defense who admitted that the purpose of the changed determination was to avoid "inconsistent" results with other Uighurs.

178.    By failing to apply the standards of the regulations consistently, the panels violated the operative standards and procedures as to each of the Petitioners.

D.    **Count IV**
**Relief Under Section 1005(e)(2)(C)(i) of the Detainee Treatment Act**
**(Failure of the Tribunal Panels to Adhere to Standards)**

179.    Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

180.    Each of the CSRTs failed to adhere to operative regulations, including, without limitation, (i) failure of the Recorder and the panel pursuant to Enclosure 1, Part G(7) of the CSRT Procedures, to take into account the reliability of hearsay evidence received from anonymous Chinese agents, (ii) failure of the Recorder to make known to the panel Government Information suggesting that the detainee should not be designated as an enemy combatant reasonably available information,  Encl. 2(B)(1), (iii) failure of the Recorder and panel pursuant

- 49 -

to Enclosure 1, Part E(2) and (3) to make part of the record and consider witness testimony and other reasonably available information "bearing on the issue of whether the detainee meets the criteria to be designated as an enemy combatant," and (iv) failure of the panel to question the Recorder, and request documentary evidence or testimony related to evidence provided by Chinese agents.

181.    The Legal Advisor for each CSRT failed pursuant to Enclosure 1, Part I(7) to conduct an appropriate "legal sufficiency" review of all CSRT cases and render an opinion as to legal sufficiency. The determination of each CSRT was not supported by a preponderance of evidence, even allowing for a rebuttable presumption in favor of the Government's evidence, as required by CSRT Procedures.

E.    Count V
Relief Under Section 1005(e)(2)(C)(ii) of the Detainee Treatment Act
(Failure to Apply Standards in Conformity with the Constitution and Laws
of the United States)

182.    Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

183.    Regardless of whether the standards and procedures were correctly applied as to any Petitioner, those standards and procedures are inconsistent with the Constitution and laws of the United States.

184.    Section 1005(e)(2)(C)(ii) provides for a judicial determination of Constitutional and legal rights. The Solicitor General of the United States, as counsel for Respondent, represented before this Court:

> Section 1005(e)(2)(C)(ii) permits review of the Constitutional and
> statutory issues raised in these appeals: whether the Due Process
> Clause of the Fifth Amendment applies to the Guantanamo
> Detainees; if so, whether the CSRT procedures satisfy due process;
> and whether the President was authorized to detain petitioners as
> enemy combatants pursuant to Article II of the Constitution.

Supplemental Br. of the Federal Parties Addressing the Detainee Treatment Act of 2005, *Al Odah v. United States*, nos. 05-5064 *et al.*; nos. 05-5062 *et al.* (D.C. Cir. Feb. 17, 2006).

185.    Where the United States exercises sufficient governing authority, citizens and

aliens alike have Constitutional rights. *See Rasul*, 542 U.S. at 484 & n.15; *United States v. Verdugo-Urquidez*, 494 U.S. 259, 277-78 (1990) (Kennedy, J., concurring); *Downes v. Bidwell*, 182 U.S. 244, 291 (1901) (White, J., concurring in judgment); *Ralpho v. Bell*, 569 F.2d 607, 619 (D.C. Cir. 1977) (Constitution extends to Micronesia); *Juda v. United States*, 6 Cl. Ct. 441, 458 (Cl. Ct. 1984) (denying motion to dismiss constitutional claims of Marshall Islanders); *Gov't of Canal Zone v. Yanez P.*, 590 F.2d 1344, 1351 (5th Cir. 1979) (fundamental fair trial rights available in territory not incorporated into United States).

186.    In 1903, the United States entered into a long-term lease with Cuba that extended complete jurisdiction and control over Guantanamo. The U.S. military enforces U.S. laws, rules and regulations on Guantanamo, and controls passage in and out of Guantanamo. By virtue of the complete jurisdiction and control exercised by the U.S. government over Guantanamo and enforcement by the U.S. military of U.S. law on all activities on Guantanamo, including control over entry to and egress from Guantanamo, persons on Guantanamo including the prisoners are subject to the protections and rights guaranteed by the Constitution.

187.    Accordingly, Petitioners were and are entitled to due process. Due process requires that review be by a fair and neutral decision maker, and include notice of the allegations and a meaningful opportunity to contest the allegations against them. *See Matthews v. Eldridge*, 424 U.S. 319, 333-35 (1976). Indefinite imprisonment on the basis of secret evidence offends the core of due process, *see United States v. Yunis*, 867 F.2d 617, 623 (D.C. Cir. 1989). Petitioners were entitled therefore to review "granted at a meaningful time and in a meaningful manner." *Hamdi*, 542 U.S. at 533; *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991).

188.    The CSRTs were not proceedings to determine what acts were committed by Petitioners and what penalty should be imposed, but simply whether prisoners are "properly classified as enemy combatants." *Cf.* U.S. Dep't of Defense, Military Commission Order No. 1 (Aug. 31, 2005), *available at* http://www.defenselink.mil/news/Sep2005/- d20050902order.pdf (purporting to set forth such procedures). Accordingly, the standards and procedures set forth by the Secretary were inconsistent with Army Regulation 190-8 and the Administrative Procedure

Act.

189.    Petitioners' imprisonment based on a post-hoc designation of "ETIM" as a terrorist organization, and a complete absence of evidence either of that organization's existence or the Petitioners' affiliation with it, violated the provisions of the Constitution that prohibit the Congress from retroactively creating grounds to justify imprisonments, contained in the ex post facto, due process, and bill of attainder clauses of the Constitution. *See Lynce v. Mathis*, 519 U.S. 433, 440 n. 12 (1997); *see generally*, W. Winthrop, Military Law and Precedents, (2d Ed., 1920 reprint) at 837 ("As in the ordinary criminal law one cannot be legally pu[n]ished for what is not an offense at the time of the sentence, so a military commission cannot, (in the absence of specific statutory authority,) legally assume jurisdiction of, or impose a punishment for, an offense committed before or after the war or other exigency authorizing the exercise of military power.").

190.    Petitioners' CSRT process offended all of these constitutional principles and laws.

### 1.    The Decision-Maker was Not Neutral.

191.    One is entitled as a matter of due process to an adjudicator who is neutral and "who is not in a situation which would offer the possible temptation to the average man as a judge . . . which might lead him not to hold the balance nice, clear and true." *Concrete Pipe & Prods. v. Constr. Laborers Trust*, 508 U.S. 602, 617-18 (1993). Even purportedly fair adjudicators "are disqualified by their interest in the controversy." *Tumey v. Ohio*, 273 U.S. 510, 522 (1927). An "interrogation by one's captor," as is the case here, "hardly constitutes a constitutionally adequate fact-finding before a neutral decision maker." *Hamdi*, 542 U.S. at 537.

192.    The Recorder and the Panel were beholden to a chain of command, pressured to conform the result, and demonstrated by their conduct a desire to achieve a prescribed result. The Recorders' failures to gather, examine and present evidence exonerating Petitioners was inconsistent with the due process requirements under administrative law duties for a hearing officer in a "non-adversarial" proceeding. *See, e.g., Dixon v. Heckler*, 811 F.2d 506, 510 (10th Cir. 1987) ("[A] nonadversarial proceeding, [is one] in which the ALJ has a basic duty of

inquiry[] 'to inform himself about facts relevant to his decision and to learn the claimant's own version of those facts.'") (quoting *Heckler v. Campbell*, 461 U.S. 458, 471 n.1 (1983) (Brennan, J., concurring)).

193.    Without a neutral adjudicator, and without a means to ensure that the panel had access to exculpatory evidence in government files at Guantanamo Bay, the CSRT process was arbitrary. This arbitrariness of this process is illustrated by its inconsistent results. There was absolutely no correlation between the Petitioner's status determination and the CSRT records.

194.    All Uighur detainees admit traveling through Pakistan into Afghanistan in 2001 or before. There was no correlation between this travel and their status as an enemy combatant or non-enemy combatant.

195.    Status determinations did not correlate to the "training" theory. The Recorder offered no independent evidence of military training of any kind. Some of the Uighurs who admitted an intention to get [nonmilitary] "training" were determined to be non-enemy combatants. FOIA CSRT 1354 (Abu Bakker Qassim (ISN 283) admits that the reason he went to the village "was to get training to fight back against the Chinese."). Others who denied that purpose were determined to be enemy combatants. *Id.* at 1925 (Abdul Razakah (ISN 219) admits bringing food to the small village, but denies ever staying there or seeing any military training or training).

196.    The record as to handling a firearm did not correlate to enemy combatant status. For example, Abdul Razakah (ISN 219) denied receiving any training and is being held as an enemy combatant while Akhtar Qassim (ISN 276) admitted participating in target practice and was determined to be a non-combatant. *Id.* 1925, 1365. Additionally, Abu Bakker Qassim (ISN 283), Adel Abdu Al-Hakim (ISN 293), Ahmed Adel (ISN 260), and Ayoub Haji Mamet (ISN 279) all admitted to learning to operate a firearm. All were determined to be non-enemy combatants.

197.    The record as to presence in the Uighur village in Afghanistan did not correlate to enemy combatant status. For example, Abdusemet (ISN 295), who was present, was determined

to be an enemy combatant while Akhtar Qassim (ISN 276), Abu Bakker Qassim (ISN 283), Adel

Abdu Al-Hakim (ISN 293), Ahmed Adel (ISN 260), and Ayoub Haji Mamet (ISN 279), all were

present and determined not to be combatants.

198.    There was no correlation between status determination and the allegations

regarding relationship to the spurious "ETIM" and related organizations claimed to exist by

communist Chinese agents.  All Uighurs denied knowledge and involvement.  Noncombatant

Adel Abdu Al-Hakim (ISN 293) denied an affiliation.  *Id.* at 1353.  Edham Mamet (ISN 102),

Ahmad (ISN 201), and Bahtiyar Mahnut all denied charges of participation, and were determined

to be enemy combatants.  *See* Mamet's Unclassified Summary, FOIA CSRT at 2609, 2468.

199.    In sum, there was no relationship between the CSRT record and the enemy

combatant determinations.

### 2.    Petitioners had No Notice of What Charge or Allegation to Meet.

200.    On information and belief, each Petitioner's CSRTs "unclassified summary of

evidence" was, in fact, bereft of any reference to evidence.  Instead, each and every Petitioner's

unclassified summary consisted of a series of vague, compound, and conclusory allegations.  To

the evident confusion of several Petitioners, as well as several Tribunals, many of the allegations

did not describe conduct that was in any way wrongful.

201.    To take a typical example, publicly available documents show that Uighur

Abdusemet's unclassified summary of evidence alleged:

> (3.a.)  The Detainee is associated with Al Qaeda.
>
> (3.a.1.)  The Detainee arrived in Afghanistan from China, via
> Pakistan, in August 2001.
>
> (3.a.2.)  The Detainee trained in a military training camp in
> Afghanistan.
>
> (3.a.3.)  The detainee completed weapons training.
>
> (3.a.4.)  The Detainee stayed in a Uighur guesthouse in
> Jalalabad.
>
> (3.a.5.)  The Detainee traveled to Afghanistan without a
> passport.

(3.b.) The Detainee participated in military operations against the United States and its coalition partners.

(3.b.1.) The Detainee was in Tora Bora for approximately three months during the U.S. bombing campaign.

CSRT at 2909-12.

202.    The insufficiency of the unclassified summary is obvious. It contains vague and conclusory allegations—several of which appear to be entirely irrelevant to the enemy combatant definition—and no *evidence* to which a Petitioner might respond.

203.    Indeed, the CSRT panels themselves noted that the unclassified summary (which was always designated exhibit R-1), was worthless as evidence. For example, the Tribunal convened for Petitioner Mahnut stated, "While [the unclassified summary of evidence] is helpful in that it provides a broad outline of what the Tribunal can expect to see, it is not persuasive in that it provides conclusory statements without supporting unclassified evidence." *See Bahtiyar Mahnut Fact Return*, Unclassified Summary of Basis for Tribunal Decision (Tribunal Panel No. 12) at 2..

204.    The Detainee's only knowledge of the reasons the Government considered him an enemy combatant was the so-called "summary of evidence." Denbeaux I, *supra*, at 2. But the summary of evidence contained no evidence. It contained only allegations. None of the Petitioners was ever able to understand what, if anything, had been alleged against him.

205.    All requests by the Detainees to see the classified evidence against them were denied. This was particularly harmful to the Uighurs because they had no effective way to bring to the Tribunal's attention the publicly-demonstrated predilection of China to brand as "terrorists" those who engaged in peaceful political dissent.

### 3.    Petitioners Were Denied a Meaningful Opportunity to Contest the Charges Against Them.

206.    The failures of the Recorder, Personal Representative and Panel to obtain easily available documents prevented the Petitioners from any ability to mount an effective case. This problem was specific to the Uighurs, but endemic to the process.

207.    In one example, Mohammad Atiq Al Harbi (ISN 333) appeared before a Tribunal

and identified documents he said would exonerate him and explain that he was not an enemy combatant:

> It is important you find the notes on my visa and passport because they show I was there for 8 days and could not have been expected to go to Afghanistan and engage in hostilities against anyone.

Denbeaux II at 32.  This request was denied.

208.    Khi Ali Gul (ISN 928) requested that his brother be produced as a witness and provided the Tribunal with his brother's telephone number and address.  *Id.* at 33.  The Government did not try to make contact with the his brother, but instead sent the request to the Afghanistan embassy.  *Id.*  The embassy did not respond within 30 days, the witness was found to be unavailable, and Khi Ali Gul is now an enemy combatant in Guantanamo.  *Id.*

209.    The inability to see any evidence or the contents of the classified record make it impossible for Petitioners to present their case.

210.    The structured deficiency of the Recorder and Personal Representative role left Petitioners unable to participate in a meaningful way.  They were unable to present the panels evidence concerning (i) how the U.S. had determined that Uighur dissident groups such as ETIM were not terrorist groups, (ii) how the U.S. determination that "ETIM" was a "terrorist organization" was a political deal with  the Chinese government, (iii) how interrogators had determined in Kandahar and Guantanamo that they were not combatants, (iv) how this conclusion had been confirmed in 2003, and (v) the numerous admissions that had been made by the State Department concerning the Petitioners to foreign governments, which statements were admissions that the Petitioners were not enemy combatants.

211.    The reliability of hearsay has always been dependent on the reliability of the of the hearsay declarant.  Because Petitioners did not know who their Chinese accusers were, they were unable to respond.

212.    Army Regulation 190-8 prohibits the detention of civilians who were seized away from the field of battle or outside occupied territory or who were not engaged in combat against the United States.  *See, e.g.*, U.S. Army Reg. 190-8 § 1-6(g) (Oct. 1, 1997) ("Persons who have

been determined by a competent tribunal not to be entitled to prisoner of war status may not be executed, imprisoned, or otherwise penalized without further proceedings to determine what acts they have committed and what penalty should be imposed.").

213.    By arbitrarily and capriciously detaining Petitioners in military custody for an unknown period in the manner described above, Respondent has acted and continues to act ultra vires and unlawfully in violation of (i) the due process clause of the Federal Constitution, (ii) Army Reg. 190-8 § 1-6(g) and (iii) the Administrative Procedure Act, 5 U.S.C. § 551, 706(2) (2006).

## VII.    LEAVE TO AMEND

214.    Petitioner Abdul Nassar files this Petition without benefit of any records or documents relating to his CSRTs other than incomplete unclassified materials obtained by the Associated Press pursuant to the Freedom of Information Act, 5 U.S.C. § 552 (and over the strenuous objections of Respondent) in unrelated proceedings.

215.    The DTA expressly provides Petitioners the right to challenge whether the determination that they are enemy combatants is "supported by a preponderance of the evidence" and whether standards and procedures specified by Respondent for CSRTs were adhered to. Under the plain language of the DTA, Petitioners are not limited to challenging the determination based only on the "record of the hearing" collected by the Recorder, but rather are entitled to prove that the determination is not supported by the "evidence." At the outset, Petitioner Abdul Nassar is therefore entitled to an immediate return of the entire CSRT record, classified and unclassified, and to supplement this petition as may then appear appropriate.

## VIII.    PRELIMINARY INJUNCTION AGAINST TRANSFER OF PETITIONERS

216.    Petitioners respectfully request immediate entry of a temporary restraining order and preliminary injunctive relief enjoining Respondent and his agents from transferring, moving or otherwise taking any action that would remove Petitioners from the jurisdiction of this Court pending a final determination with respect to this Petition, other than an unconditional release of Petitioners in the United States.

DCDOCS/677423.2/0999997-0000928762

217.    DTA § 1005(e)(2)(D) provides that this Court loses jurisdiction over claims brought by a prisoner "upon the release of such alien from the custody of the Department of Defense."

218.    On about February 9, 2006, the Department of Defense announced that it would "release" or "transfer" approximately 120 prisoners. Press Release, *U.S. Dept. of Defense, Guantanamo Bay Detainee Administrative Review Board Decisions Completed* (Feb. 9, 2006), *available at* http://www.globalsecurity.org/security/library/news/2006/02/sec-060209-dod01.htm. On information and belief, Petitioners are among those authorized for "release" or "transfer." On information and belief, Respondent is considering transfer to countries that will ensure the continued detention of prisoners, and countries that routinely practice torture. *See* U.S. Dept. of State, Country Reports on Human Rights Practices: Afghanistan, Mar. 8, 2006, *available at* http://www.state.gov/g/drl/rls/hrrpt/2005/61704.htm.

219.    Five Uighurs were already spirited to Albania on the eve of their habeas corpus hearing in this Court. *See Qassim v. Bush*, no. 05-5477 (D.C. Cir.) and *Mamet v. Bush*, no. 05-1886 EGS (D.D.C.). They have no family, community, common language there; in short, they have no chance. As discussed above, it is highly likely that Petitioners would face persecution, torture or even death if returned to China. Given the United States' inability to find a third country willing to grant Petitioners asylum, there is a substantial risk that Respondent will decide to repatriate Petitioners to China or to some inappropriate place rather than risk judicial review.

220.    This Court has inherent power and jurisdiction under 28 U.S.C. § 1651 in aid of its own jurisdiction to address the potential rendition or transfer of Petitioner. Moreover, the rendering of Petitioners to another country for interrogation or torture would also violate § 1003 of the DTA, the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment and Punishment, the International Covenant on Civil and Political Rights, Dec. 19, 1966, S. Exec. No. Doc. E, 95-2, 999 U.N.T.S. 171 and the Third and Fourth Geneva Conventions, Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135; Geneva Convention Relative to the Protection of Civilian Persons in

DCDOCS/677423.2/0999997-0000928762

Time of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287. This Court also has jurisdiction to address the potential rendition of Petitioners pursuant to 28 U.S.C. § 1350.

## IX.   PRAYER FOR RELIEF

WHEREFORE, Petitioners respectfully request the Court enter an order or orders:

A.   Directing that returns of classified and unclassified CSRT records for each Petitioners be made to Petitioners immediately;

B.   Scheduling an immediate hearing;

C.   Directing that no Petitioner be transferred to any other country without his specific written agreement or further order;

D.   Affording counsel reasonable access to each Petitioner;

E.   Ordering the immediate release of the petitioners into the United States on nominal bond pending resolution of this petition pursuant to Federal Rule of Appellate Procedure and the doctrine of *Baker v. Sard*, 420 F.2d 1342 (D.C. Cir. 1969);

F.   On Counts I-IV, declaring that the standards and procedures applied in each Petitioner's CSRT were inconsistent with the standards and procedures specified by Respondent, and directing the immediate release of each Petitioner;

F.   On Count V, declaring that the standards and procedures specified by Respondent for the Combatant Status Review Tribunals are inconsistent with the Constitution and laws of the United States and directing the immediate release of each Petitioner;

G.   On all counts of the Petition, directing the immediate release of each Petitioner;

H.   Granting such other and further relief as the Court may deem just to protect Petitioners' rights under the common law, the Constitution of the United States, federal statutory law and/or international law.

DCDOCS/677423.2/0999997-0000928762

Dated: March 14, 2007

**BINGHAM McCUTCHEN LLP**
P. Sabin Willett
Susan Baker Manning
2020 K STREET, N.W.
WASHINGTON, D.C. 20006
Telephone: (202) 373-6000
Facsimile: (202) 373-6001
*Attorneys for Petitioner Abdul Nassar*

Dated: March 14, 2007

**BAKER & MCKENZIE LLP**
George M. Clarke III
Angela C. Vigil
815 Connecticut Avenue, N.W.
Washington, D.C. 20006
Telephone (202) 452-7000
Facsimile: (202) 452-7074
*Attorneys for Petitioner Thabid*

Dated: March 13, 2007

**ELIZABETH P. GILSON,
ATTORNEY AT LAW**
383 Orange Street
New Haven, Connecticut 06511
Telephone: (203) 777-4050
Facsimile: (203) 787-3259
*Attorney for Petitioners Bahtiyar Mahnut
and Arkin Amahud*

- 60 -