**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

<table>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>IN RE:</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td>Misc. No. 08-442 (TFH)</td></tr>
<tr><td>GUANTANAMO BAY</td><td>)</td><td></td></tr>
<tr><td>DETAINEE LITIGATION</td><td>)</td><td>Civil Action Nos.</td></tr>
</table>

IN RE:

GUANTANAMO BAY
DETAINEE LITIGATION

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Misc. No. 08-442 (TFH)

Civil Action Nos.
02-CV-0828, 04-CV-1136, 04-CV-1164, 04-CV-1194,
04-CV-1254, 04-CV-1937, 04-CV-2022, 04-CV-2035,
04-CV-2046, 04-CV-2215, 05-CV-0023, 05-CV-0247,
05-CV-0270, 05-CV-0280, 05-CV-0329, 05-CV-0359,
05-CV-0392, 05-CV-0492, 05-CV-0520, 05-CV-0526,
05-CV-0569, 05-CV-0634, 05-CV-0748, 05-CV-0763,
05-CV-0764, 05-CV-0833, 05-CV-0877, 05-CV-0881,
05-CV-0883, 05-CV-0889, 05-CV-0892, 05-CV-0993,
05-CV-0994, 05-CV-0995, 05-CV-0998, 05-CV-0999,
05-CV-1048, 05-CV-1124, 05-CV-1189, 05-CV-1220,
05-CV-1236, 05-CV-1244, 05-CV-1347, 05-CV-1353,
05-CV-1429, 05-CV-1457, 05-CV-1458, 05-CV-1487,
05-CV-1490, 05-CV-1497, 05-CV-1504, 05-CV-1505,
05-CV-1506, 05-CV-1509, 05-CV-1555, 05-CV-1590,
05-CV-1592, 05-CV-1601, 05-CV-1602, 05-CV-1607,
05-CV-1623, 05-CV-1638, 05-CV-1639, 05-CV-1645,
05-CV-1646, 05-CV-1649, 05-CV-1678, 05-CV-1704,
05-CV-1725, 05-CV-1971, 05-CV-1983, 05-CV-2010,
05-CV-2083, 05-CV-2088, 05-CV-2104, 05-CV-2112,
05-CV-2185, 05-CV-2186, 05-CV-2199, 05-CV-2200,
05-CV-2249, 05-CV-2349, 05-CV-2367, 05-CV-2371,
05-CV-2378, 05-CV-2379, 05-CV-2380, 05-CV-2381,
05-CV-2384, 05-CV-2385, 05-CV-2386, 05-CV-2387,
05-CV-2398, 05-CV-2444, 05-CV-2477, 05-CV-2479,
06-CV-0618, 06-CV-1668, 06-CV-1674, 06-CV-1684,
06-CV-1688, 06-CV-1690, 06-CV-1691, 06-CV-1758,
06-CV-1759, 06-CV-1761, 06-CV-1765, 06-CV-1766,
06-CV-1767, 07-CV-1710, 07-CV-2337, 07-CV-2338,
08-CV-0987, 08-CV-1085, 08-CV-1101, 08-CV-1104
08-CV-1153, 08-CV-1185, 08-CV-1207

_____ )

**PETITIONERS' JOINT REPLY MEMORANDUM OF LAW**
**ADDRESSING PROCEDURAL FRAMEWORK ISSUES**

Pursuant to the Court's Scheduling Order of July 11, 2008, Petitioners hereby

respectfully submit this Reply Memorandum in response to the government's memorandum of

July 25, 2008.

I.    **THE APPLICABLE STATUTORY AND DUE PROCESS FRAMEWORK**

The government's proposal for a framework to govern these cases ignores both the

holding of *Boumediene v. Bush*, 128 S. Ct. 2229 (2008), and its persistent admonition that habeas

remains a flexible, robust procedure designed to provide a meaningful inquiry into the lawfulness

of detention by executive decree.  Instead, the government proposes a cookie-cutter review

process for these diverse cases that rests on two fundamental errors.  First, contrary to the

government's understanding, as a result of *Boumediene*'s holding that the jurisdictional-stripping

provision of § 7 of the Military Commissions Act of 2006 ("MCA") is unconstitutional, the

framework for adjudicating these cases is governed by the prevailing habeas corpus statute, 28

U.S.C. §§ 2241, *et seq.*  Second, the government misreads the plurality opinion in *Hamdi* to

propose a rigid and inflexible procedure that is at odds with this Court's obligation to seek the

truth through a fair and neutral process.  The habeas statute, *Boumediene*, and other controlling

habeas precedents establish a flexible, adaptable remedy capable of balancing the competing

interests of the parties while ensuring a neutral and robust truth-seeking process in the context of

the facts of a particular case.  Context-specific procedural questions are not amenable to blanket

resolution, but must be addressed on a case-by-case basis.

A.    **Petitioners' Cases Are Governed by the Habeas Corpus Statute**

Contrary to the holding of *Boumediene*, the government contends that Petitioners are only

entitled to the minimum habeas procedures "constitutionally compelled" by the Suspension

Clause.  This contention is wrong.  These cases have always been, and remain, statutory habeas

cases brought under 28 U.S.C. § 2241(c)(1) and (3).  Although Congress sought to bar statutory

jurisdiction through § 7 of the MCA, *Boumediene* held that § 7 is unconstitutional, and therefore

void.  Petitioners' habeas petitions were properly filed under 28 U.S.C. § 2241.  Now that the

constitutionally-invalid provision has been stricken, Petitioners are entitled to proceed with their petitions under the habeas statute that has always been available to them, which necessarily includes those "modern" statutory habeas proceedings of 28 U.S.C. §§ 2243-48 described in Petitioners' opening brief. The logic of this conclusion can be elaborated as follows:

*Rasul* held that this Court has jurisdiction in Petitioners' cases under the habeas corpus statute, 28 U.S.C. § 2241, *et. seq.* Congress attempted to amend the statute in § 7 of the MCA, which purported to strip the courts of jurisdiction over habeas petitions filed by foreign nationals detained as enemy combatants. *Boumediene* expressly held that § 7 of the MCA was unconstitutional. 128 S. Ct. at 2274. As a result of *Boumediene*, the jurisdictional repeal of MCA §7 is simply void, and the habeas corpus statute is as applicable as it was before. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176 (1803) ("[A]n act of the legislature, repugnant to the constitution, is void").

The Court must therefore "disregard" the unconstitutional provision (*see Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 231 (1995)), and proceed under the pre-existing statutory authority. *See United States v. Klein*, 80 U.S. (13 Wall.) 128, 147-48 (1872) (disregarding an unconstitutional statute that divested the court of jurisdiction and reinstating a judgment obtained under prior statutory scheme); *accord Armstrong v. United States*, 80 U.S. (13 Wall.) 154 (1872) (same); Henry M. Hart, The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic, 66 Harv. L. Rev. 1362, 1387 (1953) ("If the court finds that what is being done is invalid, its duty is simply to declare the jurisdictional limitation invalid also, and then proceed under the general grant of jurisdiction"). *See also Boumediene v. Bush*, 476 F.3d 981, 1011 (D.C. Cir. 2007) (Rogers, J., dissenting) (stating that the habeas repeal was unconstitutional, and that the proper outcome was to hold that "on remand the district courts

shall follow the return and traverse procedures of 28 U.S.C. § 2241, *et seq.*"); *Boumediene*, 128 S. Ct. at 2266 (stating that "[t]he differences between the DTA and *the habeas statute that would govern in MCA §7's absence, 28 U.S.C. § 2241*, are likewise telling") (emphasis added).

This Court's jurisdiction in habeas cases comes from § 2241, not from "constitutional habeas." As Chief Justice Marshall explained, "the power to award the writ [of habeas corpus] by any of the courts of the United States, must be given by written law." *Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 94 (1807). Disregarding the unconstitutional amendment by § 7 of the MCA, that "written law" is § 2241.

The government's suggestion that "*Boumediene* 'did not hold' that constitutional habeas proceedings for wartime status determinations must duplicate statutory proceedings under § 2241 and modern habeas practice," (Gov't Br. at 6 (quoting 128 S. Ct. at 2267, 2274)), both takes the Court's statement out of context and reveals the depth of the government's confusion. Nothing in *Boumediene* diminishes the obvious conclusion that the jurisdiction-stripping provision of MCA is void. The Court said only: "Although we do not hold that an adequate substitute must duplicate § 2241 in all respects, it suffices that the Government has not established that the detainees' access to the statutory review provisions [of the Detainee Treatment Act of 2005] at issue is an adequate substitute for the writ of habeas corpus. MCA § 7 thus effects an unconstitutional suspension of the writ". 128 S. Ct. at 2274. The Court was merely explaining that, even though the DTA is unconstitutional, the Court would not specifically catalogue the ways in which a statute would potentially constitute an adequate substitute for the writ. Indeed, the *Boumediene* Court evinced its understanding that § 2241 would govern as a result of its holding. *See, e.g.,* 128 S. Ct. at 2276 (noting that, following remand, consolidation before a

district judge "is a legitimate objective that might be advanced even without an amendment to § 2241"); *id.* at 2269-70 (considering *Hamdi*'s analysis of § 2241).

Petitioners are therefore in precisely the same position they were in prior to enactment of § 7 of the MCA, and are in the same position as any other federal habeas petitioner invoking 28 U.S.C. § 2241. Petitioners may proceed, as some of the early petitioners had already been doing in this Court pursuant to *Rasul*, under the framework established by the habeas statute, to traverse the government's proffered return to the writ, to undertake discovery where needed, and to have disputed factual questions decided by an evidentiary hearing at which evidence will be taken as prescribed by statute and the Federal Rules of Evidence. *See* Pet. Br. at 5-7; 28 U.S.C. §§ 2243 and 2246.

### B.     *Hamdi* Does Not Compel or Support the Inflexible Procedural Framework Proposed by the Government

In place of the governing habeas statute, the government seeks to impose a narrow and rigid framework that it argues is compelled by the plurality opinion in *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004). The government's proposed framework was not mandated by *Hamdi*, and would give the government advantages not authorized by statute or permitted by due process, including an undefined presumption in favor of the government's evidence, a presumption in favor of hearsay, and a prohibition against discovery.

As an initial matter, *Hamdi*'s suggested procedures relied upon by the government are clear dicta. As dicta, it is in no way controlling, and is rendered all the less persuasive as a result of Justice Souter's concurrence, refusing to accept the plurality's suggestion that the government could be entitled to a presumption or that the burden of proof could fall on the petitioner. *See* 542 U.S. at 553 (Souter, J., concurring) ("It should go without saying that in joining with the plurality to produce a judgment, I do not adopt the plurality's resolution of constitutional issues

that I would not reach. … I do not mean to imply agreement that the Government could claim an evidentiary presumption casting the burden of rebuttal on Hamdi").  Nothing in *Marks v. United States*, 430 U.S. 188 (1977) lends any support to the government's position that dicta in the plurality opinion, much less in Justice Thomas's dissent, is binding precedent when it is specifically disclaimed by the concurring justices.  *See King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991) (*en banc*) ("*Marks* is workable – one opinion can be meaningfully regarded as "narrower" than another – only when one opinion is a logical subset of other, broader opinions").  Indeed, the Supreme Court has already rejected the argument that the *Hamdi* plurality's suggested procedures are binding precedent.  "Setting aside the fact that the relevant language in *Hamdi* did not garner a majority of the Court, it does not control the matter at hand."  *Boumediene*, 128 S. Ct. at 2269.

In any event, even the *Hamdi* plurality opinion does not support the government's position.  There is no rigid "*Hamdi* Framework" that can be applied across the board to all "war on terror" habeas cases.  Rather, as stated in Judge Traxler's controlling opinion in the Fourth Circuit's recent *en banc* decision in *Al-Marri v. Pucciarelli*, *Hamdi* sets forth one particular fact-based application of a *Mathews v. Eldridge* due process balancing framework.  *See Al-Marri v. Pucciarelli*, __F.3d __, 2008 WL 2736787, at *31 (4th Cir. July 15, 2008) (Traxler, J., concurring) (noting that the *Hamdi* plurality does not impose "a cookie-cutter procedure appropriate for every alleged enemy-combatant").  As *Boumediene* recognized, habeas is an "adaptable remedy.  Its precise application and scope changed depending upon the circumstances."  128 S. Ct. at 2267.

The balancing test of *Mathews v. Eldridge*, as adopted by the Supreme Court in *Boumediene* and its plurality opinion in *Hamdi*, requires consideration of "the risk of an

erroneous deprivation of [a liberty interest] and the probable value, if any, of additional or substitute procedural safeguards." *Boumediene*, 128 S. Ct. at 2268 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)); *see also Hamdi*, 542 U.S. at 529.  As set forth in Petitioners' opening brief, the Petitioners' liberty interests have grown as the years of indefinite detention have worn on, while the government's national security interests with respect to these particular detainees have become weaker and more remote.

It is the government's burden to show – not through generalized and unsupported assertions, but through a specific showing targeted to a particular petitioner's case – that any deviation from the "normal way" is warranted.  *Al-Marri*, 2008 WL 2736787 at *47 (Traxler, J., concurring).  Thus, while the *Hamdi* plurality recognizes that it is appropriate to balance the competing interests of petitioners and the government in adjudicating "enemy combatant" cases, the particular result of the plurality's balancing cannot be directly transposed to these Petitioners.

Although the specific procedures warranted in any one case may differ depending on the circumstances, certain differences between these cases as a group and *Hamdi* can be identified that suffice to reject the government's blanket approach.  First, the risk of misclassifying Hamdi was much lower than in these cases: Hamdi was captured in a "foreign combat zone" with an assault rifle as part of a "Taliban unit," 542 U.S. 512-13, 523; *see also id.* at 549 (Souter, J., concurring) (Hamdi "was taken bearing arms on the Taliban side of a field of battle").  In contrast, few of these Petitioners were captured on any "battlefield" (an amorphous term for which the government has never proposed a definition).  Indeed, according to the Defense Department's own data, only 5% of detainees held in Guantanamo are alleged to have been captured by American forces.  *See* Mark Denbeaux *et al.*, Seton Hall University School of Law, *Report on Guantanamo Detainees: A Profile of 517 Detainees through Analysis of Department*

*of Defense Data* 2-4 (2006), http://www.law.shu.edu/ aaafinal.pdf.  Or, as Brigadier General

Martin Lucenti has explained, "Most of these guys weren't fighting, they were running."  Mark

Huband, *US Officer Predicts Guantanamo Releases,* Fin. Times, Oct. 5, 2004.

      Second, the definition of "enemy combatant" employed by the Court in *Hamdi* was much

narrower and therefore less subject to erroneous application than the definition that the

government has since applied in Petitioners' Combatant Status Review Tribunals ("CSRTs").  In

*Hamdi*, the Court limited the definition to a person who was "part of or supporting forces hostile

to the United States or coalition partners in Afghanistan and who engaged in armed conflict

against the United States there."  *See Hamdi*, 542 U.S. at 516.  Through the CSRT process, these

Petitioners were improperly held subject to a wildly expansive definition of "enemy combatant"

purportedly authorizing the detention of a person picked up anywhere in the world, and for mere

"support" of forces "hostile to the United States," even if that support is unintentional.  *See In re*

*Guantanamo Bay Detainee Cases*, 355 F. Supp. 2d 443, 475 (D.D.C. 2005) (noting that under

the "enemy combatant" definition employed in Guantanamo, the government claims authority to

detain "a little old lady from Switzerland who writes checks to what she thinks" is an Afghan

orphanage but is "really a front to finance al Qaeda").  If the government is correct that even

unintentional conduct can justify indefinite detention under the laws and Constitution of the

United States (a proposition that Petitioners firmly reject), then the "risk of error" in these cases

is high, indeed.  *Boumediene*, 128 S. Ct. at 2270; *see also* Pet. Br. at 12-14.  Due process

therefore requires more protective procedures than the *Hamdi* plurality suggested "may" be

permitted in certain circumstances.

      Despite the government's attempt to resurrect its favorite controversy regarding

application of the Fifth Amendment (Gov't Br. at 35), it should now be clear that detainees held

at Guantanamo have fundamental due process rights. Relying again upon *Johnson v. Eisentrager*, 339 U.S. 763 (1950), a case distinguished away once by *Rasul* and again by *Boumediene*, the government claims that "*Boumediene* did not upset the well-established holding that the Fifth Amendment and other individual rights secured by the Constitution do not apply to alien enemy combatants lacking any voluntary connection to the United States." Gov't Br. at 9. Thus, the government implies, whatever restricted procedures were available for Hamdi, "must be good enough for an alien." Gov't Br. at 6. The government's premise is incorrect.

As to at least some Petitioners, all doubt has been resolved as to the application of the Fifth Amendment in their cases. Judge Green ruled in the cases previously transferred to her for coordinated consideration that the Petitioners have rights under the Fifth Amendment. *See In re Guantanamo Bay Detainee Cases*, 355 F. Supp. 2d at 465. The government appealed that ruling, but the applicability of the Fifth Amendment was not addressed on appeal. It is therefore the law of the case in the cases in which it was entered. *See Kimberlin v. Quinlan*, 199 F.3d 496, 500 (D.C. Cir. 1999) ("the same issue presented a second time in the same case in the same court should lead to the same result") (quoting *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (*en banc*)). But even as to the cases that were not before Judge Green, the Supreme Court in *Boumediene* relied heavily on the line of cases, including the *Insular Cases*, that applied fundamental rights in territories controlled by the United States. *See Boumediene*, 128 U.S. at 2254-57, and cases cited therein. *See also id.* at 2261 ("In every practical sense Guantanamo is not abroad; it is within the constant jurisdiction of the United States"). Detainees in Guantanamo are entitled to fundamental rights, and there is no right more fundamental than the right not to be deprived of liberty without due process of law. *See Foucha v. Louisiana*, 504 U.S. 71, 80 (1992); *In re Guantanamo Bay Detainee Cases*, 355 F. Supp. 2d at 465.

II.    **THE PROCEDURAL FRAMEWORK**

The government's specific proposals related to the procedural issues identified by the

Court are all flawed by the fundamental conceptual errors discussed above.  Once these

conceptual errors are recognized, it is clear that the habeas statute governs in these cases, that the

plurality opinion in *Hamdi* is not controlling and, at any rate, does not set forth a "cookie-cutter

approach," and that the government's proposals are not workable.  Instead, Petitioners'

proposals, set out in detail in their opening brief, are the ones most faithful to the habeas statute

and the Court's decision in *Boumediene* entitling Petitioners to a speedy and just resolution of

their habeas cases.

A.    **Entitlement to an Evidentiary Hearing**

As fully described in Petitioner's opening brief, under the habeas statute and the

governing case law, an evidentiary hearing is required where the petition, return, and the traverse

raise disputed issues of material fact.  *See* 28 U.S.C. § 2243; Pet. Br. at 7-9 (discussing cases).[1]

In addition, *Boumediene* clearly contemplated resolution of factual disputes by evidentiary

hearing.  The Court would not have ordered that district courts hear and consider new evidence

presented by Petitioners, *see, e.g.*, 128 S. Ct. at 2270, if the Court did not contemplate a factual

---

[1]    Even assuming any relevance of historical practice to these statutory cases, the
government's conclusion that evidentiary hearings and live testimony were uncommon at
common law is incorrect.  *See, e.g. Boumediene*, 128 S. Ct. at 2268 (citing cases); *Ex Parte
Bollman*, 8 U.S. 75, 125 (1807) (holding five days of factual hearings during which time the
Court "fully examined and attentively considered" the relevant evidence and ordered the
petitioner released); *accord Ex parte Randolph*, 20 F. Cas. 242 (C.C.D. Va. 1833); *see also
Delaware v. Clark*, 2 Del. Cas. 578 (Del. Ch. 1820) (live testimony from third parties regarding
enlistee's asserted incapacity); *R.* v. *Turlington*, 97 Eng. Rep. 741 (K.B. 1761) (discharging
woman from custody after reviewing doctor's affidavit and conducting examination of
petitioner's mental condition); *R.* v. *Lee*, 83 Eng. Rep. 482 (K.B. 1676) (considering petitioner's
testimony based on "oath in Court" that "she went in danger of her life by [her husband]" and
should be freed from his custody); Brief of Legal Historians as *Amici Curiae* in Support of
Petitioners, *Boumediene v. Bush*, S. Ct. No. 06-1195; No. 06-1196.

contest between the government's and a Petitioner's case resolved by a full judicial process, including the possible issuance of an order releasing Petitioners based on that judicial disposition. In arguing against the opportunity for any evidentiary hearing, the government makes no mention of this central component of the *Boumediene* ruling.

Remarkably, the government takes the skewed position that evidentiary hearings should occur only when the "court determines that, absent an evidentiary hearing, the weight of the evidence supports the habeas petitioner." Gov't Br. at 32.[2] The provenance of this standard is unclear, other than that such a standard would be highly favorable to the government. *Cf. Warden v. Oregon*, 412 U.S. 470, 475 (1972) (due process requires reciprocal procedural rights to avoid unfair advantage). In support of its proposal, the government cites to *Schriro v. Landrigan*, 127 S. Ct. 1933, 1940 (2007), which is a post-conviction habeas action subject to the procedural limitations imposed by the Antiterrorism and Effective Death Penalty Act ("AEDPA") – a category of cases irrelevant to these proceedings. *See Boumediene*, 128 S. Ct. at 2264 ("cases discussing implementation of that statute [AEDPA] give little instruction (save perhaps by contrast) for the instant cases, where no trial has been held"). At any rate, the suggestion is both slanted and circular: it appears to require the Petitioner to prove his case (establishing the "weight of the evidence" supports him) before he is entitled to prove his case (through an evidentiary hearing), without imposing any similar burden on the government.

District courts are well equipped to use their discretion in each case to deny an evidentiary hearing if it deems the government's or a Petitioner's allegations to be "vague,

---

[2]    The government also argues that Petitioners should be allowed to participate in the hearing only by video conferencing. Effectuation of the Petitioners' right under 28 U.S.C. § 2243 to be present at the hearing unless the petition and return present only issues of law can be addressed according to the circumstances of particular cases. The issue is outside the scope of the briefing required by this Court's Scheduling Order of July 11, 2008, and need not be addressed at this time.

conclusory or palpably incredible." *Machibroda v. United States*, 386 U.S. 487, 495 (1962).

Indeed, there may well be cases in which the government's evidence is so weak and

unsubstantiated that no hearing will be necessary. But an evidentiary hearing is required if,

under the circumstances of a particular case, "the petition, the return, and the traverse raise

substantial issues of fact." *Walker v. Johnston*, 312 U.S. 275, 286 (1941). "If a detainee can

present reasonably available evidence demonstrating there is no basis for his continued

detention, he must have the opportunity to present this evidence to a habeas corpus court."

*Boumediene*, 128 S. Ct. at 2273.

### B.      The Burden of Proof

The government argues that the traditional rule in the post-conviction habeas context is

that the Petitioner bears the burden of proving the detention unlawful (Gov't Br. at 14-15), but,

as stated above, the post-conviction context is inapplicable, as it follows a proceeding in which

the government has already borne its burden of proof beyond a reasonable doubt. *Boumediene*,

128 S. Ct. at 2264. Recognizing that these cases implicate "special circumstances," however, the

government proposes a burden-shifting scheme, including a "presumption in favor of the

government's evidence," based on inapposite *Hamdi* plurality dicta (Gov't Br. at 40 (citing

*Hamdi*, 542 U.S. at 533-34)).[3]

Consistent with the practice of habeas courts in the executive detention context, as

opposed to the post-conviction context, *Boumediene* specifically stated that the government

would bear the burden of establishing the lawfulness of the detention, but left it open for the

---

[3]      The government does not explain what a "presumption in favor of the government's evidence" would mean in practice. Is it a presumption that the government's evidence is authentic? A presumption that its evidence is true, including unsupported conclusions in intelligence reports such as those rejected in *Parhat v. Gates*, __ F. 3d __, 2008 WL 2576977, at *12-13 (D.C. Cir. June 20, 2008? Or does the government seek a presumption in favor of the inferences it chooses to draw from the evidence?

district courts to decide the "*extent* of the showing required of the Government in these cases."
128 S. Ct. at 2271 (emphasis added).  As described in detail in Petitioner's opening brief, three
factors support a heightened burden of proof on the government, requiring it to demonstrate the
factual sufficiency of its evidence by clear and convincing proof.  First, Petitioners are not
collaterally attacking a prior judgment by a court of record, but are challenging, in the first
instance, the executive's unilateral decision to detain.  "In this context, the need for habeas
corpus is more urgent."  *Boumediene*, 128 S. Ct. at 2269; *see also* Pet. Br. at 10-11 and n. 3.
Second, the extent of the liberty deprivation at stake in these cases is severe – measured in terms
of the length of the detention, its indeterminate nature, and its harshness.  *See* Pet. Br. at 11-12.
The Supreme Court has repeatedly held that for similarly-substantial liberty deprivations, the
government has to meet its burden by clear and convincing evidence.  *Id.* (collecting cases).
Finally, as numerous government officials and others have concluded, the Guantanamo prison
camp has housed, and continues to house, many innocent men.  *Id.* at 13-14; *see also*
*Boumediene*, 128 S. Ct. at 2270 (detentions in Guantanamo via CSRT process present
"considerable risk of error").

    Nothing short of a heightened burden of proof in Petitioners' cases could meet the writ's
function to guard against arbitrary deprivations of liberty.  "Within the Constitution's separation-
of-powers in our constitutional structure, few exercises of judicial power are as legitimate or as
necessary as the responsibility to hear challenges to the authority of the Executive to imprison a
person."  *Boumediene*, 128 S. Ct. at 2277.

### C.     Discovery

#### 1.     Discovery is Necessary to Effectuate the Purpose of Habeas Corpus

Contrary to the government's assertion, habeas review is far more than a mere review for legal sufficiency in a proceeding where the petitioner cannot controvert the government's facts (Gov't Br. at 16-17).  Habeas is, and always has been, a searching fact-finding endeavor.[4] Accordingly, factual development, including discovery and the duty to disclose exculpatory evidence, is required.  *Boumediene* reaffirmed the role of discovery as necessary to "preserve the writ and its function."  128 S. Ct. at 2263.

Under the habeas statute, the Court must "summarily hear and determine the facts" and provide the petitioner the opportunity, under oath, to "deny any of the facts set forth in the return or allege any other material facts."  28 U.S.C. § 2243.  Section 2246 grants the Court the authority to consider evidence orally or by deposition, and allows a party to "propound written interrogatories" in response to the introduction of testimony by affidavit.  *See Harris v. Nelson*, 394 U.S. 286, 296 (1969).  As discussed in the Petitioners' opening brief, the Court has the authority to expand discovery beyond what is provided by § 2246 in furtherance of its fact-finding function.  *See* Pet. Br. at 18-22.[5]

---

[4]     Historically, the Judiciary Act of 1789 gave courts authority "to grant writs of habeas corpus for the purpose of an inquiry into the cause of commitment."  1 Stat. 73 at 82.  To accomplish this task, the courts have a "duty … to cause the facts on which they found their sentence or decree, fully to appear upon the record."  1 Stat. at 83.  The Judiciary Act of 1789 further provided, "That the mode of proof by oral testimony and examination of witnesses in open court shall be the same in all the courts of the United States, as well in the trial of causes in equity and of admiralty and maritime jurisdiction, as of actions at common law."  1 Stat. at 88. *See also* Act of Aug. 29, 1842, ch. 257, 5 Stat. 539, 539 (judges "shall proceed to hear the said cause" to determine if it were "duly proved"); Act of Feb. 5, 1867, ch. 28, 14 Stat. 385, 386 (judges "shall proceed in a summary way to determine the facts of the case, by hearing testimony and the arguments of the parties interested").

[5]     Ironically, if the government were correct and § 2241 did not provide the applicable rules, the default would be discovery directly under the civil rules: "These rules apply to

Contrary to the government's position that the executive is entitled to discretion to control the information provided to a Petitioner, *Harris v. Nelson* reaffirms the Court's authority to require that the government produce evidence within its control that bears on the illegality of the detention:

> [W]here specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry. Obviously, in exercising this power, the court may utilize familiar procedures, as appropriate, whether these are found in the civil or criminal rules or elsewhere in the 'usages and principles of law.'

*Harris*, 394 U.S. at 300. The government cannot arrogate to itself authority that is exclusively within the discretion of the Court. *Id.* at 300 n. 7 ("[D]istrict courts have the power to require discovery when essential to render a habeas corpus proceeding effective"). Accordingly, when the Court orders discovery, the executive must provide the requested evidence and may not disregard the order as a "matter of Executive discretion" (Gov't Br. at 18).

Nor does *Harris* conclude that "Federal Rules of Civil Procedure on discovery do not apply to habeas proceedings," (Gov't Br. at 16). To the contrary, *Harris* provides for discovery mechanisms "in which a district court may, in an appropriate case, arrange for procedures which will allow development, for purposes of the hearing, of the facts relevant to disposition of a habeas petition." 394 U.S. at 298. Thus, while the liberal discovery process under the Rules of Civil Procedure may not be generally applicable in the habeas context, discovery is by no means prohibited, as the government suggests. *Harris* recognizes that the Court may use the Rules of

---

proceedings for habeas corpus....to the extent that the practice in those proceedings: (A) is not specified in a federal statute, the Rules Governing Section 2254 Cases, or the Rules Governing Section 2255 Cases; and (B) has previously conformed to the practice in civil actions." Fed.R.Civ.P. 81(a)(4); *accord Woodford v. Garceau*, 538 U.S. 202, 208 (2003) ("The Federal Rules of Civil Procedure apply in the context of habeas suits to the extent they are not inconsistent with the Habeas Corpus Rules").

Civil Procedure "by analogy to existing rules or otherwise in conformity with judicial usage" to "fashion appropriate modes of procedure." *Id.* at 299. In fact, "[w]here their duties require it, this is the inescapable obligation of the courts." *Id.*

### 2. The Government Must Produce Exculpatory Evidence

The government further asserts that the production of exculpatory evidence is a matter of grace, to be provided only if such evidence happens to cross the government attorneys' desks while they are preparing the return. In support of this extreme proposition, the government suggests that the constitutional obligation of *Brady v. Maryland*, 373 U.S. 83 (1963), applies only to criminal trials. In *Boumediene*, however, the Court expressly concluded that in these proceedings the Court must have the opportunity "to consider relevant exculpatory evidence that was not introduced during the earlier proceeding." 128 S. Ct. at 2270.

The government's duty to locate and to disclose exculpatory evidence is grounded in due process. This constitutional imperative cannot be limited only to exculpatory evidence independently obtained and introduced by the Petitioners, but must include evidence in the government's possession. In the context of habeas corpus litigation involving a state conviction, the Supreme Court rejected the proposition that "the prosecution can lie and conceal and the prisoner still has the burden to ... discover the evidence," in "a system constitutionally bound to accord defendants due process." *Banks v. Dretke*, 540 U.S. 668, 696 (2004) (citing *Bracy v. Gramley*, 520 U.S. 899, 909 (1997) (quoting *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14-15 (1926) (internal quotation marks omitted))). Concealing exculpatory evidence undermines the government's role as a seeker of truth. *Banks*, 540 U.S. at 696 (citing *Strickler v. Greene*, 527 U.S. 263, 281 (1999)). The government should not be rewarded for unwarranted

concealment. *Banks,* 540 U.S. at 696 (citing *Kyles v. Whitley,* 514 U.S. 419, 440 (1995) ("The

prudence of the careful prosecutor should not ... be discouraged")).

The government's proposal to provide only that exculpatory evidence its attorneys

happen upon is fundamentally inconsistent with the government's responsibilities in an

adversary proceeding in which such a serious liberty deprivation is at stake. *See, e.g*., *Demjanjuk*

*v. Petrovsky*, 10 F.3d 338, 353 (6th Cir. 1993) (applying *Brady* to civil immigration cases where

the government seeks denaturalization or extradition based on proof of alleged criminal activities

of the party proceeded against).  The Supreme Court made clear that willful blindness is not

sufficient: "the individual prosecutor has a duty to learn of any favorable evidence known to

others acting on the government's behalf in the case." *Kyles*, 514 U.S. at 437. "Because the

prosecution is in a unique position to obtain information known to other agents of the

government, it may not be excused from disclosing what it does not know but could have

learned." *Carriger v. Stewart*, 132 F.3d 463, 480 (9th Cir. 1997) (*en banc*); *see also United*

*States v. Chapman*, __ F.3d __, 2008 WL 1946744, at *10 (9th Cir. May 6, 2008) (holding that

reckless failure to disclose exculpatory information as required by the Constitution may

constitute flagrant misconduct in violation of due process).

An example of the potential importance of discovery of exculpatory information in these

cases occurred several years ago, after the previously classified (now unclassified) interrogation

logs of Guantanamo detainee Mohamed al Qahtani were leaked to Time Magazine.  The

disturbing logs reveal seven weeks' worth of humiliating treatment, sleep deprivation, and a

variety of "enhanced interrogation techniques" during late 2002 and early 2003.[6]  Qahtani

subsequently incriminated a number of prisoners at Guantanamo, and his statements constitute a

---

[6]      *See* Interrogation Log: Detainee 063, *available at* http://ccrjustice.org/files/Publication_
AlQahtaniLog.pdf.

significant portion of the government's factual returns for many of the habeas petitioners. By the Pentagon's own assertion, Qahtani has "[p]rovided detailed information about 30 of Osama Bin Laden's bodyguards who are also held at Guantanamo."[7]

The factual returns for the habeas petitioners, however, did not include a single reference to the Qahtani interrogation logs, or to the fact that he had named so many of them during his coercive interrogations. The factual returns likewise made no reference to another document, procured by the ACLU pursuant to the Freedom of Information Act, in which an FBI deputy director complained to the Pentagon that Qahtani had been held in isolation for months, and that, by November 2002, he was "evidencing behavior consistent with extreme psychological trauma (talking to non-existent people, crouching in a corner of the cell covered with a sheet for hours on end)."[8] The letter and the interrogation logs, of course, undermine the reliability of any statements made by Qahtani. Counsel for petitioners, however, are privy to this information only by the fortuity of a classified document which was leaked to the press and by the military's response to a FOIA request made by a non-party. Without the opportunity to take discovery, similar revelatory documents and information would never come to light.

This is by no means a unique example. In the case of detainee Faruq Ali Ahmed, No. 04-cv-1254 (HHK), for example, in a rare statement in Petitioner Ahmed's unclassified return, his personal representative indicates that a detainee who had made incriminating statements against Petitioner Ahmed was "unreliable" and "has lied about other detainees to receive preferable treatment." *See* Brief for Former Federal Judges as Amici Curiae Supporting Petitioners,

---

[7]     U.S. Dep't of Defense News Release, Guantanamo Provides Valuable Intelligence Information, June 12, 2005, *available at* http://www.defenselink.mil/releases/release.aspx?releaseid=8583.

[8]     Letter from T.J. Harrington, Deputy Director of FBI Counterterrorism Division, to Major General Donald J. Ryder, Department of the Army, July 14, 2004.

*Boumediene v. Bush*, 128 S. Ct. 2229 (2008) (Nos. 06-1195, 06-1196), 2007 WL 2441585, at *25; Corine Hegland, *Guantánamo's Grip*, Nat'l Journal, Feb. 3, 2006.[9] Because the personal representative does not identify who the detainee is or what he has lied about before, Petitioner Ahmed would not be able to challenge the relevance and credibility of this evidence which comprises the bulk of the allegations against him without first receiving appropriate discovery.

## D.    Hearsay

The government objects that an evidentiary hearing with live witnesses would conflict with this Court's obligation to adjudicate these cases expeditiously and, therefore, argues for unrestricted admission of hearsay. *See* Gov't Br. at 32. Of course, the fastest way to decide the cases would be to flip a coin. The government's proposal to decide the cases based on hearsay alone amounts to little more than that, because it leaves the Court with little means of weighing one piece of evidence against another. But the clear import of *Boumediene* is not just that the Court will adjudicate the cases promptly, but that it will seek the truth. *See* 128 U.S. at 2269 ("The habeas court must have sufficient authority to conduct a meaningful review of both the cause for detention and the Executive's power to detain"). The government's proposal to decide virtually all cases based on hearsay alone is not what the Supreme Court expected for this Court's fulfillment of its truth-seeking role.[10]

---

[9]    Ahmed's personal representative, a lieutenant colonel in the Army, wrote in a partially redacted statement, "I do feel with some certainty that ISN [redacted] has lied about other detainees to receive preferable treatment and to cause them problems while in custody. Had the Tribunal taken this evidence out as unreliable, then the position we have taken is that a teacher of the Koran (to the Taliban's children) is an enemy combatant (partially because he slept under a Taliban roof)."

[10]    As noted earlier, some, if not many, of these cases may be decided without the need for discovery or hearings because, as in *Parhat*, 2008 WL 2576977, the evidentiary support for detention will be deficient on its face.

The government argues repeatedly that this Court should implement a "prudent and incremental" approach to admission of evidence (*see* Gov't Br. at 1, 2, 3, 25, 29, 30, 31, and 32), but the approach it suggests involves nothing short of casting out the rulebook and centuries of judicial experience. It would be neither prudent nor incremental to accept hearsay evidence in violation of the Rules of Evidence without at least considering whether a particular declarant is available to testify in person, and without demanding sufficient information to assess the reliability of the hearsay, including the circumstances in which it was obtained. As Judge Traxler explained in *Al-Marri*, a prudent and incremental approach would entitle a Petitioner "to the normal due process protections available to all within this country, including an opportunity to confront and question witnesses against him," and alternatives will be considered only on the basis of a government showing of a particular necessity. *Al-Marri*, 2008 WL 2736787 at *49 (Traxler, J., concurring). The Court "is not handcuffed by an inflexible procedure that would demand acceptance of a hearsay declaration from the government simply because the government has labeled [the petitioner] an enemy combatant." *Id.* at *48.

As set forth in Petitioners' opening brief, the analysis of the admissibility of hearsay must begin with the Federal Rules of Evidence, which are applicable by their terms to habeas corpus cases. Fed R. Evid. 1101(e). The government barely mentions those Rules, and fails to acknowledge their applicability in habeas cases at all. The government also does not discuss the application of the procedures under 28 U.S.C. § 2246, under which the Court has discretion to admit affidavits in habeas corpus cases, but only if the opposing party is given the opportunity to serve interrogatories or obtain an answering affidavit.

Instead, the government rests virtually its entire argument on a single ambiguous line of dicta in the *Hamdi* plurality opinion stating merely that hearsay "may need to be accepted as the

most reliable available evidence ....." *See* Gov't Br. at 36 (quoting *Hamdi*, 542 U.S. at 533-34).

From this seemingly innocuous acknowledgment that there are cases in which hearsay can be

admitted if it is shown to be necessary and to have a high degree of reliability (*see, e.g.,* Fed. R.

Evid. 807), the government seeks to establish the proposition that *all* hearsay *must* be admitted,

regardless of its reliability. *See* Gov't Br. at 39 ("Exclusion of hearsay ... would serve no useful

purpose").

The government correctly notes that the *Hamdi* plurality's statement "does not set forth a

standard of admissibility ....." *See id.* at 36. There was no need for *Hamdi* to set forth a

standard of admissibility. That has already been done in the Federal Rules of Evidence and 28

U.S.C. § 2246. Hearsay is admissible in certain contexts, such as under Fed. R. Evid. 807, which

permits use of hearsay with circumstantial guarantees of trustworthiness if the requisite elements

are present. And affidavits may be accepted in habeas cases in the Court's discretion, so long as

the procedures in § 2246 are applied. But the Court should not accept unreliable hearsay, such as

statements obtained through use of torture or other coercive techniques, and the Court should not

accept hearsay when sufficient information is not provided to evaluate the reliability of the

statements and the contexts in which they were obtained. *See, e.g., Parhat v. Gates*, 2008 WL

2576977, at *12-13 (rejecting use of hearsay lacking indicia of reliability). The Court would

abandon its duty to exercise its discretion if it were to allow all hearsay without requiring at least

a particularized showing that the declarant is not available to testify and the hearsay statement

has circumstantial guarantees of trustworthiness.

### E.    Confrontation of Witnesses

The most effective method of testing the reliability of evidence is cross-examination. As

stated above, Petitioners acknowledge that hearsay may be admissible in certain narrow contexts

if sufficient circumstantial guarantees of trustworthiness are shown to exist. But the baseline assumption, applying a prudent and incremental approach, should be that evidence will be given by witnesses subject to cross-examination. *See Al-Marri*, 2008 WL 2736787 at *49 (Traxler, J., concurring). A party seeking to admit hearsay should face a heavy burden to show that it is both necessary and reliable. Contrary to the government's assertion, the right to confrontation is not limited to the criminal context. *See* Pet. Br. at 33-34 (citing cases).

The government disingenuously raises the specter that a rule allowing confrontation of witnesses would allow Petitioners to "haul United States servicemembers away from the battlefield." *See* Gov't Br. at 33. The government's statement is completely divorced from any actual evidence or event, and it shows exactly why context matters. The Court should not entertain the government's abstract scenario. The sky will not fall if the Court does what courts do every day, which is to decide matters on the law and the facts, not on speculation or innuendo, and to determine along the way whether and which live witnesses will be necessary, and whether they are available, in a specific factual context. As the government well knows, few Petitioners were captured on any battlefield or amidst the "rubble of war." *See supra* part I.B. Indeed, because only an even smaller fraction of the Petitioners were captured by U.S. forces, it is unlikely that U.S. troops will be burdened in any significant way. *See id.* Moreover, most Petitioners were taken into custody years ago. It is unlikely that any witnesses with relevant information will be on a battlefield almost seven years later.

In those cases in which hearings are necessary to resolve factual disputes, compelling the attendance of witnesses and confrontation through cross-examination will be necessary in most cases to reduce the "considerable risk of error" that accompanies summary procedures without proper mechanisms to test critical evidence. *See Boumediene*, 128 S. Ct. at 2270. The

government concedes the necessity of evaluating the weight that its hearsay evidence should be given. *See* Gov't Br. at 39. But it suggests no mechanism for making such an evaluation without the context in which the statements were made – such as inquiry into the declarant's personal knowledge, recollection, opportunity to observe, or motive to lie, including for the purpose of avoiding torture or threats or to curry favor with military authorities. Cross-examination is the means by which evidence is ordinarily evaluated, and one cannot cross-examine an anonymous intelligence report. *See, e.g., Parhat*, 2008 WL 2576977, at *12-13 (rejecting use of anonymous intelligence reports).

The government notes that "the costs of an erroneous determination against the Government … are grave." Gov't Br. at 40. Clearly, the costs of an erroneous determination against a detainee are at least as grave -- the Petitioners' prolonged confinement is real, and denial of the habeas petition could mean confinement for the indefinite future. But even taking the government's concerns at face value, the weighty issues before this Court do not justify a process based upon unreliable evidence. The Court's role is to ensure a fair process to seek the truth, not to guarantee a result in favor of one party or the other. Indeed, the gravity of the matters before the Court is all the more reason to insist scrupulously that the cases be decided only on reliable, testable evidence. The scope of the constitutional due process right to confront witnesses depends on the facts of individual cases. *See Gagnon v. Scarpelli*, 411 U.S. 778, 786 (1973); *Morrissey v. Brewer*, 408 U.S. 471, 478 (1972). A "prudent and incremental" approach cannot permit abandonment of this principle.

## CONCLUSION

For the reasons stated, this Court should resist the temptation to establish a rigid, inflexible procedure unconnected to the facts and circumstances of individual cases. The Court

should also reject the government's insistence on one-sided rules that strip the Court of its fact-finding tools such as evidentiary hearings, discovery, and cross-examination.  Petitioners request this Court to adopt the framework set forth in Petitioners' opening brief, order the government to produce exculpatory evidence, and leave other procedural issues to be decided by individual judges based on the facts of their particular cases.

August 1, 2008                                    Respectfully submitted,


                                                  _____/s/ mjm_____
                                                  David J. Cynamon (D.C. Bar No. 182477)
                                                  Matthew J. MacLean (D.C. Bar No. 479257)
                                                  PILLSBURY WINTHROP SHAW PITTMAN LLP
                                                  2300 N Street, N.W.
                                                  Washington, DC 20037
                                                  Tel: (202) 663-8000
                                                  Fax: (202) 663-8007

                                                  Shayana D. Kadidal (D.C. Bar No. 454248)
                                                  J. Wells Dixon
                                                  Emi MacLean
                                                  CENTER FOR CONSTITUTIONAL RIGHTS
                                                  666 Broadway, 7th Floor
                                                  New York, NY 10012
                                                  Tel: (212) 614-6438
                                                  Fax: (212) 614-6499

                                                  Baher Azmy
                                                  SETON HALL LAW SCHOOL
                                                  Center for Social Justice
                                                  One Newark Center
                                                  Newark, NJ 07102
                                                  Tel: (973) 642-8700

                                                  *On behalf of Petitioners*